## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| CITY OF MIAMI GENERAL EMPLOYEES' & SANITATION EMPLOYEES' RETIREMENT TRUST, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GLOBE LIFE INC. f/k/a TORCHMARK CORPORATION, GARY L. COLEMAN, LARRY M. HUTCHISON, FRANK M. SVOBODA, M. SHANE HENRIE, JAMES MATTHEW DARDEN, and THOMAS P. KALMBACH,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED** |

Plaintiff City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami" or "Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Globe Life Inc. f/k/a Torchmark Corporation ("Globe Life" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) press releases, presentations, and media reports issued and disseminated by the Company; (c) analyst and media reports concerning Globe Life; and (d) other public information regarding the Company.

## INTRODUCTION

1. This securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired shares of Globe Life common stock between May 8, 2019, and

April 10, 2024, inclusive (the "Class Period").  The claims asserted herein are alleged against Globe Life and certain of the Company's current and former senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.      Headquartered in McKinney, Texas, Globe Life is an insurance company that offers a wide range of insurance products, including life insurance, mortgage protections, and supplemental health insurance.  Globe Life operates five wholly owned insurance subsidiaries. The largest, by both premiums collected and number of sales agents employed, is American Income Life Insurance Company ("AIL").

3.      Throughout the Class Period, Globe Life touted its consistent revenue growth, particularly from AIL, which accounted for 50% of the Company's profits in 2022 and 2023. During the Class Period, Globe Life reported consistent premium revenue growth at the Company, led by consistent premium revenue growth at AIL.  The Company also represented that its employees adhered to a Code of Conduct that expressly prohibited various forms of misconduct, and which required that all Globe Life employees comply with relevant laws and regulations, purportedly ensuring that the Company would maintain a workplace free from violence, threatening behavior, and illegal drugs.  As a result of Defendants' misrepresentations, shares of Globe Life common stock traded at artificially inflated prices throughout the Class Period.

4.      The truth emerged on April 11, 2024, when investment research firm *Fuzzy Panda* published a report alleging that Globe Life had engaged in wide-spread insurance fraud, while permitting a culture of unchecked sexual harassment.  Specifically, the report alleged that several Globe Life subsidiaries were underwriting policies for dead and fictitious people, as well as adding policies to existing users' accounts without their consent.  In addition, the investment research firm

uncovered evidence that the subsidiaries maintained a hostile workplace where sexual harassment, drug use, and sexual assault went unchecked — conduct that violated the Company's Code of Conduct.  As a result of these disclosures, the price of Globe Life common stock declined $55.76, or 53%, from a closing price of $104.93 per share on April 10, 2024, to a closing price of $49.17 per share on April 11, 2024.

**JURISDICTION AND VENUE**

5.      The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Globe Life maintains its headquarters in McKinney, Texas, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

**A.      Plaintiff**

7.      Plaintiff Miami is a government entity that was founded in 1985 to provide benefits—including retirement, death, and disability benefits—to eligible employees of the government of the City of Miami, Florida.  As indicated on the Certification submitted herewith,

Miami purchased Globe Life common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.    Defendants**

8.    Defendant Globe Life is incorporated in Delaware and maintains its corporate headquarters at 3700 South Stonebridge Drive, McKinney, Texas.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "GL."  As of January 31, 2024, Globe Life had over 93 million shares of common stock outstanding, owned by hundreds or thousands of investors.

9.    Defendant Gary L. Coleman ("Coleman") served as co-Chief Executive Officer of the Company from June 2012 until December 31, 2022.  Coleman also served as a member of the Company's Board of Directors from August 2012 until April 2023, and served as co-Chairman of the Company's Board of Director from April 2014 until April 2023.

10.    Defendant Larry M. Hutchison ("Hutchison") served as co-Chief Executive Officer of the Company from June 2012 until December 31, 2022.  Hutchison also served as a member of the Company's Board of Directors from August 2012 until April 2023, and served as co-Chairman of the Company's Board of Director from April 2014 until April 2023.

11.    Defendant Frank M. Svoboda ("Svoboda") served as Executive Vice President and Chief Financial Officer of the Company from June 2012 until January 1, 2023.  Svoboda has served as Globe Life's co-Chief Executive Officer since January 1, 2023.

12.    Defendant M. Shane Henrie ("Henrie") has served as the Corporate Senior Vice President and Chief Accounting Officer of Globe Life since November 2019.

13.    Defendant James Matthew Darden ("Darden") has served as Globe Life's Co-Chief Executive Officer since January 1, 2023.

14.    Defendant Thomas P. Kalmbach ("Kalmbach") has served as Globe Life's

4

Executive Vice President and Chief Financial Officer since January 1, 2023.

