UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

| | | |
|---|---|---|
| CITY OF MIAMI GENERAL EMPLOYEES' & SANITATION EMPLOYEES' RETIREMENT TRUST, on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>GLOBE LIFE INC. f/k/a TORCHMARK CORPORATION, GARY L. COLEMAN, LARRY M. HUTCHISON, FRANK M. SVOBODA, M. SHANE HENRIE, JAMES MATTHEW DARDEN, THOMAS P. KALMBACH, STEVEN K. GREER, JENNIFER A. HAWORTH, R. BRIAN MITCHELL, and JOEL P. SCARBOROUGH,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:24-cv-00376-ALM<br><br>CLASS ACTION<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   JURISDICTION AND VENUE .........................................................................8

III.  PARTIES .............................................................................................................9

    A.    Plaintiffs .....................................................................................................9

    B.    Defendants ..................................................................................................9

IV.   COMPREHENSIVE STATEMENT OF THE CASE AND OVERVIEW OF THE
      FRAUDULENT SCHEME ...............................................................................14

    A.    Background of the Company .....................................................................14

         1.    Globe Life's Business Environment ...............................................14

         2.    AIL Is the Largest Contributor to Globe Life's Success ...............16

         3.    The Company's Hierarchical Structure ...........................................20

    B.    During the Class Period, Defendants Misrepresented Agent Career
        Prospects and Training Opportunities .......................................................22

    C.    During the Class Period, Defendants Concealed that Fraud at AIL Was
        Inflating Sales ...........................................................................................29

         1.    Globe Life's Reported Life Premium and Life Net Sales Growth
             Was a Mirage, Premised on Insurance and Consumer Fraud ...................29

             a.    Defendants Concealed that the Company's Commission
                 Structure Contributed to Fraudulent Practices ...............................30

             b.    Defendants Credited AIL's Virtual Sales for AIL's Growth
                 in Life Net Sales and Premium Revenue Life Premium,
                 Concealing that Fraud Was Inflating the Growth .........................32

             c.    Defendants Concealed that the Company Engaged in
                 Deceptive Acts and Consumer Fraud .............................................36

          2.    Defendants Knew that Fraud Was Rampant at AIL .................................38

    D.    Defendants Concealed that Globe Life and Its Senior Insiders Created a
        Toxic Work Environment that Permeated All Levels of the Company ................40

         1.    The Giglione-Ackerman Agency ....................................................42

**Page**

2.  Arias Organization ................................................................43

E.  Fuzzy Panda Issues a Damning Report Revealing that the Company Is Plagued by Systemic Fraud and Misconduct and that Globe Life's Agencies Are Pyramid Schemes ................................................49

F.  The EEOC Determined that Globe Life Created and Condoned a Hostile Workplace Environment and "Company-Wide Culture of Sexual Harassment" ................................................................56

V.  DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ................................................................58

A.  Business Environment and Company Culture ....................................59

B.  Life Net Sales and Life Premium ................................................64

C.  Consumer Privacy and Security ................................................80

D.  Recruiting, Retention, and the Tools to Succeed ................................81

E.  SOX Certifications ................................................................90

F.  Management's Report on Internal Control over Financial Reporting ...............92

VI.  ADDITIONAL SCIENTER ALLEGATIONS ................................................95

A.  Globe Life's Sales Practices Are a Core Operation of the Company ...................97

B.  Defendants' Compensation Was Tied to AIL's Financial Performance .............100

C.  The Individual Defendants' Class Period Stock Sales Enhance the Inference of Scienter ................................................................101

D.  Testimony and Court Filings from Unrelated Litigation Supports a Strong Inference of Scienter ................................................................105

E.  A Myriad of Government Investigations, Enforcement Actions, and Consumer Protection Violations Support a Strong Inference of Scienter ..........107

1.  Enforcement Actions by the California Department of Insurance and Other States' Insurance Departments ................................108

2.  AIL's Sales Practices Violated Numerous State Insurance and Consumer Protection Laws, Including the NAIC's Model Code ...........109

F.    Hundreds of Consumer Complaints Made to the BBB, FTC, and State Insurance Departments Support a Strong Inference of Scienter ........................114

    1.    Consumer Complaints to the BBB ........................................................115

    2.    Consumer Complaints to the FTC ........................................................130

    3.    Consumer Complaints to Various State Departments of Insurance .........134

G.    The Numerous Investigations into the Misconduct Alleged Herein Supports an Inference of Scienter ..........................................................137

    1.    DOJ and SEC Investigations ................................................................137

    2.    EEOC Investigations ............................................................................139

H.    Globe Life Engaged in Massive Stock Buy-Backs to Rebut Fuzzy Panda and Prop Up the Stock Price ..........................................................141

VII.    LOSS CAUSATION/ECONOMIC LOSS ....................................................143

VIII.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ................................................................................146

IX.    CLASS ACTION ALLEGATIONS ............................................................147

X.    CAUSES OF ACTION ................................................................................149

COUNT I ................................................................................................................149

    For Violations of §10(b) of the Exchange Act and SEC Rule 10b-5(b) (Against Globe Life, Coleman, Hutchison, Svoboda, Darden, Kalmbach, and Haworth ) ..................................................................................................149

COUNT II ..............................................................................................................151

    For Violations of §10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) (Against All Defendants) ..........................................................................151

COUNT III .............................................................................................................152

    For Violations of §20A of the Exchange Act (Against Coleman, Hutchison, Svoboda, Kalmbach, Darden, Greer, Haworth, and Henrie) ..............................152

COUNT IV .............................................................................................................155

**Page**

For Violations of §20(a) of the Exchange Act (Against All Defendants) ......................155

PRAYER FOR RELIEF ..........................................................................................157

DEMAND FOR TRIAL BY JURY ........................................................................157

4877-5268-4006.v3

1.      Lead Plaintiffs KBC Asset Management NV ("KBC") and City of Birmingham Retirement and Relief System ("BRRS") (collectively, "Plaintiffs"), by and through their counsel, bring this federal class action for violations of §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of all persons or entities that purchased or otherwise acquired the common stock of Globe Life Inc. ("Globe Life" or the "Company") between May 8, 2019 and April 10, 2024, inclusive (the "Class Period"), and who were damaged thereby.

2.      Plaintiffs make the following allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel which included, without limitation: (a) review and analysis of public filings made by Globe Life and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined in §III.B., *infra*) and related non-parties; (c) review of news articles, media, investigative reports, and shareholder communications; (d) review of other publicly available information concerning Defendants and related non-parties, including securities analyst reports, court filings, and websites; (e) review of documents received in response to requests made to federal and state agencies pursuant to the Freedom of Information Act ("FOIA") and state public records laws; (f) interviews with factual sources, including individuals formerly employed by the Company; and (g) consultation with experts.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION

3.      Globe Life is a key player in the multi-trillion-dollar life insurance industry, and, with in excess of 17 million policies in force, has more policies in force than any other life insurance company in the country.  The Company markets and distributes its insurance products through its

network of wholly owned subsidiaries, the largest and most important of which is American Income Life Insurance Company ("AIL").  Globe Life's sales agents are an integral part of the Company's operations.

4.      Throughout the Class Period, Defendants publicly painted Globe Life and AIL as ethical business environments that promoted honesty and fair dealing in selling insurance, while reporting growth in the Company's key metrics including life insurance premium revenue, sales, and agent counts.  Defendants attributed Globe Life's Class Period success to "superior performance," and "never . . . unethical or illegal business practices."

5.      But unbeknownst to investors, agents at many large agencies selling policies for AIL were committing insurance fraud according to former executives and agents.  The fraudulent practices reportedly included writing life insurance policies for customers or random consumers without their knowledge or consent, writing fraudulent policies for dead or fictitious people, forging signatures, signing policies that were knowingly going to be canceled within a few months, and making a host of misrepresentations to customers in order to sell coverage.  The sham and deceptively acquired business artificially inflated key metrics reported by the Company through the duration of the Class Period, including reported net sales and premium revenue.

6.      AIL's Vice President of Field Operations, Scott Dehning ("Dehning"), reportedly escalated concerns of unethical and fraudulent practices directly to AIL's Chief Executive Officer ("CEO") defendant Steven K. Greer ("Greer") and AIL's President David Zophin ("Zophin") during the Class Period.  *See* Affidavit of Scott Dehning, dated July 1, 2024 (the "Dehning Affidavit"), attached hereto as Ex. A.  The Dehning Affidavit was executed by Dehning under penalty of perjury and filed in the U.S. District Court for the Western District of Michigan.

7.      According to the Dehning Affidavit "fraud was a serious and on-going problem" at AIL.  *Id*.  According to the Dehning Affidavit, the reported widespread fraud at AIL "showed

- 2 -

growth," "helped the agents' [*sic*] hit bonuses," and "also inflated [Globe Life's] stock price by appearing that AIL was growing exponentially." *Id.*, ¶30.

8.      According to the Dehning Affidavit, Dehning was terminated by AIL after reporting AIL's fraud in 2021 to the Michigan Department of Insurance and Financial Services ("MDIFS"), which launched an investigation into the alleged misconduct. *Id.*, ¶5.  On April 11, 2024, investment research firm Fuzzy Panda Research ("Fuzzy Panda") published an investigative report titled, "Globe Life (GL): Executives Disregarded Wide-Ranging 'Insurance Fraud' While They Received Millions in Undisclosed Kick-Back Scheme" (the "Fuzzy Panda Report"), where it revealed that Dehning reportedly "sent more than 200 emails detailing cases of fraud [to Defendant] Greer, Zophin, and Globe Life's General Counsel-[Defendant] Joel Scarborough." *See* Ex. B at 7, attached hereto.[1]

9.      Still other court filings corroborate fraudulent conduct at AIL.  For example, according to an April 2024 filing in the U.S. District Court for the Western District of Pennsylvania, former AIL agent Michael Russin ("Russin") agreed to testify to certain "stipulated facts" concerning Russin's employment with AIL (the "Zinsky-Russin Stipulation"). *See* Ex. C, attached hereto.  According to the Zinsky-Russin Stipulation, Russin was prepared to testify that he "is aware of instances in which AIL agents . . . may have performed unethical and/or fraudulent sales practices, including the following: a. Agents paying for policies from their own pockets; [and] b. Taking confidential information from CAS [a customer data system] to write new policies." *Id.* at 16.

---

[1]    Despite its unusual name, Fuzzy Panda is known for publishing reliable reports. *See, e.g.*, Carmen Reinicke, "Short Seller Behind Globe Life's Plunge Has Winning Record," Bloomberg, Apr. 12, 2024, https://www.bloomberg.com/news/articles/2024-04-12/short-seller-behind-globe-life-s-record-drop-has-winning-record.

10.     Separately, Defendants also publicly misrepresented throughout the Class Period that Globe Life did not tolerate harassment or unethical business practices, and that Globe Life promoted a "culture of accountability . . . driven by [Globe Life's] Co-Chairmen and Chief Executive Officers and senior leadership."  Globe Life's Code of Business Conduct and Ethics ("Code of Conduct"), published in 2019, claimed to "ensure that the work we perform and the business each of us conducts is done with integrity and in accordance with the highest ethical standards."  Defendants echoed those sentiments during the Class Period, publicly promising that the Company "'takes seriously any allegation brought to its attention concerning sexual harassment, inappropriate conduct, or unethical business practices' and 'makes clear that it does not tolerate' such behavior."  Globe Life publicly avowed to investigate any reported violation of the Company's Code of Conduct.

11.     Defendants' Class Period statements concerning the Company's Code of Conduct and associated polices were demonstrably false and belied a far different internal reality.  In truth, Defendants did not enforce compliance with Globe Life's Code of Conduct, and instead, Globe Life and its most senior insiders reportedly allowed the Company's subsidiaries, including AIL, to perpetuate a toxic workplace culture remarkably devoid of any level of "accountability," where sexual harassment, threatening behavior, and illegal drugs were commonplace and even encouraged. Misconduct was reportedly pervasive at every level of AIL's hierarchy and has exposed the Company to a host of lawsuits and liability.

12.     On September 26, 2024, the U.S. Equal Employment Opportunity Commission ("EEOC") issued several letters of determination concerning its investigations into various allegations of workplace misconduct and sexual harassment at Globe Life and AIL, occurring as far back as 2011 and continuing through the present day.

13.     In one determination relating to conduct occurring during the Class Period, the EEOC determined that Globe Life "deliberately misclassif[ied] its employees as independent contractors,"

- 4 -

and engaged in a host of unlawful employment practices, including subjecting its agents "to a hostile work environment," "*quid pro quo* harassment," "threats and demotion, or alternatively, constructive demotion" on the basis of sex, and "retaliation for protected activity."  *See* September 26, 2024 EEOC Determination (the "EEOC Determination"), attached hereto as Ex. D at 4-5.  According to the EEOC, Globe Life "failed to take action to abate a company-wide culture of sexual harassment." *Id*. at 5.

14.     The EEOC Determination confirmed that Globe Life "created, condoned, and actively promoted a work environment that is hostile and abusive to female employees because of their sex." *Id.* at 4.  The EEOC determined "a number of the participants in the sexual harassment and/or who have knowingly fostered a working environment in which such conduct is considered acceptable were/are of sufficiently high status or authority" that "their actions are therefore automatically imputed to [Globe Life]."  *Id*.

15.     According to the EEOC, Globe Life "has persistently failed to remedy individual instances of sexual harassment of which it had notice."  *Id.* at 5.  And, Globe Life "has not demonstrated that it has taken reasonable preventive and corrective action with regard to sexual harassment perpetrated by both supervisory and non-supervisory male employees despite the information of which it had notice, and the evidence establishes that [Globe Life] has consistently failed to take such action."  *Id.* at 4.

16.     Finally, throughout the Class Period, Defendants concealed that at AIL, it was more lucrative to recruit additional agents than it was to sell insurance, and that increasing agent count – not effective selling – was the key to success.  Defendants falsely represented that Globe Life and AIL offered the prospect of "Opportunity Unlimited" to agents, through which agents could achieve "Unlimited Annual Earnings Potential" and the allure of six- to seven-figure income.  But those promises failed to materialize.  In truth, new agents provided unpaid labor, and were allegedly

- 5 -

routinely exploited, with managers and agencies overcharging recruits for training, and even forcing agents to pay managers in order to keep working or to obtain leads.

17.    In a Form 8-K filed with the SEC on March 14, 2024, the Company disclosed that Globe Life and AIL each received subpoenas from the U.S. Attorney's Office for the Western District of Pennsylvania concerning misconduct at AIL.  Globe Life's announcement on March 14, 2024 was the first time the Company publicly confirmed a pending U.S. Department of Justice ("DOJ") investigation that had commenced in 2023, amid mounting pressure and media reports concerning workplace misconduct, sexual harassment, and customer abuses.  Defendant Frank M. Svoboda ("Svoboda") later clarified during the Company's earnings call for the first quarter of 2024 ("Q1 2024") on April 23, 2024 that the subpoenas "were received in late 2023" and "sought documents related to sales practices from certain licensed agents . . . contracted to sell American Income policies," and that Globe Life and AIL were cooperating with the DOJ's investigation.

18.    The Fuzzy Panda Report revealed the falsity of Defendants' Class Period statements. Drawing on its extensive and vigorous investigation that involved going "undercover," interviewing dozens of former executives and agents, and its synthesis and review of a host of individual complaints, the Fuzzy Panda Report revealed among other things that Globe Life and AIL were plagued by widespread insurance fraud, were rife with unchecked sexual harassment and abuse, and operated like a pyramid scheme, where agent recruitment was valued more than selling insurance.

19.    According to Fuzzy Panda's investigation, insurance "fraud began spreading at AIL after [Defendant] Steve Greer became AIL's CEO in 2017 and Dave Zophin became its president the following year." *See* Ex. B at 3.  In the years that followed, according to former AIL Vice President Dehning and the Fuzzy Panda Report, the fraud "'became a lot more rampant.'" *Id.* at 7.  Fuzzy Panda also reported that its "[i]nterviews with formers and internal emails make it clear that many

- 6 -

executives at Globe Life and American Income Life have been complicit in allowing insurance fraud to persist." *Id.* at 3.

20.    As a result of Defendants' misrepresentations, shares of Globe Life common stock traded at artificially inflated prices throughout the Class Period.  On April 11, 2024, the price of Globe Life common stock plummeted when the Fuzzy Panda Report revealed the widespread fraud and toxic culture plaguing Globe Life and AIL.  In the hours following the publication of the Fuzzy Panda Report, Globe Life stock lost approximately 53% of its trading value, dropping from a closing price of $104.93 per share on April 10, 2024, to a closing price of $49.17 per share on April 11, 2024:



21.    Analysts quickly reacted to the scathing report.  Evercore ISI, for example, issued an April 11, 2024 report highlighting the allegations in the Fuzzy Panda Report, which it acknowledged

"accus[ed] the firm of agent mis-selling practices, insurance fraud, aggressive accounting, a distribution pyramid scheme, and an overall toxic workplace environment."  Evercore ISI noted that the Fuzzy Panda Report, coupled "[w]ith the recent disclosure that the DOJ has issued a subpoena to the company to investigate some of these allegations . . . has created significant uncertainty for the shares as demonstrated by the extremely negative reaction in the shares today (over 50%)."

22.     In the wake of the Fuzzy Panda Report, the SEC also initiated an inquiry into Globe Life.  On May 21, 2024, Globe Life disclosed in a Form 8-K filed with the SEC that the Company recently received an inquiry from the SEC related to information revealed in recent short seller reports.  In its Form 10-Q for the second quarter of 2024 ("Q2 2024") filed with the SEC on August 7, 2024, the Company confirmed that it received the SEC inquiry in April 2024.

## II.     JURISDICTION AND VENUE

23.     The claims asserted herein arise under §§10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and §27 of the Exchange Act.

25.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because many of the acts and practices complained of herein occurred in substantial part in this District.  Globe Life's corporate headquarters are located in McKinney, Texas, which is situated in this District.  Globe Life conducts substantial business in Texas sufficient to provide for general jurisdiction over it in this District.

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.    **PARTIES**

A.    **Plaintiffs**

27.    Lead Plaintiff KBC Asset Management NV serves as the asset manager for KBC Equity Fund NV ("KBC Equity Fund"), which, as shown in the Certification Pursuant to Federal Securities Laws, purchased the common stock of Globe Life at artificially inflated prices during the Class Period. *See* ECF 14-3. KBC acts on behalf of the KBC Equity Fund pursuant to the terms of the Management Company Agreement and Declaration of Assignment by KBC Equity Fund NV to KBC Asset Management NV. *See* ECF 14-6; ECF 14-7.

28.    Plaintiff City of Birmingham Retirement and Relief System is a public pension fund that provides retirement, disability, and survivor benefits to over 7,000 members, including eligible civil service employees, elected officials, and appointed employees of the City of Birmingham, Alabama. As shown in BRRS's Certification Pursuant to Federal Securities, BRRS purchased the common stock of Globe Life at artificially inflated prices during the Class Period. *See* ECF 14-3.

B.    **Defendants**

29.    Defendant Globe Life is an insurance holding company that distributes life and supplemental health insurance products through its network of subsidiary agencies functioning as Globe Life's insurance distributors. As disclosed in its SEC filings, "Globe Life" refers to "Globe Life, Inc. . . ., and its subsidiaries and affiliates. Its primary subsidiaries are Globe Life And Accident Insurance Company, American Income Life Insurance Company, Liberty National Life Insurance Company, Family Heritage Life Insurance Company of America, and United American Insurance Company." The Company's stock is listed and trades on the New York Stock Exchange ("NYSE") under the symbol "GL." As of January 31, 2024, Globe Life had over 93 million shares of common stock outstanding.

30.     Defendant Gary L. Coleman ("Coleman") served as Co-CEO of the Company from June 2012 until December 31, 2022.  Coleman also served as a member of the Company's Board of Directors (the "Board") from August 2012 until April 2023, and served as Co-Chairman of the Company's Board from April 2014 until April 2023.  During the Class Period, Coleman sold 525,000 of his personally held shares of Globe Life stock at artificially inflated prices for proceeds of approximately $51.8 million while in possession of material, non-public information, including shares sold contemporaneously with KBC Equity Fund and other members of the Class (defined in §IX, *infra*).  Defendant Coleman signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") accompanying each of the Forms 10-K and Forms 10-Q issued by Globe Life during his tenure as Co-CEO and made numerous false and misleading statements during the Class Period.

31.     Defendant Larry M. Hutchison ("Hutchison") served as Co-CEO of the Company from June 2012 until December 31, 2022.  Hutchison also served as a member of the Company's Board from August 2012 until April 2023, and served as Co-Chairman of the Company's Board from April 2014 until April 2023.  During the Class Period, Hutchison sold 525,000 of his personally held shares of Globe Life stock at artificially inflated prices for proceeds of approximately $51.6 million while in possession of material, non-public information, including shares sold contemporaneously with KBC Equity Fund and other members of the Class.  Defendant Hutchison signed SOX certifications accompanying each of the Forms 10-K and Forms 10-Q issued by Globe Life during his tenure as Co-CEO, and made numerous false and misleading statements during the Class Period.

32.     Defendant Frank M. Svoboda served as Executive Vice President and Chief Financial Officer ("CFO") of the Company from June 2012 until January 1, 2023.  Svoboda has served as Globe Life's Co-CEO since January 1, 2023.  Svoboda was the President of AIL from January 2017 to July 2018.  During the Class Period, Svoboda sold 285,000 of his personally held shares of Globe

- 10 -

Life stock at artificially inflated prices for proceeds of approximately $29 million while in possession of material, non-public information, including shares sold contemporaneously with KBC Equity Fund and other members of the Class. Defendant Svoboda signed SOX certifications accompanying each of the Forms 10-K and Forms 10-Q issued by Globe Life during his tenure as CFO and made numerous false and misleading statements during the Class Period.

33.    Defendant M. Shane Henrie ("Henrie") has served as the Corporate Senior Vice President and Chief Accounting Officer ("CAO") of Globe Life since November 2019, and as the Divisional Senior Vice President, Corporate Accounting, CFO, and Treasurer of AIL (and other subsidiaries) since September 2019. Henrie is also a member of Globe Life's Ethics Committee. According to AIL's corporate records and business registrations, Henrie, together with defendants James Matthew Darden ("Darden") and Joel P. Scarborough ("Scarborough"), is a Principal Officer of AIL. During the Class Period, Henrie sold 58,450 of his personally held shares of Globe Life stock at artificially inflated prices for proceeds of approximately $6.2 million while in possession of material, non-public information, including shares sold contemporaneously with KBC Equity Fund and other members of the Class.

34.    Defendant James Matthew Darden has served as Globe Life's Co-CEO since January 1, 2023. According to AIL's corporate records and business registrations, Darden, together with defendants Henrie and Scarborough, is a Principal Officer of AIL. Darden was the President of AIL from July 2018 to December 2022. During the Class Period, Darden sold 19,951 of his personally held shares of Globe Life stock at artificially inflated prices for proceeds of approximately $2.3 million while in possession of material, non-public information, including shares sold contemporaneously with KBC Equity Fund and other members of the Class. Defendant Darden signed SOX certifications accompanying each of the Forms 10-K and Forms 10-Q issued by Globe

- 11 -

Life during his tenure as Co-CEO and made numerous false and misleading statements during the Class Period.

35.     Defendant Thomas P. Kalmbach ("Kalmbach") has served as Globe Life's Executive Vice President and CFO since January 1, 2023, and as Senior Vice President and Chief Actuary of AIL from August 2018 to December 2022.  During the Class Period, Kalmbach sold 24,162 of his personally held shares of Globe Life stock at artificially inflated prices for proceeds of approximately $2.9 million while in possession of material, non-public information, including shares sold contemporaneously with KBC Equity Fund and other members of the Class.  Defendant Kalmbach signed SOX certifications accompanying each of the Forms 10-K and Forms 10-Q issued by Globe Life during his tenure as CFO and made numerous false and misleading statements during the Class Period.

36.     Defendant Steven K. Greer has served as CEO of AIL since 2018.  Prior to becoming CEO of AIL, Greer served as President of AIL Agency Division of AIL.  Greer is identified in SEC filings by Globe Life as a Section 16 reporting person given his role first as the President, and later as CEO, of AIL.   Greer's business address is identified in SEC filings as at Globe Life's headquarters in McKinney, Texas.  During the Class Period, Greer sold 43,226 of his personally held shares of Globe Life stock at artificially inflated prices for proceeds of approximately $4.7 million while in possession of material, non-public information, including shares sold contemporaneously with KBC Equity Fund and other members of the Class.

37.     Defendant Jennifer A. Haworth ("Haworth") has served as Globe Life's Executive Vice President and Chief Marketing Officer since January 2020 and the Division Senior Vice President, Marketing of Globe Life since September 2019.  Prior to that, Haworth served in other marketing roles for the Company.  During the Class Period, Haworth sold 9,824 of her personally held shares of Globe Life stock at artificially inflated prices for proceeds of approximately $931,000

- 12 -

while in possession of material, non-public information, including shares sold contemporaneously with KBC Equity Fund and other members of the Class.

38.     Defendant R. Brian Mitchell ("Mitchell") has served as Executive Vice President and General Counsel since June 2012 and Chief Risk Officer at Globe Life since May 2017. Additionally, Mitchell has served as President of AIL since at least January 2023.  Mitchell is also a member of Globe Life's Ethics Committee. During the Class Period, Mitchell sold 117,217 of his personally held shares of Globe Life stock at artificially inflated prices for proceeds of approximately $12.7 million while in possession of material, non-public information.

39.     Defendant Joel P. Scarborough is Corporate Senior Vice President, Legal and Compliance for Globe Life, and has served as Divisional Senior Vice President, General Counsel, and Secretary of AIL and other Globe Life subsidiaries since September 2019.  According to AIL's corporate records and business registrations, Scarborough, together with defendants Darden and Henrie, is a Principal Officer at AIL.

40.     Defendants Coleman, Hutchison, Svoboda, Henrie, Darden, Kalmbach, Greer, Haworth, Mitchell, and Scarborough are collectively referred to herein as the "Individual Defendants," and together with Globe Life, the "Defendants."  The Individual Defendants, because of their respective positions with the Company, possessed the power and authority to control the contents of Globe Life's reports to the SEC and other public statements made by Globe Life during the Class Period.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports or other statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material, non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had

- 13 -

not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV. COMPREHENSIVE STATEMENT OF THE CASE AND OVERVIEW OF THE FRAUDULENT SCHEME

### A. Background of the Company

#### 1. Globe Life's Business Environment

41. Globe Life operates with four business segments: life insurance, supplemental health insurance, annuities, and investments. Life insurance has historically been Globe Life's predominant and most profitable segment.

42. Globe Life serves the middle-income market, marketing and selling its basic life and supplemental health insurance products through its distribution channel of wholly-owned subsidiaries. AIL has historically been the largest contributor to Globe Life's success.

43. Shortly after the start of the Class Period, the Company changed its name from Torchmark Corporation to Globe Life to enhance the "Company's ability to build name recognition with prospective customers and agent recruits through the use of a single brand," and in order to allow AIL and the Company's other subsidiaries to "use and take advantage of the Globe Life brand."

44. Defendant Hutchison described the name change as a reflection of "the [C]ompany's commitment to an enterprise-wide brand alignment to enhance sales and recruitment to improve, [*sic*] name recognition." According to an August 9, 2019 press release, "'[t]he name change signifies the Company's focus on a brand strategy designed to position Globe Life as a leader in our industry. . . [and] furthers our goal of continuing to offer quality insurance policies to families across the country." As part of the re-branding, throughout 2019, the Company worked toward "converting all [of its] agencies from the individual agencies to divisions of Globe Life."

- 14 -

45. To maintain a consistent brand image, Globe Life: (i) provided training, technology, and data support to each agency; (ii) maintained a corporate call center and provided policy customer service to policyholders at each of the Company's subsidiaries; and (iii) controlled its agencies' advertising, requiring that any materials published be approved by the Globe Life Advertising Committee. According to one former sales agent, AIL controlled virtually all aspects of his work, including, but not limited to, his schedule, his hours, and the manner in which he performed his day-to-day duties.

46. Following the rebranding, in August 2019, the Company, together with defendants Coleman and Hutchison, publicly introduced Globe Life's Code of Conduct, a document they claimed "expresses the standards of integrity and business conduct that every Company employee, contractor, officer and director must uphold and follow," to "ensure that the work we perform and the business each of us conducts is done with integrity and in accordance with the highest ethical standards." According to the Company, the Code of Conduct "sets out the guiding principles by which we operate Globe Life Inc. and its subsidiaries," and assured the public that the Company conducted itself ethically and legally, and provided a safe workplace, free from violence and discrimination.

47. The Code of Conduct was formally adopted by AIL and the Company's other subsidiaries, and set forth the process for escalating ethics complaints or concerns, including to defendants Mitchell and Henrie as members of the Company's Ethics Committee. According to Globe Life, "[t]he CEO and all senior financial officers, including the CFO, principal accounting officer, controller and persons performing similar functions, are bound by the provisions set forth [in the Code of Conduct] relating to ethical conduct, conflicts of interest and compliance with law."

48. The Company's CEOs and each senior financial officer also had an affirmative obligation to "promptly bring to the attention of the General Counsel or the CEO and to the Audit

4877-5268-4006.v3

Committee any information he or she may have concerning any violation of the Company's Code of Business Conduct and Ethics."

### 2. AIL Is the Largest Contributor to Globe Life's Success

49.     Globe Life publicly reports financial results for its subsidiaries and for the Company as a whole. Globe Life's overall financial performance is a product of the financial results of its subsidiaries, the largest and most important of which is AIL.

50.     The Company's proxies filed with the SEC reveal that a number of Globe Life executives, including some of the Individual Defendants here, also serve, or have served, in an executive position for AIL and, therefore, had a hand in AIL's success:

(a)     Defendant Darden, prior to serving as Co-CEO of Globe Life, was President of AIL from July 2018 to December 2022;

(b)     Defendant Henrie, in addition to his role as Corporate Senior Vice President and CAO of Globe Life, is also the Divisional Senior Vice President, Corporate Accounting, CFO, and Treasurer of AIL;

(c)     Defendant Kalmbach is Executive Vice President and CFO of Globe Life and was Senior Vice President and Chief Actuary of AIL from 2018-2022;

(d)     Defendant Svoboda, prior to serving as Co-CEO of Globe Life, served as President of AIL from January 2017 to July 2018;

(e)     Defendant Scarborough, Globe Life's Corporate Senior Vice President, Legal and Compliance, has served as Divisional Senior Vice President, General Counsel, and Secretary of AIL (and other subsidiaries) since September 2019; and

(f)     Defendant Mitchell, Globe Life's Executive Vice President, General Counsel, and Chief Risk Officer, has served as the President of AIL since January 2023.

- 16 -

51.    Throughout the Class Period, AIL was by far the largest contributor to Globe Life's annual premium revenue, contributing premium revenue in excess of $1 billion annually for the Company:



52.    AIL produced close to, or in excess of, 50% of Globe Life's total reported life premium revenue each year of the Class Period, as shown in the table below:



4877-5268-4006.v3

53.    In addition to being the most significant driver of Globe Life premium revenue, AIL contracted the vast majority of Globe Life's producing agents.  Two-thirds of Globe Life's total producing agents sold for AIL, making AIL Globe Life's largest subsidiary both in terms of premium revenue and number of sales agents.

54.    AIL consistently had more than three times the number of agents as the Company's next largest subsidiary from 2020-2023:



55.    Globe Life's management measured the Company's profitability by underwriting margin, which consists of premium revenue, less policy obligations and policy acquisition costs and commissions.  Globe Life's SEC filings emphasize AIL's contribution to the Company's overall profitability.  For example, according to Globe Life's 2023 Form 10-K, filed with the SEC on February 28, 2024:

- 18 -

**GLOBE LIFE INC.**
**Management's Discussion & Analysis**

In 2023, the largest contributor of total underwriting margin was the life insurance segment and the primary distribution channel was the American Income Life Division. The following charts represent the breakdown of total underwriting margin by operating segment and distribution channel for the year ended December 31, 2023.



56.     AIL was by far the largest contributor to the Company's life underwriting margin and, therefore, profitability, every year from 2020 to 2023:



57.    In Globe Life's 2023 Annual Report, signed by defendants Darden and Svoboda, Defendants acclaimed AIL's contribution to more than half of the Company's premium revenue: "For more than seven decades, American Income has offered the same basic protection life insurance products to working families and it remains the most significant contributor of life premiums (51%) and life underwriting margin (60%) among all of Globe Life's distribution channels."

### 3.    The Company's Hierarchical Structure

58.    Because Globe Life focuses on marketing simple, basic protection life insurance products, which are historically small-face amount policies with low premium revenue per policy, the key to the Company's success is to build legions of agents to sell its low-cost policies. Accordingly, recruiting is a key metric tracked by Globe Life.

59.     The Company has described its agent count as a "leading indicator for sales yet to come," and has stated that the "[d]evelopment and retention of producing agents are critical to support sales growth." According to analysts, Globe Life's reported "average producing agent counts . . . are an important indicator for future sales growth." Given the importance of the Company's reported agent counts to the Company's stock price, Globe Life took an active role in its agencies' recruiting of new agents.

60.     Agencies at AIL have a hierarchical structure. At the very bottom are "career agents." These purely selling agents often lack any experience in the insurance industry – or even in sales generally – but are recruited with promises of a lucrative career and an unlimited income stream. The Company purports to recruit "agents to an opportunity, and that's a career opportunity where folks come in, learn the sales side of the business, but then quickly move up into management. And then ultimately, the goal is to own their own agency someday."

61.     In reality, only 10% of Globe Life's recruits remain after their first year. To offset the steep attrition, the Company set monthly recruiting quotas and offered lucrative recruiting bonuses and promotions dependent upon recruiting. According to internal business records obtained through the efforts of investigative journalists, the key to success at AIL was recruiting:

> **"Why do we recruit?…to Grow and not die!"**
> **"Your Pipeline is your Life Line"**

62.     Once promoted to middle management, an agent's duties shift to recruiting other agents and growing their "agent count," and away from selling insurance. In these levels that are above the very bottom, agents receive compensation for recruiting and for insurance sold by career

- 21 -

agents, *i.e.*, sold by their "downline."  These positions include Supervising, General, Master, and Regional Agents.  At the top of the hierarchy are State General Agents ("SGA"), who own their own agencies under the Globe Life brand, much like franchisees for a fast-food chain.

63.    The    following    chart    illustrates    Globe    Life's    agent    hierarchy:



**B.**    **During the Class Period, Defendants Misrepresented Agent Career Prospects and Training Opportunities**

64.    Throughout the Class Period, Defendants promised investors that Globe Life and its subsidiaries "never" sought competitive advantages "through unethical or illegal business practices," while repeatedly boasting about growing agent counts and "Opportunity Unlimited" for new recruits. As discussed more fully below, the Company created a compensation structure that not only rewarded insurance fraud and increased the threat of additional, illegitimate policies (to cash in on immediate commission), but also, unbeknownst to investors, incentivized new agents to recruit more than it did for selling insurance.

