# Exhibit 5

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**
**SCHEDULE 14A**
**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934**
**(Amendment No. )**

☒     Filed by the Registrant
☐     Filed by a Party other than the Registrant

Check the appropriate box:

☐     Preliminary Proxy Statement
☐     Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☒     Definitive Proxy Statement
☐     Definitive Additional Materials
☐     Soliciting Material Pursuant to Rule 14a-11(c) or Rule 14a-12

# GLOBE LIFE INC.

(Name of Registrant as specified in Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒     No fee required.

☐     Fee paid previously with preliminary materials.
☐     Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11



March 17, 2022

To the Shareholders of
GLOBE LIFE INC. (the Company):

Globe Life Inc.'s 2022 Annual Meeting of Shareholders (Annual Meeting) will be held at Company Headquarters, 3700 South Stonebridge Drive, McKinney, Texas 75070 at 10:00 a.m., Central Daylight Time, on Thursday, April 28, 2022. The Annual Meeting will be conducted using Robert's Rules of Order and Globe Life Inc.'s Shareholders' Rights Policy. This policy is posted on the Company's website at *https://investors.globelifeinsurance.com* under the *Corporate Governance* heading, or you may obtain a printed copy by writing to the Corporate Secretary at 3700 South Stonebridge Drive, McKinney, Texas 75070.

The accompanying Notice and Proxy Statement discuss proposals which will be submitted to a shareholder vote. If you have any questions or comments about the matters discussed in the Proxy Statement or about the operations of the Company, we will be pleased to hear from you.

It is important that your shares be voted at the Annual Meeting. Please mark, sign, and return your proxy or vote over the telephone or via the Internet. If you attend the Annual Meeting, you may withdraw your proxy and vote your stock in person if you desire to do so.

We hope that you will take this opportunity to meet with us to discuss the results of operations of the Company during 2021.

Sincerely,

**Gary L. Coleman**
*Co-Chairman and Chief Executive Officer*

**Larry M. Hutchison**
*Co-Chairman and Chief Executive Officer*

TABLE OF CONTENTS

**Elements of Compensation**[8]

The total compensation package for all executives at the Company and its subsidiaries, including the NEOs, consists of multiple elements. Some of these elements focus on compensation paid during the executive's active working career, while others focus on compensation and benefits paid upon or related to retirement. Executives may also receive certain limited perquisites and personal benefits.

When the Committee annually reviews compensation, it primarily focuses on the "Target Pay" of the executive - the salary, target bonus and accounting grant value of long-term incentives.

The adjacent graph shows the relative importance of these elements in the Co-CEO 2021 target pay mix and illustrates that 88% is performance-linked.



Co-CEO 2021 Target Pay Mix

*Base Salaries*

The Compensation Committee sets (or, in the case of a Co-CEO, recommends to the Board) base salaries for our NEOs. Factors considered included competitive pay ranges, the officer's experience in the position, pay relative to organizational peers and individual performance. The Co-CEOs are paid on a 12-month basis commencing March 1 and ending on the last day of February of the following year, and the other NEOs are paid on a calendar-year basis. Effective January 21, 2022, the Compensation Committee set salaries for the NEOs, with the exclusion of Messrs. Coleman and Hutchison (whose salaries were set by the Board on February 23, 2022), as shown in the table below:

| Name | 2021 Salary ($) | 2022 Salary ($) |
|---|---|---|
| Gary L. Coleman | 1,000,000 | 1,025,000 |
| Larry M. Hutchison | 1,000,000 | 1,025,000 |
| Frank M. Svoboda | 590,000 | 650,000 |
| J. Matthew Darden | 590,000 | 650,000 |
| Steven K. Greer | 505,000 | 530,000 |
| Michael C. Majors | 445,000 | 465,000 |

*Annual Cash Bonuses*

Annual cash bonuses are a key component of our executive compensation program and are positioned as a percentage of salary between the 25th percentile and median. In 2021, we operated using an annual Management Incentive Plan (MIP Plan), under which annual cash bonuses were paid to the Co-CEOs and other NEOs. That plan utilized a "Plan within a Plan" approach in which the criteria set by the Compensation Committee stipulated the maximum bonus that could be paid to each NEO covered under the MIP Plan.[9] The Compensation Committee was also authorized to pay discretionary bonuses to executives outside of the MIP Plan.

