UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

| | | |
|---|---|---|
| CITY OF MIAMI GENERAL EMPLOYEES' & SANITATION EMPLOYEES' RETIREMENT TRUST, on Behalf of All Others Similarly Situated, | § § § § § | Civil Action No. 4:24-cv-00376-ALM<br><br>Hon. Amos L. Mazzant, III<br><br>CLASS ACTION |
| Plaintiff, | § § | |
| vs. | § § | |
| GLOBE LIFE INC. f/k/a TORCHMARK CORPORATION, et al., | § § § | |
| Defendants. | § § § § | |

**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................... ii

I.      INTRODUCTION ..................................................................................................................1

II.     FACTUAL BACKGROUND ................................................................................................4

III.    STATEMENT OF ISSUES ...................................................................................................8

IV.     ARGUMENT .........................................................................................................................8

        A.      Defendants Offer an Impermissible Counter-Narrative Based on
                Extraneous Facts Inappropriate for Judicial Notice..................................................8

        B.      Fuzzy Panda Is a Reliable Source.............................................................................9

        C.      Plaintiffs Have Adequately Alleged Materially False and Misleading
                Statements and Omissions .......................................................................................10

                1.      Defendants' "Business Culture" Statements Are Actionable .....................11

                2.      Defendants' Statements Concerning Globe Life's Financial Results
                        Are Actionable ............................................................................................15

                3.      Defendants' Privacy Statements Are Actionable........................................19

                4.      Defendants' Agent Recruitment and Retention Statements Are
                        Actionable....................................................................................................20

                5.      Defendants' SOX Certifications Are Actionable.........................................22

        D.      Plaintiffs Allege a Strong Inference of Scienter .....................................................24

                1.      Testimony from Company Insiders Supports Scienter ...............................25

                2.      The Consumer Complaints Support Scienter...............................................27

                3.      The Fuzzy Panda Report Supports Scienter................................................28

                4.      The Individual Defendants' Executive Compensation and Insider
                        Trading Supports Scienter...........................................................................30

                5.      Plaintiffs' Additional Allegations Further Support Scienter .....................31

        E.      The Complaint Sufficiently Alleges Scheme Liability............................................34

        F.      Plaintiffs Adequately Allege Loss Causation .........................................................38

        G.      Plaintiffs Adequately Allege Claims Under Sections 20A and 20(a)....................40

V.      CONCLUSION....................................................................................................................40

CERTIFICATE OF SERVICE .......................................................................................................42

## TABLE OF AUTHORITIES

**CASES**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) .................................................................................... 17

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005) ................................................................................. 30

*Bond v. Clover Health Investments, Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022) ........................................................ 10, 29

*Boston Retirement System v. Alexion Pharmaceuticals, Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021) .................................................................. 17

*Brody v. Zix Corp.*,
2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) .................................................... 13

*Budde v. Global Power Equipment Group, Inc.*,
2018 WL 4623108 (N.D. Tex. Sept. 26, 2018) .................................................... 24

*Camelot Event Driven Fund v. Alta Mesa Resources, Inc.*,
2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) ...................................................... 33

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ............................................................ 32, 33

*Chau v. Musk*,
2023 WL 4707138 (W.D. Tex. July 21, 2023) ..................................................... 14

*City of Ft. Lauderdale Police & Firefighters' Retirement System v. Pegasystems Inc.*,
683 F. Supp. 3d 120 (D. Mass. 2023) ................................................................... 13

*City of North Miami Beach Police Officers' & Firefighters' Retirement Plan v.
National General Holdings Corp.*,
2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ......................................................... 26

*City of Omaha Police & Fire Retirement System v. LHC Group, Inc.*,
2013 WL 1100819 (W.D. La. Mar. 15, 2013) ................................................ 31, 32

*City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*,
686 F. Supp. 2d 404 (D. Del. 2009) ..................................................................... 24

*Coggins v. Camber Energy Inc.*,
693 F. Supp. 3d 736 (S.D. Tex. 2023) .................................................................. 37

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) ....................................................................... 34

*Dawes v. Imperial Sugar Co.*,
975 F. Supp. 2d 666 (S.D. Tex. 2013) .................................................................. 32

*Delaware County Employees Retirement System v. Cabot Oil & Gas Corp.*,
620 F. Supp. 3d 603 (S.D. Tex. 2022) .................................................................. 33

*Developer's Mortgage Co. v. TransOhio Savings Bank*,
706 F. Supp. 570 (S.D. Ohio 1989) ................................................................................ 27

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)........................................................................................................ 38

*Eastwood Enterprises, LLC v. Farha*,
2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) ............................................................... 33

*Fadia v. FireEye, Inc.*,
2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) .................................................................. 9

*Fryman v. Atlas Financial Holdings, Inc.*,
2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ................................................................... 19

*Genesee County Employees' Retirement System v. FirstCash Holdings Inc.*,
667 F. Supp. 3d 295 (N.D. Tex. 2023) ............................................................................ 39

*Handal v. Tenet Fintech Group Inc.*,
2023 WL 6214109 (E.D.N.Y. Sept. 25, 2023) ................................................................ 10

*Huang v. Higgins*,
2019 WL 1245136 (N.D. Cal. 2019) ............................................................................... 30

*In re AGNC Investment Corp.*,
2019 WL 464134 (D. Md. Feb. 6, 2019) ......................................................................... 26

*In re Akorn, Inc. Securities Litigation*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) .............................................................................. 33

*In re Apple Inc. Securities Litigation*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) ................................................................... 16

*In re ArthroCare Corp. Securities Litigation*,
726 F. Supp. 2d 696 (W.D. Tex. 2010).......................................................................... 34

*In re BofI Holding, Inc. Securities Litigation*,
977 F.3d 781 (9th Cir. 2020) .......................................................................................... 40

*In re Cannavest Corp. Securities Litigation*,
307 F. Supp. 3d 222 (S.D.N.Y. 2018)............................................................................ 34

*In re Cassava Sciences, Inc. Securities Litigation*,
2023 WL 3442087 (W.D. Tex. May 11, 2023) ............................................................... 10

*In re Countrywide Financial Corp. Derivative Litigation*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .................................................................... 27, 34

*In re Eletrobras Securities Litigation*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017)............................................................................. 14

*In re Enron Corp. Securities, Derivative & ERISA Litigation*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ...................................................................... 26, 35

*In re Fleming Cos. Inc. Securities & Derivative Litigation*,
2004 WL 5278716 (E.D. Tex. June 16, 2004)........................................................... 24, 27

*In re Genius Brands International, Inc. Securities Litigation*,
    97 F.4th 1171 (9th Cir. 2024) ..................................................................... 39, 40

*In re Intuitive Surgical Securities Litigation*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014) ................................................................ 31

*In re KBR, Inc. Securities Litigation*,
    2018 WL 4208681 (S.D. Tex. Aug. 31, 2018) .................................................. 14

*In re Levi Strauss & Co. Securities Litigation*,
    527 F. Supp. 2d 965 (N.D. Cal. 2007) ............................................................. 17

*In re Petrobras Securities Litigation*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)......................................................... 15, 22

*In re Plains All American Pipeline, L.P. Securities Litigation*, 307 F. Supp. 3d 583
    (S.D. Tex. 2018)................................................................................................ 14

*In re Sears, Roebuck & Co. Securities Litigation*,
    291 F. Supp. 2d 722 (N.D. Ill. 2003) ............................................................... 33

*In re Signet Jewelers Ltd. Securities Litigation*,
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018).................................................. 13

*In re Silvercorp Metals, Inc. Securities Litigation*,
    26 F. Supp. 3d 266 (S.D.N.Y. 2014)................................................................. 29

*In re SolarWinds Corp. Securities Litigation*,
    595 F. Supp. 3d 573 (W.D. Tex. 2022)........................................................ 13, 25

*In re Syncor International Corp. Securities Litigation*,
    239 F. App'x 318 (9th Cir. 2007) ..................................................................... 17

*In re Tesla Inc. Stockholder Derivative Litigation*,
    2023 WL 6060349 (W.D. Tex. Sept. 15, 2023)................................................ 14

*In re Toronto-Dominion Bank Securities Litigation*,
    2018 WL 6381882 (D.N.J. Dec. 6, 2018).................................................... 24, 27

*In re VeriFone Holdings, Inc. Securities Litigation*,
    704 F.3d 694 (9th Cir. 2012) ............................................................................ 28

*Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008) ....................................................................... 21, 34

*Jacobowitz v. Range Resources Corp.*,
    596 F. Supp. 3d 659 (N.D. Tex. 2022) ............................................................. 14

*Jaso v. Coca Cola Co.*,
    435 F. App'x 346 (5th Cir. 2011) ....................................................................... 9

*Kapps v. Torch Offshore, Inc.*,
    379 F.3d 207 (5th Cir. 2004) ....................................................................... 11, 14

*Kohut v. KBR, Inc.*,
    2015 WL 11995250 (S.D. Tex. Sept. 3, 2015) ................................................. 24

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009) ................................................................................. 33

*Linenweber v. Southwest Airlines Co.*,
693 F. Supp. 3d 661 (N.D. Tex. 2023) .............................................................. 14, 37

*Loc. 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*,
810 F.3d 951 (5th Cir. 2016) ....................................................................... 30, 31, 32

*Lorenzo v. Securities & Exchange Commission*,
587 U.S. 71 (2019)....................................................................................... 35, 36, 37

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ........................................................... 8, 10, 16, 38

*Lovelace v. Software Spectrum Inc.*,
78 F.3d 1015 (5th Cir. 1996) ................................................................................... 9

*Markman v. Whole Foods Market, Inc.*,
2016 WL 10567194 (W.D. Tex. Aug. 19, 2016)................................................... 16

*Marrari v. Medical Staffing Network Holdings, Inc.*,
395 F. Supp. 2d 1169 (S.D. Fla. 2005) ................................................................. 20

*Middlesex Retirement System v. Quest Software Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007) ................................................................ 22

*Mulligan v. Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................................... 29

*Ng v. Berkeley Lights, Inc.*,
2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ........................................................ 22

*Nykredit Portefolje Administration A/S v. Propetro Holding Corp.*,
2021 WL 9037758 (W.D. Tex. Sept. 13, 2021)....................................... 13, 20, 22

*Oklahoma Firefighters Pension & Retirement System v. Six Flags Entertainment Corp.*,
58 F.4th 195 (5th Cir. 2023) ....................................................................... 30, 32, 33

*Prause v. TechnipFMC, PLC*,
2019 WL 1211428 (S.D. Tex. Jan. 18, 2019) ...................................................... 11

*PS Audio, Inc. v. Allen*,
2018 WL 5309834 (D. Colo. Aug. 10, 2018) ......................................................... 9

*Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) .......................................................................... 38, 39

*Ramirez v. Exxon Mobil Corp.*,
334 F. Supp. 3d 832 (N.D. Tex. 2018) ................................................................. 39

*Red Rock Analytics, LLC v. Apple Inc.*,
2021 WL 5828368 (W.D. Tex. Dec. 8, 2021) ......................................................... 9

*Reneker v. Offill*,
2010 WL 1541350 (N.D. Tex. Apr. 19, 2010) ....................................................... 9

- v -

*Rougier v. Applied Optoelectronics, Inc.*,
    2019 WL 6111516 (S.D. Tex. Mar. 27, 2019) ................................................................... 13