15.     Defendants Coleman, Hutchison, Svoboda, Henrie, Darden, and Kalmbach are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Globe Life, possessed the power and authority to control the contents of the Company's reports to the SEC and other public statements made by Globe Life during the Class Period.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports or other statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## BACKGROUND

16.     Globe Life is an insurance company offering a wide range of insurance products, including low-cost life insurance policies that offer comparatively lower payouts.  Globe Life operates through five wholly owned insurance subsidiaries, which in turn operate agencies located across the country.

17.     AIL is the largest of Globe Life's subsidiaries, by both premiums collected and number of sales agents employed.  Throughout the Class Period, AIL accounted for approximately one third of Globe Life's total premiums, and nearly half of its total underwriting profits.

18.     Globe Life agents are compensated based on the number of life insurance policies they sell.  During the Class Period, Globe Life made a substantial change to how compensation was paid: instead of bonuses being paid out at the end of the year, the Company began front loading the payment of sales commission bonuses, which meant that agents would receive their bonus for

a new policy in their very next paycheck.  At the same time, Globe Life instituted a claw back policy, whereby an agent would have to pay back any bonus received on a policy that was cancelled within a certain number of months.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

19.     On May 7, 2019, after the market closed, the Company filed with the SEC on Form 10-Q its quarterly report for the first quarter of 2019.  The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda attesting to the purported accuracy and completeness of the 10-Q.  In that 10-Q, Defendants represented that "[t]otal premium income rose 5% for the three months ended March 31, 2019 to $891 million.  Total net sales increased 4% to $144 million . . . [t]otal first-year collected premium was $118 million."  Defendants also represented "[l]ife insurance premium income increased 4% to $624 million over the prior year total of $598 million.  Life net sales rose 4% to $105 million for the three month period of 2019.  First-year collected life premium rose 2% to $81 million . . . [u]nderwriting income increased to $170 million for the first three months of 2019, 10% over the same period in 2018."  Defendants also reported life insurance premiums by distribution channel, and reported that AIL generated nearly $282 million in life insurance premiums, and made up 45% of the Company's 2019 year-to-date total life premiums, a 7% increase over the prior year.  That 10-Q also reported net sales by distribution channel, and represented that AIL had over $57.5 million in net sales, making up 54% of the Company's total net sales.  The 10-Q also reported first year collected premiums by distribution channel, and represented that AIL had nearly $47.5 million in first year collected premiums, making up 58% of the Company's total first year collected premiums.

20.     The Class Period begins on May 8, 2019, the first day of trading after the Company

reported its financial results for the first quarter of 2019.

21.     On July 25, 2019, the Company held a conference call with analysts and investors to discuss the Company's earnings and operations for the second quarter of 2019.  On that call, Defendant Coleman stated, "[i]n our life insurance operations, premium revenue increased 5% to $631 million; and life underwriting margin was $175 million, up 9% from a year ago."  On the same call, Defendant Hutchison stated, "[a]t [AIL], life premiums were up 7% to $288 million and life underwriting margin was up 9% to $97 million.  Net life sales were $61 million, up 2%."

22.     Throughout the Class Period, Globe Life maintained a Code of Business Conduct and Ethics (the "Code of Conduct").  On August 5, 2019, the Company published its Code of Conduct on the Company's website.  The Code of Conduct stated, "[t]his Code of Conduct expresses the standards of integrity and business conduct that every Company employee, contractor, officer, and director must uphold and follow" and that the Code of Conduct "has been formally adopted by . . .  each of [Globe Life's] subsidiaries."  The Code of Conduct represented that everyone is "expected to understand, respect and comply, in letter and spirit, with all of the laws, rules, and regulations that apply to them in their respective positions at the Company."  The Code of Conduct also assured, "[t]he Company is committed to providing an inclusive and welcoming environment" and "to ensuring that employment, promotion, and workplace advancement decisions are based on the individual's abilities and qualifications."  The Code of Conduct further committed that "[v]iolence and threatening behavior are not permitted" and that "[t]he use of illegal drugs in the workplace will not be tolerated."

23.     On August 8, 2019, Globe Life filed with the SEC on Form 10-Q its quarterly report for the second quarter of 2019.  The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda attesting

to the purported accuracy and completeness of the 10-Q.  That 10-Q stated that, for the three months ended June 30,2019, Globe Life's life insurance premium revenue was $631 million.  For AIL specifically, Globe Life reported that "during the six months ended June 30, 2019 . . . [n]et sales increased 3% to $119 million in 2019 over the 2018 total of $115 million."