65.     Globe Life frequently attributed its Class Period sales growth and financial success to productive recruiting efforts that were consistently growing agent count.  According to Defendants, the Company offered recruiting bonuses purportedly to "address agent retention," to encourage "correct behavior," to "pay[] for success," and to "enhance agent productivity and agent retention." These statements concealed that AIL rewarded agents more for bringing in new recruits – who were thereafter swindled out of funds for the financial gain of those above them in the hierarchy – than it did for selling insurance.

66.     Globe Life's promises of unlimited earning potential, emphasis on recruiting rather than sales, and use of high-pressure sales tactics on recruits are tell-tale signs of a possible pyramid scheme.  This exposes Globe Life to potential legal and regulatory scrutiny, as pyramid schemes are illegal.  According to the Federal Trade Commission ("FTC"), though pyramid schemes are structured to resemble legitimate multi-level marketing ("MLM") organizations, pyramid schemes are scams:

> The promoters of a pyramid scheme may try to recruit you with pitches about what you'll earn.  They may say you can change your life – quit your job and even get rich – by selling the company's products.  That's a lie.  Your income would be based mostly on how many people you recruit, not how much product you sell. Pyramid schemes are set up to encourage everyone to keep recruiting people to keep a constant stream of new distributors – and their money – flowing into the business.

67.     The FTC provides useful warning signs to identify a potential pyramid scheme:

- 23 -



Here are some warning signs of a pyramid scheme:

- **Promoters make extravagant promises about your earning potential.** Stop. These promises are false.

- **Promoters emphasize recruiting new distributors for your sales network as the real way to make money.** Walk away. In a legitimate MLM program, you should be able to make money just by selling the product.

- **Promoters play on your emotions or use high-pressure sales tactics, maybe saying you'll lose the opportunity if you don't act now and discouraging you from taking time to study the company.** Leave by the nearest exit. Any company that tries to pressure you to join is one to avoid.

68.    According to Fuzzy Panda's investigation, recruits at AIL are told that not only can they make more money recruiting people than from selling insurance, but that they personally do not even need to sell insurance so long as their own recruits, or "downline," sell insurance.  Ex. B at 27. Recruits are subjected to high-pressure recruitment tactics, including immense pressure to sign up immediately as an agent and being given the false promise of a lifetime of "residuals" on insurance they sold.  *Id.* at 27-29.  The recruiting bonus was steep – according to former agents identified by Fuzzy Panda and others, recruiting new agents could yield bonuses of $750 per recruit, plus a cut of the new recruit's insurance sales.  According to one former agent for AIL, it was possible to make hundreds of thousands of dollars more a year for recruiting activities as compared to selling activities.

69.    According to the Fuzzy Panda Report, undercover investigators that navigated through AIL's hiring process "were explicitly told that 'yes, you can make more money, recruiting people than selling insurance.'"  *Id.* at 27.  Fuzzy Panda's experience was similar to that of Dehning,

- 24 -

AIL's former Vice President of Field Operations who worked out of AIL's home office at Globe Life's headquarters, who claimed, "'[t]hat's what they always told us. We're a recruiting company that happens to sell insurance.'" *Id.* at 26. Dehning later filed a sworn affidavit in the U.S. District Court for the Western District of Michigan confirming his belief that AIL's business model is a pyramid scheme:

Case 1:23-cv-01117-HYJ-PJG   ECF No. 89-1, PageID.743   Filed 07/01/24   Page 2 of 8

AFFIDAVIT

STATE OF MICHIGAN          )
                           )   SS:
COUNTY OF INGHAM           )

AND NOW COMES the undersigned Affiant, Scott Dehning, who, being of proper age and duly sworn, states the following:

1. My name is Scott Dehning, and I reside in Lansing, MI.

2. I worked at American Income Life (AIL) for a number of years between 2012 and 2023.

3. I am writing this affidavit in response to the motion for summary judgment filed by my former employer, AIL.

4. I was terminated in May 2023 from AIL.

5. I believe that my termination was a direct result of my ongoing and repeated reporting of fraud to the Michigan Department of Insurance and Financial Services (DIFS). Thus, there is a causal connection between my reporting of fraud to DIFS and my termination by AIL.

6. I was one of about five vice presidents of AIL, putting me squarely in the hierarchy of management, though I still had several bosses/superiors at AIL. My immediate supervisor was Dominic "Dom" Bertini, the sole Senior Vice President at AIL. Above Dom was David Zophin, the President of AIL, and Steve Greer, the CEO of AIL.

7. Over the cou...        23.    Shortly after meeting Angie, she let me how unhappy she was at her job as a
problem that...                bartender, and how she would like to switch jobs. The insurance agencies who sell
the number o...                AIL insurance are often referred to as recruiting companies that also sells insurance.
the lack of re...              This description explains how important recruiting and new "hires" are to AIL.
did not consi...               There is an ever-present search for new employees, as the turnover employment
appropriately...               rate is astronomical. Thus, when Angie told me that she wanted a new job, I told
                               her that AIL's insurance agencies are always looking to hire due to AIL's business
8. If instances                model based on a pyramid scheme, or multi-level management business ("MLM").
instances of f...
and specifically told me to stop bringing fraud to their attention. Moreover, no
efforts were being made to determine why fraud began, and what policies,

- 25 -

70.　　The intense recruiting pressure also resulted in "recruiting fraud," whereby agents falsified agent contracts to collect the recruitment bonus.  According to the Fuzzy Panda Report, "[m]anagement at all levels were aware of the consumer and recruiting fraud."  Ex. B at 18.  One former agent even reported "***making up fake people as recruits to hit his monthly target***."  *Id.* at 25 (emphasis added).

71.　　Defendants repeatedly misrepresented that Globe Life's agents had immediate, lucrative career prospects in order to attract recruits.  For example, defendant Darden claimed that recruits had a "career opportunity" where they would "quickly move up into management."  Defendants also repeatedly touted the focus Globe Life had on training and retaining its agents and how this created robust growth in the Company's reported agent counts.

72.　　Globe Life coined the phrase "Opportunity Unlimited," through which it purported to offer unlimited earnings potential for recruits, with career agents supposedly seeing mid-five-figure income and SGA seeing mid-seven-figure income annually.  According to defendant Hutchison, "7-figure income is achievable.  It's not uncommon in American [I]ncome," and it is "not unusual" for a middle manager to have an "income of middle 6 figures," though the Company touts "Unlimited Annual Earnings Potential":



*See* https://www.ailcareers.com/articles/career-tracks-with-american-income-life-opportunity-unlimited.html.

73.     Consistent with those promises, Russin, a former agent for AIL, was prepared to testify that "representatives of AIL made various representations to Russin and other agents" during the recruiting process, including "the ability to earn a six-figure income as of his first year as a sales agent," and "[p]roviding all AIL sales agents with ample sales leads at no cost." *See* Ex. C at 10.

74.     In reality, agents were exploited with dim prospects of advancement, and new agents provided months of unpaid labor. Globe Life was plagued by "astronomical" turnover in career agents (Ex. A, ¶23) and has been described as a revolving door of people. AIL churned through thousands of agents yearly as those agents, who were thrown into workplaces rife with toxicity, struggled to even make minimum wage, let alone seven-figures. Ex. B at 2.

75.     Contrary to Defendants' representations about "Opportunity Unlimited," "immediate" opportunities, and "lots of prospects," new agents could expect to see in as few as five to ten days after joining the Company, Fuzzy Panda's investigation revealed that new recruits were ineligible to

receive sales commissions and were forced to provide one to two months of unpaid labor. Fuzzy Panda also revealed that agencies up-charged new recruits for insurance licensing courses and then pocketed the difference for themselves. Despite promises of "lots of prospects," agents were even required to pay "management fees" to their supervisors to keep working as agents and paid "[t]ribute [p]ayments to [their] [u]plines" (those higher up in the pyramid) to receive better leads for selling insurance. *Id.* at 25.

76.    In actuality, the average agent writes $30,000 Annual Life Premium ("ALP") per year and is making below-minimum wage.[2]  Approximately 75% of agents generate less than $30,000 ALP per year.

77.    Globe Life also attributed its Class Period success to its unique ability to provide "better training" and to "incentivize" agents to be more productive and stay with the Company. Globe Life boasted of the "comprehensive training program" it provided AIL's agents, including not only through its "Globe Life University," located at Globe Life's headquarters in McKinney, Texas, which was marketed as a tool to provide a "solid foundation of learning for agents," and to "teach[] new agents how to recruit and lead," but also through other "[c]ontinual learning" opportunities for its sales agents.

78.    In actuality, Globe Life's agents were far from "better trained." Defendants failed to disclose that better training or more focus on training was not, in fact, driving the "robust" growth in the Company's reported agent counts. Agents were not only improperly trained, which greatly increased the likelihood that fraud and other misconduct would occur, but they were also affirmatively taught and encouraged to commit fraud. Defendants' statements tying training and retention to agent growth masked what was occurring: AIL was growing its agent counts through an

---

[2]    ALP represents the annual premiums on life insurance policies, and is a term used internally by Globe Life.

undisclosed pyramid-like MLM scheme and a culture that incentivized and ignored – and even rewarded – fraud.

**C.      During the Class Period, Defendants Concealed that Fraud at AIL Was Inflating Sales**

79.      Defendants concealed that much of AIL's life insurance revenue came from AIL agencies that employed fraudulent practices, including using customers' personal information to create sham policies, increasing policy values after customers signed agreements, forging policyholders' signatures, falsifying applications, lying to customers about their benefits, impersonating customers' unions, using bait-and-switch tactics, and more, according to Fuzzy Panda's investigation.

**1.      Globe Life's Reported Life Premium and Life Net Sales Growth Was a Mirage, Premised on Insurance and Consumer Fraud**

80.      Throughout the Class Period, Defendants reported growing life insurance revenue and net sales at Globe Life, but concealed that 16 or more of the agencies writing business for AIL were committing insurance and consumer fraud, according to former agents and executives identified by Fuzzy Panda.  Fuzzy Panda's investigation revealed that from 2019-2023, agencies that sources said engaged in fraudulent business practices grew new ALP at 16% per year, while ALP declined by 0.5% per year at agencies that did not engage in such practices.  By 2023, more than 60% of AIL's new ALP came from agencies which, according to Fuzzy Panda's sources, were committing fraud. Ex. B at 5, 11.

81.      Defendants also promised in Globe Life's Code of Conduct that "[t]he Company seeks competitive advantages through superior performance, ***never through unethical or illegal business practices***," when the truth was that fraud inflated AIL's growth in life insurance sales and premium revenue throughout the Class Period, according to inside sources.

- 29 -

82.     While Globe Life's business model and toxic work environment fostered fraud, Globe Life and AIL implemented changes during the Class Period that further motivated and enabled agents to commit fraud to meet their targets and accelerate their own compensation: commissions were paid immediately at the point of sale, and virtual selling replaced in-person sales during and following the Covid-19 pandemic.

**a.      Defendants Concealed that the Company's Commission Structure Contributed to Fraudulent Practices**

83.     As alleged in §IV.A.2., AIL was by far Globe Life's largest and most profitable subsidiary and drove Globe Life's total reported premiums and sales.  Globe Life reported AIL's "Life Insurance Net Sales" ("Life Net Sales") and "Life Insurance Premium" ("Life Premium") as two of the primary financial metrics of the agency's performance.  Globe Life defined Life Net Sales as "annualized premium issued . . ., net of cancellations in the first thirty days after [policies were] issue[d]."[3]  AIL's Life Premium is the premium revenue that is recorded under Generally Accepted Accounting Principles ("GAAP") on Globe Life's consolidated income statement during a reporting period, such as its quarterly or annual reports filed with the SEC.

84.     In 2018, the financial reporting year preceding the Class Period, AIL reported disappointing financial results and agent recruitment, materially impacting Globe Life's overall results.  AIL's Life Net Sales were down  2% in the fourth quarter of 2018 ("Q4 2018") over the fourth quarter of 2017 ("Q4 2017") and flat for the full year 2018 compared to 2017, due to a lack of growth in agent count and productivity.  Average producing agent count for Q4 2018 was flat over Q4 2017, and down 2% sequentially from the third quarter of 2018 ("Q3 2018"), due to low unemployment across the country.  New agent retention also declined due to the high number of other work opportunities.

---

[3]    "Annualized premium issued" is gross premium that would be received during the policies' first year in force, assuming that none of the policies lapsed or terminated.

85.     Given the importance of AIL's life insurance sales and productivity to Globe Life's overall performance, and given Globe Life's business model of growing sales by growing agent count, Defendants quickly needed to curb AIL's declining sales and agent count and retention coming off of 2018.

86.     Historically, AIL's agents were paid commissions months after the date of sale. That changed in early 2019 when Defendants accelerated sales agent commissions so that they were paid immediately upon life insurance sales, in the hopes of improving agent recruitment and retention, as agents were paid strictly on commission and bonuses tied to sales volume.

87.     Following the commission restructuring, Defendants told analysts and investors that AIL was achieving increased Life Net Sales in 2019 as a result of higher agent retention thanks to its new commission policy. On Globe Life's October 24, 2019 earnings call with analysts and investors to discuss results for the third quarter of 2019 ("Q3 2019"), a BofA Merrill Lynch analyst noted that AIL's sales "were particularly good this quarter" at a 9% increase over Q3 2018, and asked if the agency was seeing a "turnaround." Hutchison responded that "strong recruiting" and "fewer terminations that was caused in part by the restructure in compensation" drove AIL's high sales in Q3 2019.

88.     Hutchison also commended the Company's new commission structure for AIL's 2019 sales growth and agent retention. At a Globe Life Inc. at Bank of America Merrill Lynch Securities Insurance Conference on February 12, 2020, Hutchison remarked: "The second thing we did early in 2019 was restructure our compensation. We didn't increase our compensation. ***We've moved some of that sales commission off the back end of the renewal and moved it to the front to the point of sale***, so the new agents have a greater income, and they stay with the company longer."

89.    But Defendants concealed that AIL's new immediate commission structure, combined with bonuses based on sales volume, created a culture centered on making money quickly by any means necessary and actually encouraged fraud at its largest agencies.

90.    For example, agents routinely took advantage of the new commission structure by engaging in a practice known internally as "rebating."  Rebating is a scheme whereby agents themselves pay the first several months of policy premiums on policies they produced for either actual or fictitious policyholders in order to make "sales" and collect their commissions.  The cost of a few months' premiums on a policy was a fraction of the agent's commission on the same policy, so that agents profited by rebating.

91.    Agents often promised customers that the agent would pay the first several months of the policy, and that the customers could then cancel the policy.  This practice allowed the sales agent to record the sale, achieve sales targets, be paid the resulting commissions in the immediate term, and quickly build sales volume toward bonus qualification.  Agents established bank accounts for the specific purpose of paying policy premiums.  After several months, and after receiving their commissions, the agents stopped paying on the policies, and the customers would cancel the policies or let them lapse.

92.    Rebating inflated AIL's Life Net Sales because even if policies lapsed or were canceled after 30 days, *i.e.*, after the very first premium payment, Globe Life reported the full amount of annual premium as net sales at the time they were made, because net sales excluded only those policies that were canceled within 30 days.

> **b.    Defendants Credited AIL's Virtual Sales for AIL's Growth in Life Net Sales and Premium Revenue Life Premium, Concealing that Fraud Was Inflating the Growth**

93.    Defendants implemented virtual technology at AIL in early 2020 in response to the Covid-19 pandemic.  That technology allowed agents to meet with customers, make presentations

- 32 -

and close sales on life insurance policies remotely, and also allowed managers to recruit new agents remotely.

94.     During the Class Period, Defendants claimed "the ability to recruit both virtually and in-person and to sell virtually and in person, will enhance our ability to grow the agencies."  In actuality, as was later revealed by Fuzzy Panda, some agents capitalized on the new virtual capabilities as additional means to engage in deceptive practices, further lending to artificially inflated Life Net Sales and Life Premium during the Class Period.  The new virtual technology created an environment that allowed agents to write polices without meeting with consumers in person and even sign policies without consumers' knowledge.  In addition, the virtual technology allowed agents to work remotely so that their conduct could not be monitored as effectively as it could be in person.

95.     After a brief, temporary decline in the second quarter of 2020 ("Q2 2020") due to the pandemic, Globe Life reported growing Life Net Sales through the remainder of 2020:

| Reporting Period | Globe Life Life Net Sales | Increase Over Prior Year Reporting Period | AIL Life Net Sales | Increase Over Prior Year Period | AIL % of Globe Life Annual Life Net Sales |
|---|---|---|---|---|---|
| Q2 2019 | $112 million | 1% | $61 million | 2% | |
| Q3 2019 | $105 million | 6% | $60 million | 9% | |
| Q4 2019 | $107 million | 7% | $59 million | 9% | |
| **FY 2019** | $430 million | 4% | $238 million | 6% | 55% |
| Q1 2020 | $111 million | 5% | $63 million | 9% | |
| Q2 2020 | $114 million | 2% | $51 million | (16%) | |
| Q3 2020 | $128 million | 21% | $68 million | 14% | |
| Q4 2020 | $131 million | 23% | $71 million | 20% | |
| **FY 2020** | $484 million | 13% | $253 million | 7% | 52% |

96.     AIL's Life Premium similarly grew 7%-10% quarterly in 2020.

97.     By the end of 2020, 80% of AIL's sales were virtual.  Globe Life's net sales continued to grow annually from 2021 through 2023 thanks to growth at AIL:

| Reporting Period | Globe Life Life Net Sales | Increase (Decrease) Over Prior Year Reporting Period | AIL Life Net Sales | Increase (Decrease) Over Prior Year Period | AIL % of Globe Life Annual Life Net Sales |
|---|---|---|---|---|---|
| Q1 2021 | $128 million | 16% | $70 million | 11% | |
| Q2 2021 | $136 million | 19% | $73 million | 42% | |
| Q3 2021 | $128 million | — | $74 million | 9% | |
| Q4 2021 | $129 million | (1%) | $74 million | 4% | |
| **FY 2021** | $522 million | 8% | $291 million | 15% | 56% |
| Q1 2022 | $139 million | 8% | $85 million | 23% | |
| Q2 2022 | $140 million | 2% | $85 million | 16% | |
| Q3 2022 | $126 million | (1%) | $76 million | 4% | |
| Q4 2022 | $126 million | (2%) | $70 million | (6%) | |
| **FY 2022** | $531 million | 2% | $317 million | 9% | 59% |
| Q1 2023 | $140 million | 1% | $83 million | (2%) | |
| Q2 2023 | $139 million | — | $82 million | (4%) | |
| Q3 2023 | $134 million | 6% | $81 million | 6% | |
| Q4 2023 | $130 million | 3% | $76 million | 9% | |
| **FY 2023** | $544 million | 3% | $323 million | 2% | 59% |

98.    Globe Life's and AIL's Life Premium followed suit during that same timeframe, consistently growing over prior year reporting periods.

99.    Defendants attributed Globe Life's and AIL's sales and premium growth from 2020-2023 to a successful shift to virtual sales and recruiting.  For example:

- By the third quarter of 2020 ("Q3 2020"), Hutchison told analysts that Globe Life's "agencies have adapted to virtual sales appointments and recruiting.  ***They are thriving in this environment***."

- During the Globe Life Inc. at Bank of America Insurance Conference on February 10, 2021, Hutchison stressed that Globe Life's ability to sell and recruit virtually was the "***new normal***," and that its "13,000 agents have done very well.  ***They've transitioned from an in-person sale in March [2020] to a virtual sale and . . . once they made that transition, we saw sales pick up in the second quarter and strong sales in the third and fourth quarter***, and we've had good recruiting this year."

- In Globe Life's 2020 Annual Report, signed by defendants Coleman and Hutchison, Defendants commended AIL for generating over 52% of Globe Life's 2020 Life Net Sales and 47% of Life Premium through virtual sales: "***American Income Life*** . . . ***quickly overcame obstacles presented by the pandemic, successfully adding virtual sales and recruiting processes developed in cooperation with the home office***."

- 34 -

- In Globe Life's 2021 Form 10-K signed by defendants Coleman, Hutchison, Svoboda, and Henrie, Defendants told investors: "In 2021, American Income Life was the largest contributor of life premium at 48% of Globe Life's 2021 total life premium. The division generated life net sales growth of 15% in 2021. . . . The vast majority of customer appointments are now virtual. ***The ability to meet customers face to face both virtually and in person greatly enhances this division's growth potential***."

100.   AIL's Life Net Sales and Life Premium growth from 2019 through 2023, however, were inflated by rebating and other fraudulent sales practices, some of which were enabled by AIL's shift to virtual sales.

101.   In order to meet the aggressive sales targets set by managers, agents at AIL's highest grossing agencies commonly wrote unauthorized life insurance policies, increased policy values without customer authorization, and added unauthorized benefits to existing policies by: (a) wrongly using personal information of current and former AIL customers; (b) manually altering the value of policies in AIL's Eapp system, which was used to submit policy applications; (c) forging signatures of customers with existing policies to enhance those policies or add additional policies without the customers' approval; (d) collecting checking and credit card information from prospective customers and then creating policies without their approval; (e) producing sham policies in the names of friends and family members; (f) writing life insurance policies for deceased people; (g) making false representations to customers about their policies and what benefits they would receive; and (h) manipulating and coercing consumers and union members into purchasing policies they did not want or need.

102.   Such practices were reportedly used throughout the Class Period at AIL's largest, most productive agencies such as AO, Arias Organization, Parks-Salvaggi, Quinterro, Giglione-Ackerman ("G-A"), Henderson Locker, and others. According to Fuzzy Panda, the insurance fraud committed by these agencies artificially inflated Globe Life's reported Life Net Sales and Life Premium.

- 35 -

103.    In addition, at AIL, managers had access to the customer management system ("CAS"), which contained social security numbers and other sensitive data concerning existing policyholders.  Fuzzy Panda revealed that "favored salespeople" were purportedly given access to the system and used that improper access to create new insurance applications.  Ex. B at 16. Further, agents used a system known as Eapp to complete and submit insurance applications, which lacked live scan checks and the ability to confirm that social security numbers or birth dates were valid or associated with a real person.

104.    Agents' prohibited use of private consumer and customer data violated consumer privacy rights and federal and state laws regulating Globe Life's possession and use of private, personally identifiable information, putting the Company at risk for civil and criminal regulatory action, lawsuits, fines, and penalties, as well as putting at risk its reputation and business operations.

105.    While knowing and concealing that such risks had materialized, Defendants misleadingly cautioned investors throughout the Class Period in Globe Life's Forms 10-K for 2019-2023 that "[n]on-compliance with laws or regulations related to customer and consumer privacy and information security, including a failure to ensure that our business associates with access to sensitive customer and consumer information maintain its confidentiality, could materially adversely affect our reputation and business operations."

### c.    Defendants Concealed that the Company Engaged in Deceptive Acts and Consumer Fraud

106.    Defendants' representations throughout the Class Period that Globe Life and its subsidiaries "never" sought competitive advantages "through unethical or illegal business practices" were also false and misleading because AIL's agents often lied to customers in order to drum up more business.

107.    Fuzzy Panda's investigation revealed that the only way to keep up with colleagues "willing to employ deceitful and manipulative tactics" was to "lie, cheat and mislead."  Ex. B at 18.

- 36 -

For example, Fuzzy Panda revealed that AIL's agents would make deceitful representations to customers about their policies and what benefits they would receive. *Id.* at 17. According to Fuzzy Panda, one former agent revealed that management was well aware of the purported consumer fraud and sometimes even actively encouraged it. *Id.* at 18. Former agent Pedro Lemos wrote an email to a Vice President in August 2021, allegedly informing the Vice President of the "deceitful and unethical" sales practices. According to the Fuzzy Panda Report, former agents have said that "they repeatedly told senior manager [*sic*] what they were seeing." *Id.* at 17.

108. Using bait-and-switch tactics, AIL preyed upon members of labor unions in particular. AIL would first gain access to union members' personal information by convincing unions to accept a "free" benefit for its members (such as accidental death and dismemberment policies worth $4,000 or less). *Id.* at 46. Then, AIL would use the "free" benefit to get a foot in the door of union members' homes, where agents would pivot from the small benefit to aggressively trying to sell more expensive policies, misrepresenting themselves as being connected to the members' unions, or even trying to convince the members that they had to buy an AIL policy to stay in their unions. *Id.* at 18, 46. For example, agents at AIL's Carvajal Agencies were trained to refer to prospective customers as "***our*** union members" and to represent that the union was stating that the members had to decide whether to purchase insurance that same day.

109. AIL was well aware that it was a common occurrence for its agents to misrepresent themselves as being connected to prospective customers' labor unions. Indeed, in AIL's "frequently asked questions" document addressed to unions, AIL includes the following: "Someone called and said they are from the Union." Thus, AIL has admitted that unions were "frequently asked" about agents falsely representing to customers that the agents were from the union.

110. Another favorite bait-and-switch strategy used by Globe Life and AIL was the "Child Safe Kit," which Globe Life and AIL used to obtain parents' personal information in order to get a

- 37 -

foot in the door of the parents' homes. First, AIL advertised the free "Child Safe Kits" on Facebook and through other marketing as a tool for helping to locate a missing child quickly by saving important personal information in one place (*e.g.*, height, weight, eye color, and blood type). Rather than make the kits available online for easy download, as the federal government's Ready.gov website does with its Child ID Kits, Globe Life and AIL had parents provide their personal information.

111.    Globe Life and AIL would then have their army of captive agents contact the parents to set up home visits to deliver the kits, falsely representing that they were working with police, teachers, and Amber Alert. Once parents let the agents in their homes, they would be subjected to Globe Life's true agenda of having a captive audience for a lengthy sales pitch.

### 2.    Defendants Knew that Fraud Was Rampant at AIL

112.    Defendants were well aware that fraud was rampant and driving AIL's incremental Life Net Sales and Life Premium throughout the Class Period, but concealed the misconduct because Globe Life and the other defendants benefitted from it.

113.    Dehning, a former Vice President of Field Operations at AIL from 2019 to 2023, attested to internal knowledge and acceptance of widespread fraud. According to the Dehning Affidavit, Dehning was "one of about five vice presidents at AIL." Ex. A, ¶6. Dehning reported to Dominic "Dom" Bertini ("Bertini"), who was the sole Senior Vice President at AIL. *Id*. Bertini, in turn, reported to AIL President Zophin and AIL CEO defendant Greer. *Id*. Dehning stated under penalty of perjury that:

> I noticed that fraud was a serious and on-going problem that was not being adequately handled by AIL. I was troubled not just by the number of instances of fraud, nor by the variety of sources of the fraud, but by the lack of response by AIL. What I found most astonishing was the fact that ***AIL did not consider the widespread fraud to be a significant issue that needed addressed appropriately***.
>
> . . . AIL did not want to hear about the instances of fraud and specifically told me to stop bringing fraud to their attention. . . .

- 38 -

Because the fraud was so rampant, and because AIL did not make any serious efforts to curb the continued, on-going fraud, I began to suspect that certain people at AIL sanctioned the fraud. ***The more I considered the matter, the more I realized that the fraud was actually profitable to AIL***.

\*        \*        \*

Over the past several months, there have been multiple reports about Globe Life/AIL, identifying the exact types of fraud that I was blowing the whistle on between 2021-2023.

\*        \*        \*

I have seen the reports by Fuzzy Panda and Viceroy, and others, discussing the fraud that I had blown the whistle on. . . . What these reports seem to grasp is that ***"growth" was always the key metric upon which business at AIL was judged. Everything was about growth, and that is why the fraud was looked on favorably within the top of the pyramid at AIL: the fraud showed growth. The fraud helped agents hit bonuses, but it also inflated the stock price by appearing that AIL was growing exponentially***. It appeared as though the company kept selling more and more insurance policies, and as though the pyramid was getting bigger and bigger. If those policies were later retracted, it was no longer a factor.

*See id.*, ¶¶7-9, 21, 30.

114.    According to Fuzzy Panda, Dehning sent over 200 emails to AIL executives, including defendants Greer and Scarborough, detailing rampant fraud at AIL.

115.    Defendants also knew about the fraud at AIL because they were aware of several ongoing investigations by state regulators who found:

- In order to meet performance quotas and receive associated bonuses, AIL's agents created fraudulent policies using false applicant names, addresses, telephone numbers, and social security numbers. Agents used websites specializing in generating and providing random personal identifiable information.

- In other cases, agents used personal information from prior acquaintances, friends, and family members and altered that information, making it impossible for AIL to contact those individuals or verify the veracity of the application information.

- Despite Globe Life's purported quality control processes, agents were able to create scores of fictitious policies that went unnoticed ***for years***. In one instance, an AIL agent carried on a fraudulent and fictitious policy scheme for nearly five years.

- 39 -

**D.    Defendants Concealed that Globe Life and Its Senior Insiders Created a Toxic Work Environment that Permeated All Levels of the Company**

116.    Globe Life's management has emphasized the importance of the Company's culture to the overall business, especially because life insurance is a "people business."  Indeed, the Company boasts of holding contests and annual conventions that purportedly promote productivity. It has also stated that its "office culture" contributes to better agent retention.

117.    During the Class Period, Defendants repeatedly promised that "Globe Life prohibits and will not tolerate" discrimination or harassment, and that "[v]iolence and threatening behavior are not permitted."  They also represented that Globe Life took proper action in response to violations, including through investigating and implementing corrective actions, including termination of wrongdoers.

118.    But the Fuzzy Panda Report revealed it was all a façade – while Defendants promised during the Class Period that Globe Life did not tolerate harassment, violence, and drug use at the workplace, the truth was that AIL was permeated by a toxic "Wolf of Wall Street" workplace culture in which abuse, sexual harassment, and drug use were rampant, and not only tolerated, but even openly encouraged.  Ex. B at 29-30.

119.    Fuzzy Panda shined a light on the troubling conduct at the Company's highest levels, identifying defendant Greer, CEO of AIL, and Zophin, President of AIL, as individuals with knowledge of the misconduct.

120.    According to one complaint filed in New Jersey state court and identified by Fuzzy Panda, Zophin often frequented AIL agency offices to "provide direct leadership and support to agents," in addition to leading weekly meetings with SGA, and attended AIL national conventions where drugs and sexual hostility were rampant.[4]  AIL's former Vice President of Field Operations

---

[4]    *See Little, et al. v. American Income Life Insurance Company*, No. MID-L-000417-24 (N.J. Super. Ct., Middlesex Cnty.) ("*Little*").

- 40 -

described that Zophin and Greer participated in calls and meetings, and attended other offsite work events with AIL's agents.

121.    The Fuzzy Panda Report revealed that in one instance, Zophin reportedly participated in the pervasive misconduct by approaching an agent sexually and provocatively holding her hand without consent.  Ex. B at 30.  According to the allegations in the *Little* complaint, Zophin and Greer witnessed firsthand the out-of-control culture of drinking, drugs, and harassment that inundated the twice-annual AIL conventions.  That complaint described how, at a May 2021 convention in Cancun, Zophin and Greer allegedly sat in the VIP section and watched female agents "twerking" in thongs, as attendees drank and cheered.

122.    *Little* also alleged how Zophin and Greer condoned similar conduct over the course of the five-day conference, as managers ogled female agents, catcalled, and tried to "pick up" agents. Similar conduct occurred at the 2019 Las Vegas convention, where attendees were drunk and many agents and managers engaged in sexually suggestive conduct like "twerking," "grinding," and sexual touching.  It has been alleged by one former agent that at that same conference, Managing General Agents and Regional General Agents of AIL even openly solicited prostitutes.

123.    Zophin and Greer purposely turned a blind eye to the conduct.  For example, the Dehning Affidavit details that when Dehning raised the issue of sexual harassment, Zophin and Greer "admonished and berated" him and told him "to shut up, to sit down, and to stop bringing it up."  Ex. A, ¶11.

124.    Despite Defendants' assurances about Globe Life's policy against harassment and Defendants' commitments to ensuring that policy was followed, the truth was that Globe Life and AIL failed to take appropriate steps to prevent or correct harassment "***because doing so is deemed inconsistent with [the] workplace 'culture'" of Globe Life***.  Ex. D at 4 (emphasis added).

125.    As the EEOC recently determined, during the years covering the Class Period, Globe Life retaliated against employees for reporting harassment, failed to maintain ways to report harassment, and failed to terminate high-level management with multiple reports of harassment and assault made against them.  Further illustrating AIL's and Globe Life's high tolerance for harassment is the fact that AIL did not even have a human resources department for handling complaints of misconduct, according to former agent Yairaniz Ruiz's ("Ruiz") complaint, and as evidenced by the EEOC Determination.  *See id.* at 4 (noting "[Globe Life] does not maintain any reasonable avenues for reporting sexual harassment or discrimination or obtaining remedial action regarding such conduct").

### 1.    The Giglione-Ackerman Agency

126.    Still other instances of pervasive misconduct emerged during the course of Fuzzy Panda's investigation.  Fuzzy Panda identified AIL's agency G-A as another example of an AIL environment beset by alleged harassment and assault.

127.    Fuzzy Panda detailed how one former G-A agent, Ruiz, claimed she was exposed to relentless abuse, and was allegedly "stalked, choked, and repeatedly raped" by AIL Managing General Agent Richard Zuccato ("Zuccato").  Ex. B at 31.  According to a complaint Ruiz filed against AIL in New Jersey state court on March 28, 2024, "it was an accepted norm that women were called 'bitches' by male members of management."[5]  In that complaint, Ruiz alleges AIL and G-A "tolerated and perpetuated an atmosphere pervaded by sexual harassment and assault."

128.    According to *Ruiz*, G-A's SGA Eric Giglione set the tone at the top, and purportedly "repeatedly referred to his top saleswoman as 'his bitch' in the presence of her assembled colleagues . . . in large group meetings."  And at Monday meetings, "Giglione would routinely call

---

[5]    *Ruiz v. American Income Life Insurance Company, et al.*, No. MID-L-001967 (N.J. Super. Ct., Middlesex Cnty.) ("*Ruiz*").

women up to dance with him and flirt with the female agents, . . . comment on their appearances, and objectify female agents."    According to *Ruiz*, AIL and G-A "tolerated and perpetuated an atmosphere pervaded by sexual harassment and assault."

129.    According to the *Ruiz* complaint, Zophin, was often present at G-A "to provide direct leadership and support to agents," and he directly controlled and supervised agents' work.  And as she alleged, when Ruiz saw an opportunity to transfer to a new agency away from her abusers, Zophin personally denied the request and stated that she was to have no further contact with that SGA.  Ruiz alleged that a few months later she was then choked and raped again by Managing General Agent Zuccato, leaving her "devastated, embarrassed," and with "nowhere to turn."

130.    Back in the hands of her abusers, Ruiz asserts she was rewarded with retaliation in the form of lower quality leads and the loss of her primary book of business.  According to *Ruiz*, AIL then allegedly sent a letter to Ruiz indicating it would terminate her employment contract for lack of revenue.

### 2.    Arias Organization

131.    AIL's Arias Organization was founded by SGA Simon Arias ("Arias").  In late 2020, Globe Life's then Co-CEO defendant Hutchison traveled to Arias' home office to celebrate the agency's most productive month, calling Arias "'an inspiration to me and everybody in the home office.'"  All the while, the Arias Organization had a work environment plagued by pervasive sexual harassment and assault, where ridicule and abuse were commonplace.