As noted, the MIP Plan establishes an upper limit for bonuses to covered employees. The actual bonuses paid are developed using an annual incentive plan framework that determines an initial award, subject to adjustment by the Compensation Committee. For 2021, the Compensation Committee tied the annual incentive plan framework to three metrics, assigning different weights to each: (i) net operating income earnings per share (EPS) growth, (ii) underwriting income growth, and (iii) net operating income as a return on equity, excluding net unrealized gains or losses on fixed maturities (NOI ROE), subject to the Committee's discretion to further adjust the bonuses based upon consideration of subjective factors. Each metric was calculated excluding the effect of any COVID-19 deaths.

---

[8] The value of the retirement benefit, which is fixed by a formula relating average cash compensation and service, is excluded because the accounting value can vary significantly from year to year due to changes in the interest rate environment. However, the Committee does periodically consider the competitiveness of the defined benefit plan and its place in the compensation mix.

[9] The criteria established by the Compensation Committee specify that a bonus pool equal to 2% of pre-tax operating income will be established. For 2021, this pool was $20,107,000. Per the terms of the MIP Plan, the bonus payable to each of the Co-CEOs cannot exceed 30% of the pool ($5.52 million for 2021) and the bonus paid to each of the other covered employees cannot exceed 10% of the pool ($1.84 million for 2021).

TABLE OF CONTENTS

|  |  | EPS Growth (40%) | Underwriting Income Growth (30%) | NOI ROE (30%) |
|---|---|---|---|---|
| Threshold | 50% | 1.0% | 0.0% | 12.8% |
| **Target** | **100%** | **6.0%** | **4.5%** | **13.8%** |
| Maximum | 150% | 11.0% | 9.0% | 14.8% |

As noted in the Executive Summary, for 2021, net operating income EPS grew 8.3%, underwriting income increased 5.3% and NOI ROE from continuing operations was 14.0%, yielding a total framework bonus for the NEOs equal to 108.3% of their target bonus amount. This is shown in the following table. The bonuses for Messrs. Svoboda, Darden and Majors were recommended by the Co-CEOs and approved by the Compensation Committee, in accordance with the MIP Plan. The bonuses shown for Messrs. Coleman and Hutchison were recommended by the Compensation Committee and approved by the independent members of the Board.

| Name | Target Bonus as a % of Salary | Target Bonus Amount[1] ($) | Framework Bonus[2] ($) | Actual Bonus Paid ($) |
|---|---|---|---|---|
| Gary L. Coleman | 140% | 1,400,000 | 1,516,000 | 1,520,000 |
| Larry M. Hutchison | 140% | 1,400,000 | 1,516,000 | 1,520,000 |
| Frank M. Svoboda | 65% | 384,000 | 416,000 | 410,000 |
| J. Matthew Darden | 65% | 384,000 | 416,000 | 410,000 |
| Michael C. Majors | 55% | 245,000 | 265,000 | 245,000 |
| **Total** |  | **3,813,000** | **4,129,000** | **4,105,000** |

[1] Reflects target bonus amount based on targeted EPS growth, underwriting income growth and NOI ROE in 2021. The degree to which these objective criteria were achieved, along with subjective criteria considered by the Compensation Committee, were used in determining (or, in the case of the Co-CEOs, recommending to the independent members of the Board) the amount by which the maximum bonus payable to each participating NEO would be reduced. The threshold bonus amount is equal to half the target. The maximum bonus is equal to the lesser of 150% of target or the amount allowed by the MIP Plan. Rounded to the thousandth (000).

[2] Bonus earned based on the 2021 performance framework, before Compensation Committee discretion, was equal to 108.3% of Target Bonus, rounded to the thousandth (000).

Mr. Greer's 2021 bonus was not paid pursuant to the MIP Plan. The Compensation Committee awarded him a bonus of $300,000 based upon the Co-CEOs' assessment of his performance as Chief Executive Officer of the American Income Life Division, which was based in part on growth in premium, growth in and production of the sales force and profitability of the American Income Life Division, and in part on the Company's 2021 results.