*Schlagal v. Learning Tree International*,
    1998 WL 1144581 (C.D. Cal. Dec. 23, 1998) ................................................................. 31

*Schneider v. Natera, Inc.*,
    2023 WL 9958265 (W.D. Tex. Sept. 11, 2023) ......................................................... 10, 39

*Securities & Exchange Commission v. Carter*,
    2020 WL 6304889 (E.D. Tex. Oct. 28, 2020) ................................................................. 36

*Securities & Exchange Commission v. Credit Bancorp, Ltd.*,
    195 F. Supp. 2d 475 (S.D.N.Y. 2002) .............................................................................. 25

*Securities & Exchange Commission v. Frank*,
    388 F.2d 486 (2d Cir. 1968) ............................................................................................ 25

*Securities & Exchange Commission v. Mapp*,
    2017 WL 5230358 (E.D. Tex. Nov. 9, 2017) ................................................................. 35

*Securities & Exchange Comm'n v. Verges*,
    716 F. Supp. 3d 456 (N.D. Tex. Feb. 9, 2024) ..................................................... 34, 35, 36

*Talarico v. Johnson*,
    2023 WL 2618255 (S.D. Tex. Feb. 7, 2023) ................................................................... 37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................................. 24, 29

*United States v. Peterson*,
    101 F.3d 375 (5th Cir. 1996) ........................................................................................... 10

*Yoshikawa v. Exxon Mobil Corp.*,
    2023 WL 5489054 (N.D. Tex. Aug. 24, 2023) ............................................................... 36

*Yoshikawa v. Exxon Mobil Corp.*,
    2024 WL 3802997 (N.D. Tex. Aug. 12, 2024) ............................................................... 36

**RULES**

Fed. R. Evid. 201(b) ........................................................................................................... 9, 18

Fed. R. Evid. 201(f) ................................................................................................................. 9

## I.    INTRODUCTION

This case arises from Defendants' decision to operate Globe Life in a manner completely at odds with what they represented to investors, in violation of the federal securities laws.[1]

During the Class Period, life insurance sales by Globe Life's largest and most important subsidiary, AIL, steadily grew.  ¶¶95-98.  Defendants represented that this growth was due to Globe Life's superior recruitment and training, as well as AIL's shift to virtual sales and recruiting. *See, e.g.*, ¶¶77, 93-94, 99, 204-220, 240, 245.  Defendants further represented that the Company was operated with "integrity and in accordance with the highest ethical standards," possessed "a culture of accountability," and that its "superior performance" was the root of its success—not its "unethical or illegal business practices."  ¶¶178, 185, 188.  And, according to Defendants, Globe Life did not permit or tolerate workplace violence, threatening behavior, discrimination, or harassment.  ¶¶180-84, 187, 189, 193-94.  Investors would later learn that none of this was true.

In reality, Globe Life's reported growth was the product of rampant fraud and deceit at numerous AIL agencies.  ¶¶79-115.  Agents employed an array of illicit practices for the express purpose of reporting more sales—wrongly using personal information of customers; forging signatures; creating fictitious policies; making false representations; and using bait-and-switch tactics.  ¶¶79, 101-11.  Globe Life's compensation structure, which rewarded the ill-gotten sales with steep commissions, prioritized recruiting new agents over selling insurance, a fact that was

---

[1]    Capitalized terms not defined herein have the meanings ascribed in the Consolidated Complaint for Violations of the Federal Securities Law (ECF 24, the "Complaint").   The Complaint's paragraphs, sections, and exhibits are referred to as "¶__," "Compl. §__," and "Compl. Ex. __," respectively.  Defendants' motion to dismiss (ECF 39, the "Motion") and the Motion's exhibits (ECFs 39-2–21) are referred to as "Mot. __" and "Mot. Ex. __," respectively.  Unless otherwise noted, in non-case quotations emphases are added and internal quotation marks omitted.

not disclosed to investors.  ¶¶64-78, 83-92.  Globe Life's toxic business environment also was riddled with abuse as harassment and misconduct were tolerated and even encouraged.  ¶¶116-46.

On August 11, 2024, the truth concerning Globe Life's operations was finally revealed. That day, Fuzzy Panda Research ("Fuzzy Panda"), a noted short seller with a "[w]inning [r]ecord," published a report detailing its extensive undercover investigation into the Company.  ¶8 n.1.  That investigation, which included interviews of former agents and executives, revealed that Globe Life was plagued by systemic fraud and misconduct and that the Company's agencies functioned as pyramid schemes.  ¶¶147-65.

The report also painted a picture of a deeply troubled corporate culture where fraud and sexual misconduct were rampant.  Those revelations stood in contrast to Defendants' assurances that Globe Life conducted business "with integrity and in accordance with the highest ethical standards"; was "committed to maintaining a business atmosphere and work environment based on honesty, fair dealing and sound business ethics"; and that the Company "prohibits and will not tolerate any such discrimination or harassment."  ¶¶178, 182, 183, 185.  According to the Fuzzy Panda Report, "dozens of current and former agents, and hundreds of pages of documents, detailed a fraud that now appears commonplace at [AIL's] top sales agencies" and that "more policies need to be sold every year to cover up the ones from the prior year."  Compl. Ex. B at 14.  As one former VP said, AIL is '*like a Ponzi scheme*.'"  *Id.*  Fuzzy Panda also referenced examples of sexual misconduct that "la[id] bare a working environment [at AIL] where upper management protects sexual predators."  *Id.* at 30.  In response to the release of the Fuzzy Panda Report, Globe Life's stock declined by 53%, but not before several of the Individual Defendants had sold over $160 million of their Company stock at prices inflated by Defendants' fraud.  ¶¶276, 366.

The crux of Defendants' motion to dismiss is that short sellers like Fuzzy Panda are "conflicted" and their reports unreliable so any reliance on them must be rejected as a matter of law.  But their argument is not supported and ignores that Plaintiffs conducted their own investigation.  Among other sources, Plaintiffs obtained and reviewed (i) sworn affidavits of Company insiders filed in other lawsuits against Globe Life and AIL; (ii) an investigative Determination issued by the EEOC to Globe Life; (iii) various enforcement action filings by state insurance department and commissions; (iv) hundreds of consumer complaints made to the FTC, BBB, and state insurance departments; and (v) publicly available information concerning ongoing investigations by the DOJ and SEC.  Defendants' spurious claims aside, there is no credible argument that Plaintiffs failed to independently corroborate or investigate Fuzzy Panda's report.

Defendants' argument, that Plaintiffs can point to only "[a] handful" of "sparse examples of alleged misconduct," is also belied by the Complaint.  Consistent with Fuzzy Panda's claim of "[w]ide-[r]anging '[i]nsurance [f]raud,'" Plaintiffs have similarly alleged "widespread fraudulent business practices" based, in part, on an affidavit by a Company insider who repeatedly escalated the fraud to certain of the Individual Defendants and senior management.  ¶295.  That former AIL Vice President not only attested that fraud was "rampant" and "a serious and on-going problem that was not being adequately handled," but that AIL's "business model [was] based on a pyramid scheme," with those at "the top of the pyramid" looking "favorably" at the fraud because "the fraud showed growth."  ¶¶113, 247; Compl. Ex. A at 1, 5.  The Complaint also references explosive EEOC Determinations directed at Globe Life and AIL in which the agency found, based on its review of the evidence, that Globe Life (i.e., *company-wide*) "does not maintain any reasonable avenues for reporting sexual harassment or discrimination or obtaining remedial action regarding such conduct" and that the Company "engag[ed] in threats and other retaliatory adverse actions,

- 3 -

active discouragement of complaints, [and] failing to act on complaints." ¶356.  It is no wonder, then, that Fuzzy Panda unearthed numerous lawsuits filed by female former agents alleging sexual misconduct by Company personnel.  These and other allegations in the Complaint are far from isolated or "sparse," and substantiate (and lend credence to) the Fuzzy Panda revelations.

Finally, attempting to recast Plaintiffs' well-pled allegations, Defendants argue that Plaintiffs failed to allege how and to what extent Globe Life's financial results were misrepresented.  Defendants then provide their own, self-serving metrics that (they claim) render Plaintiffs' allegations implausible.  But at this stage of the litigation factual allegations that the Company's financials were artificially inflated by specific and widespread misconduct suffice. Defendants' argument, like others raised in the Motion, confuses disputes about factual interpretation and affirmative defenses with the limited inquiry of whether Plaintiffs have adequately pled their claims.  Defendants' Motion should be denied in its entirety.

## II.    FACTUAL BACKGROUND

Globe Life distributes life and health insurance products through its network of subsidiary agencies, including AIL.  ¶29.  During the Class Period, AIL produced approximately 50% of Globe Life's premium revenue, ¶¶52, 57, accounted for two thirds (or more) of the Company's total agent count, ¶54, and was the largest contributor to Globe Life's underwriting margin and profitability, ¶56.  Globe Life's reported results were, in large part, reflective of AIL's operations.

During the Class Period, Defendants made multiple public disclosures concerning Globe Life's business and operations.  Those public statements (1) misrepresented that Globe Life and AIL conducted their business "with integrity," according to "the highest ethical standards," with "honesty, fair dealing and sound business ethics," ¶¶178-79—while concealing that AIL regularly sold Globe Life insurance policies through a variety of fraudulent, dishonest, coercive, and manipulative means, ¶¶80, 106-11; (2) falsely attributed increases in the Company's Life Net Sales

- 4 -

and Life Premium to legitimate causes, including its agents' successes with virtual selling and recruiting, higher agent retention, increased agent counts, and agents' skill, quality, and hard work, ¶¶196-221—while concealing its agents' fraudulent and deceptive sales practices; (3) misrepresented and concealed the Company's noncompliance with privacy laws, which its agents violated by illegally accessing customers' protected information to sell insurance, ¶¶103, 222-23; (4) falsely attributed the growth in the Company's key agent count metric to "continual" and "better training," "increased productivity," "additional [sales] tools," and new "sales technologies"—while concealing that increases in agent count were, in fact, driven by an undisclosed pyramid-like scheme that routinely ignored fraudulent business practices and emphasized (and incentivized) the recruitment of new agents over the selling of insurance, ¶¶18, 59, 77-78, 237, 240, 245-48; (5) falsely represented that Globe Life did not permit or tolerate workplace violence, threatening behavior, discrimination, or harassment, ¶¶180-84, 187, 189, 193-94; and (6) issued SOX certifications that falsely certified the truthfulness of the Company's public SEC filings and the effectiveness of Globe Life's internal controls, ¶¶249-55.

The falsity of Defendants' Class Period statements came to light through two disclosures. On March 14, 2024, facing mounting media pressure, the Company announced for the first time that Globe Life and AIL had received subpoenas from the U.S. Attorney's Office for the Western District of Pennsylvania concerning unethical business practices and sales agent misconduct.  In response, Globe Life's stock price declined 2.6%.  ¶364.  The following month, Fuzzy Panda issued its bombshell report, which further contradicted Defendants' Class Period statements and shined a light on wide-ranging deceptive conduct and business practices at the Company.  The April 11, 2024 Fuzzy Panda Report fully exposed Defendants' fraud to the market.  ¶¶147-65.