24.      On August 30, 2019, Globe Life published its Environmental, Social & Governance Report for 2018 (the "2018 ESG Report").  In the 2018 ESG Report, Globe Life stated, "[o]ur Code of Conduct expresses the standards of integrity and business conduct that every company employee, contractor, officer and director must uphold and follow" and that "[t]he Company is committed to providing an inclusive and welcoming environment for all members and our community."  The 2018 ESG Report went on to state, "Non-Discrimination and Anti-Harassment Policy:  Globe Life is committed to a work environment in which all individuals are treated with respect and dignity.  Each individual has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits discriminatory practices, including harassment.  Therefore, Globe Life expects that all relationships among persons in the workplace will be professional and free of bias, prejudice and harassment."  The 2018 ESG Report also stated, "Globe Life prohibits and will not tolerate any such discrimination or harassment."

25.      On October 24, 2019, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the third quarter of 2019.  On that call, Defendant Coleman stated "[i]n [the Company's] Life insurance operations, premium revenue increased 4% to $631 million, and life underwriting margin was $181 million, up 8% from a year ago.  Growth in underwriting margin exceeded premium growth due to higher margin percentages in all distribution channels."  In addition, Defendant Hutchison stated, "[a]t [AIL], life premiums were up 7% to $293 million; and life underwriting margin was up 9% to $100 million.  Net life

sales were $60 million, up 9%.  The sales growth was driven primarily by agent count growth."

26.     On November 12, 2019, Globe Life filed with the SEC on Form 10-Q its quarterly report for the third quarter of 2019.  The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.  That 10-Q stated that, for the three months ended September 30, 2019, Globe Life's life insurance premium revenue was $631 million.  For AIL specifically, Globe Life stated that, for the nine months ended September 30, 2019, AIL's "net sales increased 5% to $178 million in 2019 over the 2018 total of $169 million."

27.     On February 5, 2020, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourth quarter and full year of 2019.  On that call, Defendant Coleman stated, "[i]n our Life Insurance operations, premium revenue increased 5% to $631 million and life underwriting margin was $177 [million], up 6% from a year ago."  On that same call, Defendant Hutchison stated, "[a]t [AIL], life premiums were up 8% to $297 million and life underwriting margin was up 9% to $98 million.  Net life sales were $59 million, up 9% . . . Net life sales for the full year 2019 grew 6%.  The sales increase was driven by increases in agent count."

28.     On February 27, 2020, Globe Life filed with the SEC on Form 10-K its annual report for the fourth quarter and full year 2019.  The 10-K was signed by Defendants Coleman, Hutchison, Svoboda, and Henrie, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-K.  That 10-K stated that, for the year ended December 31, 2019, Globe Life's life insurance underwriting margin was $703 million, while total net sales increased 6% to $621 million, when compared to the same period in 2018.  For AIL specifically, Globe Life stated that, for the full year 2019, AIL's life

insurance "[n]et sales increased to $238 million in 2019 over the 2018 total of $224 million."

29.     On April 23, 2020, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the first quarter of 2020.  On that call, Defendant Coleman stated, "[i]n our life insurance operations, premium revenue increased 4% to $650 million, and life underwriting margin was $179 million, up 5% from a year ago."

30.     On May 7, 2020, Globe Life filed with the SEC on Form 10-Q its quarterly report for the first quarter of 2020.  The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.  That 10-Q stated, for the three months ended March 31, 2020, Globe Life's life premium was $649.6 million, while the Company's life insurance underwriting margin was $179 million.  For AIL specifically, for the three months ended March 31, 2020, AIL's life insurance premium was $302 million, and "[n]et sales increased 9% to $63 million in 2020 over the 2019 total of $58 million."

31.     On July 23, 2020, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the second quarter of 2020.  On that call, Defendant Coleman stated, "[i]n life insurance operations, premium revenue increased 6% to $671 million . . . [w]ith respect to the premium revenue, we've been very pleased to see the persistency and premium collections improved since the onset of the [Covid-19] crisis."  On that same call, Defendant Hutchison stated, "[a]t [AIL], life premiums were up 7% to $309 million . . . [and] while life sales were down for the quarter, we have seen an increase in agent[s] and activity.  The rise in activity is not reflected in the second quarter sales where the increased time for policies to be issued resulting from changes in our underwriting procedures."

32.     On August 6, 2020, Globe Life filed with the SEC on Form 10-Q its quarterly report

for the second quarter of 2020.  The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.  That 10-Q stated, for the three months ended June 30, 2020, Globe Life's life premium was $670 million.  For AIL specifically, for the six months ended June 30, 2020, AIL's life insurance premium was $612 million, and "[n]et sales declined 4% to $114 million during the first six months of 2020 over the 2019 total for the same period of $119 million."

33.     On October 9, 2020, Globe Life published its Environmental, Social & Governance Report for 2019 (the "2019 ESG Report").  The 2019 ESG Report again reiterated that the "Code of Conduct expresses the standards of integrity and business conduct that every employee, contractor, officer, and director must uphold and follow."  The 2019 ESG Report also stated that "all employees are required to take annual training on our Code of Conduct."  In addition, the 2019 ESG Report stated that "[v]iolence and threatening behavior are not permitted."  The 2019 ESG Report also included a link to Globe Life's Code of Conduct, thereby incorporating by reference the Company's representations in its Code of Conduct, as set forth in ¶22.