132.    Fuzzy Panda and other reports highlight the wide-ranging toxicity of the Arias Organization, as was described by former agent Renee Zinsky ("Zinsky") in a lawsuit against AIL and Arias filed in the U.S. District Court for the Western District of Pennsylvania.[6]  For example, Zinsky alleged that male leaders drugged female subordinates with "'date rape drugs' . . . without

---

[6]    *Zinsky v. Russin, et al.*, No. 2:22-cv-00547 (W.D. Pa.) ("*Zinsky*").

their knowledge or consent," and often referred to males as "studs" and "stallions" while referring to females as "sluts," "bitches," and "whores."  Meanwhile, the use of steroids, male enhancing drugs, cocaine, painkillers, and other drugs was purportedly open and frequent during work hours, and male leaders allegedly often engaged openly in physical fights, wrestling matches, and similar aggressive and violent behavior at the workplace.

133.    Zinsky's allegations detailed the abuse she experienced, including, but not limited to, her supervisor Russin allegedly exposing his genitals to her and female peers, seeking sexual favors from Zinsky, touching her without her consent, and drugging her without her consent, causing her to lose consciousness and/or control of her body.

134.    Globe Life was well aware of the abusive environment at the Arias Organization. First, according to Zinsky, defendant Greer and Zophin frequently visited the Arias Organization. Second, Zinsky allegedly personally informed AIL's Senior Vice President of Agency, Debbie Gamble ("Gamble"), of her concerns, at which point Gamble escalated the matter directly to Globe Life's Assistant General Counsel, Logan P. Blackmore ("Blackmore").

135.    Thereafter, Globe Life's Assistant General Counsel retained outside counsel, Janet Hendrick ("Hendrick") of the Phillips Murrah law firm, to investigate Zinsky's claims on behalf of the Company.  According to the complaint in *Zinsky*, Hendrick received large volumes of details concerning sexual harassment as well as unethical and fraudulent business practices at the Arias Organization, along with names of witnesses.

136.    Globe Life's outside counsel interviewed Zinsky on November 30, 2021.  One month later, counsel represented to Zinsky that AIL would handle the alleged ethics issues internally, managed by Globe Life's Assistant General Counsel Blackmore.

137.    Defendant Darden confirmed during the Company's earnings call for the fourth quarter of 2023 ("Q4 2023"), that in 2021, the Company "engaged an external third party to conduct

- 44 -

an impartial and thorough investigation" into Zinsky's allegations.  According to Zinsky, on February 2, 2022, Globe Life's outside counsel represented to Zinsky that her claims of sexual harassment had been substantiated.  AIL thereafter terminated Russin, but according to Zinsky's allegations, the "termination" has proven meaningless, as AIL (and thus Globe Life) allegedly continued to work with Russin in order to obtain leads and new recruits, and Russin has allegedly continued participating in meetings, communications, and work events.

138.    Just three months after Globe Life's Assistant General Counsel retained outside counsel to investigate Zinsky's claims, and the same month those claims were allegedly deemed substantiated by Company counsel, defendants Coleman and Hutchison personally presented Arias with the Globe Life Legacy Award.  The leader of the Arias Organization accepted the Company's $25,000 award with a smile:

- 45 -



139.     According to court filings in *Zinsky*, just days after the Fuzzy Panda Report Russin, a defendant in *Zinsky*, was prepared to testify about his experience working with AIL.  In particular, according to the Zinsky-Russin Stipulation, Russin agreed to testify as to certain "stipulated facts," including that:

> Russin witnessed other AIL agents behave inappropriately toward subordinate female agent [*sic*] in the following manner:
>
> a.  Openly making comments about females [*sic*] agents, including regarding their physical appearance in a sexualized manner;
>
> b.  Use of derogatory terms in general but to include "bitches" "sluts" and "whores";

- 46 -

c.  Agents publicly discussing sexual encounters with other agents; and

d.  Callouts that included humiliating or offensive behavior such as hair removal, getting tattoos, and consuming alcohol.

*See* Ex. C at 14.

140.    The Zinsky-Russin Stipulation also includes as a "stipulated fact," to which Russin was prepared to testify, that "AIL leaders such as Steve Greer and David Zophin frequently visited the office that Russin worked out of, participated in calls and meetings, and attended other offsite work events (dinners, convention, speaking engagements, social outings) with the AIL agents.  AIL leaders must have been aware of the culture in the Arias office . . . ."  *Id.*

141.    Russin was also prepared to testify that to his knowledge, "AIL was aware of . . . '[u]nwelcomed sexual comments toward subordinate female agents,'" and the following:

a.  Russin engaged in and witnessed alcohol and drug use by sales agents at Arias during the course and scope of the typical workday;

b.  AIL managers and business leaders used language that could be seen as discriminatory, lewd, and offensive in the work environment;

c.  AIL managers and business leaders behaved in a manner that could be seen as lewd and offensive in the work environment;

d.  AIL and Arias' managers and business leader also behave in a manner that could be seen as lewd and offensive in a normal work environment;

e.  Russin witnessed footage of a colleague physically assault[ing] another agent by throwing him through door;

f.  AIL managers and business leaders would frequently host work-related events at bars and nightclubs;

g.  AIL managers and business leaders would use threats against subordinate agents;

h.  When agents separated from Arias/AIL, the managers would typically make disparaging and/or defamatory comments about their former agents;

i.  AIL managers and business leaders discouraged subordinate agents from retaining legal counsel and/or initiating legal claims against AIL; and

*         *         *

- 47 -

4877-5268-4006.v3

    k.  Leaders would withhold Leads as a disciplinary measure;

    l.  Leaders would remove subordinate agents as a disciplinary measure; and

    m.  All AIL applications had to be reviewed and approved by AIL.

*Id.* at 14-15.

142.    On February 28, 2023, *Business Insider* published an article concerning AIL's Arias Organization titled, "Lawsuit Against Globe Life Subsidiary Alleges Sex Abuse, Hard Drugs, Fraud at Top Agency."  To alleviate any investor concern of widespread misconduct, defendant Haworth, Globe Life's Executive Vice President and Chief Marketing Officer, provided comments to *Business Insider*.

143.    In that article, Haworth promised that AIL "'takes seriously any allegation brought to its attention concerning sexual harassment, inappropriate conduct, or unethical business practices' and 'makes clear that it does not tolerate' such behavior."  The Globe Life spokesperson took it a step further, with Haworth promising that "[a]gents or others 'are subject to contract termination if they engage in misconduct.'"  In truth, Globe Life and AIL not only tolerated, but encouraged, widespread fraud at agencies as well as a toxic workplace of sexual harassment and abuse.  As the EEOC Determination makes clear, Globe Life and AIL actually continued employing high-level management officials even after multiple reports of sexual harassment and assault were made against them.  *See* Ex. D at 5 ("In fact, high-level management officials and others against whom multiple reports of sexual harassment and assault have been made have continued to work for [Globe Life] even after such reports and have not been subject to appropriate corrective action.").

144.    Unbeknownst to investors, on November 30, 2023, the DOJ subpoenaed Globe Life and AIL seeking a wide array of documents related to AIL's Arias Organization agencies and certain individuals, including Arias and Russin, to investigate alleged misconduct.  The subpoenaed documents included, among other things, insurance policy documents, financial statements,

- 48 -

accounting records, work papers, personnel files, internal investigation files, financial or business transactions, and communications among Arias, Russin, and others.  Then on December 29, 2023, *Business Insider* published an article titled, "EEOC takes up sexual harassment cases against Globe Life subsidiary," revealing that the EEOC had revoked its dismissal of two sexual harassment claims filed by agents against AIL and "its star agency, the Arias Organization."

145.    A few weeks later, during the Company's Q4 2023 earnings call for analysts and investors held on February 8, 2024, defendant Darden admitted that the Company was aware of the allegations in *Zinsky* but claimed that AIL had taken "prompt and appropriate action" and that Globe Life and AIL "take seriously" and "do not tolerate" "harassment, inappropriate conduct or unethical business practices."  Despite choosing on that call to speak to the *Zinsky* allegations against AIL and Arias, which included allegations of harassment and fraud, Defendants remained silent as to their receipt of the DOJ subpoena directed at AIL and Arias three months prior.

146.    Feeling mounting pressure, on March 14, 2024, Defendants issued a press release attached to a Form 8-K filed with the SEC finally confirming Globe Life received a subpoena from the DOJ through the U.S. Attorney's Office for the Western District of Pennsylvania.  The next month, Fuzzy Panda revealed the pervasive and ongoing fraud and misconduct plaguing the Company.

E.    **Fuzzy Panda Issues a Damning Report Revealing that the Company Is Plagued by Systemic Fraud and Misconduct and that Globe Life's Agencies Are Pyramid Schemes**

147.    Just prior to markets opening on April 11, 2024, investment research firm Fuzzy Panda issued a bombshell investigative report revealing widespread misconduct.  Based on a comprehensive investigation that included interviews with dozens of former executives and agents, uncovering an executive level whistleblower, and undergoing AIL's recruiting process as undercover agents, Fuzzy Panda revealed numerous facts showing that AIL had engaged in widespread

insurance fraud, while encouraging a culture of sexual harassment and abuse.  Ex. B at 1.  According to Fuzzy Panda, AIL Vice President of Field Operations Dehning allegedly sent in excess of 200 emails detailing fraud to Company executives, including to defendants Greer and Scarborough.

148.    Fuzzy Panda revealed that issues of fraud were not limited to a single sales team, but rather were systemic, pervasive, and widespread within AIL.  *Id.* at 9.  In early 2023, *Business Insider* briefly discussed fraudulent practices at the agency run by Arias.  *Id.*  But through its interviews with dozens of former executives and agents, Fuzzy Panda found that AIL's problems were not limited to the Arias Organization, but were instead widespread throughout AIL sales teams. *Id.*  Fuzzy Panda uncovered more than 16 AIL agencies with corroborated fraudulent insurance production.  *Id.* at 2.

149.    Fuzzy Panda reported that AIL sales teams alleged to have committed insurance fraud accounted for more than $200 million of AIL's new ALP in 2023, which is more than 60% of AIL's total new business.  *Id.* at 11.  Fuzzy Panda evaluated AIL sales teams that made up 70% of AIL's total new ALP and through its analysis, was able to confirm that AIL sales teams ***with*** corroborated fraudulent underwriting made up 61% of AIL's total new ALP. *Id.* at 11-12.  AIL sales teams with suspected, though not yet confirmed, fraud made up 7% of AIL's new ALP.  *Id.* at 12.  Sales teams without confirmed fraudulent practices were responsible for only 2% of AIL's new ALP.  *Id.*

150.    Fuzzy Panda found that even under a conservative assumption that  the suspected, but not yet confirmed, fraudulent sales team were "clean," less than 12% of AIL's sales teams were not writing fraudulent insurance policies.  *Id.*  Fuzzy Panda published the following chart detailing the rampant fraud among AIL sales teams:

## Globe Life - American Income Life Division
### Life Insurance - 2023 Annual Life Premium (ALP) Reported

| Sales Agency Name | Annual Life Premium (ALP) Written in 2023 | Former(s)'s Commentary - Does this "Sales Team" Commit lots of Fraud? | Other Sources Indicating Rampant Fraudulent Underwriting | Year of ALP Metric |
|---|---|---|---|---|
| AO | $ 107,490,218 | Yes - lots of illegal underwriting | Numerous reports of Fraud by Executives | 2023 |
| Simon Arias | $ 20,805,887 | Yes, Oh God Yes | Former Executives; Sales Agents; & Documents in Lawsuits | 2023 |
| Arias-Dlabik | $ 4,071,196 | Yes they are dirty as hell | Former Executives; Sales Agents; & Documents in Lawsuits | 2023 |
| S-S-Parks-Salvaggi | $ 18,105,435 | Yep | Former Executives | 2023 |
| S-S-Bendure-Hartwig | $ 7,575,562 | Yeah | Former Executives | 2023 |
| Beto Quintero | $ 8,990,646 | Yes - "Oh God. Notorious. He's Notorious - Company has threatened to fire him for the last 5-8 years" | Former Executives | 2023 |
| Quintero-Vidal | $ 1,738,904 | Yep - they are all doing it | Former Executives | 2023 |
| Sabrina Lloyd | $ 6,192,581 | Yes - She's terrible | Documents about internal investigation inside GL | 2023* |
| Giglione Ackerman | $ 5,910,244 | Yes | Rape & Sexual Harrssment Lawsuits; Former Executives | 2023 |
| Albert "Alby" Serur | $ 4,386,395 | Yes, absolutely. Big into drugs too. | Previous Top Agent - Arias | 2023 |
| Walter Icaza | $ 3,752,506 | Yes - Came from Quintero ... They are birds of the same feather | Previous Top Agent - Quintero | 2023 |
| Henderson Locker | $ 4,259,364 | Yes, easily bad. Also, when all the SGAs got together he had lots this color, [Lockie] was the Wolf of Wall Street and really bad just like Zach Hart | Former Executives + Sales Agent | 2023* |
| Jamison Weatherspoon | $ 3,204,905 | Yes he does do fraud. | Former Executives | 2023 |
| Zach Hart / Hart-McCallum | n/a | Yes | Former Quotes & Emails | left in 2021 |
| Cindy Furer | $ 2,916,890 | Yes | Former Executives | 2023* |
| Stephen Giddens/Giddens Org/Giddens-Giddens | $ 3,828,687 | Yes they are slimy | Former Executives | 2023 |
| | **$ 203,229,420** | | | |

| American Income Life - Total 2023 Life Insurance ALP | $ 333,676,991 |
|---|---|
| **% Underwritten by Teams Confirmed of Fraudulent Underwriting** | **61%** |

*Id.*

151. As indicated in the chart, based on Fuzzy Panda's detailed investigation, sales agencies at AIL that engaged in fraudulent underwriting wrote over $200 million of ALP out of a total of approximately $333 million (or 61%) ALP in 2023.

152. The Fuzzy Panda Report also revealed that AIL's growth was "a mirage." *Id.* at 2. Indeed, Fuzzy Panda discovered that over the last four years AIL sales teams that engaged in insurance fraud grew ALP at a rate of 16% each year, while the "[c]lean" sales team, the teams without fraudulent underwriting practices, declined by 0.5% year over year. *Id.*

- 51 -

153.    Fuzzy Panda also exposed AIL's corporate culture where drug use and sexual misconduct was rampant.  Fuzzy Panda brought to light that AIL was riddled with misconduct and that AIL's culture created an environment rife with alleged sexual harassment.  *Id.* at 3.  The April 11, 2024 Fuzzy Panda Report highlighted multiple lawsuits brought by former agents against AIL and several of its largest captive sales teams detailing a hostile work environment.  *Id.*

154.    The Fuzzy Panda Report highlighted a lawsuit filed in New Jersey state court in March 2024 against AIL and its G-A agency, where AIL management failed to respond to rape, sexual assault, harassment, and retaliation.  *Id.* at 30.  Fuzzy Panda revealed that agent Ruiz endured a relentless campaign of sexual terror that lasted the entire seven years she worked for the agency, including unwanted sexual advances.  *Id.* at 30-32.  According to Fuzzy Panda, Ruiz attempted to report her alleged abuse but was informed by the AIL corporate office that there was no human resource department to report to, and that she must file a complaint to the same managers who were abusing her.  *Id.* at 31.  "AIL allegedly failed to take any meaningful steps to protect Ruiz and instead actively retaliated against her for speaking up, denying her transfers and assigning her lower-quality leads, ultimately crippling her career."  *Id.* at 32.

155.    Fuzzy Panda also brought to light another New Jersey lawsuit filed in January 2024 by six former AIL agents detailing a debauched sexualized atmosphere at AIL's bi-yearly conferences.  *Id.* at 33.  Fuzzy Panda reported that, at a conference in Cancun in May 2021, Greer and Zophin allegedly joined colleagues in the VIP section where they watched female employees "twerk" in thongs.  *Id.*  Fuzzy Panda reported that this open and notorious behavior was condoned by AIL's CEO and President at AIL conferences.  *Id.*

156.    Fuzzy Panda reported that AIL CEO defendant Greer and AIL President Zophin witnessed firsthand some of the disturbing conduct in the office and at work events as each often frequently visited the Arias Organization office and attended work-related events.  *Id.*  The Fuzzy

- 52 -

Panda Report exposed text messages from Russin to agent Zinsky that the only way to get a promotion is if Zinsky and her wife "'blow [him] at the same time.'" *Id.* at 35. The *Zinsky* complaint details a string of horrifying sexual assaults Zinsky experienced at the hands of her superior Russin, including Russin: (i) "[e]xposing his genitals to [Zinsky] and other female agents during work meetings, saying 'What are you going to do about this?'"; (ii) sending nude photos of himself; (iii) "[t]aking her for a drive and then forcing her to watch him masturbate in a parking lot"; and (iv) "[a]dministering 'date rape' drugs without her knowledge" where "she was 'forced to engage in sexualized conduct against her will.'" *Id.*

157.    The Fuzzy Panda Report also concluded that AIL's MLM structure borders on an illegal pyramid scheme in multiple states. *Id.* at 2. Through its use of undercover investigators navigating through the AIL recruiting process more than ten times, Fuzzy Panda revealed how AIL's agents explained "'[u]plines'" and "'how recruiting new agents is more lucrative than selling [actual] policies.'" *Id.*

158.    A MLM scheme becomes an illegal pyramid scheme when recruitment of people becomes more profitable than product sales. *Id.* at 27. Fuzzy Panda's investigators were explicitly told, "'yes, you can make more money, recruiting people than selling insurance.'" *Id.* As a part of the scheme, new recruits are forced to pay $150 out of pocket for a required licensing course, and then required to work for anywhere from one to two months without pay until they become eligible to generate commissions. *Id.* at 26.

159.    A former Vice President of Field Operations for AIL described in the Fuzzy Panda Report that at AIL, "'[w]e're a recruiting company that happens to sell insurance.'" *Id.* Fuzzy Panda illustrated the purported pyramid structure:





*Id.* at 27.

160.    Through its interviews with former agents, Fuzzy Panda discovered an excessive amount of recruiting and agent churn.  Former agents revealed that in 2022 thousands of new sales agents joined AIL, while the net gain at the end of 2022 was less than 200.  *Id.* at 2.  New hires are incented to recruit friends to join the business with the allure of $750 bonuses per person brought onto the team, plus a cut of all their sales.  *Id.* at 24.

161.    As part of its investigation, Fuzzy Panda sent agents undercover through AIL's hiring process.  There, they learned that in order to recruit new agents, AIL uses high pressure recruiting tactics and false promises of lifetime residual income.  *Id.* at 27-28.  The undercover investigators were offered cash and cocaine, given details on how to cheat on state insurance exams, and encouraged to fake their own address on insurance licensing applications.  *Id.* at 23-24.  One former AIL sales agent revealed he was making up fake people as recruits to hit his monthly target.  *Id.* at 25.

162.    Fuzzy Panda also revealed that recruits were exploited with dim prospects of advancement.  For instance, recruits provided one to two months of unpaid labor and actually lost money, agencies up-charged new recruits for the licensing courses and then pocketed the difference for themselves, and new recruits were told false promises of "lifetime" residual payments for insurance they sold.  *Id.* at 22, 26.  Agents were even required to pay "management fees" to their supervisors to keep working as agents and paid "[t]ribute [p]ayments to [their] [u]plines" (those higher up in the pyramid) to receive better leads for selling insurance.  *Id.* at 25.

163.    As a result of the disclosures in the Fuzzy Panda Report, the price of Globe Life common stock declined $55.76, or 53%, from a closing price of $104.93 per share on April 10, 2024, to a closing price of $49.17 per share on April 11, 2024.  In a single day, $5 billion in market capitalization was eliminated from Globe Life stock.

164.    In response to the Fuzzy Panda Report, trading on Globe Life was halted eight times in an effort to curb the drastic volatility.



## Trading Halts

| Halt Date | Halt Time | Symbol | Name | Exchange | Reason | Resume Date | NYSE Resume Time |
|---|---|---|---|---|---|---|---|
| 4/11/2024 | 15:05:22 | GL | Globe Life Inc. | NYSE | LULD pause | 4/11/2024 | 15:10:31 |
| 4/11/2024 | 14:59:24 | GL | Globe Life Inc. | NYSE | LULD pause | 4/11/2024 | 15:04:27 |
| 4/11/2024 | 14:53:16 | GL | Globe Life Inc. | NYSE | LULD pause | 4/11/2024 | 14:58:21 |
| 4/11/2024 | 14:41:01 | GL | Globe Life Inc. | NYSE | LULD pause | 4/11/2024 | 14:46:16 |
| 4/11/2024 | 14:13:20 | GL | Globe Life Inc. | NYSE | LULD pause | 4/11/2024 | 14:18:21 |
| 4/11/2024 | 13:48:38 | GL | Globe Life Inc. | NYSE | LULD pause | 4/11/2024 | 13:53:41 |
| 4/11/2024 | 13:42:32 | GL | Globe Life Inc. | NYSE | LULD pause | 4/11/2024 | 13:47:44 |
| 4/11/2024 | 13:35:02 | GL | Globe Life Inc. | NYSE | LULD pause | 4/11/2024 | 13:40:42 |

165.    Globe Life attempted to stem the damage, issuing a general statement denying Fuzzy Panda's findings without addressing any particular facts revealed by Fuzzy Panda.

4877-5268-4006.v3

**F.    The EEOC Determined that Globe Life Created and Condoned a Hostile Workplace Environment and "Company-Wide Culture of Sexual Harassment"**

166.    On September 26, 2024, the EEOC issued 14 letters of determination to Globe Life, AIL, and the Arias Organization, with far-reaching ramifications for the Company.  The EEOC validated agents' years' long charges of sexual harassment, sexual assault, gender discrimination, and inferior job training and leads.

167.    According to the EEOC Determination directed at Globe Life, "[t]he evidence established multiple bases" for liability of Globe Life for its "sexually hostile work environment," including that Globe Life "created, condoned, and actively promoted a work environment that is hostile and abuse to female employees because of their sex." *See* Ex. D at 4.[7]  The EEOC found that "a number of the participants in the sexual harassment and/or who have knowingly fostered a working environment in which such conduct is considered acceptable were/are of sufficiently high status or authority within the organization that they constitute alter egos or proxies of [Globe Life], and their actions are therefore automatically imputed to [Globe Life] for purposes of liability." *Id.*

168.    The EEOC Determination asserts that Globe Life retaliated against workers for reporting harassment, and "consistently failed" to take "reasonable preventive and corrective action" regarding harassment.  *See id.* at 3-4.

169.    With regard specifically to Zinsky's allegations, including the misconduct described above, the EEOC determined that "[a]cting through Russin and other male management-level employees and coworkers," Globe Life "subjected [Zinsky] to unwelcome harassment because of her sex and retaliation for engaging in protected activity." *Id.* at 3.  Examples of such harassment included:

---

[7]    The EEOC's letter of determination directed at AIL contains substantially identical determinations as the EEOC Determination directed at Globe Life.

> nonconsensual sexual touching and conduct, such as groping of intimate body areas; unwelcome displays of male genitalia, acts of male masturbation and pornography; degrading and offensive comments about [Zinsky] and other female workers; sexist comments about women generally; threatening to withhold promotion unless [Zinsky] would engage in sexual conduct with him; and threats of violence and related unwelcome touching and physical restraint.

*Id*.

170.    The EEOC also determined that Globe Life "retaliated against [Zinsky] after she reported the sexual harassment to Arias Organization CEO Simon Arias," including through demoting or "constructively demot[ing] her" (*id.* at 3) and that the retaliation continued after she initiated EEOC proceedings, "in the form of highly disparaging statements and preventing [Zinsky] from being assigned to new supervisors." *Id.*

171.    The EEOC Determination extends well beyond Zinsky.  According to the EEOC, Globe Life "subjected a class of female employees to unwelcome harassment because of their sex," including through:

> frequent, open, and offensive language used toward and about female employees by male management-level employees and coworkers; male supervisors and other management-level employees offering employment-related benefits to their female subordinates in exchange for acquiescence to sexual demands; and male management-level employees and coworkers engaging in acts of unwelcome physical touching and sexual assault of female employees and subordinates.

*See id.* at 3.

172.    The EEOC Determination further asserts that Globe Life "subjected a class of employees to retaliation for engaging in protected opposition to [the] unlawful employment practices," such as "withholding sales leads from employees who attempted to report sexual harassment and assault; continued, worsening harassment of employees who attempted to report or did report sexual harassment; and discharge or constructive discharge of employees who engaged in protected activity." *Id.*

4877-5268-4006.v3

173.    According to the EEOC, "the evidence establishes" that Globe Life "consistently failed" to take "reasonable preventive and corrective action with regard to sexual harassment perpetrated by both supervisory and non-supervisory male employees despite the information of which it had notice." *Id.* at 4.  Specifically, Globe Life "fail[ed] to maintain, distribute, and implement any reasonably diligent sexual harassment policy applicable to its entire workforce," nor did it "maintain any reasonable avenues for reporting sexual harassment" or "obtaining remedial action." *Id.*

174.    In fact, the EEOC determined, quite the opposite was true.  Instead, Globe Life "engaged in conduct reasonably likely to ***deter, and that has deterred***, female employees from making sex harassment and other discrimination complaints," such as "engaging in threats and other retaliatory adverse actions, active discouragement of complaints, failing to act on complaints, refusing to make postings of Title VII rights ***because doing so is deemed inconsistent with [the] workplace 'culture'" of Globe Life***.  *Id.* (emphasis added).

175.    The EEOC also determined that Globe Life "failed to exercise reasonable care under the circumstances to correct sexual harassment of which it knew or should have known."  *Id.*  For instance, the EEOC pointed out that "high-level management officials" and others continued to work for Globe Life (and AIL) even after there were "multiple reports of sexual harassment and assault" made against them, and that the bad actors had not been "subject to appropriate corrective action." *Id.* at 5.  According to the EEOC, Globe Life "persistently failed to remedy individual instances of sexual harassment," and the Company had notice of and "failed to take action to abate a company-wide culture of sexual harassment."  *Id.*

## V.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

176.    Throughout the Class Period and as set forth below, Defendants made numerous materially false and misleading statements in public documents, including in SEC filings, Codes of

Conduct, Environmental, Social, & Governance Reports ("ESG Reports"), Sustainability Accounting

Standards Board ("SASB") Reports, and during public earnings calls with analysts.

177.    Defendants' false and misleading statements generally fall into several categories:

(i) statements about the Company's fair, ethical, and legally compliant business practices;

(ii) statements about life insurance sales and premium revenue and that "increas[ing] agent count"

and productivity, including through virtual sales, were the key drivers of sales growth at AIL; (iii)

statements about consumer privacy; (iv) statements about how AIL's compensation structure and

training programs were the reason that the Company was able to continue to increase agent count

(and thereby continue its growth trajectory); and (v) statements about the Company's financial

reporting and effectiveness of Globe Life's internal controls.[8]

### A.    Business Environment and Company Culture

178.    In its 2019 ESG Report published on the Investors page of Globe Life's website,

Globe Life attested to the sound business ethics the Company employed.   For example, the

Company's 2019 ESG Report stated:

**Code of Conduct**

As we work to meet individual and company-wide business goals at Globe Life, we must ensure that the work we perform and the business we conduct is done ***with integrity and in accordance with the highest ethical standards***.  Globe Life Inc. and its subsidiaries are committed to maintaining a business atmosphere and work environment based on ***honesty, fair dealing and sound business ethics***.

Our Code of Conduct expresses the ***standards of integrity and business conduct that every company employee, contractor, officer and director must uphold and follow***.

179.    Globe Life included substantially similar assurances in its 2020, 2021, 2022, and

2023 ESG Reports, which were all published on the Investors page of Globe Life's website.

---

[8]    Defendants' false statements herein are identified and emphasized in ***bold and italics***.

180.     Globe Life's ESG Reports also expressly avowed that the Company did not permit any violence or threatening behavior.  In its ESG Report for 2019, for example, Globe Life stated:

**Health and Safety**

Globe Life strives to provide a safe and healthy work environment.  Each of us has a responsibility to maintain a safe and healthy workplace for everyone by following safety and health rules and practices and reporting accidents, injuries and unsafe equipment, practices or conditions.  ***Violence and threatening behavior are not permitted***.

181.     Substantially similar language was published in Globe Life's ESG Reports for 2020, 2021, 2022, and 2023.

182.     The Company also expressly prohibited workplace harassment.  For example, in its ESG Report for 2019, Globe Life stated:

Globe Life expects that all relationships among persons in the workplace will be professional and free of bias, prejudice and harassment.  ***It is our policy to ensure equal employment opportunity without discrimination or harassment on the basis of race, color, national origin, religion, sex, age, disability, marital status, creed, or any other characteristic or class protected by law.  Globe Life prohibits and will not tolerate any such discrimination or harassment***.

183.     In its ESG Report for 2020, Globe Life stated:

[W]e expect that all relationships among persons in the workplace will be professional and free of bias, prejudice, and harassment.  ***We prohibit and will not tolerate any such discrimination or harassment***.

184.     Substantially similar language was included in Globe Life's ESG Reports for 2021, 2022, and 2023.

185.     In its ESG Report for 2020, Globe Life touted its culture of accountability.  There, the Company stated:

**Culture of Accountability**

***We believe in the importance of maintaining a culture of accountability. This culture is driven by our Co-Chairmen and Chief Executive Officers and senior leadership, but all of our employees play a role in ensuring that we perform our work and conduct our business with integrity and in accordance with the***

- 60 -

*highest ethical standards. We are committed to maintaining a business atmosphere and work environment based on honesty, fair dealing, and sound business ethics.*

Our Code of Conduct expresses the standards of integrity and business conduct that every employee, contractor, officer, and director must uphold and follow. Adherence to honesty and integrity in our actions only further enhances our Company, employees, policyholders, and shareholders.

We are taking steps to incorporate a culture of accountability into our hiring and engagement activities by clearly specifying expectations and standards for all of our employees. Additionally, all employees are required to take annual training on our Code of Conduct.

186. Substantially similar statements were included in the Company's 2021, 2022, and 2023 ESG Reports.

187. In its ESG Report for 2020, Globe Life provided a link to its Code of Conduct, which stated the following:

Additionally, if you are aware of an event or action that could in any way be a violation of law or this Code, it is your responsibility to report it immediately to your supervisor or the General Counsel or other appropriate contact in the Company's Legal Department. You may also report a potential violation by using a toll-free number (1-877-854-0033) which is monitored by an independent third-party reporting service. ***The Company will investigate the reported violation***. Anyone who in good faith reports a possible violation of law, this Code or Company policies will be protected from retaliation. Violations of this Code, including retaliation against any person who reports a suspected illegal or improper action, ***will constitute grounds for corrective action, up to and including termination***.

\*      \*      \*

All directors, officers, employees and contractors of the Company are expected to understand, respect and comply, in letter and spirit, with all of the laws, rules and regulations that apply to them in their respective positions at the Company.

188. In its Code of Conduct, which is published on the investor page of Globe Life's website, Globe Life stated that it "seeks competitive advantages through superior performance, ***never through unethical or illegal business practices***."

189. In its Code of Conduct, Globe Life stated the following:

*Violence and threatening behavior are not permitted.* You should report to work in condition to perform your duties, free from the influence of illegal drugs or alcohol. *The use of illegal drugs in the workplace will not be tolerated*.

190.    The Company also disclosed its dedication to its customers in the Company's published SASB Reports in addition to its ESG Reports. In its 2021 SASB Index, Globe Life stated:

We have processes in place to manage the entire customer lifecycle, *ensuring our customers' needs are met and complaints are managed swiftly and efficiently*. We monitor digital and social media channels to track customer feedback in order to consistently foster positive customer experiences.

191.    Substantially similar statements concerning the Company's customers were disclosed in Globe Life's 2022 and 2023 ESG Reports.

192.    In its 2021 SASB Index, Globe Life stated:

*We comply with all state regulatory guidelines and oversight that requires insurers to consider product suitability and ethical customer practices*.

193.    On February 28, 2023, *Business Insider* published an article concerning AIL's Arias Organization titled, "Lawsuit Against Globe Life Subsidiary Alleges Sex Abuse, Hard Drugs, Fraud at Top Agency." To alleviate any investor concern of widespread misconduct, defendant Haworth, Globe Life's Executive Vice President and Chief Marketing Officer, provided comments to *Business Insider*, claiming that AIL "'*takes seriously any allegation brought to its attention concerning sexual harassment, inappropriate conduct, or unethical business practices*'" and "'*makes clear that it does not tolerate'* such behavior." Haworth also promised readers that agents or others "'*are subject to contract termination if they engage in misconduct*.'"

194.    During Globe Life's February 8, 2024 earnings call for the fourth quarter of 2024 ("Q4 2024"), defendant Darden stated the following:

During 2023, an online publication posted articles related to litigation pending an arbitration against American Income Life and 1 of its state general agents. Although we generally do not comment on pending litigation and will not be taking any questions on the topic today, we'd like to provide the following limited statement.

- 62 -

This litigation relates to allegations made by a former independent contractor sales agent with American Income. In 2021, prior to the litigation and as soon as American Income became aware of the agent's allegations, the company engaged an external third party to conduct an impartial and thorough investigation. *American Income took prompt and appropriate action based on that investigation*. We continue to vigorously dispute and defend against the allegations made about American Income Life in this litigation. And we do not believe the litigation will be material to Globe Life's overall results or American Income Life's agency operations. *We take seriously any allegations brought to our attention concerning harassment, inappropriate conduct or unethical business practices, and we do not tolerate such behavior*.

American Income Life provides numerous ways for sales agents to raise concerns, including contacting the company's agency department directly or utilizing an independent third-party reporting hotline. We have processes in place to address such concerns when we learn of them. We also provide mandatory anti-harassment and antidiscrimination training to agents and provide and ask agents to review the company's Code of Business Conduct and Ethics, which includes information about how to report concerns. I want to emphasize that *at Globe Life, we strive to act in accordance with the highest level of ethics and integrity at all levels of our organization*.

195. Defendants' statements, as alleged in ¶¶178-194, about the Company's prohibition and intolerance of harassment, discrimination, violence, threatening behavior, drug use, and illegal or unethical business practices, its adherence to the Code of Conduct, and its ethical workplace environment and culture of accountability were false and misleading because:

(a)     A number of AIL's agencies were commonly committing insurance fraud throughout the Class Period without corrective action being taken by AIL or Globe Life, which tolerated or overlooked the unethical business practices.

(b)     AIL's agents regularly used, and were instructed to use, dishonest, coercive, and manipulative means and representations to sell life insurance policies to unsuspecting and vulnerable customers in order to generate sales.

(c)     Globe Life did not maintain a "culture of accountability," and instead, AIL's workplace environment was rife with sexual harassment and discrimination, assault, abusive behavior toward employees, open drug and alcohol abuse, and violence, and AIL had covered up or

- 63 -

ignored numerous reports of such behavior without holding instigators accountable, and allowed certain high-level managers to continue working at the Company even after alleged misconduct.