*Long-Term Equity Incentives*

The principal vehicle we use to distribute long-term incentive compensation to our Company and subsidiary executives, officers and key employees is stock options, with members of the executive management team currently also receiving performance share awards. Time-vested restricted stock awards were made in prior years, but were generally replaced by performance share awards.

| Stock Options | • Granted to all equity award recipients |
|---|---|
|  | • No timing of awards - made annually at the February Compensation Committee meeting |
|  | • Granted at market price |
|  | • Options generally have a 7-year term, vesting 50% on 2nd-year anniversary of grant date and remaining 50% on 3rd-year anniversary |
| Performance Shares | • Performance-based vesting |
|  | • Awards granted based on cumulative performance over a 3-year period |
|  | • Granted only to members of the executive management team |
| Restricted Stock | • Since 2013, restricted stock has only been granted to executive officers on a select basis where there is a need for further retention |
|  | • These awards, historically, have vested after 5 years, with no partial vesting or vesting for early retirement |
|  | • No time-vested restricted stock awards were made to NEOs in 2021 |

TABLE OF CONTENTS

Based upon recommendations from the Co-CEOs, the Compensation Committee, as the administrator of the plan, determined the NEOs (other than the Co-CEOs), other officers and key employees (a total of 160 persons) who received non-qualified stock option grants and/or performance share awards on February 24, 2021. In a February 24, 2021 meeting, the independent members of the Board acted upon the recommendation from the Compensation Committee and awarded Co-CEOs Gary L. Coleman and Larry M. Hutchison each 33,000 performance shares (at target) and non-qualified options on 140,000 shares with an exercise price equal to the market closing price on that date and a term of seven years. In making the 2021 grants, the Compensation Committee considered the Co-CEOs' recommendations for all persons other than themselves, individual performance and the Company's succession planning and retention needs.

*Stock Ownership/Retention Guidelines*

We have formal guidelines that require the following minimum stock ownership levels:

| Position | Stock Ownership Level |
|---|---|
| Chief Executive Officer(s) of Company | 6 x Annual Salary |
| Executive Vice Presidents of Company | 3 x Annual Salary |
| Chief Executive Officers of Agency/Marketing Divisions of Principal Insurance Subsidiaries | 2 x Annual Salary |
| Executive Officers of Company and its Subsidiaries designated by Governance & Nominating Committee | 1 x Annual Salary |
| Non-Management Directors of Company | 5 x Annual Cash Retainer |

The directors, the Co-CEOs, and the executive officers who are subject to the above-described stock ownership guidelines have a seven-year period from the January 1, 2007 inception of these guidelines, initial election as a director (if first elected after January 1, 2007), or initial inclusion in the above-described categories of executive officers. For purposes of meeting these ownership guidelines, common shares deemed owned, either directly or indirectly, for reporting purposes pursuant to Section 16(a) of the Securities Exchange Act of 1934, junior subordinated debentures of the Company, shares held in unitized stock funds in the Company's thrift/401(k) plan, time-vested restricted stock and restricted stock units are counted. Stock options and performance share awards are not counted toward attainment or continued satisfaction of the ownership guidelines.

Until the minimum ownership levels are attained within the requisite period, the director or executive officer cannot sell any shares owned outright, sell any restricted stock when vested or performance shares when issued other than those shares necessary to pay withholding taxes, or execute a "cashless" option exercise where more shares are sold than are necessary to pay the option exercise price and withholding taxes. The executive or director must retain all "profit shares" (the net shares remaining after payment of the option exercise price and taxes owed at the time of an option exercise, vesting of restricted stock or earnout of performance shares) until minimum ownership levels are met; provided, however, that in exceptional circumstances, upon obtaining an advance and specifically-defined waiver of the guidelines from the Governance and Nominating Committee of the Board, profit shares may be sold.

We have no formal stock retention policy for shares derived from stock options or other equity grants after the stock ownership guidelines have been met. The Company believes the decisions regarding when to exercise options and whether to retain stock should be each individual award recipient's decision if that award recipient is in compliance with the stock ownership guidelines.

Our insider trading policy prohibits directors, officers and employees of the Company and its subsidiaries who are subject to Section 16 reporting requirements from purchasing financial instruments (such as prepaid variable contracts, equity swaps, collars, and exchange funds) or otherwise engaging in transactions that hedge or offset, or are designed to hedge or offset, any decrease in the market value of Company equity securities granted to any such director or officer by the Company or held, directly or indirectly, by the director or officer.