The Fuzzy Panda Report revealed that (1) multiple agents at many of AIL's largest agencies have engaged in a wide variety of fraudulent practices, including writing life insurance policies for customers or random consumers without their knowledge or consent, writing fraudulent policies for dead or fictitious people, forging signatures, and signing policies they knew would be canceled within a few months, ¶¶5, 147-52; (2) AIL's agents engaged in widespread sexual misconduct, drug use, and sexual harassment, ¶¶153-56; and (3) AIL's structure borders on an illegal pyramid scheme in multiple states, ¶¶157-62.

The Fuzzy Panda Report also revealed that an AIL Vice President, Scott Dehning, "sent more than 200 emails detailing cases of fraud" to "[Defendant] Greer, Zophin, and Globe Life's General Counsel-[Defendant] Joel Scarborough." ¶6; *see also* Compl. Ex. B at 7. Dehning's allegations of fraud are corroborated by his affidavit dated July 1, 2024, which he executed under penalty of perjury and filed in federal court. ¶¶6, 69, 113, 123, 295. Just weeks after the Fuzzy Panda Report, a federal court filing of former AIL agent Michael Russin addressing the pervasive fraud at the Company further substantiated Fuzzy Panda's findings. In that filing, Russin agreed to testify to certain "stipulated facts" concerning his employment with AIL, including that he was "aware of instances in which AIL agents . . . may have performed unethical and/or fraudulent sales practices, including the following: a. Agents paying for policies from their own pockets; [and] b. Taking confidential information from CAS [a customer data system] to write new policies." ¶¶9, 296 (quoting Compl. Ex. C at 16 (Zinsky-Russin Stipulation)).

Both the DOJ and the SEC have initiated investigations concerning the Company's sales practices and public statements. ¶¶342-49. Specifically, in late 2023, the DOJ issued wide-ranging subpoenas to Globe Life and AIL seeking information concerning insurance and consumer fraud and sexual harassment. ¶¶343-45. In April 2024, the SEC made an inquiry to the Company, which

management denied in May 2024, but subsequently disclosed in August 2024.  ¶348.  Those investigations remain ongoing.  Numerous other investigations and state enforcement actions concern the same unethical and illegal insurance sales practices described by Fuzzy Panda.  ¶¶299-302.  Those actions substantiate the pervasiveness of the Company's misconduct, which violated numerous state insurance and consumer protection laws.  ¶¶302-21.

Consumer complaints filed with the BBB, FTC, and state insurance departments in Ohio and Washington further corroborate the misconduct.  ¶¶322-41.  They detail how Globe Life and AIL's agents and employees engaged in "fraudulent insurance production" and "[f]raudulent [u]nderwriting" by "[f]org[ing] [s]ignatures to [c]reate [p]olicies [c]ustomers [n]ever [a]greed to [b]uy," "'[e]nhanc[ing]' [e]xisting [p]olicies," and "add[ing] additional policies without approval"—all so that "payments would be auto-drafted out of customer accounts" without their approval.  ¶323.  The FTC received complaints that AIL's agents had opened unauthorized policies or increased their premiums without their knowledge or consent, ¶335; taken authorized bank drafts from their bank accounts, ¶337; and falsely claimed union affiliation, ¶338—leading customers to conclude that AIL is an "MLM," "Ponzi," or "pyramid" scheme, ¶339.  Consumers in Ohio and Washington made similar complaints to those state insurance departments.  ¶¶340-41.

On September 26, 2024, the EEOC issued several Determinations finding that Globe Life "deliberately misclassif[ied] its employees as independent contractors," and engaged in a host of unlawful employment practices, including subjecting its agents "to a hostile work environment," "quid pro quo harassment," "threats and demotion, or alternatively, constructive demotion" on the basis of sex, and "retaliation for protected activity."  ¶¶12-15, 350-57; Compl. Ex. D at 4-5 (determining that Globe Life "created, condoned, and actively promoted a work environment that

is hostile and abusive to female employees because of their sex" and "persistently failed to remedy individual instances of sexual harassment of which it had notice").

These independent, corroborating sources confirm that Globe Life and AIL have—for years—engaged in widespread insurance fraud, functioned like a pyramid scheme, and encouraged a company-wide culture of sexual harassment and abuse.  But it was not until Fuzzy Panda published its bombshell investigative report that Defendants' fraud was revealed.

## III.    STATEMENT OF ISSUES

1.      Do Plaintiffs state claims under Sections 10(b) of the 1934 Act, and Rule 10b-5 thereunder, by pleading that Defendants made affirmative misrepresentations (Count I, ¶¶380-87) and/or engaged in a scheme to defraud (Count II, ¶¶388-94)?

2.      Do Plaintiffs state a claim under Section 20A of the 1934 Act by engaging in insider trading (Count III, ¶¶395-421)?

3.      Do Plaintiffs state a claim for control person liability under Section 20(a) of the 1934 Act (Count IV, ¶¶422-27)?

## IV.    ARGUMENT

### A.    Defendants Offer an Impermissible Counter-Narrative Based on Extraneous Facts Inappropriate for Judicial Notice

At the motion-to-dismiss stage, a plaintiff's well-pleaded allegations must be accepted as true and may not be supplanted by a defendant's self-serving factual counter-narrative.  *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).  In violation of this principle, Defendants urge the Court to reach outside the Complaint's four corners by considering nineteen attached exhibits and argue that "[t]he Court can take judicial notice" of "*some* of" these exhibits because "*some* of [them]" are "publicly available materials, such as SEC filings and earnings call transcripts referenced in the Complaint."  Mot. 5 n.1.  Defendants' tactics should not be tolerated.

"While [a] court may take judicial notice of facts at any stage of the proceedings, . . . 'it should be done sparingly at the pleadings stage.  Only in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case at that point.'" *Reneker v. Offill*, 2010 WL 1541350, at *5 (N.D. Tex. Apr. 19, 2010) (citing Fed. R. Evid. 201(f)).   While documents incorporated by reference in a pleading may be considered, "they are not allegations and, therefore, need not be assumed true for purposes of a 12(b)(6) motion." *Red Rock Analytics, LLC v. Apple Inc.*, 2021 WL 5828368, at *5 (W.D. Tex. Dec. 8, 2021).  Here, the fact that "some of" Defendants' exhibits are "public records" does not mean that the Court may consider their contents true.  *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (publicly filed SEC documents "should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents").

Defendants also rely on several attorney-generated "[c]harts," *see* Mot. Exs. 14-16, and a "[c]ompilation" of data purportedly from the Company's website, *see* Mot. Ex. 11.  But because the facts contained in those exhibits are "subject to reasonable dispute," are not "generally known," and their "accuracy" may "reasonably be questioned," Fed. R. Evid. 201(b)), they are especially inappropriate for judicial notice, particularly at the pleading stage, *see, e.g.*, *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *3 (N.D. Cal. Nov. 14, 2016) ("[B]ecause the chart in Exhibit 1 contains facts subject to reasonable dispute, the court declines to take judicial notice of it."); *PS Audio, Inc. v. Allen*, 2018 WL 5309834, at *4 n.5 (D. Colo. Aug. 10, 2018) ("[C]ourts have generally found that information or documents from private, non-governmental websites are not properly subject to judicial notice" (citing *Jaso v. Coca Cola Co.*, 435 F. App'x 346, 353 n.5 (5th Cir. 2011))).

## B.    Fuzzy Panda Is a Reliable Source

Rather than address the substance of Plaintiffs' allegations, Defendants' dismissal strategy primarily relies on discrediting Fuzzy Panda as a "biased" short seller.  Mot. 1.  But Defendants'

contention that an investigative report is inherently unreliable simply because it was written by a short seller has been repeatedly rejected. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at \*9 (W.D. Tex. Sept. 11, 2023) ("[C]ourts have found it permissible for plaintiffs to rely on short-seller reports to allege falsity at the motion-to-dismiss stage. . . . because the reliability of short-seller reports . . . is a question of fact that the Court cannot resolve at this time." (collecting cases)); *In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at \*8 (W.D. Tex. May 11, 2023) (noting reliability of investment analyst report raises fact issue that cannot be decided on pleadings); *Handal v. Tenet Fintech Grp. Inc.*, 2023 WL 6214109, at \*12 (E.D.N.Y. Sept. 25, 2023) (rejecting argument that "publications of a short seller" are "unreliable" and holding "the truth or accuracy" of the reports "are factual disputes not appropriate for resolution at this stage"). This is especially true when, as here, the allegations include corroborating facts. *See Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 668 (M.D. Tenn. 2022) ("[I]f pleaded with sufficient context attesting to their credibility, [short-seller reports] can appropriately be relied upon in a complaint.").

### C.    Plaintiffs Have Adequately Alleged Materially False and Misleading Statements and Omissions

To plead falsity, a plaintiff must "identify each allegedly misleading statement with particularity and explain why it is misleading." *Lormand*, 565 F.3d at 239. "'[A] duty to speak the full truth arises when a defendant undertakes a duty to say anything'" and, once defendants speak, "they ha[ve] a duty to disclose a 'mix of information' that is not misleading." *Id.* at 249. "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Id.* at 248.

The materiality of a challenged statement "is a mixed question of law and fact . . . usually left for the jury" to resolve. *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996). Thus, dismissal is not warranted "unless the misrepresentations are 'so obviously unimportant to an

- 10 -

investor that reasonable minds cannot differ on the question of materiality.'" *Prause v. TechnipFMC, PLC*, 2019 WL 1211428, at *5 (S.D. Tex. Jan. 18, 2019) (quoting *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004)).  Plaintiffs have adequately pled falsity.

### 1. Defendants' "Business Culture" Statements Are Actionable

Throughout the Class Period, Defendants repeatedly assured investors through the Company's Code of Conduct and ESG Reports—which were published on the "Investors" page of Globe Life's website—that the Company conducted business "***with integrity and in accordance with the highest ethical standards***," "never" sought "competitive advantages" "through unethical or illegal business practices," and was "committed to maintaining a business atmosphere and work environment based on ***honesty, fair dealing and sound business ethics***."  ¶¶178, 179, 188.  Globe Life's ESG Reports also included specific representations to investors that "***[v]iolence and threatening behavior are not permitted***" and that the Company "***prohibits and will not tolerate any such discrimination or harassment***."  ¶¶180-84.  The materiality of these statements is made clear by Defendants' own admissions.  During an earnings conference call for analysts and investors, for example, Darden stated:  "***We take seriously any allegations brought to our attention concerning harassment, inappropriate conduct or unethical business practices, and we do not tolerate such behavior***. . . . I want to emphasize that ***at Globe Life, we strive to act in accordance with the highest level of ethics and integrity at all levels of our organization***."  ¶194.[2]

In truth, AIL's agencies routinely committed insurance fraud without corrective action being taken by AIL or Globe Life, which ignored the unethical business practices.  *See, e.g.*, ¶80. As reported by a former AIL Vice President, "on numerous occasions [he] escalated [to senior

---

[2]    Defendants made several other similar business conduct-related statements that Plaintiffs allege were materially false and misleading.  *See* ¶¶178-94.  Those statements are actionable for the same reasons as discussed herein.

management] the unethical and potentially illegal sales practices," but was told that they "did not want to hear about instances of fraud and specifically told him to stop bringing it to their attention." ¶295. Such conduct by senior managers is the antithesis of maintaining a culture of accountability. *Contra* ¶185 ("We believe in the importance of maintaining a culture of accountability.").