34.     On October 22, 2020, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the third quarter of 2020.  On that call, Defendant Coleman stated, "[i]n our life insurance operations, premium revenue increased 7% to $674 million . . . [w]ith respect to the premium revenue, we've been pleased to see the persistency and premium collections improved since the onset of the [Covid-19] crisis."  In addition, Defendant Hutchison stated, "[a]t [AIL], life premiums were up 9% to $319 million . . . net life sales were $68 million, up 14%.  The increase in net life sales is primarily due to increased agent count."

35.     On November 5, 2020, Globe Life filed with the SEC on Form 10-Q its quarterly report for the third quarter of 2020.  The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.  That 10-Q stated that, for the three months ended September 30, 2020, Globe Life's life insurance premium was $674 million,.  For the nine months ended September 30, 2020, Globe Life's life insurance underwriting margin was $511 million.  For AIL specifically, Globe Life reported, for the nine months ended September 30, 2020, AIL's life insurance premium was $930 million, and "[n]et sales increased 2% to $182 million during the first nine months of 2020 over the 2019 total for the same period of $178 million."

36.     On February 3, 2021, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourth quarter and full year 2020.  On that call, Defendant Coleman stated, "[i]n our life insurance operations, premium revenue increased 7% to $678 million.  As noted before, we have seen improved persistency and premium collections since the onset of the [Covid-19] crisis."  In addition, Defendant Hutchison stated "[a]t [AIL], life premiums were up 10% to $327 million, and life underwriting margin was up 7% to $105 million.  Net life sales were $71 million, up 20%.  The increase in net life sales is primarily due to increased agent count."

37.     On February 25, 2021, Globe Life filed with the SEC on Form 10-K its annual report for the fourth quarter full year 2020.  The 10-K was signed by Defendants Coleman, Hutchison, Svoboda, and Henrie, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-K.  That 10-K stated that, for the year ended December 31, 2020, Globe Life's "[t]otal net sales increased 7% over the

same period in the prior year from $621 million to $662 million," while its life insurance underwriting margin was $675 million.  For AIL specifically, Globe Life reported, for the year ending 2020, AIL's life insurance premium was $1.3 billion, and " [n]et sales increased 7% to $253 million in 2020 over the 2019 total of $238 million."

38.     On April 22, 2021, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the first quarter of 2021.  On that call, Defendant Coleman stated, "[i]n the life insurance operations, premium revenue increased 9% to $708 million."  In addition, Defendant Hutchison stated, "[a]t [AIL], life premiums were up 11% to $335 million . . . Net life sales were $70 million, up 11%.  The increase in net life sales is primarily due to increased agent count."

39.     On May 6, 2021, Globe Life filed with the SEC on Form 10-Q its quarterly report for the first quarter of 2021.  The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.  That 10-Q stated, for the three months ended March 31, 2021, Globe Life's life insurance premium was $708 million, and that, when comparing the first quarter 2021 with the same period in 2020 "life premium increased 9% for the period from $650 million in 2020 to $708 million in 2021."  For AIL specifically, Globe Life stated that, for the three months ended March 31, 2021, AIL's life insurance premium was $335 million, and "[n]et sales increased 11% to $70 million during the first three months of 2021 over the 2020 total for the same period of $63 million."

40.     On July 22, 2021, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the second quarter of 2021.  On that call, Defendant Coleman stated, "[i]n our life insurance operations, premium revenue increased 9%

from the year ago quarter to $728 million . . . Life underwriting margin was $179 million, up 11% from a year ago.  The increase in margin is due primarily to the higher premium and lower amortization related to the improved persistency."  In addition, Defendant Hutchison stated, "[a]t [AIL], life premiums were up 13% over the year-ago quarter to $348 million and life underwriting margin was up 16% to $108 million, a higher underwriting margin is primarily due to improved persistency and higher sales in recent quarters . . . [i]n the second quarter of 2021 net life sales were $73 million, up 42%.  The increase in net life sales is primarily due to increased agent count and productivity."

41.     On August 5, 2021, Globe Life filed with the SEC on Form 10-Q its quarterly report for the second quarter of 2021.  The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.  That 10-Q stated, for the three months ended June 30, 2021, Globe Life's life insurance premium was $728 million, and that, for the six months ended June 30, 2021, "[t]otal net sales increased 15% to $347 million, when compared with the same period in 2020."  For AIL specifically, Globe Life stated, for the six months ended Juned 30, 2021, AIL's life insurance premiums were $683 million, and that "[n]et sales increased 25% to $143 million during the first six months of 2021 over the 2020 total for the same period of $114 million."