(d)    According to the EEOC, Globe Life "does not maintain any reasonable avenues for reporting sexual harassment or discrimination or obtaining remedial action regarding such conduct," and the Company "engaged in conduct reasonably likely to deter, and that has deterred, female employees from making sex harassment and other discrimination complaints," such as "engaging in threats and other retaliatory adverse actions, active discouragement of complaints, failing to act on complaints, refusing to make postings of Title VII rights because doing so is deemed inconsistent with [the] workplace 'culture' [of Globe Life]" (Ex. D at 4).

(e)    AIL took advantage of young and vulnerable recruits, who initially worked for little or no compensation and then were required to pay managers fees in order to maintain agent status and receive sales leads, in order to enrich the few at the top of the chain.

(f)    Defendants did not sufficiently promote, monitor, or enforce compliance with Globe Life's Code of Conduct.

(g)    At the time of Defendants' February 8, 2024 statements, Globe Life and AIL were already under investigation by, and had already received subpoenas from, the DOJ concerning AIL's sales and business practices and alleged misconduct.

**B.    Life Net Sales and Life Premium**

196.    Throughout the Class Period, Globe Life reported that AIL's Life Net Sales and Life Premium increased materially almost every quarter and annually in the Company's Annual Reports, Forms 10-Q, and Forms 10-K signed by defendants Coleman, Hutchison, Svoboda, Henrie, Darden, and Kalmbach, quarterly earnings releases filed with the SEC on Forms 8-K, and quarterly earnings calls with analysts and investors during which defendants Coleman, Hutchison, Svoboda, Kalmbach, and Darden reported, discussed, and answered questions about Globe Life's and AIL's financial

- 64 -

results. The following charts summarize Globe Life's and AIL's reported quarterly and annual Life

Premium and Life Net Sales, and AIL's percentage of Globe Life's total reported results:[9]

| Reporting Period | Global Life Total Life Premium | Increase Over Prior Year Reporting Period | AIL Life Premium | Increase over prior year period | AIL % of Globe Life Annual Total Life Premium |
|---|---|---|---|---|---|
| Q2 2019 | $631 million | 5% | $288 million | 7% | |
| Q3 2019 | $631 million | 4% | $293 million | 7% | |
| Q4 2019 | $631 million | 5% | $297 million | 8% | |
| FY 2019 | $2.5 billion | 5% | $1.2 billion | 7% | 46% |
| Q1 2020 | $650 million | 4% | $303 million | 7% | |
| Q2 2020 | $671 million | 6% | $309 million | 7% | |
| Q3 2020 | $674 million | 7% | $319 million | 9% | |
| Q4 2020 | $678 million | 7% | $327 million | 10% | |
| FY 2020 | $2.7 billion | 6% | $1.3 billion | 12% | 47% |
| Q1 2021 | $708 million | 9% | $335 million | 11% | |
| Q2 2021 | $728 million | 9% | $348 million | 13% | |
| Q3 2021 | $729 million | 8% | $356 million | 12% | |
| Q4 2021 | $733 million | 8% | $364 million | 11% | |
| FY 2021 | $2.9 billion | 8% | $1.4 billion | 8% | 48% |
| Q1 2022 | $755 million | 7% | $370 million | 10% | |
| Q2 2022 | $760 million | 4% | $376 million | 8% | |
| Q3 2022 | $755 million | 4% | $378 million | 6% | |
| Q4 2022 | $754 million | 3% | $381 million | 5% | |
| FY 2022 | $3.0 billion | 4% | $1.5 billion | 7% | 50% |
| Q1 2023 | $773 million | 3% | $388 million | 5% | |
| Q2 2023 | $782 million | 3% | $395 million | 5% | |
| Q3 2023 | $788 million | 4% | $400 million | 6% | |
| Q4 2023 | $795 million | 4% | $406 million | 7% | |
| FY 2023 | $3.14 billion | 4% | $1.6 billion | 6% | 51% |

| Reporting Period | Globe Life Life Net Sales | Increase Over Prior Year Reporting Period | AIL Life Net Sales | Increase Over Prior Year Period | AIL % of Globe Life Annual Life Net Sales |
|---|---|---|---|---|---|
| Q2 2019 | $112 million | 1% | $61 million | 2% | |
| Q3 2019 | $105 million | 6% | $60 million | 9% | |
| Q4 2019 | $107 million | 7% | $59 million | 9% | |
| **FY 2019** | $430 million | 4% | $238 million | 6% | 55% |

---

[9]    Charts identifying the filings and conference calls in which these statements were made, the dates on which they were filed or made, and the defendants who made the statements are attached hereto as Exs. E-F.

| Reporting Period | Globe Life Life Net Sales | Increase Over Prior Year Reporting Period | AIL Life Net Sales | Increase Over Prior Year Period | AIL % of Globe Life Annual Life Net Sales |
|---|---|---|---|---|---|
| Q1 2020 | $111 million | 5% | $63 million | 9% | |
| Q2 2020 | $114 million | 2% | $51 million | (16%) | |
| Q3 2020 | $128 million | 21% | $68 million | 14% | |
| Q4 2020 | $131 million | 23% | $71 million | 20% | |
| **FY 2020** | $484 million | 13% | $253 million | 76% | 52% |
| Q1 2021 | $128 million | 16% | $70 million | 11% | |
| Q2 2021 | $136 million | 19% | $73 million | 42% | |
| Q3 2021 | $128 million | — | $74 million | 9% | |
| Q4 2021 | $129 million | (1%) | $74 million | 4% | |
| **FY 2021** | $522 million | 8% | $291 million | 15% | 56% |
| Q1 2022 | $139 million | 8% | $85 million | 23% | |
| Q2 2022 | $140 million | 2% | $85 million | 16% | |
| Q3 2022 | $126 million | (1%) | $76 million | 4% | |
| Q4 2022 | $126 million | (2%) | $70 million | (6%) | |
| **FY 2022** | $531 million | 2% | $317 million | 9% | 59% |
| Q1 2023 | $140 million | 1% | $83 million | (2%) | |
| Q2 2023 | $139 million | — | $82 million | (4%) | |
| Q3 2023 | $134 million | 6% | $81 million | 6% | |
| Q4 2023 | $130 million | 3% | $76 million | 9% | |
| **FY 2023** | $544 million | 3% | $323 million | 2% | 59% |

197.    Globe Life's and AIL's reported Life Net Sales and Life Premium results for the second quarter of 2019 ("Q2 2019") through fiscal year 2023 in ¶196 were false and misleading because they were inflated by fraudulent, deceptive life insurance sales, and by sales achieved as a result of improper consumer coercion and manipulation, as inside sources disclosed to Fuzzy Panda. Fuzzy Panda's investigation revealed that from 2019-2023, 16 or more AIL agencies that sources said engaged in fraudulent business practices grew ALP at 16% per year, while ALP declined by 0.5% per year at agencies that did not engage in such practices.  By 2023, more than 60% of AIL's new ALP came from agencies committing fraud according to former agents and executives. Defendants concealed that such unethical and illegal practices were spurring Globe Life's and AIL's results.  Instead, Defendants misleadingly attributed AIL's continually increasing Life Premium and Life Net Sales to the success of virtual selling and recruiting, higher agent retention due to up front

- 66 -

commissions, increasing agent counts, and the skill, quality, and hard work of AIL's agents. Moreover, virtual selling and immediate commissions were in fact encouraging and enabling fraud at AIL, as was the high pressure and abusive environment in which agents were given aggressive sales targets and then abused or humiliated if they failed to achieve them.

198.    During Globe Life's October 24, 2019 earnings call with analysts to discuss Q3 2019 results, a Bank of America Merrill Lynch analyst asked whether AIL was "starting to see a turnaround in sales" given the fact that "they were particularly good this quarter" at a 9% increase over Q3 2018, while AIL's Life Net Sales had been down in Q4 2018 and flat for the full year. Hutchison responded that "strong recruiting" and "***fewer terminations that was caused in part by the restructure in compensation***" drove AIL's high Net Life Sales in Q3 2019.

199.    Then in Globe Life's February 5, 2020 earnings call to discuss results for the fourth quarter of 2019 ("Q4 2019"), Hutchison again attributed "sales growth in all 3 of the agencies," which included AIL, to "***a fairly high-quality recruit across the 3 agencies***."

200.    AIL ended 2019 with $238 million in Life Net Sales, a 6% increase over 2018, and $1.2 billion in Life Premium, a 7% increase over 2018.  During the February 5, 2020 call, Hutchison told analysts and investors that "***[t]he [6%] sales increase was driven by increases in agent count***."

201.    Defendants attributed AIL's impressive 2019 Life Premium and Life Net Sales to strong recruiting and improved agent retention in the Company's 2019 Annual Report, signed by defendants Coleman and Hutchison:

>    American Income Life is our largest contributor to premium and underwriting margin. . . .
>
>    We are very pleased with the results at American Income Life in 2019. ***Strong recruiting, improvements in new agent retention, and growth in agency middle management drove solid sales growth***. . .

202.    AIL's 2019 Life Premium and Life Net Sales contributed materially to Globe Life's 2019 results, with AIL generating 46% of Globe Life's total underwriting margin, 55% or its Life

- 67 -

Net Sales, and 46% of its total Life Premium. Defendants attributed the Company's "strong performance" to the skill and dedication of its agents in the 2019 Annual Report signed by defendants Coleman and Hutchison:

> Globe Life (formerly Torchmark) had a very good year in 2019. Total premium grew over 5%. . . . Total exclusive agency sales grew 8%, driven by agent count and productivity gains. Net operating income per share increased 10% from a year ago.

*      *      *

> *Globe Life's strong performance in 2019 was due to the outstanding efforts of our talented, hard-working agents and employees*. We are truly grateful for their contributions.

203.    At the February 12, 2020 Globe Life Inc. at Bank of America Merrill Lynch Securities Insurance Conference, Hutchison commended AIL's new commission structure for agent retention and consequently increased sales: "The second thing we did early in 2019 was restructure our compensation. We didn't increase our compensation. We've moved some of that sales commission off the back end of the renewal and moved it to the front to the point of sale, *so the new agents have a greater income, and they stay with the company longer*."

204.    During Globe Life's April 23, 2020 earnings call with analysts to discuss results for the first quarter of 2020 ("Q1 2020"), the first call during the pandemic, an analyst asked, "even if the shelter-in-place orders are eliminated, don't you think there's going to be a very slow or reduced ability for face-to-face meetings? And going forward, that it's probably going to take longer than that for the normal activity from a sales standpoint to improve?" Hutchison responded: "*[V]irtual sales, our training and our success, our closing rates of virtual sales are going up*. So as virtual sales become the norm, I think it will help our sales process."

205.    By Q3 2020, Hutchison told analysts that Globe Life's agencies were "thriving" in the virtual sales environment during Globe Life's October 22, 2020 earnings call: "*We are pleased with the third quarter sales . . . . [T]he agencies have adapted to virtual sales appointments and*

- 68 -

*recruiting. **They are thriving in this environment***.”  When a Crédit Suisse analyst asked for more clarity on why AIL's and other agencies' 2021 sales outlook were "very strong" and "the qualities that are enabling that," Hutchison responded, "I think the uncertainty with the agency is that in-person sales recruiting can be a challenge during the pandemic if the restrictions come back in place. However, ***we can offset some of those challenges through our use of virtual recruiting and sales***."

206.    In Globe Life's February 3, 2021 earnings call with analysts to discuss results for the fourth quarter of 2020 ("Q4 2020"), Hutchison again commended the Company's adaptation to virtual sales for not only allowing it to thrive during the pandemic year, but also for paving the way to higher sales in the future:

> I believe we will emerge from the pandemic stronger than before as a result of the adjustments we have made during the crisis.  We now have more ways to generate sales and recruiting activity, ***the ability to recruit agents and sell to customers, both virtually and in-person in the future, will enhance our ability to generate sales growth***.
>
> Looking back at fourth quarter, we were pleased with the results as we continue to see strong growth in sales and agent count. . . .
>
> At American Income, life premiums were up 10% to $327 million, and life underwriting margin was up 7% to $105 million.  Net life sales were $71 million, up 20%.  ***The increase in net life sales is primarily due to increased agent count***.  The average producing agent count for the fourth quarter was 9,642, up 26% from the year ago quarter and up 4% from the third quarter.  The producing agent count at the end of the fourth quarter was 9,664.  We continue to see significant recruiting opportunity due to current economic conditions and our ability to recruit both virtually and in person.

207.    During the February 10, 2021 Globe Life Inc. at Bank of America Insurance Conference, analysts were particularly interested in how Globe Life had performed in the context of the pandemic in 2020, and what the Company anticipated going forward in the post-pandemic environment.  Hutchison stressed Globe Life's ability to sell and recruit virtually as a "new normal":

> [BofA Securities Analyst:] Can you just talk a little bit about . . . how your employees are managing this very unusual time.

*       *       *

- 69 -

[Hutchison:] [O]ur 13,000 agents have done very well.  They've transitioned from an in-person sale in March to a virtual sale and [] once they made that transition, ***we saw sales pick up in the second quarter and strong sales in the third and fourth quarter, and we've had good recruiting this year***.  So right.  I have to complement the feel that they quickly adapted to the COVID environment and have been successful in that environment.

> . . . [BofA Analyst:] Obviously, that's a testament to the company's strength.

> \*        \*        \*

Given COVID going on, the resiliency of your agency force, are there things that you learn about distribution during COVID, that if and when things get back to normal, the business model is going to continue to use those skills that you've developed in the past year . . . . [A]re there any learnings that really enhance the future for Globe?

> . . .[Hutchison:] I think it will be a new normal.  One of the things we really learned with the advent of COVID is, we could sell virtually in addition to in-person.  And we looked at virtual sales related to COVID, encouraged us to make the investment and the change.  In the agencies, all 3 agencies have said, we want to continue virtual sales and virtual recruiting.  So I think it's really opened another distribution for the Globe Life companies.  I think in-person sales will still be important.  Part of the change with virtual is the consumer itself.  I think consumers now are much more open to virtual presentations than they were a year ago or 2 years ago.  So to go forward, ***I think you'll see that the virtual sales will be a large percentage of the sales within the Globe Life agencies, and there's some advantage of those virtual sales***.  It really expands the efficiency in the territory for the agent.  Now the agent can work leads to be in Houston this morning, in Dallas this afternoon, in Oklahoma City tomorrow, and there's not that time lost in travel.

208.    Defendants again commended AIL in the Company's 2020 Annual Report, signed by defendants Coleman and Hutchison, for generating over 52% of Globe Life's Life Net Sales, 58% of its first-year collected life premium and 47% of Life Premium in 2020, despite the constraints of the pandemic, due to AIL's introduction of virtual sales processes:

> American Income Life is Globe Life's largest provider of premium and underwriting margin.  As shown in the charts, agent count and life net sales have grown at a compound annual growth rate of 9.5% and 6.2%, respectively, over the past ten years.

> We are pleased with the results at American Income Life in 2020.  The agency quickly overcame obstacles presented by the pandemic, successfully adding virtual sales and recruiting processes developed in cooperation with the home office.

*Strong recruiting, agent retention, and growth in agency middle management drove significant net sales growth.*

209.    Defendants also attributed Globe Life's overall ability to grow premiums and sales during 2020 to virtual insurance sales and the continued success of its business model:

> Globe Life persevered through this difficult time and will emerge stronger than before as the pandemic subsides. *Our ability to recruit agents and sell needed coverage has been enhanced by having the capability to use both face-to-face and virtual approaches* . . . .
>
> *Despite the challenges presented by the pandemic, Globe Life adapted quickly and continued to generate growth.* Premium grew over 6% and life net sales grew 13%, while the agent count in our exclusive agencies grew 21%. Net operating income as a return on equity, excluding net unrealized gains on fixed maturities, was 13.5%.
>
> Even though COVID-19 forced changes in the way we do business, it did not change our business model. This model is the key to Globe Life's success. Focused execution of this model has produced consistent, solid results year after year . . . .

210.    Also in Globe Life's 2020 Form 10-K, filed with the SEC in February 25, 2021, Defendants attributed Globe Life's successful 2020 performance to the ability of its exclusive agency divisions, which included AIL, "to quickly pivot and continue to write new business . . . due in part to new and updated information technology systems put in place over the last several years."

211.    During Globe Life's April 22, 2021 earnings call with analysts to discuss results for the first quarter of 2021 ("Q1 2021"), Hutchison told analysts:

> We experienced strong growth in life sales during the first quarter, and we continue to make progress in the areas that drive recruiting and sales activity. . . . At American Income Life, life premiums were up 11% to $335 million, while life underwriting margin was down 2% at $98 million. The lower underwriting margin is primarily due to COVID claims. Net life sales were $70 million, up 11%. *The increase in net life sales is primarily due to increased agent count.* The average producing agent count for the first quarter was 9,918, up 30% from the year ago quarter and up 3% from the fourth quarter. The producing agent count at the end of the first quarter was 10,329. *The American income agency has adapted exceptionally well to the virtual environment and continues to generate positive momentum.*

- 71 -

212.    During Globe Life's July 22, 2021 earnings call with analysts to discuss results for the second quarter of 2021 ("Q2 2021"), Hutchison told analysts:

> In the second quarter of 2020, sales were limited due to the onset of COVID. In the second quarter of 2021, net life sales were $73 million, up 42%. ***The increase in net life sales is primarily due to increased agent count and productivity***. The average producing agent count for the second quarter was 10,478, up 25% from the year ago quarter and up 6% from the first quarter. The producing agent count at the end of the second quarter was 10,406. The American Income Agency continues to generate positive momentum.

213.    Hutchison also said that AIL's Q2 2021 Life Premium was up 13% over Q2 2020, life underwriting margin was up 16%.

214.    During the same call, when asked by Piper Sandler & Co. analyst John Bakewell Barnidge how Globe Life "think[s] through the strength in life sales" and whether that strength was "based on the strong agent growth over the last year," defendant Hutchison replied that "agent count is a very important component," and that "***at American Income, I think the primary driver of the life sales growth will continue to be the agent growth, and we had a 25% average agent growth quarter-over-quarter***."

215.    In Globe Life's October 21, 2021 earnings call with analysts to discuss results for the third quarter of 2021 ("Q3 2021"), Hutchison told analysts, "I'm very pleased with the overall agency results. Looking forward, ***the addition of virtual recruiting and selling opportunities will continue to enhance our ability to grow***." Hutchison said that AIL's 12% increase in Life Premium in Q3 2021 produced an 11% increase in life underwriting margin, which was "***primarily due to improved persistency and higher sales in recent quarters***." Life Net Sales were up 9% "***primarily due to increased agent count***." Hutchison also said that digital sales were leading to higher agent retention:

> [T]he ability to sell with the digital presentation has made that agent opportunity more attractive. And therefore, we've seen an increase in retention and particularly the American Income versus the prior 2 years. Agents are now going to make more

- 72 -

presentations.  They spent less time away from home and they incur far fewer travel expenses.

\*    \*    \*

I would estimate right now that 80% to 85% of the sales of American Income are virtual.  We think that will continue past the pandemic.

And specifically regarding AIL, Hutchison said, "the ability to sell the digital presentation has made that agent opportunity much more attractive as agents are now able to make more presentations. They can utilize leads better. . . .  [T]hey can work from home, they incur far fewer travel expenses. We think that will help with retention and recruiting as we move forward."

216.    Hutchison reiterated that higher productivity and virtual selling drove an 11% increase in Life Premium and a 4% increase in Life Net Sales in the fourth quarter of 2021 ("Q4 2021") during Globe Life's February 3, 2022 earnings call with analysts: "***The increase in net life sales is due to increased productivity*** . . . . [W]e obviously have additional technology we've entered or we've given the agents from 2019, '20 and '21, so they can better recapture leads and are more efficient with the virtual presentations in terms of more presentations and it's a lower cost to them because it does not have the travel involved."

217.    During the February 15, 2022 Globe Life Inc. at Bank of America Insurance Conference, the moderator asked whether "the pandemic created a different set of learnings that have developed the newest recruits in a different sort of way" over the course of 2021.  Hutchison responded:

COVID's biggest impact is that virtual sales and virtual recruiting have really accelerated. . . . Prior to COVID, any recruiting, any sale was in-house, in the office. And once COVID hit, we quickly switched to virtual recruiting, virtual sales . . . . [Consumers] are accepting virtual sales or virtual presentations versus pre-COVID.

218.    Darden added:

[W]e see agents also getting licensed in adjacent states because they can now work leads virtually.  To Larry's point, a lot of these sales are occurring in a virtual environment.  And so the next appointment for an agent is as near as the next phone

- 73 -

call away versus having to travel to all of those different appointments.  *So the pandemic and the virtual activities that we've implemented in the organization have greatly expanded our agents' ability to be effective from a time frame perspective*.  And so that's really what we see as a big difference between now and prepandemic of how our agents do their business.

219.    Similarly in Globe Life's 2021 Annual Report, signed by defendants Coleman and Hutchison, Defendants acclaimed AIL's continuing sales and premium growth, with the "vast majority" of customer appointments now being held virtually:

> American Income Life remains a consistent leader in premium and underwriting margin among Globe Life's distribution channels.  In 2021, American Income Life was the largest contributor of life premium at 48% of Globe Life's 2021 total life premium.
>
> The division generated life net sales growth of 15% in 2021.
>
> *    *    *

The vast majority of customer appointments are now virtual.  *The ability to meet customers face to face both virtually and in person greatly enhances this division's growth potential*.

220.    During the Globe Life Inc. at Bank of America US Financials Conference on February 14, 2023, Darden thanked virtual sales and recruiting for Globe Life's ability to succeed despite the combined headwinds of not being able to sell insurance in person and low unemployment:

> [BofA Securities Analyst:] Well, imagine a company that's really reliant on face-to-face sales in order to sell a product and then you have a pandemic come in that completely stops that.  Imagine another situation where unemployment is at 70-year lows and the recruiting of people to do face-to-face sales maybe harder than it's ever been because the war for talent.  It seems like 2 completely opposite things that are at the core of the success of Globe Life and are one after another impediments to how you operate this business for a very long time.
>
> Can you talk about those 2 things, having a quick succession?  What it means for the pipeline, what it means for sales recruitment?  And then how you've been adapting?
>
> [Darden:] Yes, we're very proud of our performance during the pandemic.  As you had mentioned early on, you were dealing with lockdowns.  A lot of our business is sold, obviously, face-to-face, some of that in the work site as well.  *What*

- 74 -

*we were able to do very early on is pivot on our face-to-face sales into electronic format, so digital presentations, and we quickly move the agent force into that mode.  What that's benefited us is that even now as we emerge out of the pandemic, we have that capability embedded in the organization*.  And that's something that you saw from a consumer behavior change is that consumers now are much more adept to working online, much more used to Zoom video calls, those kind of things.  And so it's a capability that has been beneficial to the organization that will continue and grow.

So even as things have opened back up and the pandemic seems to weigh in, our agent force tool does quite a bit on the sales side from that digital presentation.

221.    Defendants' representations in ¶¶196-220 about AIL's Life Net Sales and Life Premium growth from Q2 2019 to Q4 2023, and that AIL achieved the growth as a result of virtual sales, up front commissions, higher agent retention, quality recruits, and agent productivity were false and misleading for the following reasons:

(a)    AIL's Life Net Sales and Life Premium grew because 16 or more of AIL's agencies and top producers employed unethical, fraudulent practices to churn sham life insurance policy sales, without which AIL's growth in Life Net Sales and Life Premium would have been flat or negative, according to Fuzzy Panda's investigation.  According to the dozens of former AIL executives and sales agents Fuzzy Panda interviewed and documents it reviewed, fraudulent insurance production and other unethical business practices began to become widespread at AIL in 2017, when Greer became CEO and Zophin became Executive Vice President and then President.  By 2023, $200 million of AIL's new ALP was sold by agencies that Fuzzy Panda identified as having written fraudulent policies.  The 16 agencies identified by Fuzzy Panda, which included AO, two Arias Organization agencies, Parks-Salvaggi, Quinterro, G-A, and Henderson Locker, were responsible for contributing the vast majority – 60% – of AIL's new ALP.  According to Fuzzy Panda's investigation, AIL's sales teams that committed insurance fraud grew new ALP at approximately 16% per year from 2019-2023, while ALP from sales teams that sources confirmed as "clean" *declined* by 0.5%.  The volume of sales generated by agents and agencies engaging in fraud

- 75 -

was a red flag.  For example, at AO, top-producing agents sometimes generated $200,000-$300,000 in weekly sales, amounts that are not physically possible to achieve through proper sales practices, according to Dehning, a former AIL Vice President of Field Operations.  According to Fuzzy Panda, the average annual life insurance premium is $1,000, so that an agent would have to write 200 sales, or 40 policies per day, in order to achieve $200,000 in sales in one five-day work week.

(b)    Agents at AIL's highest grossing agencies routinely engaged in various methods of insurance fraud, according to Fuzzy Panda's investigation.  Throughout the Class Period, agents at 16 or more of AIL's agencies, including, but not limited to, AO, Arias Organization, Parks-Salvaggi, Quintero, G-A, and Henderson Locker, commonly:

- wrote life insurance policies for consumers who did not authorize or agree to purchase policies;

- increased policy values after customers signed agreements, then submitted the policies for approval at the inflated amounts not agreed to by the customers;

- wrote additional and multiple life insurance policies for customers who already had policies and neither requested nor approved additional policies;

- wrote life insurance policies for deceased people;

- wrote policies for friends and families knowing that the policies would lapse or be canceled; and

- added benefits to existing life insurance policies without policyholder authorization or approval.

As a result, consumers and AIL customers lodged hundreds of complaints with regulators and oversight agencies such as the Better Business Bureau ("BBB"), FTC, and state insurance regulators complaining of unauthorized policies and charges.  *See* §§VI.E.-F.  Agents used the following fraudulent, illegal practices to write unapproved, unauthorized policies and extensions to existing policies:

(i)    Illegal access to AIL's customers' private, personal identification information.  AIL stores clients' social security numbers, driver's license numbers, HIPPA

- 76 -

information and other private, personal data in a system known as CAS.  Access to the personal client information stored in CAS was supposed to be password protected and accessible only by SGA, the highest level of agent at AIL, in order to be in compliance with federal and state consumer privacy laws and regulations.  However, at several AIL agencies, including, but not limited to, AO and Arias Organization, high level managers routinely gave CAS access to agents who then wrongly obtained and used personal information of current and former AIL customers to write unauthorized life insurance policies or to add benefits to existing policies without policyholder authorization. Scores of consumers and policyholders complained to the BBB, FTC, and insurance regulators upon discovering that they had been charged for policies or benefits they had not authorized, and frequently complained of discovering multiple unauthorized policies written in their names or the names of relatives.

        (ii)     Rebating: Agents writing sham policies that are initially paid for out of fake bank accounts and then canceled after a few months, after agents collect commissions.  Agents at Arias Organization agencies, AO, and other AIL agencies routinely engaged in a practice known internally as "rebating."  Rebating became prevalent after AIL restructured commissions to be paid up front when agents signed policies.  Agents would create fictitious bank accounts, write sham policies, collect their immediate full commissions, and pay the first several months' policy premiums out of the fake accounts.  Then, the agents would stop paying, and the policies would either lapse or be canceled.  The cost of a few months' premiums on a policy was a fraction of the agent's commission on the same policy, so that agents profited by rebating.  In order to make the sales, achieve the agent's sales targets, and be paid the resulting commissions, agents often promised customers that the agents would pay the first several months of the policies and that the customers could then cancel.  Agents also used the identities of family members or friends, current or former customers who did not authorize the policies, deceased people, or random consumers to write

- 77 -

policies for rebating.  Agents also received incentive bonuses for sales volumes, so that rebating accelerated volume accumulation and therefore bonuses.

(iii)    Increasing policy values without customer authorization.  Agents used Eapp, Globe Life's application software, to write and submit life insurance applications.  Agents commonly increased policy values in the Eapp system after customers signed agreements, so that policies were marked in Eapp at the altered value and submitted and approved for inflated amounts, thereby increasing sales and premium numbers.  Eapp was antiquated and not highly automated, allowing for manual manipulation such as altering policy values.

(iv)    Forged signatures.  According to Fuzzy Panda's sources, agents in AIL's largest agencies forged signatures of current customers with existing policies to enhance those policies or add additional policies without the customers' approval.  AIL's rapid transition in 2020 to virtual sales and Zoom meetings with current and prospective customers further enabled agents to forge signatures.  Agents also used websites specializing in generating and providing random personal identifiable information to complete policy applications for random consumers, using forged signatures.

(v)    Writing sham policies for prospective customers.  Former agents and executives told Fuzzy Panda that it was standard procedure at several AIL agencies for agents to collect checking and credit card information from prospective customers and then create policies without their approval.  One way agents accomplished this was to misrepresent to prospective customers that the agent was attempting to activate coverage that was already in place, when there was no coverage in place, and then obtain the prospective customer's signature via DocuSign.

(vi)    Producing sham policies in the names of friends and family members.  Agents used personal information from prior acquaintances, friends, and family members and altered

that information, not allowing AIL to contact those individuals or verify the veracity of the application information.

(vii)    Writing life insurance policies for deceased people.  According to Fuzzy Panda's sources, AIL's agents commonly issued life insurance policies for people who were deceased.

(viii)    Making false representations to customers.  AIL's agents made false representations to customers about their policies and what benefits they would receive.  Management was aware of the deceitful practices and even encouraged them.

(ix)    Manipulating and coercing consumers and union members into purchasing policies they did not want or need.  AIL's agents used bait-and-switch tactics with customers, such as offering "free" benefits to union members in order to push more expensive policies and misrepresenting themselves as being connected to customers' unions.  AIL's agents would also use "Child Safe Kits" to gain access to potential customers' homes and then pivot to the true agenda of selling policies, while misrepresenting themselves as working with police, teachers, and Amber Alert.

(c)    Globe Life's application software known as Eapp, used by AIL's agents to electronically write and submit insurance applications, facilitated fraud.  Eapp was antiquated and lacked consumer live scan checks that are common in software used by other insurance companies, and could not confirm that social security numbers or birth dates entered were valid or associated with a real, living people.  Globe Life did not make necessary improvements to add such capabilities to Eapp during the Class Period.

- 79 -

C.    **Consumer Privacy and Security**

222.    Throughout the Class Period, Defendants included the following Risk Factor in Globe Life's Forms 10-K for 2019, 2020, 2021, 2022, and 2023, signed by defendants Coleman, Hutchison, Svoboda, Henrie, Darden, and Kalmbach:

> Non-compliance with laws or regulations related to customer and consumer privacy and information security, including a failure to ensure that our business associates with access to sensitive customer and consumer information maintain its confidentiality, could materially adversely affect our reputation and business operations.  The collection, maintenance, use, disclosure and disposal of personally identifiable information by our insurance subsidiaries are regulated at the international, federal and state levels.  These laws and rules are subject to change by legislation or administrative or judicial interpretation. . . . Noncompliance with any privacy laws, whether by us or by one of our business associates, could have a material adverse effect on our business, reputation and results of operations and could include material fines and penalties, various forms of damages, consent orders regarding our privacy and security practices, adverse actions against our licenses to do business, and injunctive relief.

223.    Defendants' cautionary statement that noncompliance with privacy laws by Globe Life's business associates "could have a material adverse effect on" the Company's business, results, and reputation, and result in damages and punitive measures, was materially misleading because throughout 2019 to 2023, several of AIL's largest agencies were not complying with federal and state privacy laws and regulations by giving agents unauthorized access to CAS, as alleged in ¶¶9, 103-104, 296, which was in turn: (a) affecting Globe Life's business operations and artificially inflating its results of operations; and (b) contemporaneously placing Globe Life at current risk for the civil and criminal damages and punitive measures as described in the Risk Factor.

224.    Similarly, in Globe Life's 2019 ESG Report, Defendants represented that the Company's "strong top-down management direction":

> aids in the development and maintenance of physical, electronic and procedural safeguards to comply with applicable regulations and to protect the personal information of our customers, agents and employees.  These measures, as set forth in enterprise-wide security policies and procedures, are designed to help prevent loss, misuse, unauthorized access or disclosure, alteration, or destruction of such personal information.  ***Access to this personal information is restricted to those team***

*members who "need to know" as a part of delivering the products and services requested*.

225.    Defendants' statement that access to the personal information of Globe Life's customers was restricted to team members who "'need to know'" the information as part of delivering products and services was false because managers at AIL's largest agencies gave the password and access to the CAS system to agents who did not need to know personal customer information, who then used Globe Life customers' private data to write sham life insurance policies or improperly gain access to leads, as alleged in ¶¶9, 103-104, 296.

### D.    Recruiting, Retention, and the Tools to Succeed

226.    Throughout the Class Period, Defendants disclosed Globe Life's purported quarterly average producing agent count for each of its distribution channels.  On July 24, 2019, for example, Globe Life filed with the SEC a Form 8-K attaching a press release announcing the Company's results of operations for Q2 2019.  There, the Company disclosed that AIL's quarterly average producing agent count for the quarter ending June 30, 2019 was 7,364 agents, and that AIL ended the quarter with 7,477 producing agents:

**TORCHMARK CORPORATION**
Earnings Release—Q2 2019
(Dollar amounts in thousands, except share and per share data)
(Unaudited)

**PRODUCING EXCLUSIVE AGENT COUNT RESULTS BY DISTRIBUTION CHANNEL**

| | Quarterly Average Producing Agent Count(1) | | | | | End of Quarter Agent Count | | | | |
| | June 30, | | | March 31, | | June 30, | | | March 31, | |
| | 2019 | 2018 | %Chg. | 2019 | %Chg. | 2019 | 2018 | %Chg. | 2019 | %Chg. |
|---|---|---|---|---|---|---|---|---|---|---|
| American Income Exclusive Agency | 7,364 | 7,064 | 4 | 6,865 | 7 | 7,477 | 7,143 | 5 | 7,233 | 3 |
| Liberty National Exclusive Agency | 2,290 | 2,185 | 5 | 2,179 | 5 | 2,390 | 2,198 | 9 | 2,297 | 4 |
| Family Heritage Exclusive Agency | 1,081 | 1,052 | 3 | 1,002 | 8 | 1,089 | 1,090 | — | 1,020 | 7 |

(1) The quarterly average producing agent count is based on the actual count at the end of each week during the period.

227.    The Company also disclosed quarterly producing agent counts to analysts and investors during quarterly earnings calls.  The day after the Company's July 24, 2019 Form 8-K disclosing Globe Life's results of operations, the Company held its Q2 2019 earnings call for

analysts and investors to report on Globe Life's results for the Q2 2019.  During the July 25, 2019 earnings call, Defendant Hutchison again highlighted the Company's agent counts, noting that for AIL, "*[t]he average producing agent count for the second quarter was 7,364, up 4% from the year ago quarter and up 7% from the first quarter.  The producing agent count at the end of the second quarter was 7,477*."