AIL's agents regularly used dishonest, coercive, and manipulative means and representations to sell policies to unsuspecting and vulnerable customers. *See, e.g.*, ¶¶106-11. Additionally, AIL's workplace environment was rife with sexual harassment and discrimination, assault, abusive behavior toward its agents, and drug and alcohol abuse and violence, all of which were covered up or consciously ignored by management while the Company's top agents were being sued in courts across the country. *See, e.g.*, ¶¶127, 143, 174. Globe Life also was the subject of an EEOC investigation regarding alleged sexual harassment, which ultimately revealed that "high-level management officials and others against whom multiple reports of sexual harassment and assault have been made have continued to work for [Globe Life] even after such reports and have not been subject to appropriate corrective action." ¶143 (citing Compl. Ex. 2 at 5). The EEOC confirmed that Globe Life "does not maintain any reasonable avenues for reporting sexual harassment or discrimination or obtaining remedial action regarding such conduct," and the Company "engaged in conduct reasonably likely to *deter, and that has deterred*, female employees from making sex harassment and other discrimination complaints," such as "engaging in threats and other retaliatory adverse actions, active discouragement of complaints, failing to act on complaints, refusing to make postings of Title VII rights *because doing so is deemed inconsistent with [the] workplace 'culture' [of Globe Life]*." ¶174 (alterations in original).

Defendants argue that "[c]ourts in the Fifth Circuit consistently hold that statements about business ethics, such as those in a code of conduct, are 'aspirational'" and therefore inactionable.

Mot. 13.  Not so.  Numerous courts within the Fifth Circuit have held such statements actionable when they "could be found to contain material representations and there is nothing vague or merely optimistic about them."  *Brody v. Zix Corp.*, 2006 WL 2739352, at *5 (N.D. Tex. Sept. 26, 2006); *see also In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 587 (W.D. Tex. 2022) ("[W]hen there are differences between the image projected by the speaker and the reality on the ground, especially when an utterance is repeated, the alleged statement can be considered misleading."); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111516, at *10 (S.D. Tex. Mar. 27, 2019) (statement material when truth "conflicted with what a reasonable investor would take from the statement itself").  Courts have also upheld statements concerning a company's general "fundamental policy . . . to conduct its business with honesty and integrity in accordance with the highest legal and ethical standard."  *Nykredit Portefolje Admin. A/S v. Propetro Holding Corp.*, 2021 WL 9037758, at *24 (W.D. Tex. Sept. 13, 2021).

Other courts have likewise upheld virtually identical statements pertaining to codes of conduct.  For example, in *In re Signet Jewelers Ltd. Securities Litigation*, the plaintiff challenged statements in Signet's codes of conduct and ethics "published on Signet's website" that stated Signet was "committed to a workplace that is free from sexual, racial, or other unlawful harassment[.] . . . Abusive, harassing, or other offensive conduct is unacceptable."  2018 WL 6167889, at *9 (S.D.N.Y. Nov. 26, 2018) (alterations in original).  In denying defendant's motion to dismiss, the court expressly noted that, "[w]hile generalized, open-ended or aspirational statements do not give rise to securities fraud (as mere puffery), ***statements contained in a code of conduct are actionable where they are directly at odds with the conduct alleged in a complaint*****.**"  *Id.* at *17; *see also City of Ft. Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 683 F. Supp. 3d 120, at 134 (D. Mass. 2023) (finding code of conduct statement

- 13 -

"not 'aspirational'" because "it describes with specificity a course of conduct that Pega promised to abjure"); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (finding company's "repeated assertions about its strong ethical standards" actionable when they "stand in stark contrast with" reality).  Regardless, the materiality of Defendants' code of conduct statements is a fact issue that should not be decided at this stage.  *See, e.g.*, *Kapps*, 379 F.3d at 216.

Defendants rely heavily on *In re KBR, Inc. Securities Litigation*, but there "the alleged misrepresentations . . . merely state the indisputably true fact that KBR is 'subject to' and 'governed by' the[ relevant] laws and corporate policies."  2018 WL 4208681, at *6 (S.D. Tex. Aug. 31, 2018).  In *Linenweber v. Southwest Airlines Co.*, "Plaintiffs fail[ed] to show that Southwest's January 2017 commitment to 'ensuring that no disciplinary action will be taken against any Employee for reporting a Safety or Security occurrence or hazards' was misleading when made" because "Plaintiffs d[id] not allege that Southwest exerted pressure on mechanics around the time of Southwest's January 2017 commitment."  693 F. Supp. 3d 661, 680 (N.D. Tex. 2023).  And the magistrate's report in *Chau v. Musk*, which was subsequently adopted by the District Court, found "Plaintiffs d[id] not refute the majority of the content of the excerpted statements" and "cite[d] no authority to support the position that disagreement with the Board's characterization of its abilities rises to the level of false or misleading statements."  2023 WL 4707138, at *8 (W.D. Tex. July 21, 2023) (R. & R. adopted in part, rejected in part by *In re Tesla Inc. S'holder Derivative Litig.*, 2023 WL 6060349 (W.D. Tex. Sept. 15, 2023)).[3]

---

[3]    The challenged statements in *Jacobowitz v. Range Resources Corp.* were far more generalized than the statements at issue here.  *See* 596 F. Supp. 3d 659, 682 (N.D. Tex. 2022). And the court in *In re Plains All American Pipeline, L.P. Securities Litigation* held that the company's code of conduct statements "outline general commitments to improving safety and legal compliance.  The statements are not specific or objective factual representations, much less 'unambiguous representations' that every Plains pipeline was safely maintained or fully complied with all applicable laws and regulations."  307 F. Supp. 3d 583, 626 (S.D. Tex. 2018).

Finally, Globe Life's stock price fell by 53% on extraordinary volume in response to the Fuzzy Panda Report and trading in the Company's stock had to be halted eight times. ¶366. The severe market reaction to the Fuzzy Panda Report—which corrected the challenged statements made throughout the Class Period—further demonstrates their materiality. *See, e.g.*, *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015) (market reaction showed materiality).

### 2.  Defendants' Statements Concerning Globe Life's Financial Results Are Actionable

Globe Life repeatedly reported that AIL's Life Net Sales and Life Premium increased materially almost every quarter and annually throughout the Class Period. *See* ¶¶196-221. Defendants misleadingly attributed those increases to the success of virtual selling and recruiting, higher agent retention, increased agent counts, and the skill, quality, and hard work of AIL's agents. *See, e.g.*, ¶200 ("***The [6%] sales increase was driven by increases in agent count.***"); ¶201 ("***Strong recruitment, improvements in new agent retention, and growth in agency middle management drove solid sales growth.***"); ¶206 ("***The increase in net life sales is primarily due to increased agent count.***"); ¶208 ("***Strong recruiting, agent retention, and growth in agency middle management drove significant net sales growth.***").  These and similar statements were false because they concealed that the Company's financial results were inflated by fraudulent, deceptive life insurance sales and transactions achieved through improper consumer coercion and manipulation.  For example, Fuzzy Panda's investigation revealed that from 2019-23, ALP at sixteen or more AIL agencies that engaged in fraudulent business practices grew at 16%, while ALP declined by 0.5% per year at agencies that did not engage in such practices. ¶197.  By 2023, more than 60% of AIL's new ALP ($200 million) came from agencies committing fraud. ¶221(a).

- 15 -

Unlike in *Markman v. Whole Foods Market, Inc.*, where the complaint "d[id] not state with particularity how the sale of inaccurately weighed items contributed to the falsity of any specific financial results," 2016 WL 10567194, at *9 (W.D. Tex. Aug. 19, 2016), Plaintiffs have alleged the percentages and dollar amounts of misconduct that impacted the Company's financial results. *See* ¶¶197, 221(a).[4]  And Plaintiffs' allegations have been corroborated by two former Company insiders.  *See, e.g.*, ¶295 (quoting Dehning's affidavit stating that he reported "these same **widespread** fraudulent business practices" to Greer and Scarborough).

Defendants contend the allegation "the results were 'inflated' and 'achieved' by fraud . . . even if taken as true, does not support a Section 10(b) claim."  Mot. 16.  Defendants are wrong. Once Defendants spoke about the Company's financial condition, "they had a duty to disclose a 'mix of information' that [was] not misleading."  *Lormand*, 565 F.3d at 248-49.  Here, Defendants claimed the Company's growth was premised on legitimate sales and agent growth.  Those affirmative representations implicitly warranted that fraud was not the root cause of the Company's success.  By putting the bases of the Company's financial results at issue, Defendants were required to disclose that they were inflated by fraudulent and deceptive sales practices.  *See In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *10 (N.D. Cal. June 2, 2020) ("[W]here a party goes

---

[4]      Defendants' argument that ALP is not a financial metric reported in Globe Life's financial statements is misguided.  ALP was a term and metric used internally by AIL and Globe Life to measure agent and agency performance.  *See, e.g.*, ¶¶76, 80, 149-52.  Plaintiffs allege that ALP represented the annual premiums on life insurance policies.  ¶76 n.2.  ALP would be related to "Annualized Premium Issued" ("API"), defined as gross premium that would be received in all new policies' first year if none were cancelled or lapsed.  ¶83 n.3.  Globe Life does not publicly report API, but defines it in its SEC filings as the gross component of Life Net Sales, which nets out policies that were cancelled in the first thirty days.  *Id.*  Fuzzy Panda stated that ALP was $333 million for AIL in 2023, while AIL's reported Life Net Sales were $323 million that year. ¶196.  ALP would have impacted AIL's Life Net Sales results reported every quarter.  ¶83.

beyond describing historical results and touts specific factors driving those results, it is obligated to disclose negative information related to those factors.").[5]

That "Deloitte provided clean audit opinions from 2019 through 2023 that have not been withdrawn by the firm since the Fuzzy Panda Report" and "[t]he forensic accounting firm hired by the Company's audit committee found no evidence of fraud or misstated financial results" is wholly irrelevant.  Mot. 21.  Putting aside the fact that Defendants once again improperly go outside the pleadings, *see supra* pp. 8, 9, whatever Deloitte and a forensic accounting firm found is of no consequence to the analysis here.  *See, e.g.*, *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 987 (N.D. Cal. 2007) ("[A]n unqualified independent auditor's opinion does not absolve or shield a defendant from liability."); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (upholding securities fraud complaint on allegedly misstated financial results despite auditor's subsequent clean audit opinion).  Likewise, Defendants' assertion that "Plaintiffs' theory [is] that Deloitte and *state and federal regulators missed a massive insurance fraud* only for it to be 'uncovered' by Fuzzy Panda," Mot. 21, is demonstrably false given regulatory investigations into the Company's operations by the DOJ, SEC, and EEOC.

According to Defendants, if a "material number of agents" created "sham polic[ies] to collect commissions," this "trend" would be readily apparent in a set of vaguely defined financial metrics that Defendants cherry-pick from Globe Life's financial statements:  "other receivables," "agent debit balance," and "allowance for credit losses."  Mot. 6, 20 (citing Mot. Exs. 2-4, 6-7).