42.     On September 3, 2021, Globe Life published its Environmental, Social & Governance Report for 2020 (the "2020 ESG Report").  The 2020 ESG Report contained the same representations regarding the Company's Code of Conduct contained in the 2019 ESG Report, as set forth in ¶33.  The 2020 ESG Report also included a link to Globe Life's Code of Conduct, thereby incorporating by reference the Company's representations in its Code of Conduct, as set

forth in ¶22.

43.     On October 21, 2021, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the third quarter of 2021.  On that call, Defendant Coleman stated, "[i]n our life insurance operations, as we've noted before, we have seen improved persistency since the onset of the pandemic.  In the third quarter, life premium revenue increased 8% from a year ago to $729 million."  In addition, Defendant Hutchison stated "[a]t [AIL], life premiums were up 12% over the year-ago quarter to $356 million, and life underwriting margin was up 11% to $111 million.  The higher underwriting margin is primarily due to improved persistency and higher sales in recent quarters.  In the third quarter of 2021, net life sales were $74 million, up 9%.  The increase in net life sales is primarily due to increased agent count."

44.     On November 4, 2021, Globe Life filed with the SEC on Form 10-Q its quarterly report for the third quarter of 2021.  The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.  That 10-Q stated, for the three months ended September 30, 2021, Globe Life's life insurance premium was $729 million, and that, for the nine months ended September 30, 2021, "[t]otal net sales increased 9% to $518 million, when compared with the same period in 2020."  For AIL specifically, Globe Life stated, for the nine months ended September 30, 2021, AIL's life insurance premiums were $1.03 billion, and that "[n]et sales increased 19% to $217 million during the first nine months of 2021 compared with $182 million in 2020 for the same period."

45.     On February 3, 2022, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourth quarter and full year 2021.  On

that call, Defendant Coleman stated, "[i]n our life insurance operations, we continue to see improved persistency compared to pre-pandemic levels.  In the fourth quarter, premium revenue increased 8% from a year ago to $733 million."  In addition, Defendant Hutchison stated "[a]t [AIL], life premiums were up 11% over the year ago quarter to $364 million . . . Higher premium is primarily due to improved persistency and higher sales in recent quarters.  In the fourth quarter 2021, net life sales were $74 million, up 4%.  The increase in net life sales is due to increased productivity."

46.     On February 24, 2022, Globe Life filed with the SEC on Form 10-K its annual report for the fourth quarter and full year 2021.  The 10-K was signed by Defendants Coleman, Hutchison, Svoboda, and Henrie, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-K.  That 10-K stated, comparing year-to-date 2021 with 2020, Globe Life's "[l]ife premium increased 8% for the period from $2.7 billion in 2020 to $2.9 billion in 2021."  For the full year 2021, Globe Life reported  life insurance underwriting margin of $624 million.  For AIL specifically, Globe Life stated, for the full year 2021, AIL's life insurance premium was $1.4 billion, and [n]et sales increased 15% to $291 million in 2021 over the 2020 total of $253 million.  The increase in net life sales is due to increased productivity [as] well as an increase in agent count."

47.     On April 15, 2022, Globe Life published its Environmental, Social & Governance Report for 2021 (the "2021 ESG Report").  The 2021 ESG Report contained the Company's "Code of Ethics", which included the same representations regarding the Company's Code of Conduct contained in the 2019 ESG Report, as set forth in ¶33.  The 2021 ESG Report also included a link to Globe Life's Code of Conduct, thereby incorporating by reference the Company's representations in its Code of Conduct, as set forth in ¶22.

48.     On April 21, 2022, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the first quarter of 2022.   On that call, Defendant Coleman stated, "[i]n our life insurance operations, premium revenue increased 7% from a year ago to $755 million, life underwriting margin was $150 million up 10% from a year ago.   The increase in margin is due primarily to increased premium."   In addition, Defendant Hutchison stated "[a]t [AIL], premiums were up 10% over the year ago quarter to $370 million and life underwriting margin was up 13% to $111 million.   The higher premium is primarily due to higher sales in recent quarters.   In the first quarter of 2022, net life sales were $85 million, up 23%.   The increase net life sales is due [in part] to increased productivity."

49.     On May 6, 2022, Globe Life filed with the SEC on Form 10-Q its quarterly report for the first quarter of 2022.   The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.   That 10-Q stated that, for the three months ended March 31, 2022, Globe Life's life insurance premiums were $755 million, and "[t]otal net sales increased 8% to $182 million, when compared with 2021."   For AIL specifically, Globe Life stated, for the three months ended March 31, 2022, AIL's life insurance premium was $370 million, and "[n]et sales increased 23% to $85 million during the first three months of 2022 compared with $70 million in 2021 for the same period."