228.    The following table provides Globe Life's stated agent counts for AIL for every other quarter during the Class Period, as disclosed in the earnings press releases appended to the Company's Forms 8-K filed with the SEC and in the Company's earnings calls held the day after each respective Form 8-K disclosure:

| Period Ended | Quarterly Results | Globe Life Form 8-K SEC Filing Date | Globe Life Earnings Call Date (Speaker) | Quarterly Average Producing Exclusive Agent Count – AIL | End of Quarter Agent Count – AIL |
|---|---|---|---|---|---|
| September 30, 2019 | Q3 2019 | October 23, 2019 | October 24, 2019 (Hutchison) | *7,578* | *7,364* |
| December 31, 2019 | Q4 2019 | February 4, 2020 | February 5, 2020 (Hutchison) | *7,631* | *7,551* |
| March 31, 2020 | Q1 2020 | April 22, 2020 | | *7,630* | *8,044* |
| June 30, 2020 | Q2 2020 | July 22, 2020 | July 23, 2020 (Hutchison) | *8,393* | *8,597* |
| September 30, 2020 | Q3 2020 | October 21, 2020 | October 22, 2020 (Hutchison) | *9,288* | *9,583* |
| December 31, 2020 | Q4 2020 | February 2, 2021 | February 3, 2021 (Hutchison) | *9,642* | *9,664* |
| March 31, 2021 | Q1 2021 | April 21, 2021 | April 22, 2021 (Hutchison) | *9,918* | *10,329* |
| June 30, 2021 | Q2 2021 | July 21, 2021 | July 22, 2021 (Hutchison) | *10,478* | *10,406* |
| September 30, 2021 | Q3 2021 | October 20, 2021 | October 21, 2021 (Hutchison) | *9,959* | *9,800[10]* |
| December 31, 2021 | Q4 2021 | February 2, 2024 | February 3, 2022 (Hutchison) | *9,530* | *9,415* |

---

[10]    AIL's end of quarter agent count was not disclosed during the October 21, 2021 earnings call.

| Period Ended | Quarterly Results | Globe Life Form 8-K SEC Filing Date | Globe Life Earnings Call Date (Speaker) | Quarterly Average Producing Exclusive Agent Count – AIL | End of Quarter Agent Count – AIL |
|---|---|---|---|---|---|
| March 31, 2022 | Q1 2022 | April 20, 2022 | April 21, 2022 (Hutchison) | *9,385* | *9,543* |
| June 30, 2022 | Q2 2022 | July 27, 2022 | July 28, 2022 (Hutchison) | *9,670* | *9,637* |
| September 30, 2022 | Q3 2022 | October 26, 2022 | October 27, 2022 (Hutchison) | *9,477* | *9,441* |
| December 31, 2022 | Q4 2022 | February 1, 2023 | February 2, 2023 (Darden) | *9,243* | |
| March 31, 2023 | Q1 2023 | May 3, 2023 | May 4, 2023 (Darden) | *9,714* | |
| June 30, 2023 | Q2 2023 | July 26, 2023 | July 27, 2023 (Darden) | *10,488* | |
| September 30, 2023 | Q3 2023 | October 25, 2023 | October 25, 2023 (Darden) | *10,983* | |
| December 31, 2023 | Q4 2023 | February 7, 2024 | February 8, 2024 (Darden) | *11,131* | |

229.    On August 8, 2019, the Company filed its Form 10-Q with the SEC for the period ending June 30, 2019.  There, the Company also reported AIL's agent counts, noting that the "*average producing agent count increased 3% to 7,115 for the six months ended June 30, 2019.*"

230.    As with the agent counts reported in the Company's Forms 8-K and during the Company's earnings conference calls, each of the quarterly reports (Forms 10-Q) and annual reports (Forms 10-K) filed by Globe Life with the SEC during the Class Period disclosed purported agent counts for AIL:

| Form (Date Filed with SEC) | Period Ending | AIL Reported Agent Count |
|---|---|---|
| Q3 2019 – Form 10-Q (November 12, 2019) | September 30, 2019 | *7,269* |
| FY 2019 – Form 10-K (February 27, 2020) | December 31, 2019 | *7,360* |
| Q1 2020 – Form 10-Q (May 7, 2020) | March 31, 2020 | *7,630* |
| Q2 2020 – Form 10-Q (August 6, 2020) | June 30, 2020 | *8,012* |
| Q3 2020 – Form 10-Q (November 5, 2020) | September 30, 2020 | *8,437* |
| FY 2020 – Form 10-K | December 31, 2020 | *8,738* |

- 83 -

| Form<br>(Date Filed with SEC) | Period Ending | AIL Reported Agent Count |
|---|---|---|
| (February 25, 2021) | | |
| Q1 2021 – Form 10-Q<br>(May 6, 2021) | March 31, 2021 | *9,918* |
| Q2 2021 – Form 10-Q<br>(August 5, 2021) | June 30, 2021 | *10,198* |
| Q3 2021 – Form 10-Q<br>(November 4, 2021) | September 30, 2021 | *10,118* |
| FY 2021 – Form 10-K<br>(February 24, 2022) | December 31, 2021 | *9,971* |
| Q1 2022 – Form 10-Q<br>(May 6, 2022) | March 31, 2022 | *9,385* |
| Q2 2022 – Form 10-Q<br>(August 5, 2022) | June 30, 2022 | *9,528* |
| Q3 2022 – Form 10-Q<br>(November 8, 2022) | September 30, 2022 | *9,511* |
| FY 2022 – Form 10-K<br>(February 23, 2023) | December 31, 2022 | *9,444* |
| Q1 2023 – Form 10-Q<br>(May 9, 2023) | March 31, 2023 | *9,714* |
| Q2 2023 – Form 10-Q<br>(August 8, 2023) | June 30, 2023 | *10,101* |
| Q3 2023 – Form 10-Q<br>(November 6, 2023) | September 30, 2023 | *10,395* |

231.    During Globe Life's Q3 2019 earnings call with analysts and investors on October 24, 2019, defendant Hutchison remarked that the Company was "especially pleased with the year-to-date agent count growth we've seen across all 3 of our exclusive agencies."  Defendant Hutchison announced during that same call that the Company was increasing its guidance for agent counts to end 2019.  Hutchison attributed the anticipated agent growth to "***strong recruiting, [and] fewer terminations that was caused in part by the restructure in compensation***."

232.    Additionally, during this same call defendant Svoboda stated, "we've . . . res[tructured] . . . our compensation and ***really focused on the training and retention of our new agents***.  So I think it's a long-term business model that works."

233.    On February 12, 2020, defendants Svoboda, Coleman, and Hutchison participated in the Globe Life Inc. at Bank of America Merrill Lynch Securities Insurance Conference.  There, Hutchison touted the "immediate" opportunity and "lots of prospects" new agents could expect to see in as few as five to ten days after joining the Company:

- 84 -

When a new agent comes to the company, they see that opportunity without the competition, **lots of prospects**, that you're **in the field selling within 5 to 10 days** after their license as an agent.  The products are that simple, and the training is that direct and so **their opportunity is immediate**.  And I think the other thing that helps American Income is we promoted 16 new agency owners over the last 2 years.  I mean, when they just come in, they see a real opportunity.  They decide if they go in the middle management, they can quickly move up in a short period of time.  It's a real possibility they can run their own agency.

234.    At the Globe Life Inc. at Bank of America Insurance Conference on February 10, 2021, Bank of America analyst Joshua David Shanker asked the Company to address Globe Life's agency force as "one of the most important things to talk about," and what it takes to be successful at the Company:

We've really – I think one of the most important things to talk about is your agency force.  And we really talked about their life cycle a little bit.  Can you explain to the audience, the training that goes into a new prospective agent and the potential for them to be successful at Globe?  How many people do you hire?  How many actually turn out to be good producing agents?  And how many can actually develop a revenue base that propels them to long-term success with the company?

235.    During that February 10, 2021 conference, defendant Hutchison explained the expected trajectory for Globe Life's agents, and how they could advance through the agency hierarchy:

As they move forward, **their income is a 6-figure income** as you have renewal commissions, new business commissions, they have what's called an override commission on the agents that they've recruited and put in their hierarchy.  On that next year, they will move forward to the next levels of management and the income increases significantly.  If you're in the top level of the middle manager, **it's not unusual to have an income of middle 6 figures**.  In 4 or 5 years that agent/middle manager is thinking about if they want to be an agency owner.

236.    According to defendant Hutchison, "[i]t's not unusual as they move towards their tenth year, **7-figure income is achievable.  It's not uncommon in American [I]ncome**."

237.    During the February 10, 2021 conference, defendant Hutchison also provided more detail on new agent training.  According to Hutchison, "**[t]he new [agent] really is having continual training**," and Globe Life's "home office certainly gives data support and they also **use best**

- 85 -

*practices among the agencies to help the agent be successful*."  During the Q4 2021 earnings call on February 3, 2022, defendant Hutchison reported that "[o]ur agent retention has actually increased over the last 2 years, particularly American Income."  According to Hutchison, Globe Life was committed to "growing middle management, expanding through new office openings and *providing additional sales tools to our agents*," to aid in the Company's recruiting efforts.  Hutchison attributed the Company's increased sales to "*increased productivity*," in its agency force, and remarked that the Company was "*providing additional sales technologies to support our agents*."

238.    On April 21, 2022, the Company held its earnings call for analysts and investors to report Globe Life's results for the first quarter of 2022 ("Q1 2022).  According to defendant Hutchison:

> We are confident American Income will continue to grow.  *The agent count was trending up the last several weeks of the quarter*.  We also have seen improvement in personal recruiting, which generally yields better candidates and better retention than other recruiting sources.  *In addition, we've made changes to the bonus structure designed to improve agency middle management growth*.

239.    During the Company's October 27, 2022earnings conference call for analysts and investors to report Globe Life's results for the third quarter of 2022 ("Q3 2022"), analyst Jamminder Singh Bhullar of JPMorgan Chase & Co. asked about the Company's recruiting and retention environment.  According to defendant Coleman, despite higher-than-anticipated departures, "American Income actually had a strong recruiting quarter with 6% growth in recruits over the prior year . . . .  *We addressed this with restructuring compensation and middle management bonuses to address agent retention*."

240.    When asked by analyst Andrew Scott Kligerman of Crédit Suisse AG to elaborate on the different incentives, defendant Hutchison remarked that Globe Life's restructured agent compensation "affect[ed] behavior" and encouraged "better training":

> And so when you change those incentives, you're not increasing compensation, you're shifting compensation to *affect behavior*.  What you kind of do is encourage

- 86 -

your middle managers to **better train those new recruits.  And what's a better training, there's more activity, and the training is just how to sell, but encouraging greater activity with those new recruits and agents**.  As there's greater activity, better training, they make more money because they have higher sales levels and retain more agents.

241.    According to Hutchison, Globe Life's "home office leadership" shifts compensation to "encourage that [correct] behavior":

> **So the bonus is not paying more money, it's paying for the correct behavior. It's paying for success**.  It's much like, we don't give an agent more money to have more activity.  Agent gets more money as a result of more activity and better sales. So this is much the same principle.  **You're just affecting behavior**.  As you shift the compensation, over time the focus might be on training versus recruiting.  There are just a lot of factors within the agency.  So constantly, the agency owners as well as the **home office leadership are looking at what are the behaviors we need to modify and they shift the compensation to encourage that behavior**.

242.    According to Hutchison, when a distribution channel identifies offices "that have not done so well," Globe Life will "work with them to provide them data with respect to the middle managers . . . .  That just is a constant process as we inspect our training systems, our activity models, and out of that comes the long-term goals."

243.    During the Company's February 2, 2023 earnings  call for analysts and investors to report Globe Life's results for the fourth quarter of 2022 ("Q4 2022"), defendant Darden emphasized that, "we have seen positive recruiting momentum over the latter part of the fourth quarter into the beginning of this year.  We've also started to have some success with our new retention efforts.  I believe the **agency compensation adjustments we have made to emphasize recruiting and retention will help continue this momentum**."

244.    According to Darden, "there's been some adjustments to the incentive side of the compensation at American Income," that "went in very late in the year [2022]."  When asked by Crédit Suisse AG analyst Andrew Scott Kligerman during the question-and-answer segment of the call to provide more detail on compensation adjustments, defendant Darden clarified that the adjustments were made to target "specific behavior":

- 87 -

And I also wanted to just clarify, when we talk about compensation adjustments, there's 2 primary components to the compensation for agents. One is just the base commission on sales. *And then we also have incentive-based compensation that's targeted at a specific behavior*. And we do that throughout our history. So when we talk about changing the compensation we're really not changing the total amount of compensation that is in our overall pricing and profitability targets, but really, *we're targeting 2 specific activities and behavior that we're trying to influence*. So I just wanted to clarify that overall, our compensation and acquisition costs are going to be consistent with what we've experienced in the past.

245. Two weeks later, on February 14, 2023, defendants Svoboda, Darden, and Kalmbach participated in the Globe Life Inc. at Bank of America US Financials Conference. During that conference, defendant Darden remarked on the Company's recruiting hierarchy:

[W]e get a lot of questions around just how does the job market impact you? And we've always recruited from all sources, and we're recruiting agents to an opportunity, and *that's a career opportunity where folks come in, learn the sales side of the business, but then quickly move up into management*. And then ultimately, the goal is to own their own agency someday.

So we're providing an opportunity where those that are looking for a different type of a position they may have seen themselves and currently are "dead in job," they *have an opportunity to be more in control of their destiny and take that entrepreneurial activity, and we provide that opportunity in the sales and the training guidance*. Most of the agents that we recruit do not have insurance experience and many of them don't even have sales experience.

So we've got methodology processes and people put in place that can . . . recruit from all different walks of life, all different sources, get them up training and selling during that time frame. So the current – we get questions about the current environment, the unemployment. I mean, we had 8% agent growth in 1 of our agent sees 12% growth in another agency, both in 2022. We've got momentum carrying on into 2023. *So we feel very positive about where our agent growth is going, and then how we grow our sales is just having more agents.* So that agent growth is just a leading indicator to the sales that are going to come.

246. After the close of the second quarter of 2023 ("Q2 2023"), the Company held its earnings call for analysts and investors. During that July 27, 2023 earnings call, analyst Jamminder Singh Bhullar of JPMorgan Chase & Co. asked, "what's really driving" the Company's "significant increase in the agent count across all of your channels?" In response, defendant Darden attributed the growth on being "*really focused on growing our middle management count, putting more tools*

- 88 -

*in the hands of our agent managers*," because it is "that middle management count who are responsible in many ways for that new agent recruiting, onboarding and training."

247.    Following the close of fiscal year 2023, the Company held its earnings call for analyst and investors to report on year-end results.  During that February 8, 2024 earnings conference call, defendant Darden stated:

> The average producing agent count for the fourth quarter was 11,131, up 20% from a year ago.  American Income has had sequential agent growth each quarter of 2023, but accelerated in the last half of the year to double-digit growth, which bodes well for sales growth in 2024.  I am pleased to see the **strong growth in agent count and sales as we continue to build momentum from the recruiting and agent retention initiatives put in place at the end of 2022**.

248.    The statements in ¶¶226-247 above concerning the Company's agent counts, recruiting, training, and compensation were false and misleading for several reasons, including:

(a)    Globe Life experienced "recruiting fraud," and the Company's reported agent counts included counts for agents fictitiously created by other agents hoping to cash in on the Company's recruiting bonus.  The Company's compensation structure did not encourage "correct behavior," nor "enhance agent productivity," but instead rewarded fraud.  Globe Life's strong "agent count growth" was due to the Company's undisclosed MLM scheme that rewarded new recruits more for recruiting than selling insurance.

(b)    Globe Life struggled with agent retention.  The Company's agencies were a "'revolving door of people,'" and "[t]here is an ever-present search for new employees, as the turnover employment rate is astronomical."  To offset its steep attrition, the Company had to recruit thousands of agents to show even minimal perceived sequential "net gain" in agent count, such that agent growth at the end of any given period represented just a fraction of those agents recruited and retained.

(c)    The Company's compensation structure was designed to reward recruitment over selling, providing new agents with near-four-figure bonuses for each agent recruited, in addition

to "override commissions" on agents recruited into their hierarchy. Globe Life's agencies "are often
referred to as recruiting companies that also sells [*sic*] insurance." According to a former Vice
President of Field Operations for AIL, "AIL's insurance agencies are always looking to hire due to
AIL's business model based on a pyramid scheme." Globe Life's reported growth in middle
management was a product of the pyramid scheme, as agents were promoted only if they recruited
additional agents.

(d)     Despite Globe Life's promises of "immediate" opportunities and allure of
unlimited earnings, AIL's "Opportunity Unlimited," and the prospects of lifetime income and lavish
lifestyles, the Company's new agents provided unpaid labor and received no income for several
months, while having to pay for leads and being up-charged for licensing courses. In actuality, the
average AIL agent made below minimum wage.

(e)     Globe Life failed to provide adequate training to its agents, and new and
existing agents were improperly trained and monitored, and were in fact trained and taught to act
fraudulently. The Company's lack of oversight exposed the Company to substantial risk and
resulted in producer, actuarial, and consumer fraud that inflated the Company's reported results.

### E.     SOX Certifications

249.    The Q2 2019 Form 10-Q included SOX certifications signed by defendants
Hutchison, Coleman, and Svoboda. The SOX certifications each attested to the filing's accuracy and
affirmatively stated, among other things, that:

(a)     "I have reviewed this quarterly report on Form 10-Q of Globe Life Inc."[11] and
it "does not contain any untrue statement of a material fact or omit to state a material fact necessary

---

[11]    Similarly, the certifications filed on the Forms 10-K during the Class Period stated "I have
reviewed this annual report on Form 10-K of Globe Life Inc."

to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and

(b)      that the Company's reported information "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

250.    The Company's Forms 10-Q/10-K contained the same SOX certifications throughout the duration of the Class Period:

| SEC Form | SOX Certification Signatories |
|---|---|
| • Forms 10-Q: <br>   • Q1 2019 <br>   • Q2 2019 <br>   • Q3 2019 <br>   • Q1 2020 <br>   • Q2 2020 <br>   • Q3 2020 <br>   • Q1 2021 <br>   • Q2 2021 <br>   • Q3 2021 <br>   • Q1 2022 <br>   • Q2 2022 <br>   • Q3 2022 <br> • Forms 10-K: <br>   • 2019 <br>   • 2020 <br>   • 2021 | • Hutchison, Coleman, and Svoboda |

| SEC Form | SOX Certification Signatories |
|---|---|
| •    Forms 10-Q:<br>     •  Q1 2023<br>     •  Q2 2023<br>     •  Q3 2023<br>•    Forms 10-K:<br>     •  2022<br>     •  2023 | •    Darden, Svoboda, and Kalmbach |

251.    The statements above in ¶¶249-250 concerning the Company's SOX certifications were false or misleading because given the long-standing and widespread fraudulent conduct that occurred at AIL during the Class Period, Globe Life's financial statements did not, in fact, fairly present the Company's operations.  For example, among other specific facts alleged herein, a former high-level employee repeatedly reported to AIL and Globe Life executives that sales agents were engaging in fraudulent business practices – activity that would have impacted financial reporting by artificially inflating the Company's reported Life Net Sales and Life Premium by virtue of fraudulent and fictitious sales, without which, AIL's growth in those metrics would have been flat or negative. In addition, the Company's Class Period reported producing agent counts were overstated because they included agents fictitiously created through "recruiting fraud."

### F.    Management's Report on Internal Control over Financial Reporting

252.    Globe Life measures the quality of its internal controls under a framework established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").  Under COSO's Integrated Framework, internal controls principally focus on three aspects of a financial institution: (1) the effectiveness and efficiency of operations; (2) the reliability of financial reporting; and (3) its compliance with applicable laws and regulations.  COSO defines "internal control" as "a process, effected by an entity's board of directors, management, and other personnel, designed to

provide reasonable assurance regarding the achievement of objectives relating to operations, reporting, and compliance." COSO further explains in its Compliance Risk Management: Applying the COSO ERM Framework ("COSO Compliance Risk Management") that "internal control is not solely about accounting and financial matters. Compliance with laws and regulations is one of the three fundamental objectives of an organization's system of internal controls." Those consist of:

(a)     Operations Objectives, which "pertain to effectiveness and efficiency of the entity's operations, including operational and financial performance goals, and safeguarding assets against loss";

(b)     Reporting Objectives, which "pertain to internal and external financial and non-financial reporting and may encompass reliability, timeliness, transparency, or other terms as set forth by regulators, recognized standard setters, or the entity's policies"; and

(c)     Compliance Objectives, which "pertain to adherence to laws and regulations to which the entity is subject."

253.     Additionally, under COSO, a company's control environment consists of "the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization." The control environment encompasses: "the integrity and ethical values of the organization; the parameters enabling the board of directors to carry out its governance oversight responsibilities; the organizational structure and assignment of authority and responsibility; the process for attracting, developing, and retaining competent individuals; and the rigor around performance measures, incentives, and rewards to drive accountability for performance."

254.     The 2019 Form 10-K, filed with the SEC on February 27, 2020, included a section titled "Management's Report on Internal Control over Financial Reporting" signed by defendants Coleman, Hutchison, and Svoboda. In their report, Globe Life's management stated that they had utilized the "Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of

the Treadway Commission" to assess the Company's "internal control over financial reporting" and that, using COSO, "[m]anagement evaluated the Company's internal control over financial reporting, and based on its assessment, determined that the Company's internal control over financial reporting was effective."  Specifically, the report stated:

**Management's Report on Internal Control over Financial Reporting**

*Management at Globe Life is responsible for establishing and maintaining adequate internal control over financial reporting for the Company and for assessing the effectiveness of internal control on an annual basis.  As a framework for assessing internal control over financial reporting, the Company utilizes the criteria for effective internal control over financial reporting described in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.*

There are inherent limitations in the effectiveness of any internal control, including the possibility of human error and the circumvention or overriding of controls.  Accordingly, even effective internal controls can provide only reasonable assurance with respect to financial statement preparation.  Further, because of changes in conditions, the effectiveness of internal control may vary over time.

*Management evaluated the Company's internal control over financial reporting, and based on its assessment, determined that the Company's internal control over financial reporting was effective as of December 31, 2019.*  The Company's independent registered public accounting firm has issued an attestation report on the Company's internal control over financial reporting as stated in their report which is included herein.

/s/ Gary L. Coleman
Gary L. Coleman
Co-Chairman and Chief Executive Officer

/s/ Larry M. Hutchison
Larry M. Hutchison
Co-Chairman and Chief Executive Officer

/s/ Frank M. Svoboda
Frank M. Svoboda
Executive Vice President and Chief Financial Officer

255.    Each of the Company's Forms 10-K throughout the duration of the Class Period contained the same "Management's Report on Internal Control over Financial Reporting," quoted above, stating that Globe Life's internal controls were evaluated under COSO.  The 2019, 2020, and

- 94 -

2021 Forms 10-K were each signed by defendants Coleman, Hutchison, and Svoboda.  The 2022 and 2023 Forms 10-K were each signed by defendants Darden, Svoboda, and Kalmbach.

256.    The above statements in "Management's Report on Internal Control over Financial Reporting" that "the Company utilizes the criteria for effective internal control over financial reporting described in [COSO]" and that under those criteria Globe Life's "[m]anagement evaluated the Company's internal control over financial reporting, and based on its assessment, determined that the Company's internal control over financial reporting was effective" were materially false or misleading when made because the COSO "criteria" by definition, includes internal controls designed to identify and monitor compliance with applicable laws and regulations.  *See* ¶252 ("[I]nternal control is not solely about accounting and financial matters.  Compliance with laws and regulations is one of the three fundamental objectives of an organization's internal controls [under the COSO 2013 Framework].") (quoting COSO Compliance Risk Management at 4).  Globe Life's control environment was ineffective, destructive, and pervasively lacking due to fraudulent sales practices, "recruiting fraud," and the Company's toxic culture.  In addition, Globe Life had no systems in place that were designed to proactively identify fraud, and had less than an adequate number of personnel whose responsibility it was to investigate fraud.  This lack of internal controls and ineffective control environment exposed the Company to material fines, reputational risk, and civil and criminal liability.  Defendants did not sufficiently monitor or enforce effective internal controls over financial reporting.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

257.    The Individual Defendants acted with scienter because at the time they issued public documents and other statements in Globe Life's name, they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts.  The Individual Defendants knew such documents and statements would be issued or

disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

258.    The Individual Defendants received information reflecting the true facts regarding Globe Life, its operations and business practices, had control over and/or received the Company's materially misleading misstatements, and/or their associations with the Company made them privy to inside information concerning Globe Life.  Accordingly, the Individual Defendants were active and culpable participants in the fraudulent schemes alleged herein.  The Individual Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The multi-year fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

259.    These facts, in conjunction with the additional indicia of scienter alleged below in §§VI.A.-H., collectively support a strong inference that throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading.

260.    Indeed, the magnitude, scope, and duration of Globe Life's misconduct described in this Complaint support a strong inference of scienter.  Both common sense and logic dictate that it is highly improbable that Globe Life engaged in the pervasive misconduct identified herein without the knowledge and instruction of the Individual Defendants.  The notion that certain lower-level or rogue employees acted without the Individual Defendants' knowledge and approval for so long on such a wide-ranging scheme impacting potentially hundreds (if not thousands) of customers belies credulity.

261.    The widespread nature of the misconduct further strengthens the inference that Defendants knew or, at minimum, were deliberately reckless in not knowing of the misstated and omitted facts.  By way of example, during the Class Period, Defendants repeatedly told investors that the Company's future growth was directly tied to adding new insurance agents, and that it had effective processes to ensure that the new agents were properly trained.

### A.    Globe Life's Sales Practices Are a Core Operation of the Company

262.    The Individual Defendants' knowledge of AIL's fraudulent and unethical business practices can be inferred because AIL was the Company's largest subsidiary in terms of premiums collected, underwriting margin, and the number of sales agents.

263.    According to Globe Life's Annual Reports and Forms 10-K, "[AIL] is our largest contributor to premium and underwriting margin."  Underwriting margin is a profitability metric used in the insurance industry to measure profit from underwriting activities.  As demonstrated below in charts included in Globe Life's Annual Reports from 2019 to 2023, a majority of Globe Life's underwriting margin (particularly since 2021) originates from AIL's operations.





264.    Also during this period, AIL's agent count grew from approximately 7,360 in 2019 to 10,579 in 2023.   In contrast, the Company's next largest division, Liberty National, had approximately 2,350 agents in 2019 and 3,229 in 2023 – fewer than half the number of agents as AIL.

265.    Consistent with these reports, analysts likewise observed that AIL was central to Globe Life's operations and during the Class Period expected to "see a continuation of solid premium growth and margins in American Income *the company's largest distribution channel*." Also, J.P. Morgan noted in its April 24, 2024 report titled, "Makeover, Takeover, Suggestivist, Activist; Several Catalysts for Upside" that "*AIL accounts for approximately half of the company's sales and income*."

266.    Knowledge of the fraudulent and abusive sales practices used by AIL – the Company's largest subsidiary – can therefore be inferred.  This is particularly true for defendant Darden, who was AIL's President before becoming Globe Life's Co-CEO, and defendant Kalmbach,

- 98 -

who was AIL's Senior Vice President and Chief Actuary before becoming Globe Life's Executive Vice President and CFO.  Not to mention, Globe Life and AIL share the same office address at 3700 South Stonebridge Drive, McKinney, Texas.  This means that Globe Life's executives worked out of the same offices as the AIL executives.

267.    That the Company's AIL division and related sales practices constitute a "core operation" of the Company is also readily apparent from the Individual Defendants' own statements.  As detailed herein, the Individual Defendants spoke regularly about the Company's growth prospects, including specifically about what drove growth at AIL.  For example, on October 24, 2019, defendant Hutchison stated, "[a]t [AIL], life premiums were up . . . and life underwriting margin was up . . . .  Net life sales were . . . up . . . .  *The sales growth was driven primarily by agent count growth*."  Later, on July 22, 2021, defendant Hutchison stated, "[a]t [AIL], life premiums were up . . . and life underwriting margin was up . . . .  The higher underwriting margin is primarily due to improved persistency and higher sales in recent quarters. . . .  *The increase in net life sales is primarily due to increased agent count and productivity*."  Then on February 8, 2024, defendant Darden stated, "[a]t [AIL], life premiums were up . . . and life underwriting margin was up . . . .  In the fourth quarter of 2023, net life sales were . . . up . . . *primarily due to growth in agent count*."

268.    As another example, Globe Life's 2021 Annual Report states the following about Globe Life's "business model": "Sales and marketing technology allows us to more efficiently engage in recruiting, lead generation, training, business conservation, sales activities and provides management dashboards for visibility into the business and agent lifecycle."

269.    The Individual Defendants' detailed and repeated pronouncements on these topics provide strong evidence that they were receiving specific information about the Company's AIL division.  They also demonstrate that the Individual Defendants were keenly aware and focused,

through "dashboards" and other "sales and marketing" technology, on AIL's sales activities. This further supports a strong inference that they were aware of or recklessly disregarded that long-running and widespread fraudulent business practices were occurring unabated at AIL and that such unsustainable business practices were impacting the Company's reported growth rate.

**B.      Defendants' Compensation Was Tied to AIL's Financial Performance**

270.    The Company's compensation structure also supports an inference of scienter, as Defendants' compensation was directly tied to AIL's financial performance in the form of annual cash bonuses and long-term equity incentives consisting of stock options and performance share awards.

271.    Defendants' performance share awards were based on the performance and growth of three key metrics: (a) net operating income earnings per share ("EPS"); (b) underwriting income growth; and (c) net operating income as a return on equity.

272.    AIL's performance was vital to Defendants' compensation during the Class Period given AIL's impact on and contribution to the Company's underwriting margin (profitability), net operating income, agent count, premiums, and Life Net Sales. As an example, in 2019, Defendants earned the following management incentive compensation for achieving the targeted metrics, thanks in large part to AIL's reported financial performance:

| Name | Target Bonus as a % of Salary | Target Bonus Amount[1] ($) | Framework Bonus[2] ($) | Actual Bonus Paid ($) |
|---|---|---|---|---|
| Gary L. Coleman | 140% | 1,330,000 | 1,596,000 | 1,590,000 |
| Larry M. Hutchison | 140% | 1,330,000 | 1,596,000 | 1,590,000 |
| Frank M. Svoboda | 65% | 364,000 | 437,000 | 435,000 |
| W. Michael Pressley | 55% | 297,000 | 356,000 | 355,000 |
| J. Matthew Darden | 65% | 351,000 | 421,000 | 420,000 |
| **Total** | | **3,672,000** | **4,406,000** | **4,390,000** |

273.    Defendants' bonuses in 2020-2023 would have likewise been impacted by AIL's performance.

274.    Defendant Greer also received annual cash bonuses tied to AIL's performance. Greer's annual bonuses were based on Co-CEO's Hutchison and Coleman's assessment of Greer's performance as CEO of AIL.  For example, the Company's 2022 Proxy disclosed:

> The Compensation Committee awarded [Greer] a bonus of $300,000 based upon the Co-CEOs' assessment of his performance as Chief Executive Officer of the American Income Life Division, which was based in part on growth in premium, growth in and production of the sales force and profitability of the American Income Life Division, and in part on the Company's 2021 results.

275.    Greer received similar bonuses based on AIL's financial performance in 2019, 2020, and 2022.

## C.    The Individual Defendants' Class Period Stock Sales Enhance the Inference of Scienter

276.    The Individual Defendants also profited massively from Globe Life's artificially inflated stock price during the Class Period by offloading their personally held Globe Life shares through a series of strategically-timed sales.  Moreover, in many instances, the Individual Defendants' Class Period sales of Globe Life shares (all of which occurred at artificially inflated prices), represent a significant departure from their sales in the time period preceding the Class Period.  All told, Individual Defendants sold ***$160 million in Globe Life shares*** during the Class Period.

277.    Defendant Coleman sold 525,000 Globe Life shares during the Class Period for proceeds of approximately ***$51.8 million***.  Coleman's sales during the 59-month Class Period were drastically different from his trading patterns during the prior 59 months (the "Control Period").[12] During the Control Period, Coleman sold 440,050 Globe Life shares for proceeds of $32.4 million, meaning that during the Class Period Coleman sold Globe Life stock of substantially greater value as compared to the Control Period.

---

[12]    The Control Period runs from June 3, 2014 through May 7, 2019.

278.    Defendant Hutchison sold 525,000 Globe Life shares during the Class Period for proceeds of approximately *$51.6 million*.  During the Control Period, Hutchison sold 460,500 Globe Life shares for proceeds of over $33.6 million, meaning that during the Class Period Hutchison sold Globe Life stock of substantially greater value as compared to the Control Period.

279.    Defendant Svoboda sold 285,000 Globe Life shares during the Class Period for proceeds of approximately *$29 million*.  During the Control Period, Svoboda sold 174,984 Globe Life shares for proceeds of over $12.2 million, meaning that during the Class Period Svoboda sold Globe Life stock of substantially greater value as compared to the Control Period.

280.    Defendant Henrie sold 58,450 Globe Life shares during the Class Period for proceeds of approximately *$6.2 million*.  During the Control Period, Henrie sold 66,017 Globe Life shares for proceeds of over $4.9 million, meaning that during the Class Period Henrie sold Globe Life stock of substantially greater value as compared to the Control Period.

281.    Defendant Kalmbach sold 24,162 Globe Life shares during the Class Period for proceeds of approximately *$2.9 million*.  During the Control Period, Kalmbach did not report any sales of Globe Life shares.

282.    Defendant Greer sold 43,226 Globe Life shares during the Class Period for proceeds of approximately *$4.7 million*.  During the Control Period, Greer did not report any sales of Globe Life shares.

283.    Defendant Mitchell sold 117,217 Globe Life shares during the Class Period for proceeds of approximately *$12.7 million*.  During the Control Period, Mitchell sold 143,250 Globe Life shares for proceeds of over $10.7 million, meaning that during the Class Period Mitchell sold Globe Life stock of substantially greater value as compared to the Control Period.

284.    Defendant Haworth sold 9,824 Globe Life shares during the Class period for proceeds of approximately $931,000.  During the Control Period, Haworth did not report any sales of Globe Life shares.

285.    The Individual Defendants' motivation to sell stock at prices inflated by the fraud further strengthens the strong inference of scienter.

286.    While some of the Individual Defendants' Class Period sales may have been conducted pursuant to §10b5-1 trading plans ("10b5-1 Plans" or "Plans"), the existence of such Plans does not negate the Individual Defendants' motive or a strong inference of scienter.

287.    Rule 10b5-1(c) created an affirmative defense to insider trading claims for those trades made under a pre-existing binding agreement or plan.  *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, at 51,727-28 (Aug. 24, 2000).  Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability only if it is entered into by an insider "before becoming aware" of inside information, and it was established "in good faith and not as part of a scheme to evade the prohibitions" against insider trading.  Notably, it does not appear that any of the Individual Defendants disclosed these Plans to the public.  Plaintiffs have not been able to locate or identify the terms of any of the Defendants' 10b5-1 Plans and understand that the SEC did not require such Plans to be made public prior to or during the Class Period.

288.    10b5-1 Plans have been, and still are, heavily scrutinized by the SEC and the public at large.  For instance, in 2007, *Bloomberg* published an article titled, "The SEC Is Eyeing Insider Stock Sales," which detailed an academic study of such trading plans which demonstrated that insiders perform "substantially better" when they make trades under 10b5-1 Plans "than would be expected if trading were truly automatic" (as trades ***should be*** under these Plans).  The study revealed that trades made based on the Plans "beat the market by 6% over six months, while those at the same firms who traded outside of the plans only topped it by 1.9%."