---

[5]    *See also In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) ("By attributing Syncor's success solely to legitimate practices, defendants implicitly (and falsely) warranted that there were no illegal practices contributing to that success."); *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 121, 124-25 (D. Conn. 2021) (finding statements misleading when "Defendants failed to disclose that illegal and unethical sales practices were key drivers of Alexion's financial success," even without allegations of "what impact (if any) the allegedly 'illegal' conduct had on Alexion's performance").

As an initial matter, this argument presents a factual dispute not suitable for resolution at this stage. In any event, these opaque metrics are inappropriate for judicial notice because their meaning, method of calculation, accuracy, and proper interpretation are not "generally known," cannot be "readily determined," and may "reasonably be questioned." Fed. R. Evid. 201(b). Indeed, while the Company claims that it "evaluate[s] [its] agent debit balances on a pool basis to determine the allowance for credit losses . . . [b]ased on factors considered by management," Mot. Ex. 7 at 67, it is a matter of pure speculation as to which "factors" management "consider[s]" in "evaluat[ing]" this debit "pool" to "determine" these "loss" "allowances."

In addition, contrary to Defendants' claim, the minimal allowance for credit losses of $1.2 million on $500 million of agent debit balances does not establish that AIL was not writing fraudulent policies and engaging in deceptive sales practices. Mot. 20. For example, AIL's publicly reported first year lapse rate of at least 8-9% (some lapses went unnoticed) during the Class Period demonstrates that AIL experienced historical losses on policies significantly greater than an allowance representing only 0.2% of the agent debit balances. *Id.* at 7; *see also* ¶¶115, 309. Thus, Defendants' recitation of discrete, cherry-picked metrics is incomplete, improper, and a red herring distracting from the real issue that Globe Life orchestrated a scheme of writing fraudulent policies that was covered up by assuring investors the growth was due to legitimate reasons.[6]

---

[6]    Defendants' argument that fraudulent policies would always result in a corresponding "increase" in "allowances for credit losses," Mot. 19-20, ignores that agent commissions based on fraudulent policies could go unnoticed, be clawed back by Globe Life, or even written off prior to the reserve being estimated for the allowance for credit losses. This could explain how Globe Life would steadily report an "allowance for credit losses" of either $1 million or $1.2 million each year from 2019 to 2023 even though the Company grew its sales (through fraudulent practices), agent counts, and "agent debit balances" during the Class Period. ¶¶196, 228; Mot. 6.

Even construing these self-serving metrics in Defendants' favor (contrary to Rule 12(b)(6)), Defendants' premise is faulty because it assumes that fraudulent policies would lapse *before* an agent's debit balance was repaid, thereby causing a "significant increase in policy lapses" and a commensurate increase in "allowance for credit losses." Mot. 6, 20. But whereas "[a]gent debit balances" are "generally" "repaid to the Company" in "one year," Mot. Ex. 7 at 67, the Complaint alleges that "agents were able to create scores of fictitious policies that went unnoticed *for years*," ¶¶115, 309, and that when customers tried to cancel unauthorized policies, the Company thwarted their efforts and often refused to cancel those policies *for years*, ¶328.[7]

### 3.   Defendants' Privacy Statements Are Actionable

Defendants stated in hypothetical terms that "[n]oncompliance with any privacy laws, whether by us or by one of our business associates *could* have a material adverse effect on our business." ¶222. While framing the risk as a mere possibility, Defendants omitted that several of AIL's largest agencies had already violated and continued to violate privacy laws (by giving agents unauthorized access to CAS), which affected the Company's business operations and artificially inflated its results or operations and placed Globe Life at risk for liability. *See* ¶¶222-23; *see also* ¶103 ("[A]t AIL, managers had access to the customer management system ('CAS'), which contained social security numbers and other sensitive data concerning existing policyholders. Fuzzy Panda revealed that 'favored salespeople' were purportedly given access to the system and used that improper access to create new insurance applications.").

---

[7] That "[t]here has been no restatement of Globe Life's financials, no write downs, and no finding of a material weakness in internal controls," Mot. 21, is irrelevant. *See Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at \*19 (N.D. Ill. Apr. 18, 2022) ("'While a restatement of financials is further evidence of materiality' in a Rule 10b–5 falsity claim, that does not mean that a restatement is *required* to show falsity." (citation omitted)).

Such disclosures were false because they presented the risk of a material adverse effect on the Company's business as hypothetical when that risk had ***already*** materialized.  *See, e.g.*, *Propetro*, 2021 WL 9037758, at \*17 (finding warnings about adequacy of internal controls misleading when "'risk' warned of had already come to pass").[8]

### 4. Defendants' Agent Recruitment and Retention Statements Are Actionable

According to the Company, Globe Life's agent count is a "leading indicator for sales yet to come," and thus the "[d]evelopment and retention of producing agents are critical to support sales growth."  ¶59 (alteration in original).  During the Class Period, Defendants repeatedly disclosed Globe Life's quarterly average producing agent count in the Company's SEC filings and discussed the importance of recruiting and retaining agents.  *See, e.g.*, ¶232 (Svoboda:  Globe Life had "***really focused on the training and retention of our new agents***.  So I think it's a long-term business model that works."); ¶237 ("Hutchison attributed the Company's increased sales to '***increased productivity***,' in its agency force, and remarked that the Company was '***providing additional sales technologies to support our agents***.'"); ¶245 (Darden:  "***So we feel very positive about where our agent growth is going, and then how we grow our sales is just having more agents***.  So that agent growth is just a leading indicator to the sales that are going to come."); ¶246 (Darden attributed the growth to the Company being "'***really focused on growing our middle management count, [and] putting more tools in the hands of our agent managers***.'").

Those agent count statements were reflected in Globe Life's stock price.  ¶59.  As with the Company's financial results, Defendants concealed the true drivers of agent count growth.  Once

---

[8]    Defendants argue that the risk factor disclosure statements should be dismissed as forward-looking.  *See* Mot. 23 n.11.  Defendants are wrong.  *See Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1179 (S.D. Fla. 2005) ("If Plaintiffs['] allegations are proven true, then the risk disclosures contained within the IPO materials would [be] inadequate, since the risk disclosures would purport to be forward-looking when in fact the risks were already present.").

Defendants discussed the agent counts and their impact on Globe Life's business, they were required to disclose that the increased agent counts were not due to factors like "continual" and "better training," "increased productivity," "additional [sales] tools," or new "sales technologies," ¶¶77-78, 237, 240, 245-48, as they claimed, but rather to an undisclosed pyramid-like scheme that condoned fraudulent business practices and emphasized (and compensated for) recruiting more agents than selling insurance and rewarding recruiting fraud.[9]  As Fuzzy Panda reported, "that's what they always told us.  We're a recruiting company that happens to sell insurance," citing an AIL Vice President who worked out of Globe Life's headquarters.  ¶¶69-70.  This was never explained to investors, who were told—falsely—that Globe Life's "methodology processes" to recruit and train individuals with no sales or insurance experience to "get them up training and selling" was the catalyst for the Company's increased agent growth and sales.  ¶¶246-48.

Defendants' argument that "Fuzzy Panda does not provide any of the details that are necessary to credit allegations from confidential sources" also fails.  Mot. 25.  All that is required is that "such sources must be described 'with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded.'"  *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (ellipsis in original).  Fuzzy Panda described its sources with particularity and identified several of them, including Dehning, who stated "[w]e're a recruiting company that happens to sell insurance" but later confirmed that the Company's business model was a "pyramid scheme."  ¶¶69, 159.  This is unlike *Ng v. Berkeley Lights, Inc.*, where the complaint "entirely relie[d] on the self-interested short-seller's *own* assertions that the characterizations passed on by the witnesses were

---

[9]    Plaintiffs' allegations that the Company engaged in "recruiting fraud," ¶¶70, 248(a), do not require Plaintiffs to allege precisely "'what the correct' agent counts purportedly were," Mot. 24.

credible" and the allegations "include[d] no particularized details about these former employees' job titles or period of employment" and did not "provide details establishing that any of the witnesses had routine interactions with the Beacon or firsthand knowledge of facts contradicting BLI's executives' public statements."  2024 WL 695699, at *9 (N.D. Cal. Feb. 20, 2024).

### 5.     Defendants' SOX Certifications Are Actionable

In Globe Life's annual and quarterly reports, Hutchison, Coleman, Svoboda, Darden, and Kalmbach signed SOX certifications stating that  the filings "do[] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that the Company's reported information "fairly present in all material respects the financial condition, results of operations and cash flows of the registration as of, and for, the periods presented in this report."  ¶¶249-50.  Those representations were false because Defendants knew that Globe Life's agents were engaged in widespread fraudulent sales practices and the Company's stated financial condition was inflated by those practices, *see infra* §IV.D.  *See also Propetro*, 2021 WL 9037758, at *21 (finding SOX certifications false when complaint alleged "management was well aware of the extensive" bribery scheme and citing with approval *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 380-81); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("For [SOX] certifications to have any substance, signatories to the certifications must be held accountable for the statements.").

Defendants contend that the SOX certifications are not actionable because, they claim, "Plaintiffs fail to allege Globe Life's financial statements and reported agent counts were false and misleading."  Mot. 26.  This argument fails for the reasons discussed above.  *See supra* 15-19, 20-21.  Similarly, Defendants' contention that "the Complaint does not allege facts showing that the Individual Defendants who signed the certifications were aware of any supposed misstatements in

- 22 -

Globe Life's Form 10-Qs or Form 10-Ks when they certified that the reports were accurate to the best of their knowledge," Mot. 26, should be rejected because Plaintiffs have readily pleaded Defendants' scienter, *see infra* §IV.D.

Defendants further assert that Plaintiffs' "assessment statements regarding internal controls on financial reporting"—which were included in the "Management's Report on Internal Control over Financial Reporting" section of the Forms 10K, ¶¶254-55—are inactionable because "compliance issues do not implicate Globe Life's financial reporting." Mot. 26. Not so. Globe Life's SEC filings expressly acknowledge that the Company "utilized the 'Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission [("COSO")]' to assess the Company's 'internal control over financial reporting.'" ¶252. COSO emphasizes that "internal control is *not* solely about accounting and financial matters. Compliance with laws and regulations is one of the three fundamental objectives of an organization's system of internal controls." *Id.*[10]

Because Globe Life's control environment was ineffective, destructive, and pervasively lacking due to fraudulent sales practices, the illegal use of private consumer information, recruiting fraud, and the Company's toxic culture (and because Globe Life had no systems in place that were designed to proactively identify fraud or address sexual harassment), this lack of internal controls and ineffective control environment exposed the Company to material fines, reputational risk, and civil and criminal liability, many of which have manifested, as evidenced by the SEC, DOJ, and EEOC investigations and EEOC Determinations. Accordingly, Defendants' certifications attesting to the sufficiency of the internal controls over financial reporting are actionable. *See,*

---

[10]    Those "fundamental objectives" include: "Compliance Objectives, which 'pertain to adherence to laws and regulations to which the entity is subject.'" ¶252.