50.     On July 28, 2022, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the second quarter of 2022.   On that call, Defendant Coleman stated, "[i]n life insurance operations, premium revenue increased 4% from the year-ago quarter to $760 million.   Life underwriting margin was $198 million, up 11% from a year ago.   The increase in margin is due primarily to increased premium."   In addition, Defendant

Hutchison stated "[a]t [AIL], life premiums were up 8% over the year-ago quarter to $376 million, and life underwriting margin was up 19% to $128 million . . . In the second quarter of 2022, net life sales were $85 million, up 16%."  In response to an analyst question about policy persistency, Defendant Coleman stated "it's reasonable to think that inflation could be affecting persistency" as well as "the end of the government COVID relief payments is less income in the hands of our policyholders.  That could have an impact.  And also, we think we're seeing a little bit of impact of some insure[d]s feeling like they . . . no longer need the coverage."  Defendant Coleman went on to state "I do want to emphasize that we're not concerned about having adverse persistency . . . it getting worse . . . at this point, we don't see anything to indicate that that's going to be an ongoing increase in lapses."

51.     On August 5, 2022, Globe Life filed with the SEC on Form 10-Q its quarterly report for the second quarter of 2022.  The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.  That 10-Q stated, for the three months ended June 30, 2022, Globe Life's life insurance premium was $760 million, and that, for the six months ended June 30, 2022, [t]otal net sales increased 5% to $366 million, when compared with 2021."  For AIL specifically, Globe Life stated, for the six months ended June 30, 2022, AIL's life insurance premium was $746 million, and "[n]et sales increased 19% to $171 million during the first six months of 2022 compared with $143 million in 2021 for the same period."

52.     On October 27, 2022, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the third quarter of 2022.  On that call, Defendant Coleman stated, "[i]n the life insurance operations, premium revenue increased 4% from the year-ago quarter to $755 million.  Life underwriting margin was $208 million, up 28%

from the year ago."  In addition, Defendant Hutchison stated "[l]ooking at the quarter, at [AIL], life premiums were up 6% over the year-ago quarter to $378 million, and life underwriting margin was up 16% to $128 million . . . In the third quarter of 2022, net life sales were $76 million, up 4%."

53.     On November 8, 2022, Globe Life filed with the SEC on Form 10-Q its quarterly report for the third quarter of 2022.  The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.  That 10-Q stated, for the three months ended September 30, 2022, Globe Life's life insurance premium was $755 million, and, for the nine months ended September 30, 2022, "[t]otal net sales increased 4% to $539 million, when compared with 2021."  For AIL specifically, Globe Life stated, for the nine months ended September 30. 2022, AIL's life insurance premium was $1.12 billion, and "[n]et sales increased 14% to $247 million during the first nine months of 2022 compared with $217 million in 2021 for the same period."

54.     On February 2, 2023, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourth quarter and full year 2022.  On that call, Defendant Svoboda stated, "[i]n the life insurance operations, premium revenue for the fourth quarter increased 3% from the year-ago quarter to $754 million.  The full-year 2022 premium income grew 4% . . . Life underwriting margin was $212 million, up 45% from a year ago."  In addition, Defendant Darden stated "The [AIL] life premiums were up 5% over the year-ago quarter to $381 million, and life underwriting margin was up 27% to $130 million."

55.     On February 23, 2023, Globe Life filed with the SEC on Form 10-K its annual report for the fourth quarter and full year 2022.  The 10-K was signed by Defendants Darden,

Svoboda, Kalmbach, and Henrie, and contained certifications by Defendants Darden, Svoboda, and Kalmbach attesting to the purported accuracy and completeness of the 10-K.  That 10-K stated, comparing year-to-date 2022 with 2021, "[t]otal net sales increased 2% . . . from $706 million in 2021 to $722 million in 2022."  For the full year 2022, Globe Life's life insurance underwriting margin was $769 million.  For AIL specifically, Globe Life stated, for the full year 2022, AIL's life insurance premium was $1.5 billion, and "[n]et sales increased 9% to $317 million in 2022 over the 2021 total of $291 million.  The increase in life net sales is due to increased productivity plus an improvement in issue rates[.]"

56.     On May 4, 2023, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the first quarter of 2023.  On that call, Defendant Svoboda stated, "[i]n life insurance operations, premium revenue for the first quarter increased 3% from the year-ago quarter to $773 million . . . Life underwriting margin was $291 million, up 1% from a year ago."  In addition, Defendant Darden stated "[a]t [AIL], life premiums were up 5% over the year-ago quarter to $388 million.  In life underwriting margin was up 2% to $176 million."