- 103 -

289.    In 2009, Alan D. Jagolinzer in his paper titled, "SEC Rule 10b5-1 and Insiders' Strategic Trade," found sales executed within 10b5-1 Plans earn returns that are, on average, greater than returns earned by the market index and also returns earned by insiders who execute sales outside of 10b5-1 Plans.  The study finds "insiders' sales systematically follow positive and precede negative firm performance, generating abnormal forward-looking returns larger than those earned by non-participating colleagues."

290.    Several years later, on November 27, 2012, *The Wall Street Journal* published an article written by Susan Pulliam and Rob Barry titled, "Executives' Good Luck in Trading Own Stock," cautioning that executives trading under 10b5-1 Plans can strategically time their trades to avoid financial losses and yield greater returns because the plans are not public and, therefore, can be canceled, amended, or modified at any time unbeknownst to the public.

291.    In February 2013, Wilson Sonsini Goodrich & Rosati cautioned clients that "[t]he floodlights now aimed at such plans are the result of recent *Wall Street Journal* articles showing that corporate insiders, even those executing trades pursuant to Rule 10b5-1 plans, have generated significant profits – or avoided significant losses – by trading company stock in the days just before their companies issued market-moving news."

292.    In their 2021 *Gaming The System: Three 'Red Flags' of Potential 10b5-1 Abuse*, academics at Stanford University and The Wharton School of the University of Pennsylvania analyzed over 20,000 10b5-1 Plans and concluded that "a subset of executives use 10b5-1 plans to engage in opportunistic, large-scale selling of company shares."  In December 2022, the SEC adopted amendments to Rule 10b5-1 under the Exchange Act.  Those amendments aimed to strengthen investor protections concerning insider trading.

293.    As detailed above, the trading behavior of the Individual Defendants during the Class Period is sufficiently suspicious in timing and/or amount so as to preclude any affirmative defense that might otherwise have been available to their pre-planned sales made under such trading plans.

### D.    Testimony and Court Filings from Unrelated Litigation Supports a Strong Inference of Scienter

294.    According to evidence presented in other pending litigation, Defendants knew or deliberately disregarded during the Class Period that Globe Life's sales practices included widespread and unchecked fraudulent behavior.  For example, according to a whistleblower complaint filed by Dehning, a former AIL Vice President of Field Operations (one of five) who worked at AIL's home office at Globe Life's headquarters, "[o]n numerous occasions [Dehning] escalated the unethical and potentially illegal sales practices" to defendant Scarborough and others on AIL's executive management team.  Dehning also alleged that Scarborough told Dehning to "'stop talking to your friend(s),'" about the fraudulent business practices, a reference to insurance regulators in Michigan.

295.    Dehning stated in a sworn affidavit filed in the U.S. District Court for the Western District of Michigan,[13] that beginning in 2021 he began reporting ongoing fraud at AIL to state insurance regulators.  Ex. A, ¶15.  Dehning stated that he also reported these same "widespread fraudulent business practices" to his supervisors, Zophin (President of AIL), defendant Greer (CEO of AIL), and Globe Life's Corporate Senior Vice President, Legal and Compliance, defendant Scarborough, but that they "did not want to hear about the instances of fraud and specifically told [him] to stop bringing it to their attention."  *Id.*, ¶¶8, 11.  He noted that "no efforts were made to determine why fraud began, and what policies, procedures, and/or financial controls could be installed to curb fraud and dissuade future fraud."  *Id.*, ¶8.  According to Dehning's complaint,

---

[13]    *Dening v. Globe Life American Income Division, et al.*, No. 1:23-cv-01117 (W.D. Mich. July 1, 2024).

Dehning alerted Zophin, Greer, and Scarborough of his concerns of "unethical and fraudulent sales practices," and subsequently to the MDIFS.  When the MDIFS commenced an investigation into AIL's sales practices, Scarborough instructed Dehning to "'stop talking to [his] friend(s),' referring to the [MDIFS] investigators."

296.    In the *Zinsky* litigation against AIL filed in the U.S. District Court for the Western District of Pennsylvania, Russin, a former sales agent in charge of training other AIL agents, stipulated to the following facts in connection with a Petition to Enforce Settlement (*see* Ex. C), of the matter:

> Russin is aware of instances in which AIL agents in the Arias office, not on or coded to Russin's team, may have performed unethical and/or fraudulent sales practices, including the following:

> *       *       *

b.  Taking confidential information from CAS  to write new policies; and

c.  The use of automatic dialers, third-party dialers, and roto dialers . . .; and

d.  AIL encouraged agents not to document the aforementioned behavior in writing.

*Id.* at 16.

297.    Thus, parties in two unrelated civil cases pending in separate federal courts independently confirm that AIL executives were aware of the widespread fraudulent business practices described herein.  These accounts also confirm that rather than take action to prevent or stop the misconduct, AIL executives instead told individuals not to report or document the fraudulent practices in writing.

298.    The fact that the fraudulent practices were long-running and widespread, and repeatedly reported to top AIL executives, including defendant Greer, supports the inference that the Individual Defendants knew or recklessly disregarded the falsity of their statements about the

supposed legitimate reasons for AIL's growth (*i.e.*, increasing the number of agents), when in fact illegal and/or unethical business practices were also (at least in part) responsible for that growth.

### E.    A Myriad of Government Investigations, Enforcement Actions, and Consumer Protection Violations Support a Strong Inference of Scienter

299.    The Individual Defendants' knowledge of AIL's unethical and illegal sales practices is further supported by the many lawsuits that have been filed and complaints lodged against AIL by customers and employees.  For example, two lawsuits that have since settled highlighted the alleged misconduct:

- **August 27, 2019** – *Baker v. American Income Life Insurance Company, et al.*, No. SOM-L-001142 (N.J. Super. Ct., Somerset Cnty.) ("AIL agent, Luis Suarez, . . . commenced certain actions to defraud Plaintiff . . . [W]ithout Plaintiff's knowledge, Mr. Suarez used Plaintiff's information and created a new policy with a new policy number along with a made up social security number and switched her payments to 2nd policy. . . . This matter is currently being investigated by the New Jersey Department of Banking & Insurance Enforcement Unit. . . . After months of no response to Plaintiff's request of the falsified 2018 policy contract, Plaintiff happened to find her copy and noticed forged signature on her copy of the policy contract.").

- **January 28, 2022** – *Betancourt v. American Income Life Insurance Company*, No. 8:22-cv-00153 (C.D. Cal.) ("[AIL's] agent used Plaintiff's checking account information to complete the process of signing Plaintiff's sister. . . . Defendant's standard practice is to automatically withdraw monthly insurance premiums from its customers personal bank accounts via electronic fund transfers . . . . Plaintiff never gave Defendant permission to withdraw funds from her checking account to pay for her sister's insurance policy. . . .  Plaintiff requested that Defendant refund the charges made to her checking account.  Defendant has failed to respond favorably to this day.").

300.    Investigations and enforcement actions by state departments of insurance and insurance commissioners corroborate Fuzzy Panda's allegations of widespread fraud and support a strong inference that the Individual Defendants knew or were reckless in not knowing about AIL's rampant unethical sales practices.

1.     **Enforcement Actions by the California Department of Insurance and Other States' Insurance Departments**

301.     The California Department of Insurance has brought numerous enforcement actions concerning the misconduct of AIL's agents in that state, including by submitting unauthorized and fraudulent applications for life insurance without customers' knowledge or approval.  For example:

- **October 24, 2018** – *In the Matter of the Licenses and Licensing Rights of Samvel A. Tigranyan*, No. VA201700284-AP (Cal. Ins. Comm'r) (Order of Summary Revocation of Restricted Licenses) (Respondent, who had previously "fail[ed] to notify CDI" of a "2009 misdemeanor domestic battery conviction," had sold life insurance policies to six consumers and "in each of the transactions described . . ., Respondent told the consumers that he was acting on behalf of a union which would pay half of the consumers' premiums" despite "there [being] no evidence that Respondent was acting on behalf of any union that would pay for consumers' insurance coverage.").

- **November 21, 2019** – *In the Matter of the Licenses and Licensing Rights of Delmy Carolina Diaz aka Delmy Carolina Diaz-Cervantes*, No. LA201600482 (Cal. Ins. Comm'r) (Accusation) (Respondent – a "general agent" who "had ten to fifteen agents working for her" and who "was responsible for training the agents" – opened a life insurance policy for the daughter of one of Respondent's co-workers "without [that co-worker's] knowledge or approval."  Respondent linked that unauthorized policy to her own bank account.  Respondent completed the policy application using the logon information of another agent who reported to Respondent, in order to "allow him to get credit for his leads.").

- **October 9, 2020** – *In the Matter of the Licenses and Licensing Rights of Claude Lee Perry a.k.a. Claude L. Perry*, No. SC201900146 (Cal. Ins. Comm'r) (Accusation) ("AIL discovered that Respondent submitted to AIL at least eight insurance policies for customers who never applied for or had knowledge of the policies" after "AIL's Concord, California office began receiving calls from existing policyholders complaining about their bank accounts being charged by AIL without their knowledge.").

- **February 22, 2021** – *In the Matter of the Licenses and Licensing Rights of Noe Alejandro Gonzales III, a.k.a. Noe Alex Gonzales III d.b.a. Alex*, No. GG202000304 (Cal. Ins. Comm'r) (Accusation) (After three customers to whom Respondent sold life insurance policies each "called [AIL's] main office to cancel" their policies and signed and returned cancellations forms, Respondent submitted unauthorized "reinstatement paperwork" for each customer's policies that Respondent "knew" were "false," which "bore a false signature," and "committed forgery," resulting in "unauthorized drafts [being] withdrawn" from each customer's bank account.).

- **July 15, 2021** – *In the Matter of the Licenses and Licensing Rights of Noe Alejandro Gonzales III dba Alex*, No. GG202200079 (Cal. Ins. Comm'r) (Accusation)

- 108 -

("Between February and April 2020, Respondent submitted at least three fraudulent reinstatement applications for three victims – one was at least 72 years old.  The applications falsely authorized a bank draft for the reinstatement.  Two applications falsely indicated that the victims wanted a reduction in the coverage and premium amounts. . . . Based on the false applications provided by Respondent, American Income Life modified and reinstated the policies.  Accordingly, unauthorized drafts were withdrawn from the victims' bank accounts.").

- **November 15, 2022** – *In the Matter of the Licenses and Licensing Rights of Noe Alejandro Gonzales III, dba Alex*, No. GG202200079 (Cal. Ins. Comm'r) (Default Decision and Order of Revocation) (finding that "Respondent 'has shown incompetency or untrustworthiness,'" "'is lacking in integrity,'" and that "[i]t would be 'against public interest' to permit Respondent to continue transacting insurance in the State of California" and "revok[ing] Respondent's licenses").

- **December 18, 2024** – *In the Matter of the Licenses and Licensing Rights of Karen Manzano Gagarin*, No. VA201300894 (Cal. Dep't of Ins.) (Order Suspending and Removing from Office and Employment with Production Agency and Notice of Right to Hearing) ("Respondent was a participant in a conspiracy scheme to defraud American Income Life Insurance Company and obtain money from the insurance company by submitting applications for life insurance on behalf of individuals who did not know that a policy was applied for in their name and/or did not want a policy.  Respondent then allegedly shared the more than $2.5 million in commissions and bonuses received from the insurance company in connection with the fraudulent applications.").

302.    In addition to California, numerous other state insurance departments and insurance commissioners have brought enforcement proceedings against AIL's agents for their unethical and illegal sales practices.  For example:

- **August 1, 2015** – *In the Matter of Trevor Fudge*, No. 18-15426 (Mich. Dep't of Ins. & Fin. Servs.) (Order Accepting Stipulation) (Respondent admitted to "creating three fraudulent insurance applications.").

- **August 29, 2019** – *In the Matter of Mary E. Rochester*, SCDOI File # 19-6742 (S.C. Dep't of Ins.) (Consent Order Imposing Administrative Fine) ("[Insurance agent] violated the laws of this State . . . when she submitted a modification document to [AIL] on [customer] without her knowledge or consent.").

### 2.    AIL's Sales Practices Violated Numerous State Insurance and Consumer Protection Laws, Including the NAIC's Model Code

303.    The Individual Defendants also allowed and encouraged their insurance producers to use unlawful and unethical sales practices in violation of the National Association of Insurance

- 109 -

Commissioners' ("NAIC") Advertisements of Life Insurance and Annuities Model Regulation ("Model Regulation"), the NAIC's Model Unfair Trade Practices Act ("UTPA"), and related state insurance consumer protection laws.

304. Sections 3 and 4 of the NAIC's Model UTPA prohibit unfair trade practices. Unfair trade practices under the NAIC Model UTPA include "[m]aking false or fraudulent statements or representations on or relative to an application for a policy, for the purpose of obtaining a fee, commission, money or other benefit from any provider or individual person."

305. All 50 states have adopted a version of the NAIC's Model UTPA, which, whether expressly or by interpretation, prohibit an agent or producer of insurance from submitting policy applications with false and fraudulent information.

306. AIL was aware of and encouraged violations of the UTPA through fraudulent insurance applications. With a conscious disregard for these laws, Globe Life and its subsidiaries, such as AIL, allowed and encouraged a general business practice of submitting false and fraudulent policy applications – including for fictitious, deceased, or unsuspecting individuals. AIL's agents have been subject to disciplinary action across the nation based on these Company-wide practices.

307. On September 14, 2022, the Texas Commissioner of Insurance disciplined a former AIL agent for submitting multiple unauthorized applications for coverage using invalid information that resulted in unauthorized bank drafts. *Mariangela Duerto Aranguren*, No. 2022-7499 (Tex. Ins. Comm'r Sept. 14, 2022). And on April 25, 2024, the Texas Commissioner of Insurance disciplined another AIL agent after "submitt[ing] life insurance applications with invalid or false information." *Theresa Gil Romer*, No. 2024-8622 (Tex. Ins. Comm'r Apr. 25, 2024).

308. Similarly, the Pennsylvania Insurance Department disciplined a former agent from Arias Organization on April 19, 2024 for "submit[ing] ten (10) fraudulent life insurance policy applications involving ten (10) fictitious Maryland consumers" between January 29, 2023 and May

28, 2023.  *In re Erica Robertson*, No. CO24-04-007 (Consent Order) (Pa. Ins. Comm'r Apr. 19, 2024).  As further evidence of how this type of fraudulent behavior was a common business practice, the former agent "admitted to being taught by a licensed coworker at Arias Organization LLC . . . to produce applications using fictitious information obtained from no-cost websites that specialize in generating and providing random personal identifiable information."

309.    Another former agent at Arias Organization was disciplined by the Pennsylvania Insurance Department on April 29, 2024, after it was found that she "submitted thirteen (13) fraudulent life insurance policy applications" between November 14, 2018 and June 27, 2023 that included fictitious consumers and intentionally false information about individuals and their bank accounts.  *In re Jenna S. Grula*, No. CO24-04-018 (Consent Order) (Pa. Ins. Comm'r Apr. 29, 2024).  Despite Defendants' assertions that they had systems in place to verify applications and prevent fraud, this agent was submitting fraudulent applications for ***almost five years***.

310.    The use of deceptive practices by AIL has been investigated by the Pennsylvania Insurance Department, through its October 12, 2023 Market Conduct Examination Report of AIL ("Examination Report") covering the period from July 1, 2021 through June 30, 2022, and found multiple violations, including violations for unfair methods of competition and unfair or deceptive acts or practices, ultimately resulting in a $130,000 fine paid by AIL and ultimately included in Globe Life's reported financial results.  Globe Life senior insiders, including defendants Mitchell and Scarborough, signed the consent decree on behalf of AIL.

311.    Specifically, across the review of 79 policies identified as Life Replacements without Illustration, the Pennsylvania Insurance Department found 68 violations where AIL's producers "falsely stated in the applications that they were not aware of an existing life insurance policy and, therefore, the transactions were not replacements" in violation of the prohibition in 40 P.S. §1171.5(a)(12) on making false or fraudulent statements on an insurance policy application.

- 111 -

312.     In that same Examination Report, the Pennsylvania Insurance Department found 48 violations for deceptive practices in "induc[ing] or tend[ing] to induce the lapse of existing life insurance coverage by failing to contact the policyholders" in violation of the prohibition in 40 P.S. §1171.5(a)(1)(vi).  Furthermore, the Pennsylvania Insurance Department found AIL in violation of 40 P.S. §323.3(a) regarding its data integrity because its "initial data file submitted for Life Replacements without Illustration was incomplete and inaccurate."

313.     The NAIC models also specifically address dishonest practices in insurance advertising.  AIL's agents were trained and recruited to use high pressure and fraudulent sales tactics that violated the Model Regulation and the related state statutes including: (1) falsely claiming program exclusivity; (2) falsely stating there were limited enrollment periods or that decisions must be made on the day of the presentation; (3) misrepresenting themselves as union representative or otherwise endorsed by a group in selling insurance to union members; (4) making misrepresentations while advising customers in the replacement of existing policies; (5) misrepresenting when rate increases on policies occur; (6) misrepresenting the value of polices and when they pay out; and (7) using beneficiaries as leads without the policyholder's consent.

314.     Under §2(A)(1) of the Model Regulation, advertisements include "material designed to create public interest in life insurance or annuities or in an insurer, or in an insurance producer; or to induce the public to purchase, increase, modify, reinstate, borrow on, surrender, replace or retain a policy," including "[m]aterial used for the recruitment, training and education of an insurer's insurance producers which is designed to be used or is used to induce the public to purchase, increase, modify, reinstate, borrow on, surrender, replace or retain a policy."

315.     Section 4(A) of the Model Regulation requires that advertisements be "truthful and not misleading in fact or by implication," "sufficiently complete and clear so as to avoid deception," and "not have the capacity or tendency to mislead or deceive."

316.    Section 5 of the Model Regulation specifically prohibits false statements or implications that: (i) "an insurer or a policy has been approved or endorsed by a group of individuals, society, association or other organization"; (ii) "the policy or combination of policies is an introductory, initial or special offer, or that applicants will receive substantial advantages not available at a later date, or that the offer is available only to a specified group of individuals" and "shall not describe an enrollment period as 'special' or 'limited' or use similar words or phrases in describing it when the insurer uses successive enrollment periods"; or (iii) "only a specific number of policies will be sold, or that a time is fixed for the discontinuance of the sale of the particular policy advertised because of special advantages available in the policy."  The Model Regulation has been adopted by 21 states, including Texas, where Globe Life is headquartered.

317.    Under §3(B) of the Model Regulation, "all advertisements, regardless of by whom written, created, designed or presented, shall be the responsibility of the insurer, as well as the producer who created or presented the advertisement."  Globe Life required training materials to be submitted for approval prior to dissemination.  With Globe Life's knowledge and approval, AIL created and used training material and producer scripts that violated these regulations.

318.    AIL pressured customers by telling them they had to make an immediate decision.  In one publicly-posted document, an Arias Organization's script instructed producers to tell customers that they had to make their decision the day of the presentation: "Either way, yes or no, that decision ***does have to made today*** during your service period in fairness to all the other members waiting to enroll.  Does that make sense? The good thing about the benefits is that they are pretty much a no-brainer; you'll know at the end whether it's something that will fill a need for you or not."

319.    Producers leveraged their customers' trust of their unions and lied about being union representatives or otherwise claim to be endorsed or approved by a union.  AIL producers were instructed to claim the approval and support of police and firefighters.  The same Arias

Organization's script had producers inform customers that AIL is "**dedicated to the Police Union** to get these [Child Safe] kits out to every single family that has children."  Another AIL script stated: "**This is where the police and the firefighters need your help. . . . [T]hey are asking you to do your part** in protecting the community by sponsoring at least 10 families with kids under the age of 18, so that we can blanket the area and make sure every child is protected."

320.    AIL also trained its agents to lie about the exclusivity of the policy.  A phone script for a referral call started with telling the customer they had a "**unique opportunity**" and explaining "basically what *(sponsor)* did [is] he/she made available to you some **exclusive benefits** that are only available to union/group members, like Police, Firefighters, and Teachers.  *(Sponsor)* felt a couple of these benefits would fit a NEED for your family.  It's great for you, because normally you wouldn't have access to these types of benefits."

321.    The Individual Defendants not only knew about, but they authorized the aggressive and predatory sales practices that violated the Model Regulation and state insurance laws.

### F.    Hundreds of Consumer Complaints Made to the BBB, FTC, and State Insurance Departments Support a Strong Inference of Scienter

322.    The inference that the Individual Defendants were aware of AIL's illegal and unethical business practices is bolstered by hundreds of consumer complaints filed during and before the Class Period with the BBB and FTC.

323.    While the complaints cover a wide range of unethical and deceptive conduct, considered collectively, they corroborate the pattern of misconduct revealed by the Fuzzy Panda Report, which detailed how Globe Life and AIL's agents and employees engaged in "fraudulent insurance production" and "[f]raudulent [u]nderwriting" by "[f]org[ing] [s]ignatures to [c]reate [p]olicies [c]ustomers [n]ever [a]greed to [b]uy," ""[e]nhanc[ing]' [e]xisting [p]olicies," and "add[ing] additional policies without approval" – all so that "payments would be auto-drafted out of customer accounts" without their approval.  The BBB and FTC complaints also corroborate the

Fuzzy Panda Report that "[w]hen the unwitting policyholder finds out, the agent is nowhere to be found, and it can then take months to cancel the policy."

           **1.**      **Consumer Complaints to the BBB**

324.    Since 2021 alone, AIL's customers have written several hundred complaints to the BBB complaining of AIL's fraudulent, deceptive, and unethical business practices, which were posted on the BBB's website.  In response to every complaint, an AIL employee issued one or more written responses to the customer that was posted on the BBB's website.  Hence, AIL has acknowledged that it was aware of these customers' complaints.  Indeed, AIL's responses often cited the specific policy number(s) at issue, thereby authenticating the complaint as made by an actual AIL policyholder.

325.    AIL's customers' complaints reveal a consistent pattern of similar misconduct by AIL's agents and employees, which typically include, among other things: (a) opening multiple unauthorized policies without a customer's knowledge or consent; (b) refusing (and obstructing and delaying) customers' repeated requests to cancel their policies; (c) continuing to auto-draft customers' bank accounts for unauthorized premium payments for months (or years) after customers had requested to cancel their policies; (d) thwarting customers' attempts to block AIL's auto-drafts with their bank by taking out "automatic premium loans" ("APL") to drain the accumulated cash value of their policies and prevent policies from lapsing; (e) agents falsely claiming membership or affiliation with the customer's labor union or other organization; and (f) customers complaining that AIL is a MLM scam.

326.    ***First***, numerous consumers complained to the BBB that AIL had opened unauthorized policies – often ***multiple*** additional unauthorized policies – without that customer's knowledge or consent.  Typically, a customer who thought they had only one policy with AIL would discover that multiple agents had covertly opened two, three, seven, or even nine policies in their

- 115 -

name or the name of their family members. Having covertly "upsold" these customers, AIL proceeded to charge their bank accounts unauthorized additional premiums (until, as Fuzzy Panda reported, "the unwitting policyholder f[ound] out"). For example:

- **April 11, 2023** – "*Your Agent . . . came into my home on 4/15/22 and with my policy information and lied and swindled me out of my money ($795.50)*. . . . I called your customer service . . . and spoke to one of your Representatives . . . . [S]he told me was that *he sold me another policy and that is where the extra money went. I would have never agreed to that. I was fine with the two policies I already have*."

- **May 30, 2023** – "*Policy was opened without my knowledge*. I had AIL for 5 years, *another account was opened last year without my husband[']s knowledge. We never signed or met with anyone last year*."

- **July 15, 2023** – "*Adding sudden death benefits to people on our policy. Refusing to remove when we contact them*. Giving a number that is not any of ours and stating they got approval from a person. *If I call they state it was [the agent] that approved. If [the agent] calls they state it was me that approved it*."

- **July 21, 2023** – "*I am filing a formal complaint against [AIL] regarding the unauthorized setup of an account* and the subsequent refusal to delete my personal information from their systems. I received an email welcoming me to the . . . Plus program, *despite never having opened an account with the [company] or being familiar with their services*."

- **July 24, 2023** – "This company gave me the run around for months, *they lied, and the sold an elder a second insurance policy that he never signed for* that he has been paying on for 1400. *They refused to give him his money back and said it must have been done on the computer and they are not responsible for their agents*. PLEASE BE CAREFUL if you are going to do ANY business with this company."

- **July 27, 2023** – "Terrible company to deal with, keep giving us the run around when trying to canc[el] our policies and getting our money back. My husband and I called in June to canc[el]our policies[.] [W]e were told they we're canc[eled] and we would not be charged anymore. I asked for proof it was canceled via email and was told that was not an option and we'd receive something in the mail which we never did! Only to continue to be charged for 2 months because apparently *they sell you multiple policies with multiple policy numbers without telling you! We had to call back after being charged twice and we're finally told we had multiple policies we had to cancel and this time given ALL the policies numbers we had and a form via email to canc[el] (which we were told the 1st time wasn't an option)[.] [N]ow we are trying to get the 2 months we were charged for because the 1st agent 'forgot' to mention we had more than on[e] policy when we called*. We would like back the last 2 months we are owed. Admit your agent made a mistake and make . . . it right with your customers instead of fighting with them and refusing to fix the issue."

- 116 -

- **October 12, 2023 –** "When I signed for whole life insurance agreement I was told I would receive a copy of everything I signed and then get debited for the monthly premium, I never received my copy of documents. The company was quick to debit my account though. ***I then had ANOTHER agent contact me to tell me my policy was wrong and needed fixed and he was going to handle that, I then ended up with TWO policies[.]  I was unaware I had two seeing as I never signed MORE paperwork***. I then was contacted by a THIRD agent who said I needed to fix my insurance policy and when I had enough of the confusion and constant change, I called to cancel my policy and asked for a full refund in which I was denied . . . ."

- **November 1, 2023** – "***Apparently, every time I update my life insurance policy (every 6 month[s]) they started a new policy without cancelling the previous policies***. When questioned today they told me I had to specifically call in after getting my policy updated and cancel the old one. Nobody ever[] told me this since I had it in 2021. ***So every 6 month[s] when they called me to go over and update my policy they [were] actually just selling me more polic[ies].  In the end I ended up with 7 policies open and paying them 500/month***. I just called and cancelled all of them. ***They never once told me they [were] adding new policies and that I would be keeping my old policies.  What a scam!  They should be ashamed***."

- **November 15, 2023** – "***We have tried to cancel for three months with this company.  They not only raised our rates, but we haven[']t been able to get a hold of any of our reps either.  When we tried to cancel, they never told us we had 7 policies to cancel*** the first time, so only one was cancelled. Even after the paperwork was filled out with all policy numbers on it, they still took out money the next month."

- **December 5, 2023** – **Initial Complaint**: "Even after giving this company our business they continue calling us about every 6 months. Sometimes not knowing ***we have a policy [i.e., one (singular) policy]*** with them, sometime saying ***our policy*** is not going to cover enough for when one of us dies. I have repeatedly asked them to stop calling and have even said if we get another call I am pulling out of my policy. . . . [I]t is getting extremely out of hand and borderline harassment now." **Business response**: "***The family has 6 policies in force at this time***."

- **December 21, 2023** – "***[AIL] open[ed] multiple policies under my name without me knowing about all [of] them except for the first one I opened and . . . without me authorizing to open up more policies***[.] I would like compensation for all these back because they took a lot of money [from] me sometimes over $200 a month and its really putting me in some hard times . . . . Yes I did have contact with the company but they all told me about changing my policy not opening a new one so ***when I gave approval they never informed me that I was opening another policy and why would I need 3 polic[ies] I was under the assumption that I only had 1 policy and now I am out a lot of money*** because I wasn[']t aware I was opening new polic[ies] just changing my one policy. . . . ***The company . . . opened accounts that I was not aware I was opening[.]  [T]hey never informed me I had to open more polic[ies] and then didn[']t inform me I was opening more and not canceling more so I would pay them more*** . . . ."

- **December 27, 2023** – "***I had reached out in November of 2023 to cancel my policy with them***. I have copies of my policy and used the form I was sent to cancel it. At the end of November I was still charged a premium. When I reached out to customer service I was told they had canceled the policy and removed it from bank drafts. However in December I was charged again. When I reached out I was told it was canceled. So I asked for a refund. I never got acknowledged in anyway if I was ever actually receiving one and was told to fill out another cancellation form. I let them know I had no remaining policy with them and wasn't sure how to go about this without just contacting my bank and letting them know they are no longer authorized to withdraw from my account. ***They asked me for info which I provided and told me that I had 3 other policies that I needed to cancel***. They provided the policy numbers. I looked at all the paperwork they had provided me and ***none of those policy numbers match up with what I have***. I still filled out the forms to cancel and sent them in asking again about the refund. Still no acknowledgment of any sort. Just another email stating they 'canceled the policy.'"

- **January 5, 2024** – "***This company is fraudulently adding on additional benefits to my policy, which is increasing my premium without my consent***. I received a letter dated November 4, 2023 stating I was approved for the accidental death benefit which increased my premium by 4.17. I've never spoken with anyone about this regardless of the questions they stated I answered on 11.1.23 at 5:15. ***I'm concerned someone is [fraudulently] adding on additional benefits and this needs to be escalated asap. . . . They are lying saying that I approved this clause instead of admitting that they are committing fraud. . . . Nobody is out this company or with the home office is taking accountability for fraud. . . . I[']m not letting this go and will escalate***."

- **January 10, 2024** – " *[AIL] for 7yrs there was an additional life insurance policy opened up on my account that I did not open or give authorization to do so. I have been fraudulently charged and an electronic signature was fraudulently placed without my knowledge or consent*. . . . This company is doing fraud transactions to its customers."

- **January 22, 2024** – "*[I] purchased [one] life insurance policy for myself. I had several payments taken from my accounts in different amounts*. Then [I] received a few phone calls telling me my policy lapsed. When [I] received a copy of the policy it had someone else[']s ID number and my beneficiary listed as my grandmother who has been dead almost 20 years. So [I] called to correct the errors with [an employee] and he said 'lets do a whole new application and start over with payments.' I asked[,] what happens to the money that was taken from my account, can [I] get my money back. He said, no its been more than 4 months. I called the number listed to reach someone who could explain to me what has happened. She said she saw no record of a policy other than the one [I] had just done that day. Money was taken from 2 of my accounts. The lady then told me to send proof of the transactions[.] So [I] did. ***The next day my husband receives a bill for a policy he did not purchase*** with my name . . . listed has the person the insurance policy is for. I never agreed to a such thing. Now no one wants to talk to me or [explain] what[']s happening. . . . ***I spoke to a representative and she told me there were 9 policies in my name[.]*** [S]he

said she'll email some paperwork for me to sign . . . I never received them. I called again spoke with a different rep who also told me they would send paperwork . . . never received."

327.    The above complaints are consistent with, and corroborate, the Fuzzy Panda Report from a former "AIL Sales Agent" that AIL's agents "'tell [customers] that they're just calling to activate their coverage that's already in place, which is total BS, and all they need to do is verify some information from them and then they send them over a DocuSign and next thing you know, they wrote more coverage on 'em without them even knowing.'"   The complaints similarly corroborate the Fuzzy Panda Report from Zinsky that "colleagues would write new policies for her clients without telling her. The clients would often fail to notice new charges for months, or longer. And they would be furious when they found out."

328.    ***Second***, numerous consumers complained to the BBB that when they asked AIL to cancel their policies, AIL refused to cancel their policies and continued refusing to cancel those policies – often for months (or years) and despite those customers' repeated requests – through a pattern of delay, obstruction, and obfuscation. The usual fact pattern begins when a customer – irritated by receiving incessant, harassing telephone calls from multiple agents or discovering additional unauthorized policies or increased premium withdrawals – calls their agent seeking to cancel their policy. The agent may be nowhere to be found or may simply hang up the phone. However, if the agent does respond, he or she often tells the customer that the agent has no authority to cancel the policy and that the customer should call Globe Life's customer service telephone number. But when the customer calls Globe Life directly, the Company's so-called "customer service representatives" – who are actually "Customer Retention Representative[s]" in the "Customer Retention Department"[14] – often place customers on hold for hours at a time only to hang

---

[14]   Although Globe Life's website publicly invites customers to "[g]ive one of our ***customer service representatives*** a call" – the actual titles of the employees who speak with customers seeking to cancel their policies are "Customer Retention Representative[s]." Those employees work in Globe

up the phone and drop the customer from the line.  And when customers do manage to speak with someone at the Company, the Customer Retention Representatives make cancelling very difficult and time-consuming by requiring customers to complete and mail in cancellation paperwork. These difficulties were compounded by the fact that customers cannot cancel all the multiple (unauthorized) policies opened in their name if they do not know about the others.  The net effect of this scheme to avoid and delay cancellations is that frustrated customers often simply give up and instead contact their bank and pay a fee to block AIL's auto-drafted bank debits.  This pattern of delay, obstruction, and deception is reflected in the following complaints:

- **March 9, 2023** – "To begin with, [AIL] is incredibly aggressive in selling you life insurance.  They reached out to my whole family and many friends repeatedly.  They will chain call you.  A few weeks ago, they called me 6 times in a row.  I finally answered and told them to stop calling.  That same night, they called 3 more times in a row until I finally answered and scheduled a meeting to discuss my policy.  During the meeting with the . . . agent, . . . *I told her I had been trying to cancel my policy for months and she said unfortunately she couldn't help me with that but that I could try the customer service number.  I repeatedly called the customer service number to cancel my policy.  First, they would answer and act like they couldn't hear you.  Other times, they would answer, transfer you to someone who could help [to] cancel the policy, and then the phone would hang up.  The last time I called a few days ago, I was on hold for an hour and a half before I finally gave up . I finally had to call **** of America and request a stop payment so that my policy can lapse or cancel.  [AIL] is violating the **** and once you buy a policy it is IMPOSSIBLE to cancel it*.  This is very wrong and I imagine they are taking advantage of many elderly people which is heartbreaking.  Please look into this. *Insurance companies should not be able to take advantage of people and hang up the phone on you when you try to cancel their policies*."

- **June 29, 2023** – "Applied for a life insurance policy through my union with this company but cancelled the application shortly after applying when I called them over the phone.  I spoke to a representative who told me they would cancel the application

---

Life's "Customer Retention Department," which "is responsible for conserving business on behalf of the Company."  Those "[r]epresentatives play a key role in ensuring that customers who call in with the intention of cancelling are provided assistance in understanding the importance of keeping their coverage, as well as providing policy maintenance."  This explains why customers have such difficulty in cancelling their policies: when a customer calls seeking to cancel, the employee they interact has been specifically hired for the purpose of "conserving business" and "retaining current policyholder business."  Indeed, these employees are paid "bonus[es] based on [their] performance" in retaining and conserving business.

- 120 -

and refund me the first payment they removed from my bank. They said I should receive a refund in the next two weeks from that phone call. Well I have been waiting for my refund and looked at my bank statement and saw they charged me again for the month of June. *I called them again June 21st and they said I was not able to cancel over the phone and I needed to send paperwork to them that they would email me in the next 24hrs. After confirming my email address they have not sent the cancellation form* . . . . I do not recommend using this company after reading how difficult it is to cancel and request refunds from them. I would like them to confirm my application/ policy was cancelled and would like my two full refunds.