*e.g.*, *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at \*10 (D.N.J. Dec. 6, 2018) ("SOX certifications are typically actionable . . . when there is an allegation that the internal controls within a company were deficient.").[11]

### D.    Plaintiffs Allege a Strong Inference of Scienter

Scienter entails either "an intent to deceive, manipulate or defraud" or "severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Kohut v. KBR, Inc.*, 2015 WL 11995250, at \*10 (S.D. Tex. Sept. 3, 2015). Courts must consider scienter allegations "***holistically***" and may not "scrutinize each in isolation." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007) (emphasis added). Allegations will suffice "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. The inference "need not be irrefutable . . . or even the 'most plausible of competing inferences.'" *Id.* Rather, "allegations of circumstantial evidence . . . justifying a strong inference of scienter will suffice." *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, 2004 WL 5278716, at \*11 (E.D. Tex. June 16, 2004).[12]

---

[11]    SOX "is not directed solely at ensuring numerical accuracy and preventing dishonest accounting practices." *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 419 (D. Del. 2009). "Any interpretation restricting its scope to these purposes would be artificially narrow and inconsistent with the remedial purpose of the statute. . . . [T]he SEC interprets 'fair presentation' of financials to include '***any additional disclosure*** necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition.'" *Id.* (emphasis added).

[12]    Plaintiffs need not reference Company documents or cite to statements by confidential informants because "pleading securities fraud do[es] not require a plaintiff to plead evidence." *Budde v. Glob. Power Equip. Grp., Inc.*, 2018 WL 4623108, at \*4 (N.D. Tex. Sept. 26, 2018).

### 1.    Testimony from Company Insiders Supports Scienter

Allegations from the *Dehning* and *Zinsky* actions support a strong inference of scienter.

According to Dehning, "fraud was a serious and on-going problem" at AIL:

> I noticed that fraud was a serious and on-going problem that was not being
> adequately handled by AIL.  I was troubled not just by the number of instances of
> fraud, nor by the variety of sources of the fraud, but by the lack of response by AIL.
> What I found most astonishing was the fact that ***AIL did not consider the
> widespread fraud to be a significant issue that needed [to be] addressed
> appropriately.***

¶¶7, 113.  The Dehning Affidavit also explains that when Dehning raised the issue of sexual

harassment with senior Company officials including Defendants Greer and Scarborough (thus

demonstrating their knowledge of the problem), Greer and others "admonished and berated" him

and told him "to shut up, to sit down, and to stop bringing it up."  ¶123.  Dehning encountered

similar behavior when he raised the issue of the pervasive insurance fraud.  ¶295 (Greer and

Scarborough (among others) "did not want to hear about the instances of fraud and specifically

told [him] to stop bringing it to their attention").  *See SolarWinds*, 595 F. Supp. 3d at 584 ("An

egregious refusal to investigate may give rise to an inference of recklessness.").[13]  This account

from a well-placed internal source is at odds with challenged statements, including that "[w]e

believe in the importance of maintaining a culture of accountability."  ¶185.  By any measure,

high-level managers imploring an employee to "stop bringing" allegations of widespread fraud "to

their attention" is the antithesis of "maintaining a culture of accountability."

In addition, Russin agreed to testify to certain "stipulated facts" concerning his

employment with AIL.  *See generally* Compl. Ex. C.  According to the Zinsky-Russin Stipulation,

---

[13]    Because "[t]he conscious avoidance of knowledge constitutes sufficient scienter under the
federal securities laws," *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 493-94 (S.D.N.Y.
2002), one cannot "escape liability for fraud by closing [ones] eyes to what [one] saw and could
readily understand," *SEC v. Frank*, 388 F.2d 486, 489 (2d Cir. 1968).

Russin was prepared to testify to his awareness "of instances in which AIL agents . . . may have performed unethical and/or fraudulent sales practices, including "[a]gents paying for policies from their own pockets" and "[t]aking confidential information from CAS [a customer data system] to write new policies." ¶9. Russin was prepared to testify that "AIL was aware of . . . '[u]nwelcomed sexual comments toward subordinate female agents,'" that he engaged in and witnessed alcohol and drug use by sales agents at Arias during the typical workday, and that AIL managers and business leaders used language (and behaved in a manner) that could be seen as lewd and offensive. ¶141. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 693 (S.D. Tex. 2002) (scienter "partially satisfied by allegations of a regular pattern of related and repeated conduct"). Dehning began reporting fraud at least as early as 2021, ¶295, and the Company discovered Zinsky's allegations that same year, ¶194. Defendants continued to attribute growth to nonfraudulent activities, with Hutchinson emphasizing that "***[t]he increase in net life sales is due to increased productivity***" during Globe Life's February 3, 2022 earnings call. ¶216.

Defendants contend that the *Dehning* and *Zinsky* actions do not support the inference of scienter because they are unsubstantiated "allegations." Mot. 34. But it is well-settled that a securities plaintiff may rely on facts recounted in complaints filed by other private litigants. *See, e.g.*, *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *6 (S.D.N.Y. Jan. 21, 2021) ("Defendants are incorrect to assert that Plaintiffs may not rely on facts pleaded in outside litigation."); *In re AGNC Inv. Corp.*, 2019 WL 464134, at *7 (D. Md. Feb. 6, 2019) ("Defendants have identified no controlling authority barring consideration of allegations derived from a complaint in another case.").[14]

---

[14]    The fact Dehning lost his lawsuit against AIL (AIL lost its counter-suit against Dehning, too) and Zinsky dismissed her case is irrelevant. *See* Mot. 34. This argument was rejected in *Developer's Mortgage Co. v. TransOhio Savings Bank*, where the defendant argued that the court

## 2.    The Consumer Complaints Support Scienter

Plaintiffs allege numerous complaints by consumers to the BBB, FTC, and state insurance departments, among others, ¶¶322-49, which further support a strong inference of scienter—particularly since the Company has conceded that it "monitor[ed] digital and social media channels to track customer feedback," ¶¶190-91.  *See In re Fleming*, 2004 WL 5278716, at \*11 ("[T]he requisite strong inference of fraud may be established where the complaint sufficiently alleges that the defendants . . . knew facts ***or had access to information*** suggesting that their public statements were not accurate." (emphasis added)).

Setting aside that Mitchell and Scarborough signed a consent decree acknowledging AIL misconduct, ¶310, the inference of scienter is particularly strong given the widespread nature of the activity encompassed by those complaints.  *See, e.g.*, *In re Toronto-Dominion Bank*, 2018 WL 6381882, at \*13 ("It appears from those allegations that these activities were widespread—and therefore widely known.").  Moreover, the volume of complaints corroborates the fraud exposed by Fuzzy Panda.  *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058 (C.D. Cal. 2008) ("Corroboration from multiple sources also supports an inference of scienter.").

While Defendants claim these averments outline "isolated misconduct" or "[a] scattershot of complaints," Mot. 35, any fair reading of the Complaint belies that characterization.  The consumer complaints are neither "isolated" nor "random" and the Complaint describes the types of fraudulent practices at issue at a Globe Life subsidiary that was the single-most important contributor to the Company's operations.  The BBB complaints reference, among other items:

---

should treat allegations related to a separate complaint "as null" because the related complaint had been dismissed.  706 F. Supp. 570, 592 (S.D. Ohio 1989) ("A court may dismiss a case for any number of reasons . . . . Dismissal of the prior case would be relevant ***only*** if [the defendant] can show that the . . . . dismissal of the case had collateral estoppel effect in this case.").  Defendants do not attempt to make such a showing.

(a) opening multiple unauthorized policies without a customer's knowledge or consent; (b) refusing (and obstructing and delaying) customers' repeated requests to cancel their policies; and (c) continuing to auto-draft customers' bank accounts for unauthorized premium payments for months (or years) after customers had requested to cancel their policies.  ¶325.  AIL knew about these complaints and issued responses.  ¶324.

Consumer complaints made to the FTC similarly detail how "AIL had opened unauthorized policies or increased their premiums without those customers' knowledge or consent," ¶335; that "Globe Life had taken unauthorized (fraudulent) bank drafts from [customers'] bank accounts," ¶337; and that AIL is an 'MLM Scheme' and a '[P]onzi/pyramid scheme,'" ¶339.  These unethical business practices were brought to the attention of multiple state departments of insurance, which similarly corroborate Fuzzy Panda's allegations by revealing that customers were unable (despite repeated efforts) to cancel their policies, that customers' coverages and premiums were increased without authorization, and that as a result, AIL made unauthorized (fraudulent) withdrawals from customers' accounts.  ¶340; *see also* ¶341 (listing multiple complaints about AIL's delays in canceling policies).  Darden admitted that the Company was aware of the allegations in *Zinsky*, ¶145, and (falsely) assured investors that *any* unethical and inappropriate conduct reported to the Company was addressed: "***We take seriously any allegations brought to our attention concerning harassment, inappropriate conduct or unethical business practices, and we do not tolerate such behavior***," ¶194 ("We have processes in place to address such concern when we learn of them."). *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("Recklessly turning a 'blind eye' to impropriety is . . . culpable conduct.").

### 3.    The Fuzzy Panda Report Supports Scienter

"Courts routinely credit analyst and investor reports like those at issue here, ***even those of short-sellers***, as sufficiently reliable for allegations of scienter against a company." *In re*

*Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014) (emphasis added). Here, Fuzzy Panda interviewed dozens of former executives and agents, uncovered an executive-level whistleblower, and engaged undercover agents to learn about AIL's recruiting process. Through those extensive efforts, Fuzzy Panda uncovered numerous facts showing that AIL had knowingly engaged in widespread insurance fraud, while encouraging a culture of sexual harassment and abuse. *See, e.g.*, ¶¶18-19, 68-70, 80, 94, 102-03, 116-18, 127. According to Fuzzy Panda, Dehning sent more than 200 emails detailing fraud to Company executives, ***including to Greer and Scarborough***, further showing their scienter. ¶147.[15] Fuzzy Panda also uncovered more than sixteen AIL agencies with fraudulent insurance issues. ¶148. And, Fuzzy Panda further reported that AIL sales teams alleged to have committed insurance fraud accounted for more than $200 million of AIL's new ALP in 2023, which was more than 60% of AIL's total new business. ¶147.

Fuzzy Panda also exposed AIL's corporate culture of widespread drug use and sexual misconduct and highlighted the numerous lawsuits brought by former agents against AIL and several of its largest captive sales teams detailing a hostile work environment. ¶¶120-23, 132, 155-59. The "recurring . . . nature" of these "severe and pervasive problems" strengthens the scienter inference. *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 961, 970 (N.D. Cal. 2014).[16]

---

[15]    Indeed, Scarborough "told Dehning to 'stop talking to your friend(s),' about the fraudulent business practices, a reference to insurance regulators in Michigan." ¶294. Fuzzy Panda also reported that Greer witnessed firsthand some of the disturbing office and work event conduct as he frequently visited the Arias Organization office and attended work-related events. ¶156.

[16]    To defeat Plaintiffs' inference of scienter, Defendants must put forward an inference "***at least as likely as*** any plausible opposing inference." *Tellabs*, 551 U.S. at 311 (bold emphasis added). Here, there is no reasonable basis for an inference that Defendants were unaware of the Company's numerous continuing violations and misconduct, and the totality of the allegations supports a finding of scienter at least as compelling as any other opposing inference. *See Bond*, 587 F. Supp. 3d at 677 (finding scienter when it was "highly implausible for [defendants] to have remained in the dark about so widespread an issue").