57.     On May 9, 2023, Globe Life filed with the SEC on Form 10-Q its quarterly report for the first quarter of 2023.  The 10-Q was signed by Defendants Darden, Svoboda, and Kalmbach, and contained certifications by Defendants Darden, Svoboda, and Kalmbach attesting to the purported accuracy and completeness of the 10-Q.  That 10-Q stated, for the three months ended March 31, 2023, Globe Life's life insurance premium was $773 million, and "[t]otal net sales increased 5% to $190 million, when compared with 2022."  For AIL specifically, Globe Life stated, for the three months ended March 31, 2023, AIL's life insurance premium was $388 million."

58.     On July 27, 2023, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the second quarter of 2023.  On that call, Defendant Svoboda stated, "[i]n our life insurance operations, premium revenue for the second quarter increased 3% from the year-ago quarter to $782 million."  In addition, Defendant Darden stated that at AIL, "life premiums were up 5% over the year-ago quarter to $395 million, and life underwriting margin was up 2% to $180 million."

59.     On August 8, 2023, Globe Life filed with the SEC on Form 10-Q its quarterly report for the second quarter of 2023.  The 10-Q was signed by Defendants Darden, Svoboda, and Kalmbach, and contained certifications by Defendants Darden, Svoboda, and Kalmbach attesting to the purported accuracy and completeness of the 10-Q.  That 10-Q stated, for the three months ended June 30, 2023, Globe Life's life insurance premium was $782 million and "[t]otal net sales increased 4% over the same period in the prior year from $366 million in 2022 to $379 million in 2023."  For AIL specifically, Globe Life stated, for the six months ended June 30, 2023, AIL's life insurance premium was $782 million, and "[l]ife sales for the first six months of 2022 grew 19% over the same period in 2021."

60.     On October 26, 2023, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the third quarter of 2023.  On that call, Defendant Svoboda stated, "[i]n our life insurance operations, premium revenue for the third quarter increased 4% from the year-ago quarter to $788 million . . . Life underwriting margin was $300 million, up 21% from a year ago."  In addition, Defendant Darden stated that at AIL "life premiums were up 6% over the year-ago quarter to $400 million and the life underwriting margin was up 8% to $181 million.  In the third quarter of 2023, net life sales were $81 million, which is up 6% from the year-ago quarter, primarily due to growth in agent count."

61.     On November 6, 2023, Globe Life filed with the SEC on Form 10-Q its quarterly report for the third quarter of 2023.  The 10-Q was signed by Defendants Darden, Svoboda, and Kalmbach, and contained certifications by Defendants Darden, Svoboda, and Kalmbach attesting to the purported accuracy and completeness of the 10-Q.  That 10-Q stated, for the three months ended September 30, 2023, Globe Life's life insurance premium was $788 million, and, for the nine months ended September 30, 2023, "[t]otal net sales increased 5% to $568 million, when compared with 2022."  For AIL specifically, Globe Life stated, for the nine months ended September 30, 2023, AIL's life insurance premium was $1.18 billion, and "[n]et sales were $81 million for the three months ended September 30, 2023, up from $76 million in the year-ago period."

62.     On February 8, 2024, Globe Life held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourth quarter and full year 2023.  On that call, Defendant Svoboda stated, "[i]n our life insurance operations, premium revenue for the fourth quarter increased 4% from the year-ago quarter to $795 million.  Life underwriting margin was $305 million, also up 4% from a year ago."  In addition, Defendant Darden stated "[a]t [AIL], life premiums were up 7% over the year-ago quarter to $406 million, and life underwriting margin was up 5% to $183 million.  In the fourth quarter of 2023, net life sales were $76 million, up 9% from a year ago, primarily due to growth in agent count."

63.     On that same phone call, Defendant Darden addressed "articles related to litigation pending in arbitration against [AIL] and one of its state general agents."  Those articles reported a "tawdry, drug-fueled, violent world" at AIL where women were "fed date rape drugs, compared to dog puke, and forced to watch a boss masturbate."

64.     On the February 8, 2024 Conference Call, Darden went on to say "as soon as [AIL]

became aware of the agent's allegations, the company engaged an external third-party to conduct an impartial and thorough investigation.  [AIL] took prompt and appropriate action based on that investigation.  We continue to vigorously dispute and defend against the allegations made about [AIL] in this litigation . . . We take seriously any allegations brought to our attention concerning harassment, inappropriate conduct or unethical business practices, and we do not tolerate such behavior.  [AIL] provides numerous ways for sales agents to raise concerns . . . We also provide mandatory anti-harassment and anti-discrimination training to agents and provide and ask agents to review the Company's Code of Business Conduct and Ethics."

65.     On February 28, 2024, Globe Life filed with the SEC on Form 10-K its annual report for the fourth quarter full year 2023.  The 10-K was signed by Defendants Darden, Svoboda, Kalmbach, and Henrie, and contained certifications by Defendants Darden, Svoboda, and Kalmbach attesting to the purported accuracy and completeness of the 10-K.  That 10-K stated that "[t]otal net sales increased 6% over the same period in the prior year from $722 million in 2022 to $768 million in 2023."  For AIL specifically, Globe Life reported, for the full year 2023, AIL's life insurance premium was $1.59 billion, and "[n]et sales were $323 million in 2023, up from $317 million in 2022."