- **June 29, 2023** – "*I had a policy with this company. I was contacted by someone talking to me about another kind of policy. I liked this policy better and agreed to go with that one and to stop the older one. I was reassured this was to happen. The next month my bank account had two withdrawals, one for the older policy and one for the new one*. I called several times to get this straightened out to no avail. When the second month came and my account had two more withdrawals I called the corporate number. *I was on the phone being transferred and on hold numerous times for 3 hours. Totally irritated I went to my bank and paid the fee to stop them from taking out any more of my money*. This was over a year ago and they still call me stating my policy 'lapsed' in November . . . . I explain nicely what had happened and that I am not interested for I have two other policies elsewhere and they become pushy. It gets to the point I hang up on them. They wait a month or so and call again. *I am tired of being harassed by this company*!"

- **July 6, 2023** – "In 2020 I was contacted by [AIL] to enroll in a life insurance plan as they are associated with the union I am a part of. . . . I signed up for a life insurance and pay protection package costing $197.64 per month. *They continuously called me and pushed different packages/benefits at me and even upgraded my policy without telling me. In March 2023 I was contacted again and told their employee . . . that I was not interested and wanted to cancel my entire policy. He proceeded to hang up on me*. In May 2023 I was contacted by . . . an employee wanting to again sell me a policy. I told her I had one and had requested for it to be canceled. She tried to research why it wasn't canceled and told me that she was canceling it and I wouldn't be charged again. She said she would follow up when it was done, I never heard back again. In June 2023, I was contacted by another employee . . . who once again was trying to upgrade my policy. *I told him again that I have been trying to [cancel] the policy and to please cancel the policy*. I have now spent $9,486 on this policy that I have no records of and continue to be charged every month."

- **July 15, 2023** – "*My wife and I have updated and changed our insurance, we called [AIL] to cancel our policies . . . . We explained [we] made an informed choice and wanted to cancel and to have our cash value returned to us from our whole life insurances*. . . . [The employee] said that the policy is canceled and that premiums would not be taken out in July but it wouldn[']t be finalized until they received signed policy cancellation paperwork from us, which we had and sent in 6/28/23 via postal service. *So you can imagine my disappointment when I went to the bank $172.47 was withdrawn by [AIL]* on 7/5/23 and not sure if the other monthly debit of $193.11 will be withdrawn later this month as well. I work nights

so I sleep during the day, ***it makes it really difficult to waste my time calling waiting on hold and jumping through hoops for hours to only have been lied to and have to call back losing sleep for an unprofessional organization who [cannot] do their job when asked the first time***."

- **July 24, 2023** – "I have been attempting to cancel my term life policies from [AIL] since May 2023. ***The last time I called the company I was left on hold for an absurd amount of time then every time I explained to the phone representative I wished to cancel my policies. I was put on hold again, transferred to someone else who then attempted to resale me another policy. [A]fter being on the phone for over 2 and half a hours the final representative told me it would take a WEEK to send the email form to cancel my policy***. Shortly after this [conversation] I called my bank and asked to put a stop payment on [AIL] to head off any attempts from them taking any more of my money. ***We are now more than half way through July and I have yet to receive the cancellation*** email but I've received two emails from them trying collect the past due policies. I am not looking for any monetary compensation I just want to cancel my policies so I do not have to keep issuing stop payments against this company every year."

- **August 18, 2023** – "In 2022, I switched to another insurance company and attempted to discontinue my policy with AIL, however, when I attempted to cancel my policy, ***I was told that I could not cancel my policy via phone and needed to sign paperwork that would be sent to me by mail in order to discontinue the policies for myself and my daughters. I waited for the paperwork and it never arrived. I contacted AIL on several occasions and was told that the paperwork would be sent again. Each time I called, the wait time was at times, up to one hour long and then when an agent answered, they would immediately put me on hold and disconnect the call. Eventually, I became frustrated and stopped calling. I also put a stop payment at my bank for their charges. Then they began calling me. They called at all hours and I explained each time that I wanted to cancel and requested the cancellation paperwork be sent again. [T]he representative informed me that they had my address as . . . instead of . . . where I live. Again, I never received the cancellation paperwork. [The agent] continued to call, email and bill me, seeking payment. [It] is interesting that they are able to contact me, seeking money but are unable to send me the promised cancellation paperwork. I just want to cancel mine and my daughters policies with AIL but it seems that I am not allowed to***."

- **November 16, 2023** – "***I've told them to cancel this account multiple times but continue to get billed and called about my policy despite being told it was cancelled***."

- **December 2, 2023** – "***Cancelled my policy over 2 years ago and I've been charged every single month since and they won't cancel my policy***."

329.    As a result of these deceptive practices, customers submitted over 100 complaints to the BBB complaining that Globe Life and AIL had either refused to cancel their policies, delayed cancellation, or made it difficult to cancel their life insurance policies.

330.    *Third*, by refusing (and delaying) to cancel customers' (often multiple, unauthorized) policies despite their repeated requests, AIL continued to auto-draft customers' bank accounts for unauthorized premium payments for months or years.  For example:

- **March 14, 2023** – "I signed up knowing it would be $42 [per] month.  I've been charged over $200 [per] month for over a year.  ***They finally canceled my policy. And once again I got charged, this time for over $100.  I've asked for refunds and why I have been paying for multiple policies when I only should've had ONE.***  Also why were the amounts so much higher than I signed up for.  They owe me over $2000 and haven't given me any indication they will reimburse."

- **April 25, 2023** – "Back in November-December 22, the company was contacted and told to cancel all policies.  On February 23, the company started taking money out of my account without authorization.  I have contacted the company through their web site several times without acknowledgment.  ***I called last Thursday, 2023, and spoke with a person, letting them know again that all policies were supposed to be canceled last year.  I got transferred to another person, waited 30 minutes, and the call got disconnected.  The next week, they removed money from my account again, which again left the account short or overdrawn.  I contacted the agent that sold the insurance, telling him about the problem and wanting reimbursement for the three months.  No response***."

- **June 1, 2023** – "***[I] have been trying to cancel an Insurance Policy with [AIL] since 2022***.  I have sent emails, I have spoken to representatives, I filled out cancellation forms and returned them, I left voicemails, I have spoken to and left messages to the representative that signed me up in the first place, and ***still no progress in cancelling this policy that I do not want.  On the first of every month, [AIL] deducts $76.12 from my personal bank account and they do not have my permission to do so, they are aware of how I feel, they know I do not want to obtain any services or policies from them but yet they continue to take from me***."

- **June 12, 2023** – "***[I] have been trying to cancel my policy since December for receiving misinformation and misleading information from the company.  Every time, I have tried to cancel I have received a different story about why it can not be cancelled or only one policy was cancelled and the others weren[']t*** and I need to send in a cancellation form.  ***This is the third time I[']ve sent in the cancellation form*** . . . . I have done everything asked and filled out forms multiple times but every time I call I get a different story about something additional I need to do including sending a copy of my social security card to cancel.  ***I am continuing to get charged every month for 1 or more of the policies.  It should not take 6 months to cancel***

- 123 -

*policies.  **I want to just to cancel my policy and a refund** for payments since January.  **I keep getting calls that some payment is due for one accident policy even tho[ugh] I[']ve cancelled all policies**.  Ridiculous.*

- **August 10, 2023** – "***I called over TWO months ago to [cancel] this policy and I keep getting bills.  I was then charged for $44 and they stated it will be refunded***.  I called again last week spoke to a supervisor she assured me this will be refunded[.]  [T]oday is 8/3 and still no refund.  [I] called again today they place me on hold for 20 minutes for a supervisor and NO ANSWER!  [H]orrible service.  ***I want to make sure ALL of the accounts [are] cancelled!***  I called two times to cancel this and still waiting for my credit card to be refunded!  Horrible customer service! Please cancel ALL of my [accounts] . . . not sure if there is more ***CANCEL ALL OF THEM***!  I also attach [the] form I had to sign for cancellation that was emailed last week and again today.  ***STOP SENDING ME BILLS!***"

- **September 6, 2023** – "***Cancelled 6 insurance policies with [AIL] on Oct. 11, 2022.  Policy numbers are: . . . .  They continued to withdraw payments from my bank account.  $71.16 was debited from my bank account on November 22, 2022 [and] December 22, 2022***[.]  I provided documentation of Cancellation Form, and bank statements showing their withdrawals."

- **September 17, 2023** – "I took out what I believed was an insurance policy to cover loss of income should I or my husband be hospitalized and life insurance.  When I realized this was not what I was paying for, ***I went through all the proper steps to cancel the policies and even received confirmations that they were cancel[l]ed.  Then, this business turned around 2 months later and took more money from me without my authorization.  They tweaked the amount they were charging me to get the deduction to go through my bank***.  When you call their office, the people are rude and argumentative.  This is a company whose agents present themselves as serving the men and women who have served our country.  The agent who sold me the policies told me it was only available to veterans and their families.  ***What a scam!***"

- **November 8, 2023** – "I just want [AIL] to leave me alone!  I attempted to cancel my policy in February and they drafted my account in March.  I got that charge reversed after calling them and the money was eventually returned to my account.  Then in April they tried it again.  They continue to try to contact me to the point of harassment.  ***I got 2 messages from them today (9 months after canceling my policy) telling me they were going to try to draft my account.  I really want them to leave me alone!!!!***"

- **November 8, 2023** – "***I have called numerous times to cancel my policy.  I have been on hold for well over a combined total of 8 hours.  Nobody will answer.  Nobody else will help***.  They just transfer you to this foreign voice over that says thanks for holding.  Cancel my policy!  There is no other way to contact them!"

- **December 6, 2023** – "In 2017 my wife and I signed up for [AIL] because I had a discount through my work at the time (kroger)[.]  In 2020 [w]e had attempted to

update our policy from term to whole life insurance. ***They instead sold us a new whole life insurance policy, but did not cancel the existing one. They have been billing my wife and I ever since. We have tried several times to cancel our old policy, but are always connected to a line that keeps us on hold, or attempt to sell us even more policies. We now have 4 policies but 3 payments per month***. . . . If AIL does not cancel our policies and refund the amount for the continuing unwanted term insurance[,] [m]y wife and I will have no option but to file suit."

- **December 21, 2023** – "***I[']ve been trying to close my account for over a year. They keep having all of these trivial things[,] reasons that prohibit them from being able to stop taking money directly out of my banking account***. I have called many times[.] I have emailed[.] I have lost my patience with them, I[']m really disappointed in their lack of service. I am disappointed in their trickery."

- **January 29, 2024** – "***[AIL] has refused to cancel two policies that I have requested to be cancelled twice***. My first call was in December. I was told that I would be sent forms to sign and send back. Three weeks later I received bills for both policies but no cancellation paperwork. I waited for one more week for that paperwork to come and when it didn[']t I called again on January 19, ****. I was kept on hold for twenty minutes. When a representative finally answered she told me she would send the required forms both by mail and to my email. I got nothing in my email or mail as of today. ***[AIL] has continued to take payments for these two policies from my wife[']s bank account for the two months of December and January***. I am sure they will also take a payment for February as well. I need this resolved as soon as possible. I don[']t want to have to wait on hold once again just to be lied to a third time. I am at my . . . end with this issue."

- **February 15, 2024** – "***In October of 2023 I asked to cancel my life insurance*** as it was too expensive for me to afford. [AIL] promised to cancel my policy and send me refund checks in the mail. Instead they sent me bills in the mail for 3 months and gave me the run around on the phone that it may take a few weeks to receive the checks in the mail. ***They continued to automatically take payments out of my account after I cancelled until I had to ask my bank to block them from being able to automatically take payments***. [AIL] called me daily for a month and th[e]n weekly. I last contacted them in January when they sent me another letter in the mail stating I had to pay them money and I asked about my refund checks and stated I was not going to pay towards an unwanted policy. [T]hey told me they had to look into the issue with their accounting department and they would get back to me in a week. I have yet to hear from them and still have not received my refund in the mail."

- **February 15, 2024** – "***I cancelled my policy in August 2023 (received a confirmation email on August 14, 2023 that my policy was successfully cancelled) and I am still being charged monthly***. I have tried countless times to contact [AIL] to stop the automatic withdrawal, as I cancelled my policy months ago, and have received no response. I have had to escalate this issue with my bank and dispute the charges. This is unacceptable, especially given I have written confirmation that my policy was cancelled."

- 125 -

331.    **Fourth**, customers also complained to the BBB that after they unsuccessfully tried to cancel their life insurance policy, they had to block AIL's direct debits with their bank.  Then, instead of returning the remaining cash value of the policy to the customer, AIL continued to send them bills and to charge further premiums against the policy's cash balance by taking out an APL. For example:

- **December 19, 2023** – "I have been charged for the last 5 years or so [$]94.87 per month for a life insurance policy.  *Every attempt to cancel, and cash out this policy I am called by another representative who tells me they can't assist in cancelling and or try to get me to continue.  I was being charged and direct deposit was taken from my account.  I had to flag it on my bank account to stop them from taking money out of my account.  Now I receive a bill monthly for the amount*.  I have been on hold when I contact them at . . . their corporate headquarters."

- **January 18, 2024** – "On November 9, 2022 *my husband and I cancelled our life insurance policy through [AIL].  A few months later I noticed money was still being withdrawn from my bank account so I went to the bank and had them block all withdrawals from [AIL].  Then a few months later we got an email saying they were continuing to pay MY policy through the reserve money that they should have given back to us.* . . . So I called and asked them what was going on and they told me that since I was an adult I had to file to cancel separately from my husband.  So they sent a form and I filled it out and sent it in.  Thought it was taken care of.  *Then a few months later we received the same email that they were using my reserve so I called again and they sent a form and I sent it back.  Jan. 7, 2023 we get another email saying our reserve is gone and THEY TOOK OUT A LOAN IN MY NAME to pay the policy*.  So I call in panic and someone finally tells me that they put my date of birth in wrong YEARS ago and couldn[']t cancel it because the dates in their system and on the form didn[']t match!  So I send in my license and called 9 days later to make sure it cancelled.  Now they[']re telling me I can[']t get my reserve back.  I am beyond exhausted over this and mad that I was paying for a policy that my husband would have had to get a lawyer to handle, in the event of my death, for it to be paid out.  *I paid thousands for a non[-]existent person and a bogus policy.  I want all my money back*!"

- **March 26, 2024** – "*We have made multiple attempts to cancel this policy*.  The company agreed during a call in October and November of 2023.  Yet we received another bill in December 2023.  [S]o, we decided to send an email requesting to cancel.  *[AIL] borrowed against the policy to continue paying THEMSELVES*.  On 3/23/2024, we receive a notice stating that we owe for borrowing against the policy plus a 8% interest will be charged."

- **April 19, 2024** – "*AIL have been overdrafting from my account for months.  In addition they took a loan against my older policies for premiums claiming they weren't paid*."

- 126 -

- **July 6, 2023** – "*[I] HAVE CONTACTED THIS COMPANY MULTIPLE TIMES IN WRITING TO CANCEL AN INSURANCE POLICY. THEY JUST IGNORE IT AND KEEP SENDING BILLS. NOW THEY HAVE TAKEN THE CASH VALUE OF THE PAYMENT FROM THE AMOUNT THE POLICY HAS ACCRUED. EVEN GOING SO FAR AS TO TELL ME THAT I WILL OWE INTEREST ON THE AMOUNT I BORROWED[,] WHICH I DID AGREE TO WHEN I ORIGINALLY OPENED THE POLICY IN CASE I COULDN'T PAY. HOWEVER THAT SHOULD NOT BE A FACTOR AS I CANCELLED THE POLICY. APRIL 20TH IS THE DATE. I HAVE EMAILS FROM THEM CONFIRMING THAT I WANT TO CANCEL AND SAYING THEY ARE SENDING ME A FORM WHICH I DID FILL OUT AND RETURN. I HAVE MULTIPLE EMAILS WHERE WE HAVE DISCUSSED THAT I CANCELLED. BUT I ALSO HAVE SEVERAL BILLS INFORMING ME THEY NEED PAID AFTER I CANCELLED*."

- **September 7, 2023** – "*I have cancelled ALL my policies numerous times with various agents, over numerous phone calls and via mail, but continue to receive letters that I owe monthly payments and the company has borrowed against the policies with interest*. I wish to resolve this before I contact an attorney."

- **March 3, 2024** – "*I have been trying to cancel a life insurance policy for almost two years while trying to get the cash value out of the policy. The business has made [it] impossible to cancel the policy to begin with, and now get the cash out*. . . . I spoke to several reps trying to get the policy cancelled, but was always referred to a number that no one answered, or told they would send me a form I had to fill out. The forms never came. When I finally sat on hold for almost two hours they did give me a policy number, but still said I had to send in a form and they would not cancel the policy without a wet signature. I had to ask for the form twice because it never came. After cancellation I got about half of the cash value they told me about and was still having money taken out of my account. After another 1.5 hour hold, I spoke to someone who said my ex wife[']s policy was still active under a different number than mine. *I was never advised there were two policies, even after expressing that this was the main reason I was cancelling*. I was told I could not cancel the policy, she had to do it. *I put a stop payment on my bank account*. My ex wife has now sat on hold numerous times for hours of her time trying to cancel only for them to tell her they['d] send a cancellation form which she has never received. *The company is now taking money out of the cash value to pay the premiums that we have both expressly told them we want to cancel and they are hindering our ability to send their required paperwork by failing to mail it, and sending us to unmanned or wildly understaffed cancellation lines*. Lastly, I understand they are doing what the contract says, but *I believe they [are] purposefully making it as difficult as possible to actually cancel the policy in an effort to not payout the cash value*."

332. **Fifth**, several customers complained to the BBB about agents falsely claiming union membership in order to sell them a policy. These reports corroborate the Fuzzy Panda Report that

- 127 -

AIL's agents "lied to prospective customers who belonged to unions – the core of AIL's business – telling them that their union membership required them to buy a policy.  Getting ahead depended on lying, former agents said."  For example:

- **August 9, 2023** – "***[A]n employee, is misrepresenting the . . . agency by claiming they are part of Teamsters . . . [The agent] is contacting . . . Teamster members and using that falsehood in an attempt to sell supplemental life insurance to individuals***.  To date, [the agent] has only contacted members who are senior citizens, and quotes them their beneficiaries and addresses in an attempt to gain their trust.  ***The . . . Division is running a scam to confuse older membership and fleece them of their income***."

- **November 15, 2023** – "***My husband received a call from*** [an AIL agent] ***POSING as a Local 12 Union member***.  [The agent] received my husband's phone number from my husband's coworker.  [The agent] insists on having a zoom call with my husband and myself to go over our "SUPPLEMENTAL benefits with the Union".  On October 24th, [d]uring the zoom call, [the agent] claims our supplemental benefits give us 85% off extra . . . care coverage.  This is a LIE! . . . [On] LinkedIn, you will see that he has been working for [AIL] for a year and has a long history of working as a used-up salesman.  ***[The agent] is NOT A UNION MEMBER***.  On November 2nd, I contacted [the agent] to cancel the policy.  He tried to sell us more insurance and I said no.  He gave us the number to cancel.  I called to cancel the policy after signing up only to be given the run around all 4 times that I called.  The first call, they claim the policy is showing pending, yet they took money out of our account and I learn that [the agent] signed us up for three policies and ***we were NOT AWARE that there would be 3 policies opened, and it does not state anywhere that there are 3 policies***, and I am locked out of two of them even though I am the beneficiary.  I told them I wanted to cancel the policy and when can I expect a refund?  [AIL] says 5 days.  [T]he second call, another representative said it was pending cancellation and I would be refunded in 10 days.  It was a lie.  The third call they said 15 days.  The fourth call they said 10 to 15 days.  Well, it has been 21 days, and I never received a refund.  I called again yesterday, and they say it will take 72 hours to send a cancellation confirmation through email.  ***I did not receive any cancellation confirmation of any kind!  I read on the [BBB] that they are stalling to try to draft more payments out of my account.  I want ALL policies cancelled!***"

- **April 4, 2024** – "***In January 2020, I received a call from an [AIL] representative . . . indicating that I qualified for discounted life insurance as a Fraternal Order of Eagles member***.  [The agent] met with me and my boyfriend . . . on February 5, 2020, to review life insurance policies available . . . .  We purchased a Group Term Life Insurance Policy # . . . .  I began paying monthly premiums (drafted from my checking account) in the amount of $92.59.  ***In September 2020, I received notification from the Fraternal Order of Eagles that they are in no way affiliated with [AIL] and that [Fraternal Order of Eagles] members should not have received***

*calls from [AIL].  I was defrauded by [AIL] representing themselves as a partner of the Fraternal Order of Eagles*."

333.    ***Finally***, several customers complained to the BBB that AIL is an "MLM scam," a "scammy" "MLM type company," and a "[d]espicable business . . . set up like an MLM" –  which collectively corroborates the Fuzzy Panda Report that "Globe Life and AIL's MLM structure borders on an illegal Pyramid Scheme."  For example:

- **September 11, 2023** – "I have been randomly contacted by AIL recruiters that are scraping my information from somewhere. . . . ***They're a 100% scam company that uses corrupt recruiting and business tactics to get people to work for free, or next to nothing***.  They were sued for it in 2021, lost, and had to pay over $5 million to agents that hadn't been compensated for training and work . . . yet they're still doing the same things today.  I have been contacted at least 5 times in the last 9 months, and every time, I tell them to leave me alone, yet they persist.  So, I'm filing this complaint, and then moving on to file reports with every relevant state level . . .  AG . . . and every relevant state labor board.  ***This business is a MLM scam masquerading as an insurance company, and they need to be SHUT DOWN and have criminal charges filed against every single manager or higher***."

- **September 26, 2023** – "***In early 2022 I got a flyer from my union about life insurance which I sure need my job is dangerous.  They upsold me***. . . .  Additionally, for the last 4-5 months, I[']ve been getting several calls per day from various numbers to review my info and policy and go over new claim forms. . . .  I[']m tired of being harassed literally 7 days a week.  Block one number and another pops up. I[']m certain this has to be illegal somehow.  Literally harassment if anyone else did it.  I didn[']t get what I thought I signed up for.  ***This is [an] MLM type company and scammy sounding***.  Super inflexible and money hungry.  I want to cancel my policy after all this but couldn[']t even get a clear answer on how to do that."

- **March 15, 2024** – "***Despicable business practice and they[']re set up like an MLM***. [I've] been put on the do not call list over a dozen times and still receive them.  This business cannot be trusted."

- **April 2, 2024** – "***We should be able to trust what agents of YOUR company are telling us and how they are representing benefits.  I don[']t care whether you feel it was in good faith or not.  You and I both know it wasn[']t.  Read your reviews online.  Read what people what to say about you.  Predators, manipulators, liars. It[']s for the same reason you have people [calling] our phones at all hours and hang up when you ask to cancel or tell them to stop calling you***."

- 129 -

### 2.    Consumer Complaints to the FTC

334.    Like the complaints to the BBB discussed above, since 2019, AIL consumers also submitted hundreds of complaints to the FTC concerning AIL's unethical and illegal sales practices, which Plaintiffs' counsel obtained pursuant to a FOIA request.

335.    *First*, customers complained that AIL had opened unauthorized policies or increased their premiums without those customers' knowledge or consent.  For example:

- **April 5, 2019** – "Company sent me a life insurance policy and billing schedule.  *I did not authorize or request this policy*. . . . I filed an online request for a quote for a $100,000 life insurance policy.  I was informed via website that my request was being processed and that I would be contacted via telephone.  *I did not authorize any payment to this company nor did I agree to purchase any product from this company*.  I received a policy in the mail on 4-5-19, for $5,000.  Which *I did not request or authorize*. . . . I also received a premium schedule and information that I would be receiving a bill in the mail for my premiums owed.  I never authorized any of this.  I do not want this policy.  I contacted customer service at approximately 7pm on 4-5-19.  I requested a $100,000 life insurance policy.  Completed application online.  Never received a response.  A month later I received a policy in the mail for $5,000 of life insurance, *which I did not authorize*."

- **August 5, 2019** – "*Dear Sirs, Your unethical and unfair business practices are not appreciated!  I did not and have never request any additional coverage* above $68,000 from your company.  On May 4, 2019, your company stole $11.10 from my checking account without my prior consent or knowledge for $25,000 of additional [AD&D] insurance coverage, which *I never requested*.  I expect $11.10 to be refunded to me via check by mail IMMEDIATELY. . . .  Your company is no longer trusted by me and shouldn't be by anyone. . . .  *You've got some nerve stealing from people just because you have their financial information and so you can*!"

- **February 3, 2021** – "Enclosed is a notice notifying me of a past due payment from Global Life Insurance Company.  I am reporting to your office because *I have no policy with this company*, but [this] implies that I have a policy and owe them a payment.  *I have no policy with them, I never asked for information from them and I have no need of a policy*."

- **September 14, 2021** – "*[I] applied for additional life insurance from Globe Life. [I] was informed by them that some one using my name and date of birth already had a policy with them*."

- **October 19, 2021** – "*I received a bill in the mail, but I never applied for insurance. I reached out to the company and they said it was done digitally.  Once again I did not apply.  This company is going back in their files and charging premiums for old accounts*."

- 130 -

- **December 30, 2022** – "*I received a policy for life insurance from Globe Life Insurance that I did not apply for or authorize*.  It was noted in Globe Life[']s welcome letter that they were unable to contact me to verify the information that was provided on the application.  However, they still moved forward with issuing this policy.  Information in the policy is incorrect and the applicant relationship is listed as other.  Upon receipt of this policy in the mail, I immediately contacted Globe Life on 12[/]29 to report that this is a fraud, and I did not authorize or apply for this policy.  Globe Life stated they would cancel the policy."

- **May 13, 2023** – "*The company Globe Life created an insurance policy without my permission and without me signing up for a new one*.  Initially I inquired online about a certain policy but, I never signed for a new policy with their company.  They have been harassing me via mail and phone in regards to signing up for a policy but, I have declined their offer.  I recently viewed an email of the policy someone within their company signed me up for and *they are asking of a payment when I have not given permission nor signed for one*."

- **May 19, 2023** – "I originally submitted an online rate quote with Globe Life a few months ago.  I did not proceed further than that.  *One day I checked my email to see a bill for a policy that I did not give permission for not sign for*.  I tried calling the company but, all I would reach was automated answering service.  *They created this policy not only without my permission but, fraudulently as I did not sign the policy in question.  I am furious and would like this company to stop harassing me with bills and to be held accountable for their fraudulent activity*."

- **December 26, 2023** – "Went on to Globe Life Insurance web page for a no-obligation quote.  I received a denial letter for myself with an invoice for my wife.  *I did not consent [to] a policy.*  I feel this is a deceptive trade practice constituting fraud.  It is well posted on their sites you are under no obligation for a free quote.  *They should not create a policy without express acceptance of the quote by the purchaser.*  After 3 transfers they did cancel the policy but it will remain on our insurance history as a canceled policy.  *This is wrong*."

- **April 10, 2024** – "*[S]uspect stole my personal information shared it with her then boyfriend [who] . . . took out a fraudulent Globe Life insurance policy*[.]"

336.    *Second*, a number of customers complained that AIL refused to cancel their policies despite their repeated requests.  For example:

- **May 14, 2021** – "*I cancelled a policy*.  They said they mailed my check in [the] mail.  And that it was sent back.  They will not mail my check to me at my address that I asked them to.  I called.  *I emailed multiple times.  They keep giving me the run around.  I believe they are committing fraud or strong arming me to keep my policy and or cash.  Please stop them.*  My Mom . . . passed away and she had this policy for me.  I selected to opt out and receive payment.  They keep offering me loans [and] asking my step dad . . . to sign up.  *They are also [harassing] us. . . . I am being bullied and I believe they are [fraudulent]*."

- **March 23, 2023** – "On 2/27/23 I contacted Globe [Life] requesting cancellation of two policies for my grands.  I was asked to reconsider.  On 2/28 I again contacted Globe and sent two cancellation letters via fax at 4:49 pm.  One week later I contacted Globe and was told that only one request was made which I disputed.  I had also asked for the return of pre-paid premiums.  I was told by a rep. that a check for [grandchild] was mailed on 3/15 but as of today I have received nothing.  On 3/20 I again sent another letter via fax at 2:58pm for [grandchild's] cancellation.  On 3/15 I received a premium notice for both policies for the month of April although I requested that both policies be canceled. . . .  I want the money that I owed for both policies returned and no further communication sent to my home from Globe Life."

- **May 20, 2024** – "I received a premium notice from Globe Life around April 3, 2024. . . . ***I have contacted Globe Life twice about the fraudulent nature of this policy***.  I received a letter from Globe Life dated [4/23/24] stating that I authorized GL to initiate a recurring monthly debit from my account ending 2709 in the amount of $34.14.  The draft date is the 9th of the month starting in April 2024.  ***I attempted to cancel the policy.  Globe Life sent another letter stating they need the proper signature before they can comply with my request to cancel the policy***.  I did not sign and return the letter because I know that my signature is not on record.  The letter is from Policy Services.  I have[n't] been able to reach a real person."

337.   ***Third***, customers complained to the FTC that Globe Life had taken unauthorized (fraudulent) bank drafts from their bank accounts.  For example:

- **July 26, 2019** – "***I was charged [$]29.84 on my debit card for a life insurance policy that has nothing to do with me***.  I called on July 12th because I saw a declined transaction in my checking account. . . . I believe and advised her ***I did not choose authorize nor pay for any policy with their company*** and I do not want my debit card charged and I want my card removed from their database.  I was [assured] that had been handled.  Then I got a charge on my account for 29.84 that posted[.]  I called Globe Life insurance again was again told my card had been removed I advised them I was charged[.]  [T]he guy I spoke with told me to email accounting at Globe Life insurance, I did.  Today I got [a] response email telling me that they will not adhere to my request only the [policyholder] can call and request account information."

- **March 12, 2023** – "***I am having [a] problem with [Globe Life] [T]hey are going into my bank account taking unauthorized payment without my permission*** and they still talking about [I] owe them money on my policies that [I] have on my family . . . . ***[T]hey have ma[d]e a mistake but the[y] will not fix the problem*** that we are having and they are threatening to terminate my policy."

338.   ***Fourth***, some customers complained to the FTC that Globe Life's agents misleadingly claimed to be affiliated with the customer's union in order to sell them life insurance.  For example:

- 132 -

- **February 15, 2024** – "***Pretended to be a free benefit program offered through [the] [D]isney union***.  The person kept calling while I was at work so I thought that we were just playing phone tag[.]  [H]e left me a voice mail every time.  ***He then started text messaging saying the same thing that we needed to do our benefit meeting***. . . .  The front reception desk has a lady ask what place this is said globe life American income.  ***I say I am here for my benefit meeting***.  She asks with who[,] she says there is only b(6) here.  I then say no that isn[']t who I am supposed to meet with I am going to go cause this is seems sketchy.  ***She then asks again sorry what was the meeting for[?]  I say union benefit with [D]isney.  She then goes yeah we are union based***. . . .  So this was a scam and I immediately walked out."

- **February 26, 2024** – "***I believe I was scammed [by] an insurance agent, first he claimed to be with the union***, then he said he was with OPM.  I am recently disability retired from the [U.S. Postal Service.]  [The agent] said he is with American financial life, and wanted to go over the benefits available to me, now that I have retired I had a stroke just over a year ago and had some trouble understanding that ***it was all a con, to get me to sign up for a life insurance policy I [don't] want or need***!  He now refuses to answer my phone calls, texts or [e]mails.  ***[T]his all started with a [f]lier [t]hat was mailed to me and claimed to be a free benefit from the APWU [i.e., American Postal Workers Union]***.  [T]he [e]mail he gave me is . . . @ arias agencies .com . . . ."

339.  ***Finally***, several customers complained to the FTC that AIL is an "MLM Scheme"

and a "[P]onzi/pyramid scheme."  For example:

- **March 3, 2020** – "First of all, I have had insurance with AIL for over 20 years. . . .  However, when calling the phone number he lists at [AIL] . . . I get a pool company in Florida.  The Head Office of [AIL] gave me the phone number for him.  ***When the pool company answered they stated that AIL and [the agent] use their number and it is a ponzi/pyramid scheme.***  AIL sells insurance through trade unions and other places where they will give you free $1,000 insurance and the[n] try to sell you more life insurance."

- **April 5, 2022** – "***Looks like a typical MLM scheme***.  Guy seems to recruit people every Wednesday at 6pm.  No way [he's] making that much money simply selling insurance and getting commissions."

- **January 30, 2023** – "Ok so I was hired to work at [G]lobe [L]ife [L]iberty [N]ational I[n]surance and it [doesn't] feel right[.]  ***There[']s a huge emphasis on recruiting and on the first day there was even a page about listing 10 people that they could call in to hire with a 500 dollar bonus for everyone the manager calls***[.]  [A]nd when you don[']t have g[uaranteed] pay because you had to make a sell in order to get paid but ***if you don[']t get paid you basically need to give them some[one] to call in to try to hire to make ends me[e]t. . . . I may be wrong but this sounds like a pyramid scheme***."

- **June 2, 2023** – "***Pyramid scheme, attempt to upsell life insurance***.  Thought I was receiving no cost life insurance benefit because a friend had purchased life insurance but it was an attempt to[] upsell a monthly [$149] [recurring] payment.  Then they contact all your emergency contacts and beneficiaries to tell them I bought life insurance and they will receive a no cost benefit, all to sell them a monthly plan.  It[']s coercion.  ***They co[n]ned me into giving them all my information***."

- **May 14, 2024** – "The target is posting jobs about benefits specialists.  ***It turns into a h[i]gh pressure pit[c]h for a MLM Scheme to [p]ush insurance sales targeting people who don[']t reali[z]e the[y're] being scammed***."

    3.    **Consumer Complaints to Various State Departments of Insurance**

340.    Like customers' complaints to the BBB and FTC, numerous consumers also reported AIL's unethical and deceptive sales practices occurring during the Class Period to various state departments of insurance.   These complaints, which are by no means exhaustive, similarly corroborate Fuzzy Panda's allegations by revealing that a customer's signature had been forged, that customers were unable (despite repeated efforts) to cancel their policies, that a customer's coverage and premiums were increased without authorization, and that as a result, AIL withdrew unauthorized (fraudulent) charges from customers' accounts.   Below are just a few examples of the complaints received by the Ohio Insurance Department:

- **December 30, 2021** – "I have requested repeatedly, over and over, called and spoke multiple times to the cancellation department, mailed, sent messages through the online contact website and even signed and sent a cancellation document in the mail, to have all the policies for me and my family, there's policies for [three persons], cancelled, yet ***they continue to send payment past due notices, and still have collected an auto deduct payment for these policies I've requested to be cancelled in Dec[ember] of 2021.  The latest payment they deducted was May 2022***.  Back in Dec[ember], ***they even stated they 'Lost my information' and I needed to resubmit the application, to which I just stated please just cancel the policies*** at that time, and they said they would.  ***It appears nothing has happened at all***.  [I]t's very discomforting that I placed my and especially my famil[y's] wellbeing in a company, made payments to and expected proper handling, and they cannot complete a simple task."