- 29 -

### 4. The Individual Defendants' Executive Compensation and Insider Trading Supports Scienter

An executive's motive to boost his or her compensation can further the inference of scienter. *See Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 215 (5th Cir. 2023) ("[P]erformance-based compensation can establish motive in circumstances 'when the potential bonus is extremely high and other allegations support an inference of scienter.'" (citation omitted)).

Here, AIL's financial performance was the single-largest driver for Globe Life's underwriting margin and net operating income and, in turn, the Individual Defendants' compensation. *See* ¶¶51-52, 55-57 (AIL was Globe Life's largest contributor to revenue and underwriting margin); ¶¶271-75 (the Individual Defendants were granted performance share awards and Coleman, Hutchison, Svoboda, Pressley, Darden, Kalmbach, Greer, and Mitchell's bonuses were directly (or solely) impacted by AIL's financial performance). For example, in 2019, Coleman and Hutchison each received performance-based bonuses of approximately $1.5 million, 140% of their base salaries. ¶272. Many of the Individual Defendants' bonuses in 2020-23 were also impacted by ALI's performance, ¶273, and all bonuses were tied to AIL's financial performance and thus directly related to the wrongdoing. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261 (5th Cir. 2005) (motive found when defendant received bonus of $597,870, or 175% of annual salary); *Huang v. Higgins*, 2019 WL 1245136, at *13 (N.D. Cal. 2019) (financial motives considered as part of scienter analysis when complaint "adequately alleges a link between Defendants' compensation and specific corporate objectives").

Likewise, "[i]nsider stock sales can enhance an inference of scienter if the trading occurs 'at suspicious times or in suspicious amounts.'" *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 960 (5th Cir. 2016). "A trade is suspicious if 'sales are out

of line with prior trading practices or at times calculated to maximize personal profit.'" *Id.*  Here, the Individual Defendants sold *$160 million* in Globe Life shares through a series of strategically timed sales.  ¶276.  In many instances, the Individual Defendants' Class Period stock sales represent a significant departure from their sales in the time period preceding the Class Period (the "Control Period").  *See* ¶¶276-84.  Indeed, several of the Individual Defendants (Kalmbach, Greer, and Haworth) did not report any stock sales during the Control Period.  *See* ¶¶281, 282, 284.  Accordingly, Defendants' argument that the "Complaint does not show that the sales during the Class Period were a 'significant departure' from the sales during the Control Period," Mot. 32, is false.  *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 839 n.4 (N.D. Cal. 2014) (inferring scienter when plaintiffs "analyzed the trading by the individual Defendants during the Class Period and during the equal-length period immediately preceding the Class Period").

Defendants' contention that "[t]he Complaint does not offer any such allegations to show that the sales were consistent with knowing or reckless fraud" fares no better.  Mot. 32. Collectively, the Individual Defendants sold over *$160 million* of their Globe Life stock during a time they knew of or recklessly disregarded the fraud at AIL and rampant violations of the Company's Code of Conduct.  ¶¶20, 30-38, 276-85; Compl. §VI.C.  *See City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, 2013 WL 1100819, at *5 (W.D. La. Mar. 15, 2013) (stock sales at inflated prices indicated scienter).  That Darden and Scarborough may not have sold stock does not defeat an inference of scienter.  *See, e.g.*, *Schlagal v. Learning Tree Int'l*, 1998 WL 1144581, at *17 (C.D. Cal. Dec. 23, 1998) ("Numerous courts have upheld scienter allegations under the Reform Act where some but not all defendants traded." (collecting cases)).

### 5.    Plaintiffs' Additional Allegations Further Support Scienter

Plaintiffs also allege the fraudulent and unethical business practices at AIL, Globe Life's largest subsidiary, ¶57 (noting 51% of the Company's life premiums originate from AIL),

contribute to a strong inference of scienter, ¶¶262-69.  Under the core operations theory, a combination of factors can "tip the scales" to support an inference of scienter.  *Six Flags*, 58 F.4th at 219; *Diodes*, 810 F.3d at 959.  The relevant factors include:  (1) company size; (2) whether the matter at issue was "critical to the company's continued vitality"; (3) whether the misrepresented or omitted information "would have been readily apparent to the speaker"; and (4) whether defendant's statements "were internally inconsistent."  *Six Flags*, 58 F.4th at 219.

It is wrong to suggest that the core operations doctrine only applies when all factors are present and, contrary to Defendants' assertion, *see* Mot. 29, Globe Life's size does not preclude its application.  *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 484 (S.D. Tex. 2016) ("[T]here is no bright-line [core operations] rule based on the company's size . . . [and n]o one 'special circumstance' is dispositive."); *Six Flags*, 58 F.4th at 219 (size of company not dispositive).  The subject matter of the fraud, AIL, was "so important to [Globe Life's] success that 'misrepresented or omitted information at issue would have been readily apparent to the speaker[s]'" and, therefore, the omission "contribute[s]" to an inference of scienter.  *Six Flags*, 58 F.4th at 219.

That AIL was "critical to the company's continued vitality" is evidenced by the fact that most of Globe Life's profits originated from AIL's operations as the Company's "largest contributor."  *See* ¶263 (from 2019 to 2023 AIL accounted for between 46% and 52% of Company's underwriting margins).  The critical importance of AIL's revenue stream strengthens the inference that Defendants understood, or were severely reckless in not understanding, its practices before speaking on the subject.  *See LHC Grp.*, 2013 WL 1100819, at *4 (holding "the vast importance of Medicare to LHC's business" supported "a strong inference that [the CEO] was aware that the company was inflating its reported financial results through abusive practices").  And, unlike in *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 699 (S.D. Tex. 2013), the

"information at issue" was "readily apparent" to Defendants here, *see, e.g.*, ¶¶87, 198, 205, 214, 234-36, because they spoke to analysts about the details of AIL. *Six Flags*, 58 F.4th at 219; *see also In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("Logically, defendants in their positions would be expected to have knowledge of the facts regarding . . . portfolio monitoring at the time they were making statements about the portfolio.").

Additionally, "the government investigation can be seen as one more piece of the [scienter] puzzle." *Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, 2021 WL 1416025, at \*12 (S.D. Tex. Apr. 14, 2021). That is especially true here because ***the EEOC determined*** that Globe Life "***deliberately*** misclassif[ied] its employees as independent contractors" and engaged in a host of unlawful employment practices, including subjecting its agents "to a hostile work environment," "quid pro quo harassment," "threats and demotion, or alternatively, constructive demotion" on the basis of sex, and "retaliation for protected activity." ¶13; *see also* ¶14.[17]

The Company's previously unannounced—and hastily arranged—buyback that authorized the repurchases of up to $1.3 billion of stock was designed to—and did—stop the bleeding associated with the decline in the Company's stock price following the release of the Fuzzy Panda Report and further adds to the scienter inference. ¶¶358-59. *See In re Countrywide Fin.*, 554

---

[17] Plaintiffs are not required to allege the outcome of the DOJ and SEC investigations. *See Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 630 (S.D. Tex. 2022) (noting existence of ongoing government investigation is "relevant to the holistic view" (collecting cases)); *see also Eastwood Enters., LLC v. Farha*, 2009 WL 3157668, at \*4 (M.D. Fla. Sept. 28, 2009) ("Courts commonly hold that ***pending government investigations are relevant*** and provide notice of a possible fraud." (emphasis added) (collecting cases)). Defendants' citations support that government investigations are relevant to the scienter analysis, notwithstanding the fact that they do not, alone, meet the standard for scienter. *See Carlton*, 184 F. Supp. 3d at 479-80; *Konkol v. Diebold, Inc.*, 590 F.3d 390, 402 (6th Cir. 2009). Additionally, the timing of the regulatory investigations into the Company's wrongdoing supports scienter given the SEC commenced its investigation after the release of the Fuzzy Panda Report. *See In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ("That the SEC and DOJ initiated investigations [after the Class Period] provides additional support for finding that scienter has been adequately pleaded.").

F. Supp. 2d at 1068 (timing of buyback "could properly be viewed as an attempt to keep the ball rolling—i.e. to propel the Company forward (steadying the stock price, or sending it upward) for a period of time before the weight of the [undisclosed illicit] practices began taking its toll on the Company's operations and the value of its stock").

Finally, given the Company's weak internal controls, the SOX certifications signed by Defendants Coleman, Hutchison, Svoboda, Darden, and Kalmbach (Compl. §V.E) contribute to the strong inference of scienter. *See, e.g.*, *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 724 (W.D. Tex. 2010) (SOX certifications "contribute[d] significantly to a strong inference of scienter" given the presence of "substantial red flags"); *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018) ("[W]eak internal controls will support an inference of scienter." (collecting cases)). The Complaint alleges that Globe Life's internal controls were "ineffective, destructive, and pervasively lacking due to fraudulent sales practices, 'recruiting fraud,' and the Company's toxic culture." ¶256. Nevertheless, these Defendants represented that Globe Life utilized and evaluated criteria for effective internal controls. ¶¶254-56. Globe Life's choice "not to implement adequate internal controls reinforces the inference that it was intentionally engaged in the fraudulent course of conduct described." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19-20 (D. Mass. 2004). Likewise, the Complaint's "facts establish[] that the officer who signed the certification had a 'reason to know, or should have suspected, due to the presence of glaring . . . "red flags," that the financial statements contained material misstatements or omissions.'" *Shaw Grp.*, 537 F.3d at 545.

**E.    The Complaint Sufficiently Alleges Scheme Liability**

"Rule 10b-5(a) and (c) scheme liability claims 'recognize that because conduct itself can be deceptive, a defendant may incur primary liability for securities fraud without making or using an oral or written statement.'" *SEC v. Verges*, 716 F. Supp. 3d 456, 466 (N.D. Tex. Feb. 9, 2024).

Scheme liability "capture[s] a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019). A defendant is liable under Rule 10b-5(a) and (c) when its conduct or role in the scheme had "the purpose and effect of creating a false appearance." *Verges*, 716 F. Supp. 3d at 466; *see also SEC v. Mapp*, 2017 WL 5230358, at \*7 (E.D. Tex. Nov. 9, 2017) (Mazzant, J.) (same). "[S]cheme[s] to artificially inflate or deflate stock prices" constitute deceptive conduct under Rule 10b-5(a) and (c). *Enron*, 235 F. Supp. 2d. at 579.

To plead scheme liability, a plaintiff must allege facts supporting a reasonable inference that a defendant "(1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *Verges*, 716 F. Supp. 3d at 467.  Because "the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *Enron*, 235 F. Supp. 2d at 580.  The Complaint readily meets these requirements, alleging in detail the nature of Defendants' scheme to create a false appearance of Globe Life's business model, agent productivity and count, and growth in the Company's key metrics, including net life sales and premium, which had the effect of artificially inflating Globe Life's stock price and enriching the Individual Defendants. *See* Compl. §IV; ¶¶388-94 (Count II).