66.     The statements set forth above in ¶¶19, 21-62, and 64-65 were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, Globe Life was engaged in wide-spread insurance fraud, therefore inflating Globe Life's financial results.  In addition, Globe Life permitted a culture of unchecked sexual harassment, in direct contravention of the Company's Code of Conduct.

**THE TRUTH EMERGES**

67.     On April 11, 2024, investment research firm *Fuzzy Panda* reported that Globe Life

and its subsidiaries had engaged in widespread insurance fraud by adding policies to existing users'
account without their consent, as well as underwriting policies for dead and fictitious people.  The
article also revealed that Globe Life also maintained a hostile workplace where sexual harassment,
drug use, and sexual assault went unchecked.  As a result of these disclosures, the price of Globe
Life common stock declined by $55.76 per share, or 53%, from a closing price of $104.93 per
share on April 10, 2024, to a closing price of $49.17 per share on April 11, 2024.

68.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline
in the market value of the Company's common stock, Plaintiff and other Class members have
suffered significant losses and damages.

## LOSS CAUSATION

69.     During the Class Period, as detailed herein, Defendants made materially false and
misleading statements and omissions, and engaged in a scheme to deceive the market.  This
artificially inflated the price of Globe Life common stock and operated as a fraud or deceit on the
Class (as defined below).  Later, when the truth concealed by Defendants' prior misrepresentations
and omissions was disclosed to the market, the price of Globe Life common stock fell precipitously
as the prior artificial inflation came out of the price over time.  As a result of their purchases of
Globe Life common stock during the Class Period—and Defendants' material misstatements and
omissions—Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under
the federal securities laws.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules
of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the
publicly traded common stock of Globe Life during the Class Period (the "Class").  Excluded from
the Class are Defendants and their families, directors, and officers of Globe Life and their families

and affiliates.

71.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of January 31, 2024, Globe Life had over 93 million shares of common stock outstanding, owned by hundreds or thousands of investors.

72.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of Globe Life common stock;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

73.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

74.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

75.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

### INAPPLICABILITY OF STATUTORY SAFE HARBOR

76.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Globe Life who knew that those statements were false or misleading when made.

### PRESUMPTION OF RELIANCE

77.     At all relevant times, the market for Globe Life common stock was an efficient market for the following reasons, among others:

(a)     Globe Life common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Globe Life filed periodic public reports with the SEC and the NYSE;

(c)     Globe Life regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, through the Company's website, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Globe Life was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

78.     As a result of the foregoing, the market for Globe Life common stock promptly digested current information regarding Globe Life from all publicly available sources and reflected such information in the price of Globe Life common stock.  Under these circumstances, all purchasers of Globe Life common stock during the Class Period suffered similar injury through their purchase of Globe Life common stock at artificially inflated prices and the presumption of reliance applies.

79.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Globe Life's

business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Globe Life's life insurance sales and persistency to its business and its customers, as alleged above, that requirement is satisfied here.

## CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

80.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

81.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase Globe Life common stock at artificially inflated prices.

82.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Globe Life common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

83.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's

financial well-being, operations, and prospects.

84.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

85.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Globe Life's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

86.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Globe Life common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Globe Life common stock had been artificially inflated by Defendants' fraudulent course of conduct.

87.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

88.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

89.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

90.     The Individual Defendants acted as controlling persons of Globe Life within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Globe Life, the Individual Defendants had the power and ability to control the actions of Globe Life and its employees.  By reason of such conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

91.     WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

92.     Plaintiff demands a trial by jury.

DATED: April 30, 2024                Respectfully submitted,

**SIEBMAN LAW**

*/s/  Elvin E. Smith III*
Elvin E. Smith III
Federal Courthouse Square
300 N. Travis
Sherman, Texas 75090
Telephone: (903) 870-0070
Facsimile: (903) 870-0066
elvinsmith@siebman.com

*Liaison Counsel for Plaintiff Miami General Employees' & Sanitation Employees' Retirement Trust*

**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**

Hannah Ross
Avi Josefson
Scott R. Foglietta
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
scott.foglietta@blbglaw.com

*Counsel for Plaintiff Miami General Employees' & Sanitation Employees' Retirement Trust*

**KLAUSNER KAUFMAN JENSEN
    & LEVINSON**

Robert D. Klausner
7080 Northwest 4th Street
Plantation, FL 33315
Telephone: (954) 916-1202
bob@robertdklausner.com

*Additional Counsel for Plaintiff Miami General Employees' & Sanitation Employees' Retirement Trust*