- **August 30, 2022** – "I received three letters from my insurance company [AIL], on 9/21/2022 for myself, . . . (wife) . . . [a]nd . . . (daughter) . . . saying Congratulations, you have been approved for additional Accidental Death benefits.  Each letter stated it would increase my current monthly policy payment by $4.17 (each person).  The

letters stated the benefits were added to my policy based on answers supplied during a phone conversation . . . I did receive a call from a number listed as Clark Video Group . . . on August 30 at 11:05 am. The caller on the other end stated they were with [AIL] and wanted to let me know that since my daughter has turned eighteen, she would be listed on her own policy and that they were sending out a letter with this updated information to file the letter with my other insurance information. According to my phone records, the call lasted 53 seconds. ***Nothing was asked about adding additional insurance, which I would have turned down because I have made it clear to [AIL] yearly that I don't need or want any additional insurance. So, in short, this person has added me, my wife, and my daughter up for additional insurance that wasn't requested or even solicited to us. Without our permission, these additional policies were falsely added to my account; if it was done to us, it had to be done to others. Please investigate this fraudulent practice by this person or company***."

- **October 6, 2022** – "***Could NOT cancel Policy*** after giving personal info[.] Tried several times. POOR CUSTOMER SERVICE. Had to cancel Bank Account to eliminate Policy[.] Agent called to join [AIL.] He was VERY PERSISTENT[.] After giving personal info, we decided policy was too good to be true[.] ***Agent kept giving excuses of which could not cancel policy[.]*** I mentioned to Agent[,] we wanted verification by email or some sort of documentation that policy would be cancelled[.] He said he would by the end of the night[.] THAT DID NOT OCCUR[.] ***Called several numbers to cancel policy within the Company and could not cancel*** . . . . Spent hours on phone on hold[,] and often getting calls transferred in the process[,] occasionally talking with other representatives within Company that ***could not help to cancel Policy***.

341.    Fuzzy Panda's allegations are also corroborated by consumers who reported AIL's unethical sales practices to the Washington State Office of Insurance Commissioner. Like the BBB, FTC, and Ohio complaints above, these Washington consumers' complaints reflect how AIL routinely made it extraordinarily difficult to cancel policies, taking customers months or years of repeated efforts while AIL continued to charge them monthly premiums, continued sending invoices and past-due notices, and engaged in "Delay after Delay." For example:

- **February 16, 2023** – "***I contacted [AIL] in October 2021 to cancel all of our policies***. I asked for confirmation and they said if I submitted paperwork under my name, it would cancel all the policies connected including my husband's and both of my children's policies. I submitted the requested paperwork in October 2021. ***I realized in November of last year (2022), that there were additional policies still open and being charged monthly for my husband and both sons. I then called them and had to call multiple times, I was told by multiple people no policies existed. Finally I reached someone that 'found' these policies***. My husband then called back and they said they would stop billing up (which they did as of January 2023) and

then I followed the same process when I canceled my policy and submitted the paperwork (January 25th, 2023) they required to cancel my husband and both son's policies. After submitting the requested paperwork that included listing the last 4 of my husband and both son's social security numbers, they replied saying I had to provide them a copy of my actual social security card to cancel. I responded via email saying I have provided all documentation that is required by the paperwork. However, I have now repeatedly received emails stating I must provide a copy of my actual social security card to cancel. *Now [I] also received emails sta[t]ing my premium is past due and they will start charging interest*."

- **October 2, 2023** – "*My wife and I sent the paperwork to the company to cancel all are policies with them. We still receive invoices from them every month for payments so I called them to find out why. . . . I called the company this morning [and] was told first that the SS# was wrong on my wife's form so they can't cancel her policy and mine was canceled but when I asked why I still receive payment notifications she had no answer*."

- **March 27, 2024** – "*I cancelled life insurance policy. Delay after Delay to send cash-out value after we sent paper work by emails several times. We have sent all information that [AIL] have asked for more [than] once, because they say they can't find the paperwork*."

- **May 1, 2024** – "This insurance company has had wrong information on me for several years and would not correct it despite numerous phone calls. *Now that I have canceled,* [I] talked with an agent and sent proper form[s] *they deny acceptance and are continuing to bill for premiums so as to diminish the refund due*."

- **July 30, 2024** – "In 2022 I was a member of the [Office and Professional Employees International Union] and they offered 'free' life insurance for their members. *As soon as I signed up I was contacted by an agent and told I needed to do a web meeting with them to start my coverage. It was two hours of constant pressure to give them names and numbers of basically anyone I knew, and to pay for additional coverage*. This was despite the fact that I don't need life insurance. *I informed them one week later I was uncomfortable with the process and wanted them to cancel my paid coverage*. [Ever] since [they] call me every couple months. It is always a different person, telling me they are following up on the coverage I 'just' signed up for. I tell them each time I didn't do anything recently and *I have told the company multiple times that my policy needs to be cancelled and they need to stop calling*. They agree, and a month or so later a [d]ifferent [p]erson calls with the same speech. . . .  They also have called all my family members and friends that were listed as beneficiaries and executors on the original policy multiple times."

- 136 -

G.    **The Numerous Investigations into the Misconduct Alleged Herein Supports an Inference of Scienter**

1.    **DOJ and SEC Investigations**

342.    The DOJ's duties include investigating and prosecuting those who commit fraud, including both consumer and securities fraud, and the DOJ is empowered to bring criminal charges or impose steep fines on offending companies and individuals.  To that end, the DOJ has inherent authority to issue subpoenas during the course of its civil and criminal investigations to compel production of relevant records.  Similarly, the SEC works to protect investors by investigating and bringing actions against companies and executives who commit securities fraud.

343.    In late 2023, the DOJ subpoenaed both Globe Life and AIL seeking "documents related to sales practices."  Despite holding their fiscal year 2023 earnings call on February 8, 2024, Defendants made no reference to the DOJ subpoenas until *after* media reports concerning the subpoenas began to emerge in early-March 2024, as the Company faced mounting pressure amid reports of "unethical business practices and other misconduct by sales agents" at AIL agencies.

344.    Following receipt of the subpoenas, defendant Scarborough distributed an internal memorandum (the "Scarborough Memorandum") urging Globe Life employees to retain relevant materials, including:

- Any and all documents, financial statements, accounting records, work papers, personnel files, internal investigation files, and financial or business transactions regarding Arias Agencies and/or any of the individuals listed in Attachment A.

- Any and all e-mail messages, text messages, and other correspondence or communications regarding Arias Agencies, any of the individuals listed in Attachment A, and/or any individuals involved with, working for, or working on the behalf of Arias Agencies or any of the individuals listed in Attachment A.

- For the time period of January 1, 2022 through December 31, 2022, any and all insurance policy documents, policyholder information, claim files, payment information, investigative reports, statements, emails, photographs, recordings, correspondence, records, and files regarding insurance policies

- 137 -

written by Arias Agencies and/or its affiliates, subsidiaries, employees, contractors, or any other individual or entity acting on their behalf.[15]

345.    The DOJ subpoenas are thus wide-ranging in both scope and timeframe, and encompass not only information concerning the alleged widespread insurance and consumer fraud, but also concerning the alleged sexual harassment and toxic business environment at AIL. Defendants would, therefore, have been on high alert concerning these issues.

346.    In the aftermath of the Fuzzy Panda Report, the SEC likewise launched its own inquiry into Globe Life's operations, and requested the Company provide information related to the allegations in Fuzzy Panda.

347.    The Company did not disclose the SEC inquiry until months after the Fuzzy Panda Report despite opportunities to do so.  For example, on May 16, 2024, Viceroy Research Group reported that Globe Life appeared to be the subject of an SEC investigation. At a J.P. Morgan conference hosted with Company management the same day, the Company's "management denied being subject to an SEC investigation (as of May 16)" as reported by J.P. Morgan on May 20, 2024.

348.    Following J.P. Morgan's May 20, 2024 report, the Company disclosed in a May 21, 2024 Form 8-K that it "received a preliminary, informal inquiry from the SEC's Fort Worth Regional Office."  Following that announcement, J.P. Morgan expressed "concern[] about the accuracy of the company's statements during meetings on [May 16, 2024]," concerning the potential SEC investigation.  It was not until August 7, 2024 when Globe Life filed its Form 10-Q for Q2 2024, that Globe Life disclosed that it received the SEC inquiry back in April 2024.

349.    The fact that the DOJ and SEC are both investigating misconduct alleged herein illustrates the gravity of fraudulent scheme.

---

[15]    Attachment A to the Scarborough Memorandum identified the following individuals affiliated with AIL: Arias, Justin Adams, Brody Evanson, Gregory Rudolph, Natalie Price, Tristan Dlabik, and Michael Russin.

- 138 -

### 2.    EEOC Investigations

350.    Globe Life and AIL were the subjects of several EEOC complaints during the Class Period and the EEOC's investigations into alleged employee misclassification and years' long sexual harassment claims further supports an inference of scienter.

351.    The EEOC enforces laws against job discrimination and harassment.  Among other things, the EEOC investigates complaints of job discrimination based on race, color, and sex, in addition to retaliation for escalating complaints about job discrimination against employers. Individuals who are not "employed" by an employer, such as independent contractors, are not covered by federal anti-discrimination laws, and thus, the EEOC also makes determinations as to whether a complainant is classified as an employee who is afforded protection (*i.e.*, whether requirements for coverage are met).

352.    In its SEC filings, Globe Life has disclosed that "[a] significant portion of our sales agents are independent contractors," and "[a]ctual or alleged misclassification of independent contractors at our insurance subsidiaries could result in adverse legal, tax or financial consequences." With 11,000-15,000 agents through the duration of the Class Period (two-thirds of which were affiliated with AIL), Globe Life's misclassification would have a profound impact on the Company. According to the Company's 2021 Form 10-K:

> If there is an adverse determination regarding the classification of some or all of the independent contractors at our insurance subsidiaries by a court or governmental agency, we could incur significant costs with respect to payroll tax liabilities, employee benefits, wage payments, fines, judgments and/or legal settlements, any of which could have a material adverse effect on our business, financial condition and results of operations.   In addition, any resulting reclassification could necessitate significant changes in our affected insurance subsidiaries' business models.

353.    Given the potential impact on Globe Life's operations, proper classification of agents would be of paramount importance to Defendants.

- 139 -

354.    During the course of recent EEOC investigations, Globe Life denied "committing any violations of Title VII" on the basis that its agents are classified as independent contractors.  Ex. D at 1.    The EEOC rejected Globe Life's argument and instead determined that Globe Life's "characterization of its workers as 'independent contractors' is inaccurate under controlling law." *Id.* at 2.  Based on "[a]n examination of the evidence," the EEOC determined that Globe Life and AIL were Title VII employers of "all persons holding the titles of . . . Agent, Supervising Agent, General Agent, Master General Agent, Regional General Agent, and State General Agent," among others.  *Id.*

355.    According to Defendants, Globe Life stressed the importance of its Code of Conduct and sexual harassment policies, stating the Company "'takes seriously any allegation brought to its attention concerning sexual harassment, inappropriate conduct, or unethical business practices.'" Yet during the course of its investigation of Zinsky's charges, the EEOC also determined that "a number of the participants in the sexual harassment and/or who have knowingly fostered a working environment in which such conduct is considered acceptable were/are of sufficiently high status or authority within the organization that they constitute alter egos or proxies of [Globe Life]."  *See* Ex. D at 4.  According to the EEOC, Globe Life acted through "male management-level employees and coworkers" and "subjected [Zinsky] to unwelcome harassment because of her sex and retaliation for engaging in protected activity."  *Id*. at 3.

356.    The EEOC also determined that Globe Life "does not maintain any reasonable avenues for reporting sexual harassment or discrimination or obtaining remedial action regarding such conduct," and that the Company "engaged in conduct reasonably likely to deter, and that has deterred, female employees from making sex harassment and other discrimination complaints," such as "engaging in threats and other retaliatory adverse actions, active discouragement of complaints, failing to act on complaints, refusing to make postings of Title VII rights ***because doing so is***

*deemed inconsistent with [Globe Life's] workplace 'culture,'* and deliberately misclassifying its employees as independent contractors purportedly lacking protection from the types of unlawful employment practices prohibited by Title VII." *Id.* at 4. The EEOC Determination makes clear the Company had notice of and "failed to take action to abate a company-wide culture of sexual harassment." *Id.* at 5.

357. The EEOC Determination exposes the Company to substantial risk that other agents are misclassified for the purposes of federal anti-discrimination laws.

### H. Globe Life Engaged in Massive Stock Buy-Backs to Rebut Fuzzy Panda and Prop Up the Stock Price

358. Not coincidentally, and almost immediately on the heels of the Fuzzy Panda Report, Globe Life authorized and issued massive stock buybacks in an effort to prop up the stock price. On April 25, 2024 during a Globe Life Board meeting, Defendants hastily arranged an effort to temper the substantial stock decline. On April 29, 2024, Globe Life announced in a Company press release, that during the April 25, 2024 meeting, its Board authorized share repurchases of up to $1.3 billion for the two-year period ending December 31, 2025 under the Company's existing stock repurchase program. This massive stock buyback was the largest stock buyback in Globe Life's history.



359. On Monday morning, April 29, 2024, Globe Life's stock price rose 2.2% in the pre-trading market on news of the massive buyback.

- 141 -

360.    On July 24, 2024, Globe Life announced in its Q2 2024 earnings release that it had purchased 3.8 million shares of Globe Life common stock during the quarter, at a total cost of $314 million and average share price of $81.87.  On July 24, 2024, analysts immediately characterized the stock buyback as positive for the Company, describing it as "robust," "strong," and "better than expected."

361.    In conjunction with its Q2 2024 earnings results, the announcement of the 3.8 million share repurchase triggered a Globe Life stock price increase.  During after-hours trading on July 24, 2024, Globe Life stock price shot up from closing price of $88.28 to an opening price of $94.01 on July 25, 2024, a $6.33 increase per share.  To prop up its stock price, Globe Life spent $356 million on stock repurchases in the first half of 2024.  Over $330 million of Globe Life's buyback expenditure was made in April-May 2024 in the wake of the Fuzzy Panda Report:

| GL Share Repurchases | | | |
|---|---|---|---|
| Month | Shares purchases | Average price / share | Cost |
| Jan | 150,000 | 122.14 | 18,321,000 |
| Feb | 40,557 | 128.4 | 5,207,519 |
| Mar | – | – | – |
| **Q1 Total** | **190,557** | **123.47** | **23,528,519** |
| Apr | 1,845,837 | 77.85 | 143,698,410 |
| May | 2,227,926 | 84.79 | 188,905,846 |
| Jun | – | – | – |
| **Q2 Total** | **4,073,763** | **81.65** | **332,604,256** |
| **H1 Total** | **4,264,320** | **83.51** | **356,132,775** |

362.    Globe Life spent over 85% of the $370 million of its buyback program guidance for 2024 in just two months.  In addition, Globe Life increased its collateralized funding agreement with the Federal Home Loan Bank ("FHLB") by $165 million in the first half of 2024, drawing an additional $180 million of liquidity via short-term funding.  Globe Life drew a total of $345 million in liquidity from its FHLB funding to finance the buyback.

VII.    **LOSS CAUSATION/ECONOMIC LOSS**

363.    The market for Globe Life common stock was open, well-developed, and efficient at all relevant times.  Throughout the Class Period, Globe Life common stock traded at artificially inflated prices as a direct result of Defendants' scheme and their materially false and misleading statements and omissions of material fact about Globe Life's and AIL's sales, premium revenue, pyramid structure, Code of Conduct, and workplace environment, which were widely disseminated to the securities market, investment analysts, and the investing public.  Plaintiffs and other members of the Class purchased or otherwise acquired Globe Life common stock relying on the integrity of its market price and market information relating to Globe Life.

364.    On the morning of March 14, 2024, Globe Life announced for the first time that the Company and AIL "are fully cooperating with the government in response to . . . subpoenas" served on them by the U.S. Attorney's Office for the Western District of Pennsylvania, in a press release attached to a Form 8-K filed with the SEC.  While the subpoenas had been the subject of two unconfirmed, third-party media reports a week earlier, Globe Life's announcement on March 14, 2024 was the first time the Company publicly confirmed the accuracy of those reports, admitted to the subpoena and investigation, and said it was cooperating with the government.  Globe Life's stock price fell from a close of $119.08 on March 13, 2024, to close at $115.99 on March 14, 2024, a decline of 2.6% on heavy volume of over $1.6 million shares.  A March 21, 2024 Morgan Stanley analyst report noted that "a DOJ probe could pose higher risk" and could negatively impact Globe Life's capital and growth.

365.    On April 11, 2024, investment research firm Fuzzy Panda issued its bombshell investigative report revealing Defendants' fraud.  Based on a comprehensive investigation that included interviews with dozens of former executives and agents and an executive level whistleblower, and undercover work in AIL's recruiting process, Fuzzy Panda revealed numerous

facts indicating that AIL functioned like a pyramid scheme and had engaged in widespread insurance fraud for years, while encouraging a culture of sexual harassment and abuse. *See, e.g.*, §IV.E., incorporated by reference. Fuzzy Panda reported, among other things:

- Fraud at AIL was not limited to a single sales team such as Arias Organization, but was systemic, pervasive, and widespread across the AIL distribution channel;

- AIL sales teams with corroborated fraudulent underwriting made up 61% of AIL's total Life Premium, while sales teams without confirmed fraudulent practices made up only 2%;

- AIL's growth was "a mirage" because over the last four years, AIL sales teams that engaged in insurance fraud grew Life Premium at a rate of 16% each year, while the "[c]lean" sales team declined by 0.5% year over year;

- The workplace culture at many of AIL's agencies, and not just Arias Organization, was toxic and wrought with sexual harassment and violence;

- AIL CEO defendant Greer and President Zophin witnessed firsthand some of the disturbing misconduct in the office and at work events, as each frequently visited the Arias Organization agencies and other offices, and attended work-related events;

- Globe Life's and AIL's business model as a multi-level marketing structure borders on an illegal pyramid scheme in multiple states because recruiting new agents is more lucrative than selling insurance policies, approximately 75% of agents generate less than $30,000 in Life Premium per year, new hires are incentivized to recruit friends to join the business with $750 bonuses per person brought onto the team plus a cut of all their sales, and in order to recruit new agents, AIL uses high pressure recruiting tactics and false promises of lifetime residual income; and

- Contrary to Defendants' representations about "Opportunity Unlimited," recruits were actually exploited with dim prospects of advancement. For instance, recruits provided one to two months of unpaid labor and actually lost money, agencies up-charged new recruits for the licensing courses and then pocketed the difference for themselves, and new recruits were told false promises of "lifetime" residual payments for insurance they sold. Agents were even required to pay "management fees" to their supervisors to keep working as agents and paid "tribute" payments to their "uplines" (those higher up in the pyramid) to receive better leads for selling insurance.

366.    As a result of the disclosures in the Fuzzy Panda Report, the price of Globe Life common stock plummeted $55.76, or 53%, from a closing price of $104.93 per share on April 10, 2024 to a closing price of $49.17 per share on April 11, 2024, on massive volume of 36,577,524

shares, dwarfing by tens of thousands of shares the trading volume on any other day during the Class Period. Globe Life lost $5 billion in market capitalization that day. And, in response to the Fuzzy Panda Report, trading on Globe Life was halted eight times.

367.    Securities analysts unanimously recognized that Globe Life's stock price dive on April 11, 2024 was a direct result of the Fuzzy Panda Report, and many lowered their price targets, expressing the opinion that the Fuzzy Panda disclosures in combination with the DOJ's investigation disclosed in March 2024 created uncertainty in Globe Life stock and would continue to do so. For instance, Morgan Stanley reported on April 12, 2024 that it was reviewing its rating and price target, commenting: "Investor concerns on the ~60% share price decline due to short seller claims could serve as a headwind for the stock for 2024 and 2025. . . .  AIL represents a major part of Globe Life's business, and if sales faces any disruption, this could have some impact on the business."

368.    On April 24, 2024, Morgan Stanley reduced its price target from $133 to a range of $39-$86, and noted the DOJ's investigation's "impact is likely to be more on the sales, capital, and regulatory/compliance side."  Evercore ISI similarly lowered its price target on April 11, 2024, from $125 to $75 because Fuzzy Panda's "scathing short selling report on GL" and "the recent disclosure that the DOJ has issued a subpoena to the company to investigate some of these allegations . . . has created significant uncertainty for the shares as demonstrated by the extremely negative reaction in the shares today (over 50%)." Jefferies also lowered its price target on April 28, 2024 from $122 to $85, "[g]iven unprecedented nature of both the Department of Justice and WilmerHale investigations related to the sales practices of one of GL's largest life insurance distribution organizations."

369.    In sum, the corrective disclosures published by Fuzzy Panda served to remove the artificial inflation from the price of Globe Life common stock, and was a direct and foreseeable

consequence of the revelation of the relevant truth concealed by Defendants throughout the Class Period.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

370.    Plaintiffs and the members of the Class are entitled to a presumption of reliance under the *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), fraud-on-the-market doctrine because the market for Globe Life stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)    Globe Life common stock was actively traded on the NYSE;

(b)    Globe Life was followed by a number of securities analysts who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms, and these reports were publicly available and entered the public marketplace; and

(c)    Globe Life regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

371.    As a result of the foregoing, the market for Globe Life stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all those who transacted in Globe Life stock during the Class Period suffered similar injury through their transactions in Globe Life stock at artificially inflated prices and a presumption of reliance applies.

372.    Without knowledge of the misrepresented or omitted material facts, Plaintiffs and other members of the Class purchased or acquired Globe Life common stock between the time Defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Plaintiffs and other members of the Class relied, and are entitled to have

- 146 -

relied, upon the integrity of the market prices for Globe Life common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

373. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements. Because this action involves Defendants' failure to disclose material adverse information regarding Globe Life's business, operations, and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. CLASS ACTION ALLEGATIONS

374. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired the common stock of Globe Life during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are the Individual Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

375. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Globe Life shares were actively traded on the NYSE. As of January 31, 2024, Globe Life had over 93 million shares of common stock outstanding. Although the exact number of Class members is unknown to Plaintiffs at this time, as it can only be

ascertained through appropriate discovery, Plaintiffs believe that there are, at a minimum, thousands of members of the Class. Class members who purchased Globe Life common stock may be identified from records maintained by Globe Life or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

376. Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

377. Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Plaintiffs have no interest that conflicts with the interests of the Class.

378. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b) whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(c) whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(d) whether the members of the Class have sustained damages, and the proper measure of damages.

379. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.   CAUSES OF ACTION

### COUNT I

**For Violations of §10(b) of the Exchange Act and SEC Rule 10b-5(b)**
**(Against Globe Life, Coleman, Hutchison, Svoboda, Darden, Kalmbach, and Haworth )**

380. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

381. Throughout the Class Period, defendants referenced above, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails or the facilities of national securities exchanges, made materially untrue statements of material fact or omitted to state material facts necessary to make their statements not misleading, and carried out a plan, scheme, and course of conduct, in violation of §10(b) of the Exchange Act and SEC Rule 10b-5(b).

382. Globe Life and defendants Coleman, Hutchison, Svoboda, Darden, Kalmbach, and Haworth intended to and did deceive the investing public, including Plaintiffs and other Class members, and artificially inflated and maintained the prices of Globe Life common stock. These defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged in this Complaint, and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and other members of the Class, by virtue of having made public statements and prepared, approved, signed, or disseminated documents

- 149 -

that contained untrue statements of material fact or omitted facts necessary to make their statements not misleading.

383.    As set forth above, Globe Life and the defendants referenced above made their materially false and misleading statements and omissions, and engaged in the fraudulent activity described in this Complaint knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and other members of the Class who purchased Globe Life common stock during the Class Period.

384.    Further, the defendants' false and misleading representations were material to investors, in that the statements conveyed or concealed information a reasonable investor would deem important in determining whether to invest in Globe Life stock.

385.    In ignorance of the materially false and misleading nature of those statements and omissions, and relying directly or indirectly on those statements, on the integrity of the market price for Globe Life common stock, or on these defendants' omissions, Plaintiffs and other members of the Class purchased Globe Life common stock at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and other members of the Class would not have purchased Globe Life stock at such artificially inflated prices.

386.    When the true facts were subsequently disclosed, the price of Globe Life common stock declined precipitously, and Plaintiffs and other Class members were damaged as a direct and proximate result of their purchases of the stock at artificially inflated prices and the subsequent decline in the stock price when the truth was disclosed to the investing public.

387.    Globe Life and defendants Coleman, Hutchison, Svoboda, Darden, Kalmbach, and Haworth accordingly are liable to Plaintiffs and other members of the Class for violation of §10(b) of the Exchange Act and SEC Rule 10b-5(b).

4877-5268-4006.v3

## COUNT II

### For Violations of §10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c)
### (Against All Defendants)

388.    Plaintiffs incorporate the allegations in ¶¶1-379 above as if fully set forth in this paragraph.

389.    Plaintiffs assert Count II for fraudulent scheme liability under the Exchange Act as well as SEC Rule 10b-5(a) and (c) against all Defendants.  Plaintiffs need not allege or prove that any of the misrepresentations or omissions of material fact alleged against certain defendants under Rule 10b-5(b) in order for all Defendants to have liability under Count II.

390.    During the Class Period, the Individual Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (a) deceive the investing public, including Plaintiffs and other Class members; (b) artificially inflate the price of Globe Life common stock; and (c) cause Plaintiffs and other members of the Class to purchase Globe Life common stock at artificially inflated prices.

391.    In furtherance of this unlawful plan, scheme, and course of conduct, the Individual Defendants employed devices, schemes, and artifices to defraud, and knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit on Plaintiffs and other Class members in connection with their purchases of Globe Life common stock, in violation of §10(b) of the Exchange Act as well as SEC Rule 10b-5(a) and (c).

392.    The Individual Defendants' deceptive acts, practices, and course of business included the knowing or reckless cover-up, suppression, and concealment of, among other things, the fact that sales growth in Globe Life's largest and most significant subsidiary was achieved through deceptive and unsustainable business practices, including through: (a) a pyramid-like MLM scheme; and (b) a culture that ignored wide-spread fraud and rewarded new sales agents, above-all else, for recruiting more agents.

393.    As a direct and proximate result of Defendants' scheme to defraud and unlawful course of conduct, Plaintiffs and other Class members suffered damages in connection with their purchases of Globe Life common stock during the Class Period.

394.    All Defendants accordingly violated §10(b) of the Exchange Act as well as SEC Rule 10b-5(a) and (c).

### COUNT III

### For Violations of §20A of the Exchange Act
**(Against Coleman, Hutchison, Svoboda, Kalmbach, Darden, Greer, Haworth, and Henrie)**

395.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1-379 above as though fully set forth herein.  This claim is asserted against Coleman, Hutchison, Svoboda, Kalmbach, Darden, Greer, Haworth, and Henrie on behalf of KBC, whose equity fund was damaged by Coleman's, Hutchison's, Svoboda's, Kalmbach's, Darden's, Greer's, Haworth's, and Henrie's insider trading.

396.    As detailed herein, Coleman, Hutchison, Svoboda, Kalmbach, Darden, Greer, Haworth, and Henrie were in possession of material, non-public information concerning Globe Life. Coleman, Hutchison, Svoboda, Kalmbach, Darden, Greer, Haworth, and Henrie took advantage of their possession of material, non-public information regarding Globe Life to obtain millions of dollars in insider trading profits during the Class Period.

397.    Coleman's, Hutchison's, Svoboda's, Kalmbach's, Darden's, Greer's, Haworth's, and Henrie's sales of Globe Life stock were made contemporaneously with KBC Equity Fund's purchases, and other Class members' purchases, of Globe Life stock during the Class Period.

398.    For example, in late April and early May 2021, Coleman sold the following shares of Globe Life stock for total proceeds of $5,201,773.59:

| Date | Share Price | No. of Shares | Proceeds ($) |
| --- | --- | --- | --- |
| 4/26/2021 | 103.23 | 12,000 | 1,238,760.00 |
| 5/3/2021 | 103.52 | 13,000 | 1,345,760.00 |

| | | | |
|---|---|---|---|
| 5/5/2021 | 104.89 | 1,593 | 167,089.77 |
| 5/5/2021 | 104.26 | 10,407 | 1,085,033.82 |
| 5/6/2021 | 105.01 | 13,000 | 1,365,130.00 |

399.    In late April and early May 2021, Hutchison sold the following shares of Globe Life stock for total proceeds of $5,201,103.80:

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 4/26/2021 | 103.22 | 12,000 | 1,238,640.00 |
| 5/3/2021 | 103.51 | 13,000 | 1,345,630.00 |
| 5/5/2021 | 104.88 | 1,652 | 173,261.76 |
| 5/5/2021 | 104.23 | 10,348 | 1,078,572.04 |
| 5/6/2021 | 105.00 | 13,000 | 1,365,000.00 |

400.    In late April and early May 2021, Svoboda sold the following shares of Globe Life stock for total proceeds of $2,866,268.92:

| Date | Share Price | No. of Shares | Proceeds ($) |
|---|---|---|---|
| 4/29/2021 | 102.94 | 15,000 | 1,544,100.00 |
| 5/5/2021 | 104.91 | 2,597 | 27,171.69 |
| 5/5/2021 | 104.41 | 12,403 | 1,294,997.23 |

401.    On April 30, 2021, KBC Equity Fund purchased 1,028 shares of Globe Life stock at a price of $102.49 per share, for proceeds of $105,359.72.

402.    In early February 2022, Greer sold the following shares of Globe Life stock for total proceeds of $2,463,121.33:

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 2/4/2022 | 104.65 | 1,915 | 200,404.75 |
| 2/4/2022 | 104.78 | 4,311 | 451,706.58 |
| 2/11/2022 | 106.53 | 17,000 | 1,811,010.00 |

403.    On February 10, 2022, KBC Equity Fund purchased 1,162 shares of Globe Life stock at $106.12 per share, for proceeds of $123,311.44.  The following day, February 11, 2022, KBC Equity Fund purchased 216 shares of Globe Life stock at $105.28 per share, for proceeds of $22,740.48.

- 153 -

404.    On March 29, 2022, Henrie sold 1,500 shares of Globe Life stock at $102.94 per share, for proceeds of $154,410.00.

405.    On March 31, 2022, KBC Equity Fund purchased 109 shares of Globe Life stock at $100.60 per share, for proceeds of $10,965.40.

406.    On February 27, 2023, Coleman sold 13,000 shares of Globe Life stock at $120.57 per share, for proceeds of $1,567,410.00.

407.    On February 27, 2023, Hutchison sold 13,000 shares of Globe Life stock at $120.56 per share, for proceeds of $1,567,280.00.

408.    In February 2023, Svoboda made the following sales of Globe Life stock for proceeds of $2,426,200.00:

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 2/24/2023 | 121.26 | 10,000 | 1,212,600.00 |
| 2/28/2023 | 121.36 | 10,000 | 1,213,600.00 |

409.    On March 1, 2023, Kalmbach sold 1,503 shares of Globe Life stock at $122.43 per share and 22,659 shares at $122.23 per share, for proceeds of $2,953,621.86.

410.    On March 1, 2023, Darden sold 9,000 shares of Globe Life stock at $121.78 per share, for proceeds of $1,096,020.00.

411.    On March 2, 2023, KBC Equity Fund purchased 188 shares of Globe Life stock at $120.81 per share, for proceeds of $22,712.28.

412.    On August 29, 2023, Henrie sold 1,325 shares of Globe Life stock at $111.20 per share, for proceeds of $147,340.00.

413.    On September 5, 2023, KBC Equity Fund purchased 1,313 shares of Globe Life stock at $108.90 per share, for proceeds of $142,985.70.

- 154 -

414.    On September 7, 2023, KBC Equity Fund purchased 74,261 shares of Globe Life stock at prices between $108.4062 and $108.4148 per share, for total proceeds of $8,050,635.81.

415.    On September 8, 2023, KBC Equity Fund purchased 19,954 shares of Globe Life stock at prices between $109.0649 and $109.1219 per share, for proceeds of $2,176,915.80.

416.    On November 15, 2023, Henrie sold 6,800 shares of Globe Life stock at $117.57 per share, for proceeds of $799,476.00.

417.    On November 16, 2023, KBC Equity Fund purchased 52,371 shares of Globe Life stock at $117.41 per share, for proceeds of $6,148,879.11.

418.    On November 17, 2023, Svoboda sold 9,500 shares of Globe Life stock at $118.22 per share, for proceeds of $1,123,090.00.

419.    On December 29, 2023, Haworth sold 2,524 shares of Globe Life stock at $121.37 per share, for proceeds of $306,337.88.

420.    On January 3, 2024, KBC Equity Fund purchased 4,703 shares of Globe Life stock at $121.68 per share, for proceeds of $572,261.04.

421.    KBC Equity Fund and other members of the Class who purchased shares of Globe Life stock contemporaneously with sales by defendants Coleman, Hutchison, Svoboda, Kalmbach, Darden, Greer, Haworth, and Henrie suffered damages because: (a) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (b) they would not have purchased the stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

### COUNT IV

### For Violations of §20(a) of the Exchange Act
### (Against All Defendants)

422.    Plaintiffs repeat and reallege each and every allegation set forth in ¶¶1-379 above.

- 155 -

423.   During the Class Period, Defendants participated in and oversaw the operation and management of Globe Life, and conducted and participated, directly and indirectly, in the conduct of Globe Life's business affairs.

424.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Globe Life's financial condition and results of operations, and to correct promptly any public statements issued by Globe Life which had become materially false or misleading.

425.   Each of the Defendants, therefore, acted as a controlling person of Globe Life.  By reason of their senior management positions and/or being directors at Globe Life and/or AIL, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Globe Life to engage in the unlawful acts and conduct complained of herein.  Each of the Defendants exercised control over Globe Life's operations and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.  Throughout the Class Period, Defendants exercised their power and authority to cause Globe Life to engage in the wrongful acts complained of herein.  Defendants, therefore, were "controlling persons" of Globe Life within the meaning of §20(a) of the Exchange Act.

426.   Globe Life had the power to control and influence the Individual Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations.  By virtue of the foregoing, Globe Life had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants, including the content of their public statements.

427.    By reason of the above conduct, Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Globe Life.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as class counsel;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED:  October 4, 2024                ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                       LAURA ANDRACCHIO (admitted *pro hac vice*)
                                       ROBERT R. HENSSLER JR. (admitted *pro hac vice*)
                                       ASHLEY M. KELLY (admitted *pro hac vice*)


                                                s/ Robert R. Henssler Jr.
                                       _____
                                            ROBERT R. HENSSLER JR.

                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)
                                       landracchio@rgrdlaw.com
                                       bhenssler@rgrdlaw.com
                                       ashleyk@rgrdlaw.com

4877-5268-4006.v3

MOTLEY RICE LLC
GREGG S. LEVIN
WILLIAM S. NORTON
JOSHUA C. LITTLEJOHN
CHRISTOPHER F. MORIARTY
MEREDITH B. WEATHERBY
(Texas Bar No. 24079006)
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
glevin@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com
mweatherby@motleyrice.com

Lead Counsel for Lead Plaintiffs

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
3811 Turtle Creek Blvd., Suite 825
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

Local Counsel

4877-5268-4006.v3