Defendants' claim that "Plaintiffs focus exclusively on misstatements" is misplaced. Mot. 39.  In addition to false and misleading statement liability under subsection (b) of Rule 10b-5, Plaintiffs have alleged a fraudulent scheme in connection with deceptive ***conduct*** implicating subsections (a) and (c), including:  (i) operating Globe Life like a pyramid scheme, ¶¶62, 64, 66-69, 78, 248(c); (ii) engaging in a wide array of fraudulent and deceptive business practices at AIL, the Company's largest subsidiary, to materially inflate Globe Life's publicly reported net life sales

- 35 -

and life premium, ¶¶80-111, 221, 196-220; and (iii) purposely concealing (and telling a former VP to stop reporting) widespread fraudulent business practices, ¶295.[18]

Defendants also assert that the alleged deceptive conduct must be "separate from the misstatements." Mot. 39. But the Supreme Court has rejected the notion that subsection (b) of Rule 10b-5 "*exclusively* regulates conduct involving false or misleading statements" because that "would mean those who [engage in deceptive conduct] with the intent to cheat investors might escape liability under the Rule altogether." *Lorenzo*, 587 U.S. at 81. And, while "the Supreme Court has carved out a path to scheme liability premised on conduct relating to [a] misstatement," deceptive conduct is also actionable when it concerns "conduct beyond the disputed statements and omissions themselves." *Yoshikawa v. Exxon Mobil Corp.*, 2023 WL 5489054, at *9 (N.D. Tex. Aug. 24, 2023).[19] As the Supreme Court has noted, there is "considerable overlap among the subsections of . . . Rule [10b-5]." *Lorenzo*, 587 U.S. at 80.

Defendants also contend that Plaintiffs "do not identify any specific deceptive or manipulative act by an Individual Defendant." Mot. 39. Not so. The Complaint alleges that seven defendants personally made false and misleading statements (*see* Compl. §V), which can form part of the basis for scheme liability. *See SEC v. Carter*, 2020 WL 6304889, at *5 (E.D. Tex. Oct. 28, 2020) (finding scheme liability violations when defendants "intentionally made, disseminated, and

---

[18]    Defendants' deceptive acts were communicated to the public through misstatements that incorporated fraudulent and deceptive metrics. ¶¶196-221. *See Yoshikawa v. Exxon Mobil Corp.*, 2024 WL 3802997, at *4 (N.D. Tex. Aug. 12, 2024) ("Plaintiffs allege sufficient facts that allow the court to infer that [the individual defendant]'s deceptive acts were communicated to the public through the development plan's incorporation into the public reports.").

[19]    Defendants cite *Verges*, 716 F. Supp. 3d at 466-67, to support their "separate from misstatements" argument. *See* Mot. 39. But *Verges*, itself, cites to *Exxon*, which expressly rejected the argument that the plaintiffs' "scheme liability claims fail because they must plead deceptive conduct beyond the misstatements." 2023 WL 5489054, at *8-9 (holding that "the scheme subsections can cover conduct that involves a misstatement even if the defendant was not the maker of it").

directed others to make and/or disseminate various materially false statements"). The Complaint further alleges deceptive and manipulative acts by non-speaking defendants Greer and Scarborough, who were personally aware of the alleged deceptive business practices yet continued to conceal them. For example, Dehning reported "widespread fraudulent business practices" and "unethical and fraudulent sales practices" directly to Greer and Scarborough, who, according to Dehning, "did not want to hear about the instance of fraud and specifically ***told him to stop bringing it to their attention***." ¶295. Neither Greer nor Scarborough made any effort "to determine why the fraud began, and what policies, procedures and/or financial controls could be installed to curb and dissuade future fraud." *Id.* These actions easily qualify as deceptive conduct. *See Lorenzo*, 587 U.S. at 79 (recognizing scheme liability "capture[s] a wide range of conduct").

Plaintiffs also plead facts supporting scheme liability as to the two other non-speaking defendants, Mitchell and Henrie. Complaints and concerns regarding violations of AIL's Code of Conduct were escalated to Mitchell and Henrie as members of Globe Life's Ethics Committee. ¶47. In violation of the Company's Code of Conduct, they remained silent about the deceptive practices at AIL that were artificially enhancing the Company's publicly reported sales and premium results, while at the same time selling Company stock at the resulting artificially inflated prices. ¶¶280, 283.[20]

---

[20] Defendants' cited case law is inapposite. The *Linenweber* plaintiffs did not "identify any fraudulent or deceptive acts by Defendants other than purportedly misleading statements." 693 F. Supp. 3d at 687. In *Coggins v. Camber Energy Inc.*, the court dismissed plaintiffs' scheme claims when plaintiffs alleged defendants had a duty to disclose the scheme but no such duty existed. 693 F. Supp. 3d 736, 752 (S.D. Tex. 2023). The allegations in *Talarico v. Johnson* were "impermissibly vague" and the complaint suffered from "impermissible" group pleading. 2023 WL 2618255, at *21 (S.D. Tex. Feb. 7, 2023).

### F.        Plaintiffs Adequately Allege Loss Causation

To plead loss causation, Plaintiffs need only provide a "short and plain statement" giving Defendants "some indication of the loss and the causal connection that [they have] in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).  Pleading loss causation "should not prove burdensome for a plaintiff." *Id.* at 347.  Allegations are sufficient if they "contain enough factual matter (taken as true) . . . to raise a reasonable hope or expectation . . . that discovery will reveal relevant evidence" of loss causation.  *Lormand*, 565 F.3d at 257 (footnote call numbers omitted).

The Complaint easily satisfies this relaxed pleading standard.  It alleges that "as a direct result of Defendants' scheme and their materially false and misleading statements and omissions," Globe Life common stock traded at artificially inflated prices, and that when the relevant truth was revealed the artificial inflation was removed and Globe Life's stock price dropped on two separate occasions.  ¶¶363-69.  The Complaint alleges that the relevant truth was revealed by the March 14, 2024 announcement of a DOJ investigation into Globe Life and the April 11, 2024 Fuzzy Panda Report.  ¶¶147-65, 364-66.  Both corrective disclosures revealed new and corrective information and caused Globe Life's share price to immediately and significantly decline (including dropping ***53% in one day*** following the Fuzzy Panda Report).  *Id.*  Financial analysts recognized that Globe Life's stock price drops were the direct result of the disclosures of the DOJ probe and the Fuzzy Panda Report.  ¶¶364, 367-68.

Defendants contend that government investigations and short seller reports cannot serve as corrective disclosures.  *See* Mot. 37-39.  But, "there is no requirement that a corrective disclosure take a particular form or be of a particular quality . . . . It is the exposure of the fraudulent representation that is the critical component of loss causation." *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014) (ellipsis in original).  Moreover, contrary to Defendants' assertion that *Amedisys* mandates that the March 14, 2024 announcement of a DOJ

- 38 -

investigation cannot serve as a partial disclosure, *see* Mot. 37, the Fifth Circuit held the "district court erred in imposing an overly rigid rule that government investigations can never constitute a corrective disclosure." *Amedisys*, 769 F.3d at 324. "[G]enerally" speaking, announcements of investigations "do not, ***standing alone***, amount to a corrective disclosure," but such announcements "***must be viewed together*** with the totality of the other alleged partial disclosures." *Id.* at 323-24 (emphases added). Here, the disclosure of the DOJ investigation ***and*** the Fuzzy Panda Report "culminate in a corrective disclosure that adequately pleads loss causation." *Id.* at 324; *see also Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 858-59 (N.D. Tex. 2018) (loss causation adequately alleged when allegations included revelations of government investigations).

Defendants again take issue with the Fuzzy Panda Report, claiming it cannot form the basis of a corrective disclosure simply because it is in the form of a short-seller report. *See* Mot. 37-39. But numerous courts have found that the publication of a short-seller report can serve as a corrective disclosure. *See, e.g.*, *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1178, 1187 (9th Cir. 2024); *Schneider*, 2023 WL 9958265, at *9-10. Unable to find any authority supporting their proposed categorical rule, Defendants argue that relying on a short-seller report is "analogous" to relying on allegations in "ongoing lawsuits." Mot. 37-38 (citing *Genesee Cnty. Emps.' Ret. Sys. v. FirstCash Holdings Inc.*, 667 F. Supp. 3d 295, 331 (N.D. Tex. 2023)). But this case is not analogous to *Genesee*, where the lawsuit alleged as a corrective disclosure did not "specify the method of its investigation or how it discovered the violations," and was "scant-on-facts." 667 F. Supp. 3d at 330-31. Here, Fuzzy Panda's report was based on a comprehensive investigation that was heavy on supporting facts. ¶¶147-64.

Defendants' focus on the holding in *In re BofI Holding, Inc. Securities Litigation*, 977 F.3d 781 (9th Cir. 2020), in which eight anonymous blog posts by the short-sellers at issue were

determined not to be corrective disclosures, is also misplaced. *See* Mot. 38. There, the blog posts had "relie[d] entirely on ***publicly available*** information," and the decision was in the context of whether "[a] disclosure based on publicly available information can, in certain circumstances, constitute a corrective disclosure." *BofI*, 977 F.3d at 789, 795. Unlike in *BofI,* the Fuzzy Panda Report was largely based on ***non-public information***, including from "interviews" with former executives and AIL sales agents and an undercover investigation. *See* Compl. Ex. 2 at 11; *see also* ¶365. At any rate, the Ninth Circuit has more recently explained that a short seller report ***can*** serve as a corrective disclosure. *See Genius Brands*, 97 F.4th at 1178, 1187.

Finally, Defendants ignore that financial analysts reported that Fuzzy Panda revealed new information and that they drew a direct line between the Fuzzy Panda Report's contents and the negative impact upon Globe Life's stock price. ¶¶367-68. Taken together, these facts, and the resulting 53% stock decline, make it plausible that investors did ***not*** take the Fuzzy Panda Report with a grain of salt. The SEC certainly did not, given it launched an inquiry in response. ¶348.

### G.    Plaintiffs Adequately Allege Claims Under Sections 20A and 20(a)

Defendants make no substantive arguments regarding Plaintiffs' claims arising under Section 20A and Section 20(a). Instead, Defendants merely assert that these claims fail for "lack of [pleading] a primary Section 10(b) violation." Mot. 40. Because Plaintiffs adequately plead a predicate violation of Section 10(b), their claims under both Sections 20A and 20(a) are also viable.

## V.    CONCLUSION

Defendants' Motion should be denied in its entirety.

DATED:  January 31, 2025                    Respectfully submitted,

_s/ Christopher F. Moriarty_

Gregg S. Levin
William S. Norton (admitted _pro hac vice_)
Joshua C. Littlejohn
Christopher F. Moriarty (admitted _pro hac vice_)
Meredith B. Weatherby (Texas Bar No. 24079006)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450
glevin@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com
mweatherby@motleyrice.com

Laura Andracchio (admitted _pro hac vice_)
Robert R. Henssler Jr. (admitted _pro hac vice_)
Ashley M. Kelly (admitted _pro hac vice_)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
Facsimile:  (619) 231-7423
landracchio@rgrdlaw.com
bhenssler@rgrdlaw.com
ashleyk@rgrdlaw.com

_Lead Counsel for Lead Plaintiffs_

Joe Kendall (Texas Bar No. 11260700)
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 825
Dallas, TX  75219
Telephone:  (214) 744-3000
Facsimile:  (214) 744-3015
jkendall@kendalllawgroup.com

_Local Counsel_

- 41 -

**CERTIFICATE OF SERVICE**

I certify that on January 31, 2025, the above document was served on counsel of record for all parties via the CM/ECF system.

_s/ Christopher F. Moriarty_
CHRISTOPHER F. MORIARTY

- 42 -